IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

JANE MCGINNIS,                          :
                                        :
Plaintiff,                              :
                                        :
v.                                      :     Civil Action
                                        :     No. 5:11-CV-284 (CAR)
AMERICAN HOME MORTGAGE                  :
SERVICING INC.,                         :
                                        :
        Defendant.                      :
_____ :

## ORDER ON DEFENDANT'S PENDING MOTIONS

Before the Court are Defendant Homeward Residential, Inc. f/k/a American
Home Mortgage Servicing Inc.'s ("Homeward") Motion for Summary Judgment [Doc.
34] and Motion for Limine to Exclude Certain Testimony of Thomas Berry [Doc. 43].  In
her Amended Complaint, Plaintiff asserts the following claims against Homeward: 1)
wrongful foreclosure; 2) violations of §§ 2605(e) and (k) of the Real Estate Settlement
Procedures Act ("RESPA"); 3) intentional infliction of emotional distress; 4) conversion;
5) tortious interference with property rights; 6) defamation; 7) violation of Georgia
RICO; 8) attorney's fees and expenses; and 9) punitive damages.  Having considered the
relevant facts, applicable law, and the parties' arguments, Defendant's Motion for
Summary Judgment [Doc. 34] and Motion in Limine [Doc. 43] are **GRANTED in part**
and **DENIED in part.**

## BACKGROUND

This lawsuit arises from Homeward's actions—or lack thereof—beginning immediately after Homeward began servicing Plaintiff Jane McGinnis's mortgage until it foreclosed on Plaintiff's property in June of 2011.  What distinguishes this case from most other wrongful foreclosure actions is that the Court cannot conclude that Plaintiff's default and eventual foreclosure was, as a matter of law, solely attributable to her actions.  The facts in the light most favorable to Plaintiff are as follows.

<u>Plaintiff's Mortgage</u>

Plaintiff has leased investment properties for over 35 years, and presently leases numerous commercial and residential properties in Monticello, Georgia, through her business, JCM Rentals, LLC.[1]  On October 31, 2006, Plaintiff entered into a cash-out refinance loan (the "Loan") for seven of her investment properties, one of which is located at 172 Hilton Street in Monticello, Georgia (the "Property"), with Taylor, Bean & Whitaker ("TB&W").[2]  To secure repayment of the Loan, Plaintiff simultaneously executed a Security Deed (the "Security Deed" or "Deed") and a Promissory Note (the "Note") in favor of TB&W, both of which contain identical provisions and obligations as the deeds and notes for the other six properties.[3]

---

[1] J. McGinnis Dep. 20-21, 16 [Doc. 36].

[2] 172 Hilton Street Promissory Note ("Note"), J. McGinnis Dep. Ex. 37 [Doc. 36-3 at 45-47].

[3] 172 Hilton Street Security Deed ("Deed"), J. McGinnis Dep. Ex. 38 [Doc. 36-3 at 49-61]; Note [Doc. 36-3 at 45-47].

Plaintiff also executed identical "Family Riders" for all of her loans that contain supplemental covenants to those made in the deeds.[4]  Therein, Plaintiff agreed to assign all rents to the lender, and she agreed to a cross-default provision that renders Plaintiff's obligations under each deed interdependent.[5]  Thus, in the event that Plaintiff fails to timely pay the full amount every month on any one of her seven loans, she defaults on all of her loan obligations, and Homeward is legally entitled to foreclose on all of the properties.[6]  The Family Rider also deleted her right to reinstate the loans in the event of a default under § 19 of the Deed.[7]

Pursuant to the Note and Deed, Plaintiff must make full monthly payments to Homeward for the principal, interest, late charges, and escrow on the "1st day of each month," but no later than the 15th day.[8]  If Plaintiff fails to make a timely payment, Homeward may collect a late fee of 5% of her overdue payment and principal on the Loan.[9]  Also, if Plaintiff fails to submit a full monthly payment, Homeward may either "return … [the] partial payment[ ]," or "accept any … partial payment" without waiving any of its rights to refuse such a partial payment in the future.[10]  By accepting the partial payment, Homeward "is not obligated to apply such payments at the time

---

[4] 172 Hilton Street Family Rider ("Family Rider"), McGinnis Dep. Ex. 39 [Doc. 36-3 at 63-65].
[5] Family Rider §§ H, J, I [Doc. 36-3 at 63-65].
[6] Note § 6A [Doc. 36-3 at 46].
[7] Family Rider § E [Doc. 36-3 at 63].
[8] Deed § 1 [Doc. 36-3 at 51]; Note § 3A [Doc. 36-3 at 45].
[9] Note § 6B [Doc. 36-3 at 46].
[10] Deed § 1 [Doc. 36-3 at 51-52].

such payments [are] accepted."[11]   Instead, the partial payment is deposited into a "suspense account" and credited as a monthly payment once the suspense account receives funds equaling a complete monthly payment.[12]

Section 3 of the Deed, entitled "Funds for Escrow Items," defines "Escrow Items" to include "a sum … to provide for payment of amounts due for: (a) taxes and assessments."[13]   To determine Plaintiff's monthly escrow payment, the lender "shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow items," but shall "not exceed the maximum amount" under the RESPA.[14]   If Plaintiff's escrow account has either a "shortage" or a "deficiency," the lender shall notify Plaintiff as required by RESPA, and in either case, the borrower shall make payments in accordance with RESPA, "but in no more than twelve monthly payments."[15]

Beginning in 2006 until her payment in October of 2009, Plaintiff made timely monthly payments to TB&W.[16]   In 2009, Plaintiff paid TB&W $605.58 a month, which included an escrow payment of $115.45.[17]

---

[11] *Id.*

[12] Delbene Dep. 32 [Doc. 46].

[13] Deed § 3 [Doc. 36-3 at 53].

[14] *Id.*

[15] *Id.*

[16] A. McGinnis Aff. ¶ 3 [Doc. 52-1 at 2].

[17] Delbene Dep. 46 [Doc. 46]; Berry Dep. 81 [Doc. 39].   Shortly after Plaintiff entered into her Loan, she moved to St. Augustine, Florida, and her son, Adam McGinnis, assumed increased responsibility with the operation of JCM Rentals, including making all payments owed on the Loan.  J. McGinnis Dep. 61 [Doc. 36]; A. McGinnis Dep. 18 [Doc. 38].  Much of the communication discussed below was by Adam.  *See*

4

<u>Plaintiff's Loans Assigned to Homeward</u>

Following TB&W's default and bankruptcy in the Fall of 2009, Homeward was assigned all seven of Plaintiff's loans, including the Loan at issue, effective October 17, 2009.[18]  On October 27, 2009, Plaintiff received a letter from Homeward to that effect.[19]  This letter did not, however, indicate any change to her monthly payment.[20]  It is undisputed that Plaintiff was current on her Loan obligation through October 31, 2009, and Plaintiff's escrow account had a balance of $260.20 when Homeward obtained the Loan.[21]

The events that transpired immediately after Homeward began servicing Plaintiff's Loan are crucial to understanding Plaintiff's case.  Unfortunately, however, Homeward's Rule 30(b)(6) witness, Default Case Manager Christopher Delbene, who Homeward proffered as the individual most familiar with Plaintiff's Loan, provides little insight.[22]  The Court was able to glean the following from the record, largely independent of his testimony.

---

*generally* A. McGinnis Dep. [Doc. 38].  However, to avoid confusion, the Court will refer to Adam's actions as those done by Plaintiff.

[18] Delbene Dep. 19, Hello/Goodbye Letter Ex. 22 [Docs. 46 & 46-2 at 43]; A. McGinnis Aff. ¶ 2 [Doc. 52-1].

[19] Delbene Dep. 19 [Doc. 46]; A. McGinnis Aff. ¶ 2 [Doc. 52-1].

[20] Hello/Goodbye Letter [Doc. 46-2 at 43-45]; A. McGinnis Aff. ¶ 15(b) [Doc. 52-1].

[21] Delbene Dep. 16-17, 39, 48 [Doc. 46].

[22] For instance, Delbene was unable to provide information regarding Plaintiff's increased escrow payment.  Whether this was because Plaintiff failed to notice him of this topic or because Homeward simply did not have information regarding this analysis, the Court finds that both reasons offer legitimate explanations, although the latter is more troubling.  Importantly, as discussed below, the escrow analysis for October of 2009 was never produced during discovery, and thus, there is no evidence in the record to support Homeward's "estimate."

At some point in October of 2009, Homeward conducted an escrow analysis on the Property and increased Plaintiff's monthly escrow payment by $238.00, thereby increasing her total monthly payment from $605.58 to $843.58.[23]  Plaintiff never received this analysis, and Homeward failed to produce this analysis during discovery.  Because this analysis is not part of the record, the figures used and calculations therein are disputed.  As Delbene so aptly testified: "Again, sir, while I'm sure an escrow analysis was performed to reach that figure, I have not seen the analysis and, therefore, I cannot account to how [Homeward] came to that number."[24]

In addition to increasing Plaintiff's monthly payment without giving her notice, Homeward also retroactively applied the increased payment to the month of October without notice, thereby treating Plaintiff's Loan as delinquent on November 1, 2009, also without notice.[25]  Compounding the problem, Plaintiff did not receive any monthly statements from Homeward the entire time Homeward serviced the Loan, despite the fact that monthly statements are "customar[il]y" sent to borrowers.[26]   Thus, on

---

[23] Delbene Dep. 16 [Doc. 46]; A. McGinnis Aff. ¶¶ 7, 13 [Doc. 52-1].

[24] Delbene Dep. 54:11-16 [Doc. 46].

[25] Berry Aff. ¶¶ 4(a), 9 [Doc. 52-2 at 2, 5]; A. McGinnis Aff. ¶ 5, 7, 13(a) [Doc. 52-1 at 1, 3].  This fact is contradicted by Delbene's testimony.  Delbene Dep. 45 [Doc. 46].  However, Delbene initially testified that as of November 1, 2009, Plaintiff was behind on her payment by $1,711.67.  *Id.* at 34.  Subsequently during his deposition, counsel for Homeward corrected Delbene's interpretation of the November 3, 2009 statement, and stated that Homeward was counting the future December 2009 payment in addition to the current November 2009 payment that Homeward had not yet received.  *Id.* at 38.  Delbene thereafter corrected his original testimony and agreed with Homeward's attorney's interpretation.  *Id.* at 45.

[26] *Id.* at 17; A. McGinnis Aff. ¶ 4 [Doc. 52-1].

6

November 1, 2009, Plaintiff was not aware that her payment increased and that it had been retroactively applied.

On November 6, 2009, Plaintiff made her first monthly payment to Homeward in her usual amount of $605.58.[27]   Soon thereafter, Homeward notified Plaintiff that she was delinquent on her Loan payments to <u>TB&W</u> in the amount of <u>$843.58</u>, although Homeward now admits that Plaintiff was current on her TB&W obligations.[28]   Plaintiff disputed Homeward's accounting, asserting that she submitted all of her payments of $605.58 to TB&W on time.[29]   The following month, on December 9, Plaintiff again paid $605.58 to Homeward, but nevertheless continued to receive notifications from Homeward that she was behind one payment to TB&W.[30]

Homeward's accounting records indicate that both Plaintiff's November and December payments of $605.58 were deposited into her suspense account as partial payments.[31]   When Homeward cashed Plaintiff's December payment on December 18th, Homeward withdrew $843.58 from Plaintiff's suspense account for her November payment as well as an additional $14.69 in late fees for the month of December.[32]   Consequently, because her suspense account did not have sufficient funds to cover her

---

[27] Delbene Dep. 30  [Doc. 46].
[28] A. McGinnis Aff. ¶ 13(a) [Doc. 52-1]; Delbene Dep. 38 [Doc. 46].
[29] A. McGinnis Aff. ¶¶ 5, 13(c) [Doc. 52-1 at 2, 4].
[30] Delbene Dep. 79-80, Account Records ("Account") Ex. 6 [Doc. 46 & 46-1 at 35-36].
[31] Account [Doc. 46-1 at 35-36].
[32] *Id.* [Doc. 46-1 at 36].

December payment by the end of 2009, Plaintiff was not "given credit" for her December payment.[33]

Toward the end of 2009, Plaintiff received an escrow analysis dated December 17, 2009, from Homeward.[34]   The December 2009 analysis stated that, beginning February 2010, Plaintiff's "present" payment of $843.58 was to decrease to $680.08 a month, $138.46 of which was escrow.[35]   It was at this time that Plaintiff first discovered that her monthly escrow payment had at some point increased by $238.00, thereby increasing her total monthly payment from $605.58 to $843.58.[36]   The analysis also quoted Plaintiff's 2009 property taxes at $1,269.49 and stated that Plaintiff's escrow account had a "shortage" of $617.83.[37]   Because of this shortage, Homeward paid an escrow advance of $1,009.29 to cover the property taxes on December 10, 2009.[38]

In January of 2010, Plaintiff again timely submitted a payment of $605.58 while continuing to dispute the $843.58 figure.[39]   Homeward's records reveal that although Plaintiff's account was charged $843.58 for the month of January, her statement for

---

[33] Berry Dep. 117, Expert Opinion, Ex. 3 [Doc. 51].  Consistent with the terminology of Plaintiff's expert Tom Berry, the Court uses the phrase "given credit" to indicate that Plaintiff's checks were cashed and cleared the bank, but her payments were not posted against her principal, interest, or escrow.  *See* Berry Dep. 49 [Doc. 39].

[34] Dec. 17, 2009 Escrow Analysis ("12/17/09 E.A."), Delbene Dep. Ex. 8 [Doc. 46-1 at 64]; A. McGinnis Aff. ¶ 6 [Doc. 52-1].

[35] Delbene Dep. 73-74, 12/17/09 E.A. [Docs. 46 & 46-1 at 64].

[36] Delbene Dep. 16 [Doc. 46]; A. McGinnis Aff. ¶¶ 7, 13 [Doc. 52-1].

[37] Delbene Dep. 73-74, 12/17/09 E.A. [Docs. 46 & 46-1 at 64].

[38] Account [Doc. 46-1 at 36].

[39] *Id.* [Doc. 46-1 at 37]; Consolidated Notes Log ("Log"), Delbene Dep. Ex. 10 [Doc. 46-1 at 86].

January quoted her payment at $680.08.[40]  In a letter dated January 15, 2010, Homeward told Plaintiff to ignore its December 2009 escrow analysis (which had reduced her February payment to $680.08) and to continue making payments in the amount quoted on her monthly billing statements, which Plaintiff never received.[41]  In February Plaintiff made another payment of $605.58.[42]  Her billing statement for February quotes her payment at $638.32, although Homeward's account records indicate that she was charged $843.5<u>9</u> that month, one cent more than previously charged.[43]

Plaintiff received Homeward's third escrow analysis later that month.[44]  Therein, Plaintiff learned that her "present" monthly payment for February, now quoted at $853.5<u>9</u>, was to decrease to $638.32 beginning <u>April</u> 1, 2010, $140.55 of which was escrow.[45]  Again, the monthly statements contradict this figure and quote Plaintiff's monthly payment as $638.32 beginning <u>February</u> of 2010.[46]

In short, Plaintiff's payment history with Homeward can be summarized as follows: From November 2009 until December 2010, Plaintiff submitted a payment to Homeward in the amount of $605.58; and from January 2011 until June 2011, Plaintiff

---

[40] Account [Doc. 46-1 at 37]; Statement Ex. 2-4 [Doc. 46-1 at 6].
[41] A. McGinnis Aff. ¶ 13(f) [Doc. 52-1].
[42] Account [Doc. 46-1 at 37].
[43] Statement Exs. 2-5 [Doc. 46-1 at 10]; Account [Doc. 46-1 at 37].
[44] Feb. 19, 2010 Escrow Analysis ("2/19/10 E.A.") [Doc. 46-1 at 10].
[44] 2/19/10 E.A. [Doc. 46-1 at 10].
[45] *Id.*
[46] Statement Exs. 2-5—2-24 [Doc. 46-1 at 10-29].

submitted a monthly payment of $638.32.[47]   Because Homeward still required Plaintiff to pay the disputed amount every month (843.5<u>8</u> or 843.5<u>9</u>), Plaintiff's monthly payments were less than the full amount and thus were consistently deposited into her suspense account until there were sufficient funds to withdraw a full payment and late fees.[48]   Homeward's accounting records reflect numerous assessed or collected late fees, foreclosure fees, and fees that are not disclosed on Plaintiff's monthly statements.[49] Again, Delbene was unable to fully explain some transactions and fees on her account records.[50]

<u>Plaintiff's Dispute</u>

All the while, Plaintiff desperately tried to discern why she was in default, a virtually impossible feat due to Homeward's contradicting responses.   In the beginning, Homeward representatives informed Plaintiff that she failed to make all of her payments to <u>TB&W</u>.   For instance, when Plaintiff attempted to pay the escrow shortage in total, Homeward representatives told her that it could not accept payment of the escrow shortage without Plaintiff first paying the alleged delinquent amount and late

---

[47] Account Compilation, Berry Dep. Ex. 3 [Doc. 51 at 2].
[48] Delbene Dep. 51-59 [Doc. 46]; Berry Dep. 117-19 [Doc. 39].
[49] Delbene Dep. 176-177 [Doc. 46]; Berry Aff. ¶¶ 4(e)(h), 11 [Doc. 52-2].   Despite Homeward's general contention that Plaintiff's late fees were waived, see Def.'s Resp. ¶ 31 [Doc. 59 at 6], Plaintiff's accounting records indicate that while some fees were waived, over $85.00 in late fees was collected.   *See* Delbene Dep. 101, 87, 88, 89, Account [Docs. 46 & 46-1 at 35-42].
[50] *See* Delbene Dep. 90-99, Account [Docs. 46 & 46-1 at 39].

fees to TB&W.[51]   Simultaneously but with more frequency, Homeward informed Plaintiff that her escrow payments increased in 2009 and that she was behind on her payments to <u>Homeward</u>.

Ultimately, much of Plaintiff's correspondence with Homeward was premised on the October 2009 escrow analysis.[52]  Not only did Plaintiff never receive this analysis, she also disputed the accuracy of the supposed calculations.[53]   In total, the increased escrow amount quoted in the alleged October 2009 escrow analysis would result in a yearly escrow amount of $4,241.40, although the taxes and insurance for 2009 only totaled $1,686.59.[54]   Believing Homeward's estimate to be inflated, Plaintiff faxed Homeward her own calculations reflecting what she believed to be the correct escrow payment.[55]   In doing so, Plaintiff refused to pay Homeward's inflated amount but acknowledged that there was a shortage in her escrow account, which she was willing to pay either in full or over a twelve-month period.[56]

Plaintiff repeatedly requested information pertaining to her account, including the total amount due on her Loan and the October 2009 escrow analysis that she never

---

[51] A. McGinnis Aff. 13(g) [Doc. 52-1].  As noted above, Homeward's position is contrary to its instant admission that Plaintiff was current on her Loan with TB&W.

[52] *See* Delbene Dep. 104-05, Log [Docs. 46 & 46-1 at 76-80, 82, 86].

[53] A. McGinnis Aff. ¶ 13(g) [Doc. 52-1].

[54] Delbene Dep. 51-53, 12/17/09 E.A. Analysis [Docs. 46 & 46.1 at 64].

[55] May 19, 2010 Fax ("Fax II"), Delbene Dep. Ex. 9 [Doc. 46-1 at 51-52]; Feb. 24, 2010 Fax ("Fax I"), Delbene Dep. Ex. 11 [Doc. 46-1 at 88-96]; A. McGinnis Aff. ¶ 13(f) [Doc. 51-2].

[56] Berry Dep. 68-69 [Doc. 39]; A. McGinnis Aff. ¶ 13(g) [Doc. 52-1].

received.[57]   Homeward responded to Plaintiff's requests once in writing on May 21, 2010, as well as several times over the phone, each time stating that it would conduct further research.[58]   While it is unclear whether any research was ever conducted, it is clear that Plaintiff's concerns went unanswered.[59]

In February, July, and September of 2010, Plaintiff requested that Homeward remove the escrow from her Loan so that she could make those payments on her own, but Homeward denied her requests.[60]   In May of 2010, Plaintiff also requested a payoff figure without late fees, so to pay off her Loan in full.[61]   Homeward did not quote Plaintiff this figure because, according to Homeward, it was permitted to collect late fees under the Note.[62]

Homeward's Acceleration of the Loan and Foreclosure

In February of 2011, Homeward informed Plaintiff that she was behind on five monthly payments and accelerated the Loan.[63]   Homeward, which had previously cashed Plaintiff's February 2011 payment on March 13, 2011, reimbursed Plaintiff for

---

[57] Fax II [Doc. 46-1 at 52]; Log [Doc. 46-1 at 76]; A. McGinnis Aff. ¶ 13(c) [Doc. 52-1].

[58] *See, e.g.*, Log [Doc. 46-1 at 80, 78, 76]; *see also* A. McGinnis Aff. ¶ 13(j), (l) [Doc. 52-1].

[59] Delbene Dep. 59-61 [Doc. 46]; *see* A. McGinnis Aff. ¶ 13(j), (l) [Doc. 52-1].

[60] Delbene Dep. 120-121, Log [Docs. 46 & 46-1 at 86, 80, 77].

[61] Delbene Dep. at 104-05, 108-09, 111, 128-29, Fax II [Docs. 46 & 46-1 at 52]; A. McGinnis Aff. ¶ 13(k) [Doc. 52-1].

[62] *See* Note § 6(A) [Doc. 36-3 at 46].

[63] Delbene Dep. 149-150, 175-176 [Doc. 46].   The Court acknowledges there is some dispute as to the amount of monthly payments Plaintiff was behind.   *Id.* at 176.   Reading the facts in the light most favorable to Plaintiff, the Court assumes that she was behind five monthly payments.

this amount two days later.[64]   Homeward then returned Plaintiff's March, April, and May payments as it received them.[65]   In March of 2011, Plaintiff tried to convince Homeward to reinstate the Loan, and Homeward quoted a reinstatement amount of $6,000.00.[66]

During the spring of 2011, Homeward advertised the Property's foreclosure sale in the Monticello Newspaper for eight weeks, which "absolutely devastated" and humiliated Plaintiff and caused her several nights of sleeplessness.[67]   On June 7, 2011, Homeward foreclosed on the Property at the Jasper County Courthouse, and the tenant leasing the Property was evicted.[68]   On June 9, 2011, Homeward cashed Plaintiff's June payment.[69]

At present, the Property is the only property that Homeward foreclosed on, despite the fact that Plaintiff's alleged default of her Loan obligations has resulted in her default of her remaining loans.

As a result of the above events, Plaintiff alleges she experienced severe and extreme mental and emotional distress.   Now, Plaintiff is being treated by a psychologist to ease the stress, anxiety, and constant fear that Homeward will foreclose

---

[64] Berry Dep. 118-19 [Doc. 39].

[65] A. McGinnis Aff. ¶ 13(n) [Doc. 52-1]; Berry Aff. ¶ 4(f) [Doc. 52-2].

[66] A. McGinnis Aff. ¶13(o) [Doc. 52-1].

[67] J. McGinnis Dep. 72, 74 [Doc. 36].

[68] A. McGinnis Aff. ¶ 14 [Doc. 52-1].

[69] Delbene Dep. 51-52 [Doc. 46]; A. McGinnis Aff. ¶ 13(n) [Doc. 52-1].   Although this fact is noted by Plaintiff numerous times in her filings, it is unclear what effect, if any, this fact has on Plaintiff's claims as she fails to include this fact in her discussion section.

on her other loans in the same manner because of the cross-default provisions.[70]  She also believes that her reputation in her community as a respectable businesswoman, which she worked 70 years to build, is destroyed.[71]

Plaintiff also suffered financially as a result of Homeward's actions.  For instance, Plaintiff's insurance premiums for her remaining six loans have increased "quite a bit."[72]  Plaintiff lost rental income on the Property and testified that her credit score is ruined and that she could not "borrow enough money to b[u]y a Snicker bar."[73]  However, in her deposition Plaintiff acknowledges that she has not had trouble finding tenants for her other properties, that she has not seen her credit score since 2009, and that she has neither applied for nor been denied a loan since the foreclosure.[74]

Procedural History

Plaintiff filed the instant action on July 21, 2011, against Homeward.  Homeward, however, failed to timely answer or otherwise respond to Plaintiff's Complaint, and consequently, the Court granted in part and denied in part Plaintiff's motion for default judgment as to liability on February 9, 2012.[75]  On February 21, 2012, Homeward moved to set aside default judgment, and on April 5, 2012, the Court granted Homeward's motion and vacated its judgment as to liability.

---

[70] J. McGinnis Dep. 67-69, 71, 74 [Doc. 36].
[71] *Id.* at 69.
[72] A. McGinnis Aff. ¶ 15 [Doc. 52-1].
[73] J. McGinnis Dep. 52, 65-66 [Doc. 36].
[74] *Id.*
[75] Default Judg. Order [Doc. 7].

In her Amended Complaint, Plaintiff asserts the following nine claims: 1) wrongful foreclosure; 2) violations of §§ 2605(e) and (k) of RESPA; 3) intentional infliction of emotional distress; 4) conversion; 5) tortious interference with property rights; 6) defamation; 7) violation of Georgia RICO; 8) attorney's fees and expenses; and 9) punitive damages.[76]

Upon initiating this suit, Plaintiff retained Mr. Thomas Berry, a Certified Public Accountant ("CPA"), to summarize and explain Homeward's method of accounting and Plaintiff's accounting history with Homeward and TB&W.  Berry also compared Homeward's accounting documents to Plaintiff's banking records to determine if any discrepancies exist.

After the close of discovery, Homeward filed the instant Motion for Summary Judgment and Motion to Exclude Certain Testimony of Tom Berry.  Plaintiff has filed timely responses to both Motions, to which Homeward has replied.  The Motions are now ripe for this Court's review.

## MOTION IN LIMINE

I.      **Legal Standard**

The admission of expert testimony in federal court is guided by Federal Rule of Evidence 702:

---

[76] Pl.'s Am. Compl. [Doc. 30].

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.[77]

Simply stated, expert testimony is admissible only upon a finding that the expert is qualified to testify competently regarding the matters he intends to address, that the methodology by which the expert reached his conclusions is sufficiently reliable, and that the expert's testimony will assist the trier of fact.[78]

Of course, "experts may be qualified in various ways."[79]  An expert's training or education can provide one means by which an expert may qualify to give certain testimony; however, experience in a particular field may also qualify an expert to offer an opinion on a particular matter.[80]  Because "experts come in various shapes and sizes[,] there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field."[81]  The district court, therefore, must focus

---

[77] Fed. R. Evid. 702 (as amended effective Dec. 1, 2011).

[78] *See McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002).

[79] *United States v. Frazier*, 387 F.3d 1244, 1260 (2004).

[80] *Id.* at 1260-61.

[81] *Santos v. Posadas de P.R. Assocs.*, 452 F.3d 59, 63 (1st Cir. 2006).

its inquiry on whether the expert has the requisite knowledge, skill, experience, training, and education to offer the testimony he intends to introduce.[82]

As to reliability, trial courts must assess "whether the reasoning or methodology underlying the testimony is . . . valid and whether that reasoning or methodology properly can be applied to the facts in issue."[83]  This inquiry must focus "solely on the principles and methodology [of the expert], not on the conclusions that they generate."[84]

In conducting this inquiry, the district court can consider many factors.  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,*[85] the Supreme Court suggested that, when evaluating the reliability of an expert's scientific testimony, a district court consider the (1) testability; (2) error rate; (3) peer review and publication; and (4) general acceptance of an expert's opinion.[86]  These factors are not generally applicable in the context of non-scientific testimony, however.[87]  In such cases, the advisory committee notes for Rule 702 suggest that courts consider factors such as:

(1) Whether the [expert is] proposing to testify about matters growing naturally and directly out of research [he has] conducted independent of the litigation, or whether [he has] developed [his] opinion expressly for purposes of testifying;

(2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

---

[82] Fed. R. Evid. 702.

[83] *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. at 579, 592-93 (1993).

[84] *Id.* at 595.

[85] 509 U.S. 579 (1993).

[86] *Id.* at 593-95.

[87] *See* Fed. R. Evid. 702, advisory committee note (2000 amends.); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 149-152 (1999).

(3) Whether the expert has adequately accounted for obvious alternative explanations;

(4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;

(5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.[88]

Expert testimony must also actually help the trier of fact to understand the facts in evidence or to determine a fact in issue.[89]   Expert testimony does so "if it concerns matters that are beyond the understanding of the average lay person."[90]   "[E]xpert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."[91]   Expert testimony also does not help the trier of fact if it fails to "fit" with the facts of the case.[92]   This occurs when "a large analytical leap must be made between the facts and the opinion."[93]   The court may also exclude otherwise reliable testimony if it does not have "sufficient bearing on the issue at hand."[94]

Ultimately, Rule 702 imposes a duty on trial courts to act as "gatekeepers" to ensure that speculative, unreliable, and irrelevant opinions do not reach the jury.[95]   At

---

[88] Fed. R. Evid. 702, advisory committee note (2000 amends.) (citations and internal quotations omitted).
[89] Fed. R. Evid. 702(a).
[90] *Frazier*, 387 F.3d at 1262.
[91] *Id.* at 1262-63.
[92] *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004).
[93] *Id.*
[94] *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1121 (10th Cir. 2004).
[95] *See Daubert*, 509 U.S. at 589 n.7; *McCorvey*, 298 F.3d at 1256; *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005).

the same time, however, a court must remain mindful of the delicate balance between its role as a gatekeeper and the jury's role as the ultimate fact-finder.  A district court's "gatekeeper role . . . is not intended to supplant the adversary system or the role of the jury."[96]  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[97]  The court's duty is thus limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence."[98]

With the above legal standards in mind, the Court addresses those opinions of Berry that Homeward challenges below.

## I.    Discussion

According to his Federal Rule of Civil Procedure 26 Expert Report and curriculum vitae, Berry is a Certified Public Accountant ("CPA") who holds a master's degree in accounting.[99]  Berry is a partner at Albright, Fortenberry & Ninas, LLP, and he has nearly two decades of experience as a public accountant preparing tax returns, financial statements, and compilation and reviews for businesses.[100]

In retaining Berry, Plaintiff asked that he review the facts and circumstances of the present case and offer his opinion as to (1) Homeward's method of accounting; (2)

---

[96] *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999).
[97] *Daubert*, 509 U.S. at 596.
[98] *Frazier*, 387 F.3d at 1272.
[99] Curriculum Vitae of Thomas Berry ("CV"), Berry Dep. Ex. 1 [Doc. 39 at 202].
[100] CV [Doc. 39 at 202].

whether any discrepancies exist between Homeward's accounting records and Plaintiff's bank statements; and (3) the amount and type of fees Homeward collected and assessed.[101]   Berry derived his opinions from his analysis and comparison of Homeward's loan summaries, escrow statements, monthly billing statements, communication log, and Plaintiff's bank statements and cancelled checks.[102]

In its Motion, Homeward seeks to exclude several opinions offered by Berry in his deposition that are unchallenged by Plaintiff in her Response Brief: the value of the Property at the time of foreclosure; whether Plaintiff was permitted to pay the amount of escrows she contends she owed; and whether Homeward failed to properly communicate with Plaintiff. Accordingly, Homeward's Motion with respect to these opinions is **GRANTED**.

The remaining opinion in Homeward's Motion is Berry's testimony regarding the "amount Plaintiff ought to have been required to pay in escrow."[103]   Relevant to Homeward's Motion, Berry offers the following opinions.[104]

> **Opinion 1**:  Plaintiff's escrow account had an "actual escrow" shortage of $663.94 and $900.60 at the end of 2009 and 2010, respectively.  Prior to foreclosure in 2011, Plaintiff's escrow account had an overage of $27.47.[105]

> **Opinion 2**: Homeward's alleged October of 2009 analysis is incorrect.[106]

---

[101] Rule 26 Expert Report of Thomas Berry ("Expert Report"), Berry Dep. Ex. 2 [Doc. 39 at 204].
[102] Expert Report [Doc. 39 at 204-06]; *see generally* Berry Dep. [Doc. 39].
[103] Def.'s Mtn. to Exclude at 3 [Doc. 43].
[104] Berry's uncontested opinions have been incorporated within this Order as appropriate.
[105] Berry Dep. 80, 172 Hilton Street Summary Ex. 3 [Docs. 39 & 51-3].
[106] *See* Berry Dep. 82-83, 142 [Doc. 39].

**Opinion 3**: Homeward's escrow analyses are illogical.[107]

**Opinion 4**: Homeward acted with "some incompetency, and truthfully, neglect" in estimating Plaintiff's escrow.[108]

Homeward first contends that Berry does not have sufficient experience in the mortgage industry to render these opinions.  The Court disagrees with respect to Opinions 1, 2, and, in part, 3.  Berry is a CPA and has extensive experience in accounting.  Berry testified that he has prepared approximately 50 escrow analyses for clients and, on "two or three" occasions, reported an error in the mortgage company's analyses to the mortgage company.[109]  The Court finds that Berry, although not specialized in the mortgage industry, is sufficiently qualified to testify about the amount of actual escrow in Plaintiff's account (Opinion 1) and about Homeward's escrow analyses (Opinions 2 and, in part, 3).  These opinions are not about the specific amount of escrow that Plaintiff should have paid, nor are they about the inner workings of the mortgage industry.  Berry's opinions are about the accuracy of Homeward's financial records and bookkeeping, and are thus within the core knowledge of a CPA.  Consequently, Berry's background as a CPA and his experience in analyzing financial data are sufficient to qualify him to offer opinions about Plaintiff's escrow accounts (Opinion 1) and Homeward's analyses (Opinions 2 and, in part, 3).

---

[107] *See id.* at 58, 85-87, 57, 66.

[108] *See id.* at 60:15-19.

[109] *Id.* at 146:21.

In so concluding, the Court must, however, make an important distinction regarding Berry's testimony that Homeward's escrow analyses are "not logical" (Opinion 3).[110]   To the extent that Berry testifies that the analyses generated by Homeward are not premised on basic escrow accounting principles, this opinion is not in and of itself, a legal conclusion, but an opinion that Berry as a CPA is qualified to render.  However, to the extent that Berry's testimony is synonymous with the term "unreasonable" pursuant to the confines of RESPA and the Deed, such an opinion is beyond the scope of Berry's designation as an expert witness.[111]  "A witness … may not testify to the legal implications of conduct; the court must be the jury's only source of law."[112]  In this context then, Berry's opinion is thus beyond the scope of his expertise.

Likewise, Berry is not qualified to opine about Homeward's incompetence and neglect (Opinion 4).  As is clear from his deposition, Berry's opinion is not based on knowledge acquired during his experience as a CPA but is instead premised on personal, subjective views.[113]  Berry offers nothing more than mere speculation,[114] and his inferences about the adequacy of Homeward's conduct are "lay matters which a jury

---

[110] *Id.* at 66:8.

[111] *See* Deed § 3 [Doc. 36-3 at 53]; *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) ("A witness … may not testify to the legal implications of conduct; the [district] court must be the jury's only source of law.").

[112] *Montgomery*, 898 F.2d at 1541.

[113] *See In re Trasylol Prods. Liab. Litig.*, No. 08-MD-01928, 2010 WL 1489793, at *8 (S.D. Fla. Feb. 24, 2010) (citing *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 543-45 (S.D. N.Y. Mar. 15, 2004)).

[114] *McDowell*, 392 F.3d at 1299.

is capable of understanding and deciding without an expert's help."[115]   Based on the foregoing, the Court excludes Opinion 3, in part, and Opinion 4.

The Court next determines whether Berry's remaining opinions are reliable and whether they assist the trier of fact.  Berry's testimony regarding the actual escrow amounts (Opinion 1) and the incoherencies of Homeward's documentation (Opinion 3, in part) rely on several pertinent documents, including detailed financial records of Plaintiff's account history with Homeward and TB&W, and Berry's factual conclusions logically arise from the information he reviewed.[116]   Berry generally employed the tools and training that a CPA uses in his regular accounting practice, and his testimony "grow[s] naturally and directly" out of his own experience.[117]   Indeed, courts regularly allow accountants, financial experts, auditors, and appraisers to rely on reports, documents, and other experts' opinions when rendering their own opinions, so long as there is no challenge to the reliability of the underlying data.[118]

If Berry has overstated the facts within his knowledge, this may certainly be brought to the jury's attention through cross-examination, but it is not necessarily

---

[115] *In re Trasylol*, 2010 WL 1489793, at *8 (quoting *Rezulin*, 309 F. Supp. 2d at 554).

[116] *See* Berry Dep. 90-91.

[117] *See* Fed. R. Evid. 702, advisory committee's note (2000 amends.); *Tindall v. H&S Homes, LLC*, No. 5:10-cv-44(CAR), 2012 WL 3242128, at *5 (M.D. Ga. Aug. 7, 2012).

[118] *See, e.g., De Saracho v. Custom Food Mach., Inc.*, 206 F.3d 874, 879-90 (9th Cir. 2000) (upholding admission of testimony of CPA who relied on loan agreements to calculate the interest due on loans); *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 80 (1st Cir. 2004) (upholding admission of testimony of an IRS financial fraud expert even though he did not have previous experience with "lock box accounts" because "Rule 702 was not so wooden as to demand an intimate level of familiarity with every component of a transaction or device as a perquisite to offering expert testimony").

grounds for exclusion because it only goes to the weight of the opinion, not its admissibility.[119]  Additionally, should Homeward disagree with Berry's opinions, it may present its own evidence at trial regarding these issues, assuming its admissibility and Homeward's proper and timely disclosure of any supportive evidence to Plaintiff during discovery.  However, disagreement with Berry's conclusions is no reason to exclude his expert opinion testimony.[120]

Any weakness that Homeward finds in Berry's admissible conclusions is best left for cross-examination, presentation of its own evidence, and resultant consideration and weight by the jury.  Admittedly, Homeward makes a very good point that Berry may not have considered the 1/6 discretionary cushion permitted by RESPA when forming his opinions.  Although Homeward's point may certainly be raised on cross-examination; it does not necessarily render his opinion unreliable.  There is not "too great an analytical gap" between the possibility that Homeward may or may not have included the 1/6 discretionary cushion under RESPA and Berry's testimony regarding the escrow account (Opinion 1) and analyses (Opinion 3, in part).[121]  Further, an expert is not required to take into account every possible factor in rendering an opinion; he

---

[119] *Daubert*, 509 U.S. at 596; Fed. R. Evid. 703; *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) ("Questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.").  Again, however, this broad terminology cannot be synonymous with "unreasonable."

[120] *See Daubert*, 509 U.S. at 596 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.").

[121] *See* Fed. R. Evid. 702, advisory committee's note (2000 amends.) (suggesting that the court consider whether the expert has "unjustifiably extrapolated from an accepted premise to an unfounded conclusion").

must only "consider enough factors to make his or her opinion sufficiently reliable in the eyes of the court."[122]  Because the escrow cushion is discretionary and there is no analysis from which to determine if Homeward did in fact consider this cushion, Berry has considered enough factors to make Opinions 1 and, in part, 3, sufficiently reliable in the eyes of the Court.

These opinions will also assist the trier of fact.  Berry compiled data and documentation provided to him by Homeward to determine Homeward's accounting methods and Plaintiff's escrow balance.   Given Homeward's perplexing and inconsistent documents, and the complexity and cumbersome nature of such a review, Berry's calculation and compilation of this information and documentation into a presentable format are helpful in that it will "assist the trier of fact to understand the evidence or to determine a fact in issue."[123]  Further, his testimony will assist the jury in extracting relevant information from the accounting documents and will facilitate their understanding of the evidence presented.  Berry's performance of these tasks amounts to more than mere addition and subtraction, and thus, his skill, education, and expertise in compiling and analyzing the data and documentation given provides the jury with valuable and necessary assistance.

In contrast, Berry's opinion about the inaccuracy of Homeward's escrow analyses (Opinion 2) is premised on nothing more than mere speculation and is not

---

[122] *MicroStrategy Inc. v. Bus. Objects, S.A.*, 492 F.3d 1344, 1355 (Fed. Cir. 2005).
[123] Fed. R. Evid. 702.

particularly helpful to the jury.  An excerpt from his testimony reveals the speculation used to arrive at Opinion 2:

> I can definitely say that this first escrow analysis was completely incorrect, and that's just—I mean, I can just look at it from a distance and say that. Anybody that did an escrow analysis could say that, so I don't know where that one came from.  Then [Homeward] got back into the ball park, see, because they decreased the $353.45 to $189.95.[124]

Although Berry need not prepare his own analysis to refute the accuracy of Homeward's analyses, Berry's conclusion must be premised on more than mere conjecture.[125]   Berry roughly estimates the accuracy of Homeward's analyses by referring generally to a "ball park" figure, thus rendering an imprecise and unspecific opinion.  This imprecision is not an anomaly as he testified shortly thereafter that "[Homeward] probably [is] in the ball park with this $189 ….  When you look at the escrow shortage [later], that's probably a good analysis there."[126]  While a "probability" is stronger than a "possibility," a "ball park" without any supporting dimensions certainly qualifies as a weaker "precision of value" with respect to helpfulness.[127]

    Not only does Berry draw an unhelpful inference, his inference is also a "lay matter[ ] which a jury is capable of understanding and deciding without an expert's

---

[124] Berry Dep. 82:11-17 [Doc. 39].
[125] *Jones v. Otis Elevator Co.*, 861 F.2d 655, (11th Cir. 1988) ("[R]elevant testimony from a qualified expert is admissibly only if the expert knows of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation.").
[126] Berry Dep. 82:4-8 [Doc. 39] (emphasis added).
[127] *See United States v. Hoang*, 891 F. Supp. 2d 1355, 1363 (M.D. Ga. Aug. 16, 2012) (quoting *Frazier*, 387 F.3d at 1266).

help."[128]  Berry's opinion, premised on probability and rough approximations, must be excluded because it does not help the jury, it says nothing more than what Plaintiff's lawyer can argue to the jury, and it will likely mislead the jury.[129]

## II.   Conclusion

Based on the foregoing, Homeward's Motion in Limine **GRANTED in part** and **DENIED in part**.  Homeward's Motion is **GRANTED** with respect to Berry's testimony that Homeward's analyses are incorrect (Opinion 2) and unreasonable within the meaning of the Deed and RESPA (Opinion 3, in part), and that Homeward acted with incompetency and neglect (Opinion 4).   Additionally, Homeward's Motion is also **GRANTED** with respect to Berry's opinions regarding the value of the Property at the time of foreclosure, whether Plaintiff was permitted to pay the amount of escrow she contends she owed, and whether Homeward failed to properly communicate with Plaintiff.  However, Berry is permitted to testify about the amount of actual escrow in Plaintiff's account (Opinion 1) and the incoherencies within Homeward's escrow analyses (Opinion 3, in part).  Thus, with respect to these opinions, Homeward's Motion is **DENIED**.

**MOTION FOR SUMMARY JUDGMENT**

## I.   Legal Standard

Summary judgment is proper if the movant "shows that there is no genuine

---

[128] *In re Trasylol*, 2010 WL 148973, at *8 (quoting *Rezulin*, 309 F. Supp. 2d at 554).
[129] *Id.*; Fed. R. Evid. 403.

dispute as to any material fact and the movant is entitled to judgment as a matter of law."[130]   The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitles it to a judgment as a matter of law.[131]  If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[132]

The Court must view the facts, and any reasonable inferences drawn from those facts, in the light most favorable to the party opposing the motion.[133]  "The inferences, however, must be supported by the record, and a genuine dispute of material fact requires more than 'some metaphysical doubt as to the material facts.'"[134]  In cases where opposing parties tell different versions of the same events, and one is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."[135]  A disputed fact will preclude summary judgment

---

[130] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[131] *Catrett*, 477 U.S. at 323 (internal quotation marks omitted).

[132] *See* Fed. R. Civ. P. 56(e); *see also Catrett*, 477 U.S. at 324-26.

[133] *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010); *Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 (11th Cir. 1992).

[134] *Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) (quoting *Penley*, 605 F.3d at 848).

[135] *Pourmoghani-Esfahani v. Gee*, 625 F.2d 1313, 1315 (11th Cir. 2010) (per curiam) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

only "if the dispute might affect the outcome of the suit under the governing law."[136]

"The court many not resolve any material factual dispute, but must deny the motion

and proceed to trial if it finds that such an issue exists."[137]

## II.   Discussion

### 1.   RESPA Claims

In Count Two of the Complaint, Plaintiff alleges that Homeward violated §

2605(e) of RESPA by failing to: (1) timely respond to her requests for information

pertaining to her account; (2) properly investigate its accounting errors; (3) correct false

reporting to credit bureaus; and (4) comply with a servicer's duty and standard of

care.[138]   Homeward contends that Plaintiff's claims under § 2605(e) fail as a matter of

law because Plaintiff's Loan was a commercial loan, not a consumer loan, and therefore

it is not subject to RESPA § 2605.   Plaintiff does not dispute that RESPA applies only to

residential, as opposed to commercial loans, nor does she dispute that her Loan was for

commercial purposes.[139]   Plaintiff does argue however, that RESPA, including § 2605(e),

nevertheless applies to her Loan based on the terms of the Security Deed.   Specifically,

Plaintiff points to the definition of RESPA therein for support: "As used in this Security

---

[136] *Id*. (internal quotation marks omitted).

[137] *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[138] *See* 12 U.S.C. § 2605(e).

[139] *See* 12  U.S.C. § 2601(b) (RESPA "does not apply to credit transactions involving extensions of credit— (1) primarily for business, commercial, or agricultural purposes."); *Oliver v. LIB Props. Ltd.*, No. 1:10-cv-0539-TWT-JFK, 2010 WL 2867932, at *6 (N.D. Ga. June 21, 2010) (emphasis in original) ("The purpose of RESPA is to effect certain changes in the settlement process for *residential* real estate.").

Instrument, RESPA refers to all requirements and restrictions that are imposed in regard to a federally related mortgage loan even if the Loan does not qualify as a federally related mortgage loan under RESPA."[140]   The parties do not dispute that RESPA is referred to in only one other section of the Deed: Section 3, Funds for Escrow Items.

As Homeward accurately contends, the Deed's inclusion of the definition of RESPA, by itself, does not oblige the parties to apply RESPA, in its entirety, to the Loan. Instead, the plain meaning of the cited portion simply defines the term "RESPA" as it is "used" in the Deed.[141]   Because Section 3, Funds for Escrow Items, is the only section in the Deed where RESPA is used, Plaintiff's § 2605(e) claims, which are unrelated to Homeward's alleged RESPA escrow violations, fail as a matter of law.

With respect to Plaintiff's claim that Homeward violated various regulations implemented pursuant to RESPA, including its failure to provide an accurate escrow statement and to maintain Plaintiff's escrow account, this claim must also be dismissed but for a different reason.

RESPA Section 10,[142] in part, bars lenders from overcharging escrow accounts.[143] Pursuant to this section, "no private right of action exists because 'the Secretary shall

---

[140] Deed [Doc. 36-3 at 50] (internal quotation marks omitted).

[141] *See Ga. Real Estate Props., Inc. v. Lindwall*, 303 Ga. App. 12, 14 (2010) ("The first rule that courts must apply when construing contracts is to look at the plain meaning of the words of the contract.").

[142] *See* 12 U.S.C. § 2609.  In 1990, § 2609 was designated by Congress as Section 10.  *See* Cranston-Gonzalez National Affordable Housing Act, Pub. L. No. 101-625, 104 Stat. 4079 (Nov. 28, 1990) (amending Section 10 of RESPA by designating the existing text as subsection (a) and adding subsections (b) through (d)).

assess to the lender or escrow servicer failing to submit the statement a civil penalty.'"[144]

Under 24 C.F.R. § 3500.17(c),

> The servicer may charge the borrower a monthly sum equal to one-twelfth (1/12) of the total annual escrow payments which the servicer reasonable anticipates paying from the account.  In addition, the servicer may add an amount to maintain a cushion no greater than one-sixth (1/6) of the estimated total annual payments from the account.[145]

"A failure to comply with the requirements under § 3500.17 'shall constitute a violation of section 10(d) of RESPA.'"[146]  Section 3500.17 of the regulations also states that "the Secretary shall assess a civil penalty" for violations.[147]

Here, Plaintiff claims that Homeward charged more than the reasonable estimate permitted under RESPA Section 10 and 24 C.F.R. § 3500.17.  Plaintiff's claim, however, fails as a matter of law because no private right of action exists for her alleged harm. Homeward's purported failure to comply with regulation 3500.17 is a violation of RESPA § 10, and "RESPA explicitly states that the Secretary of HUD enforces violations of § 10."[148]  Accordingly, Plaintiff's allegations that Homeward violated RESPA's regulations by failing to provide an accurate escrow statement and to maintain

---

[143] 12 U.S.C. § 2609(c)(2)(A).
[144] *Hardy v. Regions Mortg., Inc.*, 449 F.3d 1357, 1359 (11th Cir. 2006) (quoting 12 U.S.C. § 2609(d)(1)).
[145] 24 C.F.R. § 3500.17(c)(1)(ii).
[146] *Hardy*, 449 F.3d at 1359  (quoting 24 C.F.R. § 3500.17(m)(1)).
[147] 24 C.F.R. § 3500.17(m)(1).
[148] *Hardy*, 449 F.3d at 1359 (citing 12 U.S.C. § 2609(d)(1));  24 C.F.R. § 3500.17(m)(l).  The Eleventh Circuit designates the Secretary as the sole enforcer of violations of the entire section.  *See Hardy*, 449 F.3d at 1359.

Plaintiff's escrow account cannot defeat summary judgment. Consequently, Homeward's Motion with respect to Plaintiff's RESPA claims is **GRANTED**.[149]

## 2. Wrongful Foreclosure

Plaintiff next alleges a wrongful foreclosure claim against Homeward premised on four theories: (1) unreasonably increasing Plaintiff's monthly escrow payment without timely notification; (2) retroactively increasing her monthly payments without notification; (3) ignoring Plaintiff's requests to correct her account; and (4) failing to respond to communications informing Homeward of its errors.[150]

"'Georgia law requires a plaintiff asserting a claim of wrongful foreclosure to establish a legal duty owed to it by the foreclosing party, a breach of that duty, a causal connection between the breach of that duty and the injury [she] sustained, and damages.'"[151] A foreclosing party has the duty to exercise fairly the power of sale in a deed to secure a debt under O.C.G.A. § 23–2–114.[152] Thus, there is a breach of duty if the foreclosing party violates provisions of the loan instruments or Georgia law.[153]

---

[149] Plaintiff also alleged in the Complaint that Homeward violated § 2605(k), however, Plaintiff voluntarily withdrew this claim in her Response Brief. Pl.'s Resp. Br. [Doc. 52 at 8 n.8].

[150] Plaintiff appears to makes an additional argument that Homeward breached its duty by immediately accusing Plaintiff of being in default on November 1, 2009. The Court reads this argument in conjunction with Plaintiff's theory that Homeward retroactively applied the increased monthly payment without notice.

[151] *DeGolyer v. Green Tree Servicing, LLC*, 291 Ga. App. 444, 448 (2008) (quoting *Heritage Creek Dev. Corp. v. Colonial Bank*, 268 Ga. App. 369, 371 (2004)).

[152] *See Calhoun First Nat'l Bank v. Dickens*, 264 Ga. 285, 285 (1994).

[153] *See Heritage Creek*, 268 Ga. App. at 374; *McCarter v. Bankers Trust Co.*, 247 Ga. App. 129, 132 (2000) (noting that a violation of the Georgia foreclosure statute is necessary to state a wrongful foreclosure).

In its Motion, Homeward contends that Plaintiff failed to make full payments as required under the terms of the Deed and therefore that Plaintiff's default was caused by her own actions.[154]   Certainly, Plaintiff's failure to pay the full amount constitutes default under the terms of the Loan, a fact that Plaintiff does not dispute.[155]   What Plaintiff does dispute, however, is whether her default is a result of her actions.

It is undisputed that Homeward was obligated to act in accordance with the terms of the Deed.  With respect to escrow, the Deed states that a lender "shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow items."[156]   If a borrower's escrow account has either a "shortage" or a "deficiency," the lender shall notify the borrower as required by RESPA, and in either case, the borrower shall make payments in accordance with RESPA, "but in no more than twelve monthly payments."[157]

Pursuant to RESPA, when a new servicer changes the monthly payment amount, as was the case here, "the new servicer shall provide the borrower with an initial

---

[154] The Court acknowledges Homeward's drastic simplification of just how much Plaintiff was actually required to pay.  For instance, per Homeward's December 17, 2009 escrow analysis, Plaintiff's monthly payment was to remain $843.58 for the month of January; however, in Plaintiff's January 2010 statement, her January payment is listed as $680.08.  *Compare* 12/17/09 E.A. [Doc. 46-1 at 64] *with* Statement [Doc. 46-1 at 10].  Similarly, Plaintiff's February statement quoted her monthly payment as $638.32, despite the January 10, 2010 letter advising her to ignore the December 2009 escrow analysis.  *Compare* Statement [Doc. 46-1 at 11] *with* 2/19/10 E.A. [Doc. 46-1 at 10].  Moreover, in February, Plaintiff's account was charged $843.5<u>9</u>, one cent more than her "present" monthly payment.  Account [Doc. 46-1 at 38] (emphasis added).

[155] To the extent Plaintiff argues she cannot be in default for failing to pay the 1/6 discretionary cushion, Plaintiff fails to point to any authority for this position.

[156] Deed § 3 [Doc. 36-3 at 53].

[157] *Id.*

escrow account statement within 60 days of the date of servicing transfer."[158]  Such an analysis may include notice of a shortage or a deficiency.[159]  A deficiency, "the amount of a negative balance in an escrow account," is largely distinguishable from a shortage in that a deficiency requires a servicer to have advanced its own funds for the borrower.[160]  A shortage, by contrast, is "an amount by which the current escrow account balance falls short of the target balance at the time of escrow analysis."[161]

In accordance with the terms of the Deed and RESPA, when there is a deficiency in an amount greater than or equal to one month's escrow account payment, the servicer may either do nothing or may allow the borrower to repay the deficiency in a minimum of two, but not to exceed twelve, equal monthly payments.[162]  If the servicer's escrow account reflects a shortage, then the servicer may either, again, do nothing or require the borrower to repay the shortage in equal monthly payments over twelve months.[163]

Reading the facts in the light most favorable to Plaintiff, the Court concludes that there is a genuine issue of material fact as to whether Homeward breached its duty to timely notify Plaintiff of the new escrow analysis as well as correctly estimate and collect a reasonable escrow payment.   Importantly, Plaintiff never received and

---

[158] 24 C.F.R. § 3500.17(e)(1).

[159] *See id.* at § 3500.17(c)(2).

[160] *Id.* at § 3500.17(b).

[161] *Id.*

[162] *Id.* at § 3500.17(f)(4)(ii); Deed § 3 [Doc. 36-3 at 53].

[163] 24 C.F.R. § 3500.17(f)(3)(ii); Deed § 3 [Doc. 36-3 at 53].

Homeward has not produced the October 2009 escrow analysis from which it increased Plaintiff's escrow payment by $238.00.  Without this analysis, the Court can neither conclude that Homeward timely notified Plaintiff of this increase nor that the increase in escrow was proper.[164]  Moreover, because Homeward did not advance escrow funds until after Plaintiff's December payment, the escrow account reflected a shortage. However, the increased amount, over twelve months, as is required for a shortage, would result in a total of $4,241.40, an amount far greater than what was needed. Consequently, a reasonable jury could also conclude that Homeward impermissibly treated the shortage in her account as though it were a deficiency by collecting the amount over a minimum of two months, rather than twelve months.  Accordingly, whether Homeward timely notified Plaintiff of the change in escrow payments and whether Homeward correctly estimated and collected the escrow per the terms of the Deed are genuine issues of material fact to be resolved by a jury.

With respect to the specific monthly amount charged, a reasonable jury could conclude that an escrow estimate that increased a monthly payment from $115.45 to $353.45 was unreasonable and thus that Homeward breached its legal duty.[165]

---

[164] To the extent Homeward contends its December 17, 2009 escrow analysis comports with the sixty day requirement under RESPA, the Court rejects this argument as the time between the date of the transfer of servicing, October 17, 2009, and the date that Homeward conducted the analysis (notably, not the date that Plaintiff received the analysis), is 61 days, not 60.  See Def.'s Reply Br. at 60 n.8 [Doc. 58].

[165] Again, Delbene nails it on the head: "I do not know what figures went into that escrow analysis.  So by our department standards that $353.45 could have been a reasonable amount.  Until I review the escrow analysis, I cannot give you an answer one way or the other.  So my answer has to be I don't know." Delbene Dep. 56:21-25—57:1-2 [Doc. 46].

Although the Court acknowledges Homeward's argument that escrow calculations are estimations, a genuine issue of material fact plainly exists as to whether Homeward's estimate was reasonable.[166]   Additionally, if a jury were to find Homeward's escrow estimate unreasonable, a jury may also conclude that Homeward's subsequent failure to correct its alleged accounting errors was also in violation of its duty to comply with the Deed.

Next, with respect to causation, the Court finds that there is a genuine issue of material fact as to whether Homeward's actions or omissions proximately caused Plaintiff's injuries.   Because Plaintiff failed to pay her fully monthly payments, a reasonable jury could find that Plaintiff's failure to do so, irrespective of Homeward's actions, caused her default and eventual foreclosure.   Indeed, many Georgia courts, including this Court, have dismissed wrongful foreclosure claims based on this premise.[167]

---

[166] *See* Deed § 3 [Doc. 36-3 at 53] (requiring that lender "estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow items").   Homeward's argument that it is entitled to retain a cushion in the amount of two months escrow payments under 24 C.F.R. § 3500.17(c)(ii) and (d)(2)(i), is unavailing as there is no escrow analysis from which to conclude that Homeward did charge Plaintiff in accordance with the regulation.   Likewise, the Court is unconvinced by Homeward's contention that its estimate, at most, would create a surplus in Plaintiff's escrow account. First, this argument presupposes that Homeward's initial analysis in October was a reasonable estimate, a fact that is genuinely disputed.   Second, Homeward's line of thinking reveals a dangerous method of overcharging that is plainly contrary to RESPA's purpose.   *See* 12 U.S.C. § 2601 (b)(1)-(4) (RESPA effectuates "changes in the settlement process for residential real estate that will result … in a reduction in the amounts home buyers are required to place in escrow accounts.").

[167] *See, e.g., Jiles v. PNC Bank Nat. Ass'n*, No. 5:10-CV-180 (CAR), 2012 WL 3241927, at *2 (Aug. 7, 2012); ( *Warque v. Taylor, Bean, & Whitaker Mortg. Corp.*, No. 1:09-CV-1906-ODE-CCH, 2010 WL 9474634, at *5 (N.D. Ga. July 30, 2010); *Heritage Creek*, 268 Ga. App. at 371 (plaintiff's injury was "solely attributable to

However, what distinguishes the instant case from other wrongful foreclosure actions is that Plaintiff has pointed to sufficient evidence from which to conclude that her injury was attributable to Homeward's actions or omissions.[168]  Immediately after Homeward obtained Plaintiff's Loan, Homeward performed a mysterious escrow analysis and retroactively increased Plaintiff's monthly payment without giving her any notice.  Less than a month later, Homeward informed Plaintiff that she had defaulted on her payments to TB&W, a fact that Homeward now admits to be wrong.  Plaintiff subsequently received two different escrow analyses, each decreasing her escrow payment from the original escrow analysis, that she was unable to procure.  Over the next year, Plaintiff's desperate attempts to understand her account were met with Homeward's wildly inconsistent responses.  Further, Homeward's accounting records are so inundated with numerous unexplained discrepancies that the Court cannot discern numerous key facts, including the amount of Plaintiff's full monthly payments.  Certainly then, based on this tragedy of errors, a reasonable jury could also conclude that Homeward's nonexistent October 2009 escrow estimate was unreasonable or erroneous, and that the estimate and Homeward's failure to timely notify Plaintiff and subsequently correct its error caused Plaintiff to default on her Loan obligations.  In

---

its own acts or omissions both before and after the foreclosure" because it defaulted on loan payments, failed to cure the default, and did not bid on the property at the foreclosure sale).

[168] *See Harvey v. Deutsche Bank Nat. Trust Co.*, No. 1:12–cv–1612–RWS, 2012 WL 3516477, at *2 (N.D. Ga. Aug.14, 2012) ("When the borrower cannot show that the alleged injury is attributable to the lender's acts or omissions, the borrower has no claim for wrongful foreclosure.").

light of these disputed facts, the Court cannot conclude that Homeward is entitled to summary judgment with respect to Plaintiff's wrongful foreclosure claim premised on these theories.[169]

The Court also finds a genuine dispute with respect to Plaintiff's wrongful foreclosure theory premised on Homeward's alleged retroactive increase in Plaintiff's escrow payments for the month of October 2009. Plaintiff points to Berry's testimony that Homeward treated Plaintiff as behind one payment of $843.58 when it received Plaintiff's Loan in October, despite the fact that Plaintiff made her usual payment to TB&W and Plaintiff's testimony that she never received notice of this retroactive escrow increase. Initially, Delbene agreed with Plaintiff's interpretation; however, he subsequently clarified that he had misread the accounting documents.[170] Consequently, the Court finds that there is a genuine issue of material fact as to whether Homeward retroactively increased Plaintiff's payment without proper notification, in violation of the terms of the Deed. Additionally, because a reasonable jury could conclude that this breach of duty caused Plaintiff's default and eventual foreclosure, Plaintiff's wrongful foreclosure claim premised on this allegation will proceed to trial.

The Court reaches a different conclusion with respect to Plaintiff's remaining wrongful foreclosure claim that Homeward failed to respond to her communications.

---

[169] Homeward does not dispute that Plaintiff sustained damages as a result of the default and eventual foreclosure of the Property.

[170] See Delbene Dep. 34, 38, 45 [Doc. 46]. Delbene changed his testimony after hearing Homeward's counsel's interpretation. Id.

Under the Deed, there is no requirement that Homeward respond to Plaintiff's correspondence, and, because the Loan was not subject to the requirements of RESPA § 2605, Homeward also did not have a statutory obligation to do so.  As Plaintiff fails to point to any section of the Deed or Note or any Georgia or federal law that obligates Homeward's response, the Court concludes that Homeward was not legally obliged to respond to Plaintiff's communications.  Accordingly, Plaintiff's wrongful foreclosure claim premised on Homeward's failure to respond fails as a matter of law.

In sum, Homeward's Motion is **GRANTED** with respect to Plaintiff's wrongful foreclosure claim premised on Homeward's failure to respond to her communications. However, with respect to Plaintiff's claim premised on Homeward's failure to notify, reasonably and correctly estimate and collect Plaintiff's escrow payment, Homeward's subsequent failure to correct these errors, and Homeward's retroactive application of Plaintiff's payment, Homeward's Motion is **DENIED**.

### 3.   Intentional Infliction of Emotional Distress

In Georgia, a plaintiff must show the following elements to establish a claim of intentional infliction of emotional distress: "(1) the [defendant's] conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe."[171]   The Georgia Court of Appeals has

---

[171] *United Parcel Serv. v. Moore*, 238 Ga. App. 376, 377 (1999).

recognized on numerous occasions that "an intentional wrongful foreclosure can be the basis for an action for intentional infliction of emotional distress."[172]

Plaintiff alleges that Homeward's acts of erroneously declaring Plaintiff in default and wrongfully foreclosing on the Property, despite her repeated pleas, constitute extreme and outrageous behaviors that have caused Plaintiff to suffer from sleeplessness, stress, and anxiety.   In its Motion, Homeward argues that because Plaintiff was in default, its actions were neither extreme nor reckless, but within the terms of the Deed.  However, as explained above, a genuine issue of material fact exists as to whether Plaintiff's default was caused by her own actions or those of Homeward. Consequently, the Court cannot conclude, as a matter of law, that Homeward's actions were lawful.  Additionally, Homeward was at least aware of its alleged conduct and therefore there is sufficient evidence from which to conclude that Homeward acted, at a minimum, recklessly.  Finally, Plaintiff is being treated by a psychologist for anxiety and stress caused by Homeward's actions.   Consequently, the Court finds that a reasonable jury could find Homeward liable for intentional infliction of emotional distress, and thus Homeward's Motion with respect to this claim is **DENIED**.

**4.  Conversion**

Plaintiff claims Homeward converted her money by refusing to (1) apply all of her payments to her mortgage account, and (2) remove and refund the unauthorized

---

[172] *See, e.g., Ingram v. JIK Realty Co.*, 199 Ga. App. 335, 337 (1991) (citation omitted).

fees she was charged.  Homeward seeks summary judgment on this claim, arguing that all of Plaintiff's payments were applied per the terms of her Loan and that none of the fees charged were unauthorized.

Under Georgia law, conversion is "[a]ny distinct act of dominion wrongfully asserted over another's property in denial of his right, or inconsistent with it."[173]  In order to establish a claim of conversion, plaintiff must show "1) title to the property or right of possession, 2) actual possession in the other party, 3) demand for return of the property, and 4) refusal by the other party to return the property."[174]

Here, it is undisputed that Homeward deposited Plaintiff's monthly payments into a suspense account from which it withdrew full monthly payments and late fees when sufficient.  Homeward's contention that its use of the suspense account was consistent with the terms of the Deed assumes that Plaintiff's monthly payments were reasonable and correct and thus that Plaintiff was required to pay the amount Homeward charged.  However, as concluded above, a genuine issue of material fact exists to be tried as to whether Plaintiff's monthly payments, specifically the amount of escrow charged, were correct.

Likewise, although the Deed entitled Homeward to charge Plaintiff late fees and foreclosure fees in the event Plaintiff failed to make full monthly payment, a genuine dispute remains as to whether Plaintiff's default and subsequent foreclosure was caused

---

[173] *Md. Cas. Ins. Co. v. Welchel*, 257 Ga. 259, 261 (1987).
[174] *Metzger v. Americredit Fin. Servs.*, 273 Ga. App. 453, 454 (2005).

by Homeward's actions.[175]  Additionally, because Homeward is unable to explain some of the fees in question, a genuine issue of material fact also exists as to whether Homeward was entitled to charge Plaintiff those fees in question as well.[176] Homeward's Motion with respect to Plaintiff's conversion claim is therefore **DENIED**.

### 5. Tortious Interference with Property Rights

Plaintiff next contends that Homeward unlawfully interfered with (1) her use and enjoyment of her Property, and (2) her contractual relations with the tenant of the Property.  The Court considers each of these allegations separately.

Under Georgia law, any unlawful interference with a property right is a trespass.[177]  Section 51–9–1 of the O.C.G.A. states, "[t]he right of enjoyment of private property being an absolute right of every citizen, every act of another which unlawfully interferes with such enjoyment is a tort for which an action shall lie."[178]  This claim "does not have to be grounded in negligence, so long as the act causing the trespass was

---

[175] In what could only be described as either a poorly misplaced attempt at pity or an appalling justification to collect unauthorized fees, Homeward notes that it has over $40,000.00 in unrecovered losses because "it did not pursue the deficiency" against Plaintiff after foreclosure.  Def.'s Reply Br. at 9 n.15 [Doc. 58].  On this evidentiary record, it suffices to say that this point is wholly irrelevant to the matter at hand.

[176] *See* Delbene Dep. 90-99 [Doc. 46].

[177] *Dowdell v. Cherry*, 209 Ga. 849, 849 (1953).

[178] O.C.G.A. § 51–9–1.

intended."[179]   Additionally, a defendant must have "interfered with [a plaintiff's] possessory interests in the realty."[180]

In its Motion, Homeward again largely argues that it had an express contractual right to foreclose on the Property and therefore that its actions were lawful.  However, because the Court has already concluded that this issue is disputed, Plaintiff's tortious interference claim premised on Homeward's interference with Plaintiff's property rights, must survive summary judgment.  Homeward's Motion is therefore **DENIED** with respect to this claim.

The Court reaches a different conclusion, however, with respect to Plaintiff's claim that Homeward unlawfully interfered with her contractual rights with the tenant of the Property.  To prove a claim for tortious interference with contractual relations under Georgia law, a plaintiff must show that the defendant "(1) acted improperly without privilege, (2) purposely and with malice with intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with [Plaintiff], and (4) for which [Plaintiff] suffered some financial injury."[181]  "[O]nly a stranger to both the contract at issue and the business relationship giving rise to an underpinning the contract may be liable for tortious interference."[182]  When a defendant

---

[179] *Tacon v. Equity One, Inc.*, 280 Ga. App. 183, 188 (2006).

[180] *Tower Fin. Servs., Inc. v. Mapp*, 198 Ga. App. 563, 564 (1991) (holding that because an error in a security deed had no legal effect on plaintiff's actual title to the property, cause of action under O.C.G.A. § 51–91–1 fails).

[181] *Beeson v. Crouch*, 227 Ga. App. 578, 582 (1997).

[182] *Perry Golf Course Dev., LLC v. Hous. Auth. of City of Atlanta*, 294 Ga. App. 387, 390 (2008).

has a "financial interest in one of the parties to the contract or in the contract, the defendant is not a stranger to the contract or business relationship, even though it is not a signatory to the contract."[183]

Here, Homeward was not a stranger to the contract between Plaintiff and her tenant and thus cannot be liable for a claim of tortious interference with contractual relations.[184]   Per the terms of the Family Rider, Homeward has a direct economic interest in the Property, which was the subject of the contract between Plaintiff and tenant.   Specifically, Plaintiff agreed to assign all rents from the Property to Homeward.[185]   Accordingly, Homeward's Motion with respect to Plaintiff's claim of tortious interference with contractual rights is **GRANTED**.

### 6.  Defamation

Plaintiff next alleges that Homeward is liable for reporting her erroneous default to the credit bureaus and publishing the foreclosure advertisement in the newspaper. To prove defamation under Georgia law, Plaintiff must prove "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm."[186]   On summary

---

[183] *Tidikis v. Network for Med. Commc'ns & Research, LLC*, 274 Ga. App. 807, 813 (2005).
[184] *See Patterson v. CitiMortgage, Inc.*, No. 1:11-cv-0339-CC, 2012 WL 4468750, at *14 (N.D. Ga. Sept. 26, 2012) (concluding that defendant was not a stranger to sales contract between plaintiff and buyer).
[185] Family Rider § H [Doc. 36-3 at 64].
[186] *Infinite Energy, Inc. v. Pardue*, 310 Ga. App. 355, 356 (2011).

judgment, Homeward challenges the third and fourth elements with respect to both acts of alleged libel.[187]

To recover for libel in Georgia, Plaintiff must produce evidence sufficient to establish actual malice, meaning that the "defamatory matter was uttered with knowledge that it was false or reckless disregard for whether it was true or false."[188] Reckless disregard for the truth or falsity is when a defendant "entertained serious doubts as to the truth of his publication."[189]

Homeward contends that Plaintiff cannot produce sufficient evidence to establish that its employees acted with actual malice by reporting her default to the credit reporting agencies or publishing the advertisement for foreclosure in the newspaper.  The Court disagrees.  The record reflects that Plaintiff sent Homeward multiple faxes and that Homeward entered multiple notes of Plaintiff's dispute.  These facts establish that Homeward was continually notified of its potential falsity prior to its allegedly defamatory statements.  Accordingly, a reasonable jury could find that Homeward with at least reckless disregard when it published the foreclosure notice and reported her default status to credit bureaus.

---

[187] Homeward also challenges whether the statements were false.  However, because the Court concludes that this fact is a genuine issue of fact to be tried, Homeward's argument is unavailing.

[188] *Hammer v. Slater*, 20 F.3d 1137, 1142 (11th Cir. 1994); *McGowan v. Homeward Residential, Inc.*, 500 F. App'x 882, 886 (11th Cir. 2012) (treating lessor's claims of alleged false reports to credit agencies and alleged false foreclosure advertisements in newspapers as libel, not libel per se); *Sumner v. First Union Bank of Ga.*, 200 Ga. App. 729, 730 (1991) ("A 'business libel' may be actionable because of special damages, although not libelous per se…merely to charge one as a delinquent debtor is, as a matter of law, not libelous per se under [Georgia law].").

[189] *Hammer*, 20 F.3d at 1142.

Notwithstanding, the Court concludes that Plaintiff's defamation claim must ultimately fail because she is unable to prove special damages.  The fourth element Plaintiff must prove is that she suffered from pecuniary loss or loss to her reputation as a result of the foreclosure advertisement or credit bureau reports.  "Defamation not amounting to slander per se or libel per se requires proof of special damages."[190]  To prove special damages, Plaintiff must prove the "loss of money, or of some other material temporal advantage capable of being assessed in monetary value."[191]

On summary judgment, Plaintiff offers her own testimony that her reputation as a respectable businesswoman in her community, which she worked for 70 years to build, is destroyed, and that because of the false statements to the credit bureaus, she is unable to "borrow enough money to b[u]y a snicker bar."[192]  Additionally, Plaintiff's insurance premiums for her remaining six loans have increased "quite a bit."[193] Homeward, unsatisfied with this evidence, contends that Plaintiff nevertheless testified that she has neither applied for nor been denied a loan, that she has not checked her credit score since 2009, that she has obtained new tenants for proprieties as late as October 2012, and that as of December 2012, all of her rental properties are occupied. Consequently, Homeward contends that Plaintiff has failed to produce sufficient

---

[190] *Jordan v. Trans Union LLC*, No. 1:05-CV-305 GET, 2006 WL 1663324, at * 9 (N.D. Ga. June 12, 2006) (citing *Zarach v. Atlanta Claims Ass'n*, 231 Ga. App. 683, 689 (1998); *Sumner*, 200 Ga. App. at 730 ("A 'business libel' may be actionable because of special damages, although not libelous per se…merely to charge one as a delinquent debtor is, as a matter of law, not libelous per se under [Georgia law].").
[191] *Zarach v. Atlanta Claims Ass'n*, 231 Ga. App. 685, 689 (1998).
[192] J. McGinnis Dep. 65 [Doc. 36].
[193] A. McGinnis Aff. ¶ 15 [Doc. 52-1 at 6].

evidence to establish that she has suffered financial or economic harm as a result of the alleged defamatory statements.  The Court agrees.

Although Plaintiff testified generally that her reputation was destroyed, Plaintiff does not point to any evidence, reducible to a monetary value, that her reputation as a businesswoman has been tarnished.[194]  Indeed, the evidence of her current properties' occupancy status suggests the opposite.  Likewise, Plaintiff's general testimony that she would be unable to qualify for a loan, her son's testimony that her insurance premiums have increased "quite a bit," and her failure to allege a specific amount of rental income lost are insufficient.[195]  Consequently, because Plaintiff cannot prove that she suffered special damages, the Court finds that her defamation claims fail as a matter of law.  Defendant's Motion with respect to this claim is therefore **GRANTED**.[196]

### 7.  Georgia RICO

Plaintiff's final state law claim is that Homeward's conduct constituted a violation of the Georgia RICO statute.  Specifically, Plaintiff contends that Homeward raised her monthly escrow payments to an unreasonable estimate without giving her notice and that Homeward converted her payments and Property.  Plaintiff therefore

---

[194] *See Jamison v. First Ga. Bank*, 193 Ga. App. 219, 223 (1989) (proof of injury to reputation and feelings without proof of special damages is insufficient to authorize verdict for plaintiff in instances of libel).

[195] A. McGinnis Aff. ¶ 15 [Doc. 52-1 at 6]; *see Hicks v. McLain's Bldg. Materials, Inc.*, 209 Ga. App. 191 (1993) ("[T]he generalized allegations of appellant and her husband that they might have been hindered in obtaining credit … are insufficient to establish special damage.").

[196] Because Plaintiff's defamation claim fails to survive summary judgment, the Court need not address Homeward's argument that the Fair Credit Reporting Act preempts this claim.  *See McGowan*, 500 F. App'x at 886 (declining to discuss preemption because complaint failed to allege a viable libel claim).

alleges that Defendant's questionable accounting techniques were a "scheme to bilk Plaintiff out of unauthorized fees and to eventually take her Property."[197]   Homeward argues Plaintiff's RICO allegations fail as a matter of law because they relate to a single transaction and thus do not constitute a "pattern of racketeering activity," as required under the statute.

Under O.C.G.A. § 16–14–4, "[i]t is unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money."[198]   "'Pattern of racketeering activity' means: (A) Engaging in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission."[199]   "A pattern requires at least two interrelated predicate offenses."[200]   In other words, such acts must be linked, but not merely "two sides of the same coin."[201]

---

[197] Pl. Resp. Br. at 30 [Doc. 52].

[198] O.C.G.A. § 16–14–4(a).

[199] O.C.G.A. § 16–14–3(8).

[200] *Brown v. Freedman*, 222 Ga. App. 213, 217 (1996)

[201] *S. Intermodel Logistics, Inc. v. D.J. Powers Co., Inc.*, 10 F. Supp. 2d 1337, 1359 (S.D. Ga. 1998) (citing *Stargate Software Int'l, Inc. v. Rumph*, 224 Ga. App. 873, 877 (1997) (internal citations and quotation marks omitted); *Raines v. State*, 219 Ga. App. 893, 894 (1996); *Emrich v. Winsor*, 198 Ga. App. 333, 333 (1991)); *see, e.g., Brown*, 222 Ga. App. at 217-18 (finding that improper accounting on a note and then, after foreclosure, conversion of personal property unrelated to the note, were two separate and distinct acts joined by a common link of a single foreclosure).

In this case, Homeward's alleged act of unreasonably increasing Plaintiff's monthly payment without due notice and converting her payments and, eventually, the Property, is simply one extended transaction.  Although Plaintiff contends that this is not a single transaction because there are seven loans on seven different properties, this argument is unavailing.  The loans, while different documents, are nevertheless inherently connected by a cross-default provision in the Family Rider.  Accordingly, Homeward's actions that allegedly caused Plaintiff's default on the Loan at issue consequently also caused default on all of the loans pursuant to the terms of the Deed.  Homeward's actions are not separate, but merely two sides of the same coin and are thus part of a single extended transaction.[202]  As there is only one transaction, Plaintiff's RICO claim cannot survive summary judgment.  Accordingly, Homeward's Motion with respect to Plaintiff's Georgia RICO claim is **GRANTED**.

## 8.   Punitive Damages and Attorney's Fees

Having found that genuine issues of material fact exist as to whether Homeward may be liable for compensatory damages proximately caused by its alleged intentionally tortious conduct, the Court finds that genuine factual disputes also exist as to whether such conduct would subject Homeward to punitive damages.[203]  Likewise,

---

[202] *See Cobb v. Kennon Realty Servs.*, 191 Ga. App. 740, 741 (1989) (holding that although plaintiff entered into several contracts over an extended period of time, the evidence concerned only one extended transaction); *Brown*, 222 Ga. App. at 217.

[203] *See* O.C.G.A. § 51-12-5.1(b) (Punitive damages may be awarded if it is proven by "clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression,

Plaintiff's claim for attorney's fees also survives summary judgment.[204]  Consequently, Homeward's Motion as to Plaintiff's claims for punitive damages and attorney's fees is **DENIED**.

### III.   Conclusion

Homeward's Motion for Summary Judgment is **GRANTED in part and DENIED in part.**  Homeward's Motion is **GRANTED** with respect to the following claims: RESPA violations; wrongful foreclosure premised on Homeward's failure to respond to her communications; tortious interference with contractual relations; defamation; and Georgia RICO.  However, with respect to Plaintiff's wrongful foreclosure claim based on Homeward's alleged failure to notify, reasonably and correctly estimate and collect Plaintiff's escrow payment, Homeward's retroactive increase without notice, and Homeward's subsequent failure to correct these errors; Plaintiff's intentional infliction of emotional distress claim; her conversion claim; her tortious interference with property rights claim; and Plaintiff's punitive damages and attorney's fees claim, Defendant's Motion is **DENIED**.

### CONCLUSION

---

or that entire want of care which would raise the presumption of a conscious indifference to consequences.").

[204] *See Dept. of Trans. v. Ga. Television Co.*, 244 Ga. App. 750, 751 (2000) ("[W]here the plaintiff has specially pleaded and made prayer for expenses and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, [attorney's fees] may be allowed.") (citing O.C.G.A. § 13-6-11).

Defendant's Motion in Limine [Doc. 43] is **GRANTED in part** and **DENIED in part**.  Homeward's Motion in Limine is **GRANTED** with respect to Berry's testimony that Homeward's analyses are incorrect (Opinion 2) and unreasonable within the meaning of the Deed and RESPA (Opinion 3, in part), and that Homeward acted with incompetency and neglect (Opinion 4).  Additionally, Homeward's Motion in Limine is **GRANTED** with respect to Berry's opinions regarding the value of the Property at the time of foreclosure, whether Plaintiff was permitted to pay the amount of escrow she contends she owed, and whether Homeward failed to properly communicate with Plaintiff.  However, Berry is permitted to testify about the amount of actual escrow in Plaintiff's account (Opinion 1) and the incoherencies within Homeward's escrow analyses (Opinion 3, in part).  Thus, with respect to these opinions, Homeward's Motion in Limine is **DENIED**.

Defendant's Motion for Summary Judgment [Doc. 34] is also **GRANTED in part** and **DENIED in part**.  Homeward's Motion is **GRANTED** with respect to the following claims: RESPA violations; wrongful foreclosure premised on Homeward's failure to respond to her communications; tortious interference with contractual relations; defamation; and Georgia RICO.  However, with respect to Plaintiff's wrongful foreclosure claim based on Homeward's alleged failure to notify, reasonably and correctly estimate and collect Plaintiff's escrow payment, Homeward's retroactive increase without notice, and Homeward's subsequent failure to correct these errors;

Plaintiff's intentional infliction of emotional distress claim; her conversion claim; her

tortious interference with property rights claim; and Plaintiff's punitive damages and

attorney's fees claim, Defendant's Motion is **DENIED**.

      **SO ORDERED,** this 2nd day of July, 2013.

                                       S/  C. Ashley Royal
                                       C. ASHLEY ROYAL
                                       UNITED STATES DISTRICT JUDGE

LMH/bbp