```
1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF GEORGIA

3                        MACON DIVISION

4              _____

5

6    JANE MCGINNIS,              :
                     PLAINTIFF  :   Case No. 5:11-CV-284
7    VS                         :
                                :        August 19, 2013
8                               :
     AMERICAN HOME MORTGAGE      :        Macon, Georgia
9    SERVICING INC.,   DEFENDANT. :
     _____
10
                              JURY  TRIAL
11
                            VOLUME 1 OF 4
12
               BEFORE THE HONORABLE C. ASHLEY ROYAL
13            UNITED STATES DISTRICT JUDGE, PRESIDING

14   APPEARANCES:

15   FOR THE PLAINTIFF:        CHARLES A. GOWER
                               MIRANDA J. BRASH
16                             DAVID ROHWEDDER
                               P.O. BOX 5509
17                             COLUMBUS, GA 31906

18   FOR THE DEFENDANT:        RUSSELL J. ROGERS
                               ANNA BURNS
19                             KELLY THOMAS
                               THOMPSON HINE
20                             TWO ALLIANCE CENTER
                               3560 LENOX ROAD STE 1600
21                             ATLANTA, GA 30326

22
     _____
23              TAMMY W. FLETCHER   USCR
                    P. O. BOX 539
24              MACON, GA 31202-0539
                   (478-752-3497)
25
```

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

```
 1                   P R O C E E D I N G S
 2    August 19, 2013
 3              THE COURT:    Good morning, ladies and gentlemen.  I
 4    want to thank you for being here today.  I'm Chief Judge Royal
 5    and I will be conducting the trial.  And we are going to move
 6    right into the jury selection.  I'm going to let Ms. Purvis
 7    call the roll first and then we'll go from there.  So, please,
 8    give your attention to Ms. Purvis and then a few minutes to me
 9    and then to the lawyers.
10    (Calling of roll)
11              THE COURT:    Go ahead.
12              COURTROOM CLERK:  (Swearing in of prospective
13    jurors).
14              THE COURT:    Ladies and gentlemen, we are going to
15    begin selecting the jury in this case.  This is a process that
16    the lawyers and the Court understand as voir dire.
17              And you are going to be asked some questions.  I'm
18    going to ask you some questions and then the lawyers will ask
19    you some questions.  And the goal of these questions is to
20    make sure that you can be fair and impartial jurors in this
21    case.  It is essential that we have fair and impartial jurors
22    in this case.
23              Now the questions that are going to be asked are not
24    designed to be nosy or to embarrass you or to pry in your
25    personal affairs, but we will have to ask some questions.
```

1           If you are asked a question and you think that you

2    need to answer it and the answer may embarrass you, you just

3    let me know and I will bring you up to the front here and I

4    will have the lawyers and you can tell me and the lawyers, in

5    a sidebar conference, what the answer is.  So in that way you

6    won't be embarrassed.

7           Now, this is the way this procedure works.  A

8    question is going to be asked.  If you need to answer the

9    question I want you to raise your hand.  We have the court

10   security officer who has a microphone.  She will hand you the

11   microphone and you can answer the question.  And we will go

12   one by one.

13          Now, each one of you has a number.  Make sure that

14   that number is visible, because the number is very important.

15   And each time you stand up you have to repeat your name.  If

16   you have to stand up 20 times to answer a question, each time

17   I need for you to tell us your name.

18          Now, as I said, we're not trying to embarrass you

19   here, but we are trying to determine if you can be fair and

20   impartial.

21          Let me give you a very, very brief factual summary

22   of this case.  The Plaintiff, Jane McGinnis alleges several

23   state law tort claims against the Defendant, Homeward

24   Residential, Inc., formerly known as American Home Mortgage

25   Servicing, Inc., where its alleged acts or omissions while

1    servicing the Plaintiff's mortgages.  The Plaintiff claims she

2    suffered damages as a result of the Defendant's foreclosure

3    which she claims was wrongful under Georgia law.

4         She also makes several other state law claims which

5    I will describe for you in more detail later.

6         The Defendant in this case denies that it is liable

7    to the Plaintiff and contends that it acted in accordance with

8    the law and the loan instruments.

9         Now, I'm going to asks you a few questions and then

10   you'll be asked some more by the lawyers.

11   (VOIR DIRE CONDUCTED AT THIS TIME)

12        THE COURT:    Ladies and gentlemen, you have been

13   selected to serve on the jury for this case.  You, ladies and

14   gentlemen, have not been which means you get to go.

15        I want to thank you very much.  You do not have to

16   come back.  This is the only case we're going to try this

17   term.  But I do want to thank you very much for being here and

18   making this process possible.  Have a great day.  The roads

19   are wet.  Be careful.

20   (PROSPECTIVE JURORS ARE DISMISSED )

21        THE COURT:    I'm going to invoke the rule.  I think

22   there may be some witnesses in the court; is that correct, Mr.

23   Gower?  Do you have some witnesses in the court?

24        MR. GOWER:    Yes, sir.

25        THE COURT:    Well, I just invoked the rule.  Swear

1    them.

2           MS. PURVIS:  Members of the jury, please stand.

3    (JURORS BEING SWORN AT THIS TIME)

4           THE COURT:    Ladies and gentlemen, I'm going to

5    give you some preliminary instructions.  I want to explain

6    some basic principles about a civil trial and your duties as

7    jurors.  These are preliminary instructions.  I will give you

8    more detailed instructions at the end of the case.

9           By your verdict you will decide the disputed issues

10   of fact.  I will decide all questions of law that arise during

11   the trial.  And before you retire to deliberate together and

12   decide the case at the end of the trial, I will instruct you

13   again on the rules of law that you must follow and apply in

14   reaching your verdict in this case.  Because you will be

15   called upon to decide the facts of the case, you should give

16   careful attention to the testimony and evidence presented for

17   your consideration during the trial, but you should keep an

18   open mind and should not form or state any opinion about the

19   case one way or the other until you have heard all of the

20   evidence and have had the benefit of the closing arguments of

21   the lawyers and the instructions that I will give you on the

22   applicable law.

23          During the trial you must not discuss the case in

24   any manner among yourselves or with anyone else and you must

25   not permit anyone to attempt to discuss it with you or in your

1      presence.

2              And insofar as the lawyers are concerned, as well as

3      others whom you may came to recognize as having some

4      connection with this case, you are instructed that in order to

5      avoid even the appearance of impropriety you should have no

6      conversation whatsoever with those persons while you are

7      serving on the jury.

8              You as jurors must decide this case based solely on

9      the evidence presented here within the four walls of this

10     courtroom.  This means that during the trial you must not

11     conduct any independent research about this case, the matters

12     in the case and the individuals or agencies involved in the

13     case.  In other words, you should not consult dictionaries or

14     reference materials, search the Internet, website, blogs or

15     use any other electronic tools to obtain information about

16     this case or to help you decide this case.

17             You may not communicate with anyone about the case

18     on your cell phone or smart phone, through e-mail or text

19     messaging, through any blog or website, through any Internet

20     chat room or by way of any social networking websites

21     including Facebook, MySpace, LinkedIn, Reddit, Tumblr, Twitter

22     and YouTube.  Now, I don't know what most of those are, but

23     this is really serious what I am telling you.  Don't

24     misunderstand what I'm saying.

25             Please do not try to find out information from any

1      source outside the confines of this courtroom.

2              Until you retire to deliberate you may not discuss

3      this case with anyone even your fellow jurors.  After you

4      retire to deliberate you may begin discussing the case with

5      your fellow jurors.  But you cannot discuss the case with

6      anyone else until you have returned a verdict and the case is

7      at an end, this includes your family and friends.  A reminder

8      of this policy has been placed in your jury folders.

9              The reason for these cautions, of course, lies in

10     the fact that it will be your duty to decide this case only on

11     the basis of the testimony and evidence presented during trial

12     without consideration of any other matter whatsoever.

13             During the trial you will hear certain things that

14     are not in evidence and you must not consider them.  First,

15     the lawyers' statements and arguments are not evidence.

16             In their opening statements and closing arguments

17     the lawyers will discuss the case.  Their remarks may help

18     you follow each side's arguments and presentation of the

19     evidence, but the remarks themselves are not evidence and

20     should not play a role in your deliberations.

21             Second, the lawyers' questions and objections aren't

22     evidence.  Only the witnesses' answers are evidence.  Don't

23     decide that something is true just because a lawyer's question

24     suggests that it is.  For example, a lawyer may ask a witness,

25     "You saw Mr. Jones hit his sister, didn't you?"  The question

1    is not evidence of what the witness saw or what Mr. Jones did

2    unless the witness agrees with it.

3            There are rules of evidence that control what the

4    court can receive into evidence.  When a lawyer asks a witness

5    a question or presents an exhibit the opposing lawyer may

6    object if he thinks the rules of evidence don't permit it.

7            If I overrule the objection then the witness may

8    answer the question or the Court may receive the exhibit.

9            If I sustain the objection then the witness cannot

10   answer the question and the Court cannot receive the exhibit.

11   When I sustain an objection to a question you must ignore the

12   question and not guess what the answer might have been.

13           During the trial, it may also be necessary for me to

14   confer with the parties from time to time out of your hearing

15   concerning questions of law or procedure that require

16   consideration by the Court alone.  On some occasions you may

17   be excused from the courtroom as a convenience to you while I

18   discuss such matters with the parties.  I will try to limit

19   such interruptions as much as possible.  But you should

20   remember at all times the importance of the matter you're here

21   to determine and should be patient even though the case may go

22   slowly.

23           In that regard, as you were told during the process

24   of your selection, we expect this case to last about three

25   days but I will make every effort to expedite the trial.

1          Now, a question sometime arises as to whether

2   individual members of the jury are permitted to take notes

3   during the trial.  If you would like to take notes you may.

4   On the other hand, you're not required to take notes if you

5   don't want to.  That's left up to you.

6          If you decide to take notes be careful not to get so

7   involved in the notetaking that you get distracted from the

8   ongoing proceedings.  Also, your notes should be used only as

9   an aid to your memory and if your memory should later differ

10  from your notes you should rely upon your memory and not your

11  notes.

12         If you do not take notes you should rely upon your

13  own independent recollection or memory of what the testimony

14  was and you should not be unduly influenced by the notes of

15  other jurors.  Notes are not entitled to any greater weight

16  than the recollection or impression of each juror as to what

17  the testimony was.

18         You will notice that a complete record of the trial

19  and the testimony is being taken down by the court reporter,

20  but you will not have a copy of the transcript for your

21  deliberations.

22         Now, we're going to begin the trial at this time by

23  affording each side to make an opening statement to you in

24  which they may explain the issues in the case and summarize

25  the facts that they expect the evidence to show.

1           After all the testimony and evidence is presented,

2    each side will then be given another opportunity to address

3    you at the end of the trial and make their summation or final

4    arguments in the case.

5           The statements each side makes now, as well as the

6    arguments they present to you at the end of the trial, are not

7    to be considered by you either as evidence in the case or as

8    your instruction on the law.  Nevertheless, these statements

9    or arguments are intended to help you understand the evidence

10   as it comes in, the issues or disputes you will be called upon

11   to decide and the positions taken by both sides.

12          So I'm going to ask each of you to pay attention

13   when they make their closing arguments.

14          Now, excuse me just one minute.  Lee Anne.

15   (Conference)

16          THE COURT:    Ladies and gentlemen, this is what

17   we're going to do.  I'm not going to begin the closing

18   arguments at this time.  I'm going to let you go to lunch.  It

19   is twenty to twelve.  And I want you to be back in the jury

20   room at 12:45.

21          Now, there are a number of places to eat right

22   around here.  Please don't get in your car and go out to the

23   mall or something.  We need to have you back on time.

24   Remember that if you are not here we can't do anything.  So if

25   one of you doesn't show up on time then that stops this whole

1    process.  So please try to be prompt.  And I would like to

2    have you back in the jury room at 12:45.  That gives you an

3    hour and five minutes.  All right.  Remember not to talk about

4    the case.  Thank you.

5    (JURORS EXIT COURTROOM)

6            THE COURT:   Now, it's my understanding that there

7    is no joint exhibit book, is that correct?

8            MR. GOWER:   Yes, Your Honor.  There is none.

9            THE COURT:   Well, do you have joint exhibits?

10           MR. GOWER:   No, sir.  Really what we did --

11           THE COURT:   Just keep your seat because I can hear

12   you better when you're seated.  Pull the microphone around in

13   front of you.  It makes my court reporter much happier when

14   you do that.  Go ahead.

15           MR. GOWER:   No, sir.  We do not have joint

16   exhibits.  What we did is in the 30B6 deposition of Mr.

17   Delbene I referred to a number of exhibits in his deposition

18   by Plaintiff's number, which I had premarked.  And we felt it

19   would be confusing to the jury if we took those exhibits and

20   used them as a joint exhibit.  So I simply suggested to the

21   defense counsel that on the exhibits that I used, that if they

22   choose to use the same exhibits that they just use my exhibit

23   number since it had been referred to in the deposition.  I

24   felt like that would be the least confusing.

25           THE COURT:   Well, what about the exhibits that

1    were not used?  I understand.  That make sense.  But what

2    about the exhibits that may be joint exhibits that weren't

3    used in the deposition?

4         MR. GOWER:   I don't think there are but maybe two

5    or three.

6         THE COURT:   What about it, Mr. Rogers?

7         MR. ROGERS:   I think that's right, Your Honor.  We

8    had done a list of the joint exhibits and chart and Charlie

9    and I had communication that he referenced.  And to the extent

10   that we can, Your Honor, we're going to just try and use the

11   Plaintiff's copy of it.

12        THE COURT:   Well --

13        MR. ROGERS:   But --

14        THE COURT:   Go ahead.

15        MR. ROGERS:   But there are couple of instances

16   where they are different and so both would be used, both would

17   have been used anyway.  Other than that, the only thing I can

18   think of is you remember the payment history they had was

19   marked on and we had talked about using them if it was cleaned

20   up.  Ours is cleaned up.  I don't know if they have cleaned

21   theirs up or not.

22        MR. GOWER:   We have.  It's cleaned up.

23        THE COURT:   That's good.  That's important.  Just

24   as I told you we can't let the jury get confused about these

25   exhibits.  We can't have them back there looking at two

1    exhibits, one that says Plaintiff's number whatever and one

2    says Defendant.  They're trying to figure out the difference

3    when it's the same document.  That has to be taken care of.

4           So I don't know what that will take but I don't want

5    them spending an hour and a half back there trying to figure

6    out what the difference in the documents is.  And I know the

7    way these juries operate in Federal court in Macon and that is

8    exactly what they will do.  Go ahead.

9           MR. ROGERS:   Your Honor, is the copy of the

10   exhibits that's going to go back with the jury is it one of

11   copies that we've already handed up?  Because we can just take

12   the duplicate documents out and that won't cause that

13   confusion.

14          THE COURT:    That will be good.

15          MR. ROGERS:   We'll get our chart and maybe we can

16   do that tomorrow or before the start of court or tonight after

17   we finish if that suits you?

18          THE COURT:    That's fine.  Anything else we need to

19   cover?  How long are you going to take in your opening?

20          MR. GOWER:    Forty-five minutes to an hour at the

21   most.

22          MR. ROGERS:   You told me I had 45 minutes, Your

23   Honor, as best I can I'm right on the nose.

24          THE COURT:    All right.  Very good.  And are we

25   still thinking this is going to last three days?  Because my

```
 1    recollection was we didn't really have all that many
 2    witnesses.
 3                MR. GOWER:    I think we will finish tomorrow.
 4                MR. ROGERS:   I'm thinking we'll probably go to
 5    Wednesday, Your Honor.
 6                THE COURT:    He says he's going to finish tomorrow.
 7    You be ready to go.  Anything else?
 8                MR. GOWER:    No, sir.
 9    (LUNCH RECESS)
10                THE COURT:    Bring the jury in.
11    (JURORS ENTER COURTROOM)
12                THE COURT:    Ladies and gentlemen, I hope you
13    enjoyed your lunch.  Thank you for getting back promptly.
14                It's now time for the lawyers to make their opening
15    statements.  I will remind you that what they say is not
16    evidence, however what they do say is important.  So I want
17    you to listen to what they have to say and give you an
18    overview of what this case is about.  All right.  Go ahead,
19    Mr. Gower.
20                MR. GOWER:    Thank you, Your Honor.
21                THE COURT:    You're going to have to stand in front
22    of the microphone.
23                MR. GOWER:    Yes, sir.  I tend to talk low, but I
24    don't think I'm going to have a problem here today.
25                This case is about Jane McGinnis against what used
```

1    to be called American Home Mortgage Servicing, Incorporated,

2    AHMSI.  They changed their name to Homeward Residential, and

3    that's what we'll refer to them as in this case is Homeward,

4    which is the mortgage company.

5         Jane is from Monticello, Georgia.  And she and her

6    husband, way back yonder, worked in a grocery store, kind of a

7    momma and poppa grocery store where Jane ran the store and her

8    husband was the butcher.  And then they got a coin laundry and

9    car wash.  And over the years they saved up and scrimped and

10   purchased some homes, some houses in Jasper County,

11   Monticello, Georgia.

12        In 2006 they mortgaged seven of these houses to a

13   mortgage company called Taylor, Bean and Whitaker and they

14   borrowed that money and used it to pay on loans that they had.

15        And unfortunately at around that same time Jane's

16   husband took off with a younger woman and they had a divorce.

17   And in the divorce Jane wound up with these properties.

18        And at about that same time Jane decided to move to

19   where her daughter lives in St. Augustine, Florida.  And she

20   left the properties in Monticello for her son, Adam, to

21   manage, to collect the rent and make the payments.

22        And Adam, as you will hear him testify, is her son.

23   She has two sons and a daughter.  Adam lives in Monticello and

24   the daughter lives in St. Augustine.

25        Adam is in the real estate business, he sells real

1   estate.  He also sells insurance.  And he does appraisals.  So

2   he was charged with the responsibility of looking after his

3   mother's property, renting it out and making the payments

4   while she was in St. Augustine.

5           Everything went fine until 2000 -- to the end of

6   2009.  That's when this mortgage company Taylor, Bean and

7   Whitaker turned it over to the new mortgage company, Homeward.

8   That's when the problem started and that's why we are here

9   today.

10          What you will hear is that from '06 through the

11  month of October, 2009, Jane and her son made these payments.

12  Never missed a payment.  They were --

13          Let me back up just a minute.  Of the seven

14  properties that we are involved with here today, I'm going to

15  concentrate on one of them because all of the rest of them

16  were treated pretty much the same way.  The one I'm going to

17  concentrate on is called 172 Hilton Street, which is a

18  single-family house in Monticello.

19          What happened is on October 17th of 2009 all of

20  those loans were transferred from Taylor, Bean and Whitaker to

21  Homeward.  The October '09 payment was made to Taylor, Bean

22  and Whitaker.  And here's where the problem starts.  Homeward

23  takes over, the new mortgage company, on November 1, '09.

24  Homeward says, "Jane, you are one month behind on your

25  payments."  She was not.  That is where the problem starts.

1          So let me go back because this is real, real

2     important.  This is a letter of October 27, '09.  This is

3     where the new mortgage company says we're taking over as of

4     October 17, '09.  What you will see -- And we have taken the

5     deposition of the representative of Homeward and they will

6     admit that Jane was current, 100 percent current, through the

7     end of October '09, October 31, '09.  I think it has 31 days,

8     either 30 or 31.  Anyway, they were completely current through

9     October '09.

10          What happens when they take it over?  The very next

11    day, November 1, '09, they tell Jane, Jane you are behind one

12    month.  Plus not only are you behind one month, we are raising

13    your escrow payment by over 150 percent.  So you owe not only

14    the one payment behind but you owe additional escrow due

15    immediately, plus you owe the November payment.  That's where

16    the problems started.  Same thing happened to all the loans.

17          You'll see -- y'all have to -- I'm trying to be in

18    the new school but I'm in between.  I'm not up-to-date on the

19    computer thing so I go by both.

20          Here's what -- by the way -- what happened, and this

21    also is important.  From '09 through today Homeward has never

22    sent -- I'm going to repeat that -- never sent a monthly

23    billing statement to Jane.  Not one.  It's over three and a

24    half years.

25          But here is what they should have sent.  This is a

1    monthly billing statement and it shows -- it is dated

2    November 1, '09.  Payment due date.  Mind you, she was current

3    the day before, 100 percent current.  Now they are saying that

4    you are past due right there and you owe this.  So now you owe

5    $1,700.

6          What I'm saying is that on this loan, the day after

7    they took it over, they said she is one payment behind plus

8    they raised the escrow, the payments were 605.58 a month.

9    They raised it to 843.58 with no notice.

10         What you will hear is we'll have a deposition -- you

11   will hear on video where the person most knowledgeable at

12   Homeward -- We took his deposition and he will say we did not

13   notify Jane that we were raising the payment.  We should have

14   notified her.  And I asked him, "Well, how did you come up

15   with the computation to raise it to 843.58?" He says, "I don't

16   know."  I don't know but you just got to pay it.  That's what

17   their representative is going to say to you today shortly.

18         So here is where the problem starts.  And what they

19   do, you will hear, is when Jane -- And then Adam her son,

20   makes the payment of 605.58 a month, which is the old payment

21   he had been paying.  He makes that payment to them.  What they

22   do is they don't give him credit for any of the principal or

23   the interest of escrow.  They put it in a suspense account,

24   where they just put this money in there and they wait until

25   the next month when he pays 605.58 and then they take out the

1    843.58 plus late fees.  Plus late fees.  And that's what they

2    do every month.  And so she will never catch up ever unless

3    you just voluntarily pay what they say is owed.

4         But what they did is Adam, her son, sends -- he gets

5    calls and you will hear that he got hundreds and hundreds of

6    calls over the years, collection calls from people overseas

7    demanding that he make these payments.  Any he tries to

8    explain to them, we've made our payments.

9         And you will see -- and I apologize.  I don't know

10   whether I'm talking too loud or whatever.  But they have made

11   -- they have never ever to this day missed making a payment on

12   any of the seven loans.  They have made every payment every

13   month.

14        What you will see -- and he sent, he being Adam the

15   son, sent to the mortgage company proof that he had been

16   making the payments.  He says, "I'm not behind.  I'm not

17   behind."  They say, "Yes, you are behind."  And so there you

18   go.

19        Then -- and we admit that there was a shortage in

20   the escrow account.  I agree.  There was a shortage.  And in

21   some of the others there was an overage, but in this

22   particular one there was a shortage.  Adam says, "I will pay

23   you your shortage right now today, but I'm not going to pay

24   all these other fees.  And I'm not going to make this payment

25   past due which I don't owe."  And they said, "Well we're not

1   going to take your money on that."

2        Then he even writes them a fax and says, "Well, I

3   will pay off the loan in full if you will take off all the

4   fees and give me credit for the payment that you say I didn't

5   make, I will pay it off in full."

6        Here is that fax.  This is where Adam, the son,

7   sends a fax to American Home which is now Homeward and

8   basically says, "I'm disputing the 843.59/58 and he goes in

9   and explains it.  I'm not going to go through all of this but

10  you'll have time to see it.  And then he says, on page two of

11  the fax, he says, "I will not pay any late fees or any

12  differences.  I have attached everything to clear this up."

13  He sent all the checks from '08 up to now.  And he said, "Just

14  tell me by June 1 what we owe and we will pay you off."  They

15  wouldn't do it.  They wanted the late fees and all the other

16  fees.

17       So then what happened?  We travel along through 2011

18  continually getting calls from folks in India and wherever.

19  And Adams says, explains over and over and over and over, I'm

20  not behind.  I want to pay you but I don't want to pay out

21  something I don't owe.  We go through to 2011.

22       And then in March of '11 they start sending the

23  checks back on the monthly payment.  They say, "You have not

24  paid.  Here is your money back."  They send it in in April,

25  they sent it back.  They sent it in May and they sent it back.

1    They wouldn't take the money.

2         Then they run an ad in the paper to foreclose.  They

3    hire lawyers.  Adams gets -- contacts the lawyers and says,

4    "I've paid.  I've paid.  Here is my proof.  Please don't

5    foreclose.  I have paid."

6         What happens?  They run the ad in the paper once a

7    week for four weeks in April of '11.  They run it again once a

8    week for four weeks in May of '11.  And they foreclose on the

9    property on June the 8th of '11 and sell the property at the

10   courthouse steps for $25,000.  A piece of property that they

11   owed over 70,000 on.

12        And then when they sent in their June payment they

13   kept it after they foreclosed.  They kept the June payment.

14   And we will show you proof of that in just a minute.

15        Now what has that done?  They have done similar

16   things on the other properties.  They today, they have been

17   taken over by another company called Ocwen.  They took them

18   over in March of this year, of 2013.

19        Ocwen is now sending back the checks on another

20   piece of property and threatening to foreclose.  They have

21   sent back the April check and the May check and they are

22   fixing to foreclose right now today.

23        What you will hear is that Jane -- you will hear how

24   this has affected her.  This is her livelihood.  This is her

25   retirement that she and her husband had worked on.  This is

1    her income.  And you will hear that she has been to see a

2    psychologist over 50 times for a period of two years.

3         You will hear from the psychologist.  You will hear

4    from her children.  You will hear how she's embarrassed and

5    she wants to go back to Monticello but she's just embarrassed

6    because this is where she grew up and people think she don't

7    pay her bills, when she's tried to.

8         You will hear on the escrow -- I want to talk about

9    the escrow.  The defense you're going to hear from in this

10   case, well, she didn't pay the escrow.  You will hear from Mr.

11   Delbene, their representative, that he cannot tell you how

12   they arrived at the increase in the escrow.  He can't find it.

13   There's no document he can point to, but he says, "You've just

14   got to pay it".

15        And you will see on their own documents when they

16   send an escrow statement -- this is the second page of an

17   escrow.  Annually they're supposed to send you an escrow

18   statement, once a year.

19        Well, it says on here that, "How is a shortage

20   collected?"  Because we agree there was a shortage on this one

21   house when they took it over.  We agree there was.  And we

22   agreed we wanted to pay it.  We say, "How is a shortage

23   collected?"  They themselves say it's collected over a

24   12-month period.  They wanted to collect it over a three-month

25   period without even explaining how and with no prior notice

1       whatsoever.  I want to repeat that.  With no prior notice

2       whatsoever.

3               In other words, they said, "You're one payment

4       behind.  We're increasing your escrow retroactive, you've got

5       to pay it today.  But we're not even going to tell you how we

6       arrived at it and we can't tell you, but you just got to pay

7       it."

8               What I'm -- I apologize, this is not going to be a

9       great exciting trial because you're going to be dealing with a

10      lot of numbers.  That's just the way it is.  It's a lot of

11      numbers.

12              One thing I do want to show is this right here.  In

13      just a second I'll show it on the computer thing over there on

14      the screen.  This is -- we have hired a CPA that has spent

15      hundreds of hours going through documents on all seven loans

16      to compile what happened and to try and make sense of it.

17              This is one of the exhibits, one of the things that

18      he computed.  This is on the 172 Hilton Street and he started

19      -- if you will see here this is the mortgage company Taylor,

20      Bean and Whitaker.  And then it's taken over by this AHMSI now

21      Homeward.  There was a little mess up with Taylor, Bean and

22      Whitaker.  Taylor, Bean and Whitaker went bankrupt, the

23      mortgage company itself.  They had been taking out the money

24      by automatic draft for years, but they quit it in August '09.

25      In August of '09 they said send in your checks.  So they sent

1    in the checks.  They lost them.

2              They then sent it in again, a replacement check.

3    They sent it in in September.  So in September you'll have two

4    payments.  The August payment and the September payment.  Then

5    they sent the October payment and they were completely

6    current.

7              What we have here, this is the mortgage company

8    balance and this is the amortization schedule when you get

9    ready for all your payments.

10             Another odd thing here.  This is the date the checks

11   were posted by the mortgage company and this is the date that

12   they cleared the bank.  And there is some kind of unusual

13   things in that -- my point is, here we go.  Right here, this

14   is when they took it over.  They were 100 percent current.

15   Right here we have a check that no credit was given.  But they

16   sent in that check for 605.58.  There is no credit given for

17   that check and they said you're past due, 843.58, which you

18   can't be.

19             And it just gets worse as you go down.  They start

20   putting it in the suspense account and collecting.  And then

21   here's no credit for another check.  There were three or more

22   checks that they never got credit for.

23             And then we get down here to February and they start

24   returning checks.  And then finally they -- in June of '09

25   after they foreclosed they even cashed a check after the

1   foreclosure.

2          What I'd like to do right now is go through here.  I

3   want to show you on this one loan, we're going to go from

4   January '08 through June of '11.  I want to show you that they

5   made a payment every single month from January '08 through

6   June of '11 when they foreclosed.

7          This is -- I can see that all right.

8          THE COURT:    But you need to make sure the people

9   behind you can see.

10         MR. GOWER:    Thank you.  What statement is that

11  David?  This is January of '08.

12         THE COURT:    Mr. Gower, you might do better right

13  there.

14         MR. GOWER:    Thank you.  This is January of '08.

15  And what I have done is I've yellow lined the payment of

16  605.58.  So that's January.  We're going to kind of go through

17  them sort of fast.  That's February '08.  March of '08.  I

18  really can't see them.  I'm just guessing.  All right.  March

19  of '08.  April of '08.  May of '08.  June of '08.  July of

20  '08.  August of '08.  These are payments, 598 -- later raised

21  up because of escrow.  September '08.  October.  November.

22  Now I see the payments have gone up to 605.58 a month.

23  December of '08.  January of '09.  February '09.  March '09.

24  April '09.  May of '09.  June of '09.  July of '09.

25          I forgot, August.  What happened in August of '09 is

```
 1        they sent a check in and they lost it so they sent a
 2        replacement check in.  So here we go.  Can you throw up the
 3        whole check.  This is the check -- this is the replacement
 4        check right here.  It says check was lost and voided.  So this
 5        is the replacement check.
 6                    And if you will see, it cleared the bank in
 7        September but this is the August payment.  So that's the
 8        August payment, the replacement check we sent.
 9                    MR. GOWER:    Can you go to the next one?
10                    MR. ROHWEDDER:    This is the next one.
11                    MR. GOWER:    This is the next one.  That's the one
12        I just saw, wasn't it?
13                    MR. ROHWEDDER:    This is the next one.
14                    MR. GOWER:    Okay.  This is the next one.  This is
15        the September payment.  We just had the August.  This is the
16        September '09 payment.  Okay.  This is the October '09
17        payment.  And this is the payment that brings the loan current
18        through the end of October '09.  One hundred percent current.
19                    But if you will remember when they took it over as
20        of November 1, '09 they said you owe that payment, plus you
21        owe the escrow that we've increased, which we didn't tell you
22        about.  That's where the problem starts.
23                    So this is the November payment we make to AHMSI.
24        November.  Go ahead, please, sir.  December '09.  January '10.
25        We're going to go through these quickly through '10.  February
```

1    '10.  March.  April.  May.  June.  July.  August.  September.

2    October.  November.  December.  January of '11.  Here's where

3    we go again.  On February of '11 we send in the check, they

4    cashed the check.  But then they send their check back.  This

5    February check they cashed, they sent it back.  Can you go to

6    the March one?

7              What happened was in February they cashed the check

8    and then they wrote their check back.  So that's what we're

9    trying to get up to show they wrote the check back in March.

10   Well, I don't want to take up any more time on that unless you

11   can get it right away.

12             In March of '09 they sent a check back, their check.

13   And we sent a check in for April and they send the April check

14   back.  We sent in a check for May and they sent the May check

15   back.  I understand they are foreclosing.  They are begging

16   them not to foreclose. They did foreclose in June.  They

17   cashed the June check.  They lost the house for $25,000.

18             And then let me show you what the fees they charged.

19   This is the total fees they charged on this one house, over

20   $6,000 in fees, which Jane and her son refused to pay.

21             So you will see photos of the house where weeds are

22   this high now, today.  Now, why is that important?  Why should

23   we care?  Because this is a little bitty town, Monticello, and

24   everybody knows the McGinnises.  They know that they are in

25   the rental business.  And they say, well that's proof that

**TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497**

1    they can't pay their bills.  Look at that house how horrible

2    it is.

3            What's happening today as we're sitting here, today

4    as we're sitting here.  Last week Adam gets calls.  The week

5    before he gets calls explaining what's happening on the other

6    house, saying we've never missed a payment on any of these

7    loans.  We don't owe you these bills.

8            They are now returning checks on another house.  You

9    will see these.  Right here.  Here's April.  In April of this

10   year returning the checks for the payment saying it ain't

11   enough.  We're going to foreclose.  Here we are in May.

12   Returning checks.  It ain't enough.  We're going to foreclose.

13           Now what this case is about is this.  You're going

14   to hear, after Mr. Rogers gets up and has his opening, you're

15   going to hear a deposition of Mr. Delbene who is the person

16   Homeward designated as the person most knowledgeable about

17   Jane's affairs.  You'll hear what he has to say.  We will play

18   our portion of it and they will play their portion of it.

19           And then you will hear testimony from Tom Berry, a

20   CPA who has analyzed this that we have paid through the nose,

21   you will hear.  You will hear, we paid through the nose to

22   have him go through meticulously all these records.  And you

23   will hear what he has to say.

24           The bottom line is this.  Jane has never missed a

25   single payment. She has tried, through her son, to explain

1    this hundreds, literally hundreds of times.

2            They have written letters, they have written faxes.

3    They've hired a lawyer.  I've written letters.  They say, "You

4    have to pay what we say or else."  And the "or else" is you

5    lose your home. You lose your property.  And that's what has

6    happened.  Thank you.

7            THE COURT:    Mr. Rogers.

8            MR. ROGERS:  Good afternoon, ladies and gentlemen.

9    Again my name is Russ Rogers.  I represent Homeward

10   Residential, Inc. as we discussed during voir dire.

11           Homeward was formerly known as American Home

12   Mortgage Servicing, Inc.  I'm going to be calling it AHMSI

13   because that was it's name through most of the proceedings

14   that we are looking at.  But AHMSI and Homeward, they are the

15   same company.

16           Ladies and gentlemen, Mr. Gower would have you see

17   this as a case in which an elderly woman lost her home to the

18   callous indifference of a mortgage company.  That is not the

19   case.

20           We expect the evidence will show you that Ms.

21   McGinnis is a sophisticated businesswoman.  Mr. Gower

22   referenced some of this, but she's been buying and selling and

23   leasing properties in Monticello, Georgia for over 35 years at

24   the time of the events in question.

25           What she lost was not her home.  It was an

1  investment property at 172 Hilton Street in which neither she

2  nor her family had ever lived.

3       She lost it because her son, Adam McGinnis,

4  stubbornly refused to make an increased monthly payment that

5  AHMSI told him again and again and again that he needed to

6  make.

7       The payment went up not because AHMSI was lining

8  it's pocket at the expense of Ms. McGinnis.  The payment went

9  up because the taxes and insurance went up.  Because the

10  escrow account was underfunded and because AHMSI, three times,

11  had to advance funds to Ms. McGinnis to pay the taxes or

12  insurance on her property.

13       In short, this is not a case about an elderly woman

14  who had her house stolen from her by a mortgage company.  It's

15  a case about a business deal gone bad.

16       We expect the evidence will show that Ms. McGinnis

17  is an experienced businesswoman.  She and her husband, now her

18  ex-husband, opened and operated several businesses in the

19  Monticello area.  They began investing in real estate in the

20  Monticello area more than 35 years ago.

21       In about 2005 Ms. McGinnis and her ex-husband got

22  divorced.  In the divorce Ms. McGinnis got a number of

23  properties.  We expect the evidence will show that she got at

24  least three commercial properties and more than 12 residential

25  properties.

1          At the time she took sole ownership of the

2     properties some of them were paid off and some of them had

3     loans on them.

4          We expect Ms. McGinnis will say that she decided to

5     refinance some of those properties because she had loans with

6     McIntosh State Bank at interest rates that were higher than

7     she wanted to pay.

8          At the time that she decided to refinance, Ms.

9     McGinnis was living in St. Augustine, Florida.  Accordingly,

10    she relied on her son, Adam McGinnis, to handle the business

11    affairs of her company and her real estate investments.

12         Mr. McGinnis is also an experienced businessman.  He

13    went to West Georgia University and we expect he will tell you

14    he got a degree in finance.  He runs a small printing business

15    for which he does the books.  He buys and sells real estate.

16    He sells insurance.  And he's a certified residential

17    appraiser.

18         Mr. McGinnis helped his mother with the refinancing.

19    We expect Ms. McGinnis will tell you that she refinanced seven

20    properties with Taylor, Bean and Whitaker which we'll

21    typically refer to as TBW in this case.

22         Now I know that many of you have home loans, some of

23    you may not.  But you may all know this.  I just want to make

24    sure that we are all on the same page.

25         A home loan is like any other loan.  There's a

```
 1    lender and there's a borrower.  And the lender advances funds
 2    either to the borrower or on behalf of the borrower.
 3              What's different, of course, is there is a home
 4    involved.  And there are two kinds of home loans.  There is
 5    what's called a purchase money loan and a refinance loan.
 6              Now, a purchase money loan -- that's not a very good
 7    marker.  A purchase money loan has a lender, a seller and a
 8    borrower.
 9              THE COURT:    Mr. Rogers?
10              MR. ROGERS:   Yes, sir.
11              THE COURT:    Come get this please.
12              MR. ROGERS:   Yes, sir.  Didn't want to slow it
13    down, sir.
14              THE COURT:    I hope it has some ink in it.  I think
15    it does.
16              MR. ROGERS:   So, this is a purchase money loan.  It
17    has a lender, a seller and a borrower.  And in a purchase
18    money loan the lender pays money to the seller by the loan to
19    finance the sale from the seller to the buyer of the property.
20    So that is the way a purchase money loan looks.
21              A refinance loan is a little different.  There are
22    two kinds of refinance loans.  There is a straight refinance
23    and there is a cash out refinance loan.
24              In a refinance loan you've got two lenders.  You've
25    got the new lender and you've got the old lender.  And then
```

1    you have a borrower.

2         In a straight refinance loan, and this is what we're

3    seeing a lot of nowadays, the new lender pays money to the old

4    lender to pay off an old loan.  The borrower gets a new loan

5    from the new lender at a lower interest rate.  So they save

6    money every month.  That's the reason the borrower does it.

7         In a cash out refinance, the new lender may or may

8    not pay money to an old lender.  The new lender, however, will

9    pay money, cash out, to the borrower.  This is what was

10   happening a lot before 2008 when the real estate market fell

11   down.  It's called cashing out your equity in your property.

12        So the consistent part of both kinds of loans is

13   money.  Money may get paid to a seller or money may get paid

14   to a lender or to a lender and the borrower.

15        What does the borrower get back?  The borrower gives

16   back contractual obligations.  In Georgia borrowers sign

17   what's called a note, which is a contract in which they agree

18   to repay the loan, and a security deed, which is a document in

19   which they agree to a lot of things, but fundamentally they

20   agree that if they don't pay the loan, if they go into default

21   the borrower can foreclose.

22        Security deeds are often called mortgages.  They

23   actually have two different meanings here in Georgia.  So it's

24   not really right to call it a mortgage, but everybody does

25   anyway.

So that's why when people talk about a house loan a
lot of times they talk about it as a mortgage or a mortgage
loan.

So that, ladies and gentlemen, is how the loans
work.

Again, we expect Ms. McGinnis will say that she
refinanced seven loans with TBW on October 31, 2006. We also
expect that she'll say that it was a cash out refinance. So
Ms. McGinnis cashed out some of the equity that was in her
investment properties when she did those refinance loans with
TBW.

As Mr. Gower indicated, there is seven loans, but
we're going to really be mostly talking about 172 Hilton
Street, that investment property there.

We believe the evidence will show that on
October 31, 2006, that property didn't have any loans on it.
Ms. McGinnis and her husband had bought it, we believe the
evidence will show, in 2004 for 48,000 -- rather, sorry,
$46,800. On October 31, 2006, she refinanced it for $72,750.

So on that day Ms. McGinnis made more than $20,000
in profit on the house at 172 Hilton Street when she
refinanced it because she cashed out her profit.

In exchange she undertook certain contractual
obligations. We expect to use the documents from the 172
Hilton Street transaction to show you those obligations. Let

1    me see if I can get out of our way here.

2            THE COURT:   Can y'all all see, ladies and

3    gentlemen?  We have a "no" back there.  What about now?  Go

4    ahead.

5            MR. ROGERS:   First, we will point to the note Ms.

6    McGinnis signed in which she agreed to make monthly payments

7    on the first of each month starting in December of 2006.  You

8    see that highlighted section.

9            In this part of the note it talks about two concepts

10   that I want to make sure y'all understand.  It talks about

11   principal and it talks about interest.  Principal is the

12   amount that the lender loaned.  In this case it's $72,750.

13   You agree when you get a home loan to repay that principal

14   that was loaned to you.

15           The other thing is interest.  Interest is a

16   percentage of the principal.  It's what you have to pay the

17   lender for the use of their money for 30 years.

18           In this case, as you can see, the interest rate is

19   7.125 percent.  So what Ms. McGinnis agreed was she would pay

20   $72,750 plus 7.125 percent annual interest on the principal

21   balance of the loan.

22           If you have a fixed interest rate, which Ms.

23   McGinnis did, then your monthly payment of principal and

24   interest never changes over the life of the loan.  It stays

25   the same the whole time.  And what happens is as you pay more

1    on the principal you get less interest every month.

2         So at first you start out you're paying almost all

3    of it towards interest.  By then little by little you're

4    paying off the principal, and so over time you are paying off

5    more principal and you're paying less interest.  That's how it

6    works.  But it doesn't change over the life of the loan.

7         Let's look at section 6A, please.  6A is actually

8    the one above it.  It says late charge for overdue payments.

9    It says if the note holder has not received the full amount of

10   any monthly payment by the end of 15 calendar days after the

11   date it was due a late fee will be charged.  The full amount.

12        And let's look at 6B, please.  In 6B Ms. McGinnis

13   agreed that if I do not pay the full amount of each monthly

14   payment on the date it is due I will be in default.

15        Let's look at the Security Deed, please.  And we can

16   talk about some of the additional obligations Ms. McGinnis

17   undertook when she refinanced these loans with TBW.

18        First let's look at section one.  What section one

19   says, in the first two sentences, is that Ms. McGinnis agrees

20   that she will pay when due the principal of and the interest

21   on the debt evidenced by the note and any prepayment charges

22   and late charges due under the note.  Borrower shall also pay

23   funds for escrow items pursuant to section three.

24        Let's go to the next page now, please.  This is a

25   critical portion of this so that you can understand the

1    accounting that happened.  Now I want to say something while

2    he gets that in focus.

3          This case is going to be about the details.  It's

4    going to be about a lot of numbers and you're going to have to

5    pay attention to the details.  And this is one of those

6    details.  How the accounting occurred matters.

7          So you need to understand what it is this document

8    says about how the accounting was going to be performed,

9    because this is what Ms. McGinnis agreed was what was going to

10   happen.

11         Now, if you look at that sentence that started there

12   where it's highlighted it says, "Lender may accept any payment

13   or partial payment insufficient to bring the loan current.

14   Without waiver of any rights hereunder or prejudice to its

15   rights to refuse such payments or partial payments in the

16   future.  But lender is not obligated to apply such payments at

17   the time such payments are accepted."  And if we skip a

18   sentence and we see the next sentence that is highlighted.

19   "Lender may hold such unapplied funds until borrower makes

20   payment to bring the loan current."  That is what Ms. McGinnis

21   agreed.

22         In section three, we go down there.  We see that Ms.

23   McGinnis agreed to pay every month an amount sufficient to pay

24   the taxes and insurance on the property.  Those are the escrow

25   items.

1          There are two big differences between escrow items

2     and principal and interest.

3          The first difference is escrow items eventually get

4     paid to somebody other than your lender.  When you pay

5     principal, when you pay interest, that money is going to your

6     lender.

7          When you pay escrow items that money is being

8     collected and it's eventually going to be paid to the county

9     for the taxes that they assess on your property or it's going

10    to be paid to an insurance company for hazard insurance to

11    protect the house in case it burns down or gets flooded or

12    something like that.  So that is the first difference.  That

13    money eventually gets paid to somebody else.

14         The second difference is that unlike principal and

15    interest your escrow items change over time.  Taxes go up,

16    taxes go down.  They mostly go up.  Insurance, it seems only

17    to go up, but it's going to change over time.  So your escrow

18    items are going to change over time.

19         Section three says that, "The lender may collect

20    escrow funds in any amount that does not exceed what a lender

21    may require under RESPA."  RESPA is the Real Estate Settlement

22    Procedures Act.

23         We expect, Mr. Berry will tell you, that RESPA

24    permits a lender to keep not just what they project for taxes

25    and insurance, but a cushion in the account in case the taxes

1    and insurance are higher than expected.  And that cushion is

2    allowed to be one sixth of the projected amount.

3           So to give you an example.  If you think the taxes

4    and insurance are going to be $600 then you can collect a

5    cushion of one sixth that amount, which is $100.  So the

6    amount that you collect for escrow is $700.  That's what Ms.

7    McGinnis agreed.

8           She also agreed that if the amount in escrow was not

9    sufficient that she would pay what was not in escrow in no

10   more than 12 months.  No more than 12 months.  It could be

11   less.

12          Section 14 of the Security Deed contains a provision

13   that allows the lender to charge fees.  What section 14 says

14   is, "Lender may charge borrower fees for services performed in

15   connection with borrower's default.  For the purpose of

16   protecting lender's interest in the property and rights under

17   the security instrument, including but not limited to

18   attorneys' fees, property inspection and valuation fees."

19          So the fees of which Ms. McGinnis complains are fees

20   that she explicitly agreed could be charged if she defaulted.

21   And she defaulted.  We'll talk about that in a moment.

22          Section 22 in the Security Deed sets out the

23   remedies available in the event of a default.  What it says,

24   and we'll show you this later.  What it says is, they have to

25   give notice and ask for her to pay and if she doesn't they can

1    foreclose.  These are the important provisions that Ms.

2    McGinnis gave back for $72,750.

3              I want to put up now a flowchart.  I know I'm giving

4    y'all a lot of information but I'm trying to make sure you

5    understand how all this fits together.

6              Your Honor, if I may approach, we printed off copies

7    of these for you.

8              THE COURT:    I can see them from here.  Thank you.

9              MR. ROGERS:    As the chart shows Taylor, Bean and

10   Whitaker, TBW, was the lender and servicer on October 31,

11   2006, when it made the loans to Ms. McGinnis.

12             Shortly thereafter it sold the loans to a trust, TBW

13   mortgage-backed trust 2006-6, mortgage pass-through

14   certificates series 2006-6.  Not all of you will be familiar

15   with this kind of transaction.  I'm going to oversimplify it a

16   little bit, but in general what happened was this.  TBW took

17   the seven loans it made to Ms. McGinnis and it packaged them

18   together with hundreds of other loans it had made to other

19   people.  And it put those loans into a trust which is just --

20   think of it as a big balloon full of loans.  It's just this

21   big bag full of loans.  And then what happens is, interest

22   gets sold in that collection of loans. Just like you sell

23   shares in a corporation.  You sell shares in these kinds of

24   trusts.  Instead of shares, they're called certificates.  So

25   you have certificate holders and they just own a percentage of

1    all these loans.

2              What happens then is the trust gets a trustee.  It's

3    usually a bank.  In this case it's US Bank.  And the trustee

4    is authorized to do everything the trust needs to do.  That's

5    what trustees do.

6              The trustee then gets another company to handle

7    virtually all of the day-to-day affairs of the trust.  That

8    company is called a servicer.  And what a servicer does mainly

9    is collect on the loans.  It communicates with the borrowers,

10   it communicates with the certificate holders sometimes, sends

11   out escrow statements, makes payments to insurance, makes

12   payments to the counties and sometimes, ladies and gentlemen,

13   it forecloses.

14             When TBW sold Ms. McGinnis's loans it retained the

15   right to service the loans.  And that's what it did until

16   September of 2009 when it got into financial trouble.

17             That's when AHMSI bought the right to service Ms.

18   McGinnis's loans and all the other loans in the trust from

19   TBW.  That purchase was effective October 17, 2009.

20             So the first payment that Ms. McGinnis was obligated

21   to make to AHMSI was November 1, 2009.  Ms. McGinnis

22   immediately went into default.

23             Now, Mr. Gower said that the issue was the

24   October 2009 payment.  That is not accurate, ladies and

25   gentlemen.  He showed you a document.  It was a billing

1    statement from November 3, 2009, two days after the

2    November 1st payment was due.  It shows one payment is late.

3    That's the November 1, 2009 payment.  And it shows another

4    payment is due, that is the December 1 payment.  And you know

5    that because when you have the document you look down at the

6    bottom where it talks about late charges and it says we're

7    going to impose a late charge if you haven't paid by

8    December 16.  That's because the new payment is December 1.

9            So, ladies and gentlemen, that's a red herring.

10   We're not talking about the October 2009 payment, as he says

11   it got made.  That's not the payment that was late.  It was

12   the November 1, 2009 payment and it was due in the amount of

13   $843.58.

14           AHMSI told Ms. McGinnis and Mr. McGinnis that in the

15   welcome letter that they sent dated October 27, 2009.  We will

16   show you that letter.  And it says what's due.

17           AHMSI told them that again in the November 3, 2009

18   statement which he will deny receiving.  But he admits

19   receiving the welcome letter.

20           On November 13 Ms. McGinnis paid $605.58.  843.58

21   was due.  She paid $200 less than what was due.  And so in

22   accordance with the terms of the contract she signed AHMSI put

23   the money in a suspense account because it wasn't enough to

24   bring the loan current.

25           On December 1, 2009 the amount due was again

1   $843.58.  On December 10, 2009 AHMSI paid Jasper County the

2   property taxes due on 172 Hilton Street.  As a result the

3   escrow went negative $1,009.29.

4        On December 17 Ms. McGinnis paid $605.58.  Now,

5   because these two payments had been put in suspense there was

6   enough to make the November 1 payment.  So they combined the

7   $605.58 from November 13th with, what's that, $237 or $238

8   from the December 17th payment and they made the November 1

9   payment.  So it was applied.  It was applied in accordance

10  with the terms of the contract documents that she signed.

11       On December 17, 2009, AHMSI sent Mr. McGinnis an

12  escrow analysis.  We will show you that escrow analysis and it

13  says that the current payment due is $843.58.

14       The next day, December 18th, AHMSI sent Mr. McGinnis

15  a billing statement.  The billing statement showed that what

16  was due was $843.58.

17       Again, we expect Mr. McGinnis will deny receiving

18  the billing statement, but he admits to getting the escrow

19  analysis, and followed it up on January 14 by paying

20  $605.58.

21       We're going to show you our call log.  The call log

22  has notes from calls that were made to Mr. McGinnis.  And it

23  will show that on January 8, 2010, AHMSI called Ms. McGinnis's

24  son, Mr. McGinnis, about these payment issues.  The notes

25  showed that Mr. McGinnis said he disagreed with the

1   December 17, 2009 escrow analysis.  Then he became abusive and

2   then he hung up.

3           Those same notes show that AHMSI reached Mr.

4   McGinnis again on January 13, 2010.  The note showed that on

5   January 13 Mr. McGinnis refused to discuss the account and he

6   again hung up.

7           On January 14, 2010, rather on January 26, 2010,

8   AHMSI advanced funds to pay the insurance on the property.

9   The negative escrow balance, after that advance of $417.10,

10  was 598.91.  The reason was because with the January payment

11  having been combined with the December payment to make the

12  December 1 payment and the November 1 payment a lot of this

13  1,009 had been paid off.

14          At the end of January 2010, Ms. McGinnis was behind

15  for three consecutive months.  Her escrow balance was

16  negative.  And when AHMSI tried to talk to her about the

17  situation her agent hung up on them.

18          On February 1, 2010, the full amount due was again

19  $843.58.  On February 11 AHMSI received $605.58 from Ms.

20  McGinnis.  Again it was placed in suspense because it was a

21  partial payment.  This time because there wasn't enough in

22  suspense to make a full monthly payment no monthly payment was

23  credited in February of 2010.

24          On March 1, the full amount due was $843.59.  This

25  chart is actually wrong right here.  The reason for that is

1    because on February 20, 2010 AHMSI had sent Mr. McGinnis a

2    revised escrow analysis which showed that the current amount

3    due was $843.59.

4         And it showed the payment starting April 1 was going

5    to be $638.32.  On March 12 AHMSI received $605.58.  Because

6    the amount in suspense was again enough to make a full monthly

7    payment it was combined with the amount that was already in

8    suspense and it made the January 2010 payment.

9         On March 16 AHMSI sent Ms. McGinnis a billing

10   statement.  It showed a new payment due for April of 2010 of

11   $638.32.  The same amount that had appeared in the escrow

12   analysis.

13        On April 15 AHMSI receives $605.58 from Ms.

14   McGinnis.  It was combined with the amount in escrow and it

15   was used to make the oldest payment due.  On April 15, AHMSI

16   again sent Ms. McGinnis a billing statement.  It showed the

17   past due amount of $1,481.91 and it showed a new payment due

18   of $638.32 on May 1, 2010.

19        On May 13, 2010 Ms. McGinnis again paid $605.58.

20   Again, less than what was due.  Again it was placed in

21   suspense and this month because there wasn't enough in

22   suspense to make a full monthly payment nothing was credited.

23        On May 11, 2010 AHMSI called Mr. McGinnis.  The

24   notes show that Mr. McGinnis said he didn't know why his

25   payment went up.  He insisted his payment was $605.58.  When

1    the AHMSI representative explained that there was an increase

2    in escrow Mr. McGinnis said that he only owed $605.58.

3         AHMSI called again on May 17th, 2010.  The notes

4    from that call show that Mr. McGinnis and the AHMSI

5    representative again discuss the escrow account.  The AHMSI

6    representative explained that the payments were partial

7    payments and were being placed in suspense.  When Mr. McGinnis

8    disagreed the AHMSI representative advised him to put his

9    position in writing.

10        On May 19, 2010, Mr. McGinnis wrote to AHMSI.

11        Now, ladies and gentlemen, if you look at P9 in the

12   first sentence right there it says disputing monthly payment

13   in the amount of 843.59 for the account.  And then it goes on

14   to say, it talks about taxes went up.  And then it says, the

15   new total tax and insurance is 1,686.59 for the year divided

16   by 12 equals 140.55, plus 490.13.  So he calculates a new

17   payment of 630.68.

18        Look at the next page, please.  And he says, I know

19   I owe you a little more for the shortage in escrow, taxes and

20   insurance.  This is a critical, critical document, ladies and

21   gentlemen.  Three things occur.

22        We know that he knows how much they're asking him to

23   pay.  He acknowledges it.  He says they are not paying enough,

24   it needs to be higher than $605.58.  He says it needs to be

25   630.  And then finally he says, "And we know there is that

1   shortfall and we've got to pay that too."  In other words, he

2   admitted he knew he owed more.  He admitted he knew he was

3   being asked to pay more, and he knew he had to repay the

4   advances.

5         On June 1, 2010 the full amount due was 638.32.  On

6   June 11 AHMSI received $605.58 from Mr. McGinnis.  Less than

7   what was due, less than what he said should be paid.  And

8   because the amount in suspense was enough to make a full

9   payment it was applied to the March 1, 2010, payment.

10        On June 30, 2010 AHMSI sent Mr. McGinnis a letter in

11   response to his May 19 fax.  We will show you the letter.  The

12   letter informed Mr. McGinnis that the account was due for

13   April of 2010.  That there was a total of $497.13 in the

14   suspense account.  That those funds would remain in suspense

15   until enough was received to make full monthly payments and

16   that Mr. McGinnis needed to send $1,491.36 to bring the loan

17   current.  Mr. McGinnis did not send the past due amount.

18        Instead he mailed a check for $605.58 that AHMSI

19   received on July 13th.  AHMSI combined the partial payment

20   with the amount needed from suspense to make the April 2010

21   payment in the amount of $638.32.

22        Mr. McGinnis didn't pay the amount that was

23   requested in the June 30 letter, but he did call AHMSI about

24   the June 30 letter.

25        The notes from that call show that he spoke to two

1   representatives.  The first representative told him that his

2   payments had gone up and that he wasn't making sufficient

3   payments every month.

4        The second representative, after the call was

5   escalated, offered to research the issue and get back to Mr.

6   McGinnis about it.

7        The notes reflect that the second representative

8   researched the issue and called Mr. McGinnis back on August 3,

9   August 6, August 9, August 10, August 13 and August 17.

10       On August 17 AHMSI received another payment in the

11  amount of $605.58.  They combined it with the partial payment

12  that had been received previously and placed in suspense and

13  they made the May 2010 payment.

14       On August 18, 2010 the call log reports that AHMSI's

15  representative spoke with Mr. McGinnis again.  She reported

16  the results of her research.  The notes say that Mr. McGinnis

17  told the AHMSI representative he knew that Ms. McGinnis owed

18  the difference between the projected taxes and insurance and

19  the actual taxes and insurance, that he knew that the payment

20  amount had changed, and that he believed he could bring the

21  loan current through August if he paid $1,291.12.

22       The AHMSI representative indicated they needed to

23  pay $1,483.31 to bring the account current.  On September 13

24  AHMSI received a payment in the amount of $605.58, not in the

25  amount of $638.32 which was the new payment that was due then,

1    not in the amount of $1,291.12, which is what Mr. McGinnis

2    said he thought he needed to pay to bring the account current,

3    and certainly not in the amount of 1,483.31 which is what

4    AHMSI said he needed to pay to bring the account current.

5         AHMSI's call log reflects that AHMSI's

6    representative tried to call Mr. McGinnis again on

7    September 8, September 15, September 18 and September 21.  Mr.

8    McGinnis neither answered nor called back.

9         On September 20, 2010 a law firm sent Ms. McGinnis a

10   letter on behalf of Ms. McGinnis's lender.  We'll show you

11   that letter.

12        It informed Ms. McGinnis that she was in default for

13   failure to make full monthly payments.  And that the lender

14   was accelerating the debt and exercising its rights under the

15   security deed, but that Ms. McGinnis could reinstate the loan

16   if she paid $1,908.56.  Ms. McGinnis did not make that

17   payment.  In fact, she didn't even make the minimum monthly

18   payment that month or for the following months.

19        As the chart reflects in October, November and

20   December she paid $605.58, knowing full well the amount due

21   was $638.32 and knowing that she was in arrears.

22        On January 18, 2011, Ms. McGinnis finally made a

23   payment in the minimum amount due, $638.32.  Unfortunately,

24   even that payment, which was in the right amount, was late.

25   It wasn't on the first and it wasn't within 15 days which is

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1    the 16th.

2          February of 2011 -- oh, another thing that happened

3    in January 2011 is, because she hadn't been making full

4    payments, AHMSI had to advance the funds to pay the insurance

5    again in the amount of $262.45.

6          In February of 2011, Ms. McGinnis didn't make any

7    payment at all.  So as of the end of February, 2011 the

8    evidence will show Ms. McGinnis had never made a monthly

9    payment in the full amount due, when due, since AHMSI had been

10   servicing the loan.  Sixteen consecutive months she had been

11   in default of that obligation under the security deed.  And

12   she had made no payment whatsoever in February of 2011.

13         Ms. McGinnis was four months behind in her mortgage

14   payments.  And just as it had been at the beginning of 2010

15   Ms. McGinnis's escrow account was negative.

16         Ms. McGinnis had been offered opportunity after

17   opportunity to reinstate the loan and she had not taken

18   advantage of any of those opportunities.  And to top it off

19   she stopped communicating with AHMSI.

20         On March 1, 2011, two things happened.  First, the

21   decision was made to foreclose on the investment property at

22   172 Hilton Street.

23         Second, a payment was received from Ms. McGinnis in

24   the amount of $638.32.  As Mr. Gower told you they deposited

25   that check and sent a check back refunding the money.  The

1    account was in foreclosure.  It happened again in April and it

2    happened again in May.

3           On June 7, 2011, AHMSI foreclosed on the property.

4    We expect the evidence will show that the sale price was

5    $25,000 leaving a balance due on the loan of nearly $45,000.

6    A balance no one has sued Ms. McGinnis to collect even though

7    it is still owed under the note.

8           Ms. McGinnis has sued AHMSI now claiming that the

9    foreclosure on the investment property, 172 Hilton Street, was

10   wrongful.  The evidence will show that is untrue.

11          The evidence will show that Ms. McGinnis breached

12   her duties under the contract repeatedly and intentionally by

13   failing to make payments she knew had increased, because she

14   didn't agree with those payments.

15          Ladies and gentlemen, it is a harsh reality,

16   perhaps, of life, but she agreed to pay the full amount due.

17   She didn't agree to pay the amount she wanted to pay.  The

18   amount went up.  She knew it went up.  She didn't pay it.  She

19   agreed that that was a default.  She agreed that if she was in

20   default they could foreclose.  They foreclosed.  That is not

21   wrongful, ladies and gentlemen, that is the deal that was

22   done.

23          Now, I think you should find for AHMSI at the end of

24   this trial.  That doesn't mean I shouldn't talk about the

25   damages for a second.

1          I don't think you should award any because I think

2     you should find for AHMSI.   But if you're going to award

3     damages we expect the evidence will show that Ms. McGinnis

4     didn't suffer any financial loss.   And I said earlier, she

5     made a profit on the property at 172 Hilton Street.

6          She instead is seeking to recover her emotional

7     damages.   We expect the evidence will show you a few things

8     about her emotional damages.

9          First, we expect the evidence will show she had no

10    direct contact with AHMSI.   If she had contact with AHMSI it

11    was only because her son got her involved.

12         Second, we expect that Ms. McGinnis's psychologist

13    will express a diagnosis that is defective.   It is defective

14    because it does not meet all the criteria for the diagnosis.

15    It is defective because he didn't ask all the questions he

16    needed to ask, and it is defective because he suggested the

17    answers of the questions he did ask.

18         Third, we expect that the testimony from her

19    psychologist will show that Ms. McGinnis is like all of us.

20    Her life is full of stress.   And there are a lot of sources of

21    stress in her life.   She has got stress from her divorce.   She

22    has got stress from her family.   She has got stress from her

23    job.   She has got stress from her financial issues.   And yes,

24    she's got stress from the lawsuit she elected to file.

25         But it's not something that you can just say the

1    cause of her emotional state is because of this lawsuit.  Her

2    life, our life, is just not that simple.

3           And finally, ladies and gentlemen, we think the

4    evidence will show you that her emotional condition is of her

5    own making.  She entered into an agreement.  She agreed to

6    make a full payment every month.  She breached that agreement

7    and the consequences are a result of that breach.

8           I'm not saying it's not stressful.  I'm just saying

9    it's because there was a breach.

10          We think if you pay attention to the details in this

11   case, and it's going to be a lot of details and a lot of

12   numbers, you can tell that already, that you will find that

13   that is true.

14          We ask you, please, to do the work to pay attention

15   to the details.  We're confident if you do you will find for

16   AHMSI.  Thank you very much for your time.

17          THE COURT:    Ladies and gentlemen, we're going to

18   take a short break.  We've been going for about an hour and a

19   half and I'm going to send you back and let you take a break.

20   And I'm going to let the lawyers try and get the courtroom

21   cleaned up a little bit while you are gone.

22          So, y'all head on back.  Remember not to talk about

23   the case with anybody.

24   (JURORS EXIT COURTROOM)

25          THE COURT:    Who is going to be your first witness?

```
 1              MR. GOWER:    Mr. Delbene by video, Your Honor.

 2              THE COURT:    Are you going to need anything with

 3    that?

 4              MR. GOWER:    No, sir.

 5              THE COURT:    We have stuff all over.  I don't want

 6    the jury to be distracted by that and they may not be.  I

 7    don't know.  But we've definitely got to make sure they can

 8    get in and out.

 9              Mr. Rogers, you can give me my pen back.

10              MR. ROGERS:   Yes, Your Honor.  Your Honor, we have

11    --

12              THE COURT:    You may need it again.  I might need

13    to hold it for you.

14              MR. ROGERS:   Thanks.  Your Honor, we also have some

15    portions that we've designated that we were going to play in

16    our case in chief in the Delbene deposition.  Is that all

17    right if we just play it in our case in chief.

18              THE COURT:    So you want to let him show his part

19    and you show your part in --

20              MR. ROGERS:   In our case in chief.

21              THE COURT:    -- in your case?  I don't have any

22    problem with that.

23              MR. ROGERS:   Thank you, Your Honor.

24              THE COURT:    If that's how you want to do it that's

25    fine.
```

```
 1            MR. ROGERS:   We don't have much of a case in chief
 2    without it.
 3            THE COURT:    I understand.   There's not anywhere
 4    else that can go quite frankly.   You might be able to move it.
 5    It typically is moved back some that way.   But you're going to
 6    have to move some of the boxes, I think, in order to do that.
 7            MS. BURNS:    I guess if we moved it all the way
 8    back we'd just be blocking those jurors anyway.
 9            THE COURT:    I'll let y'all figure that out.   We're
10    going to take about a 10 or 15-minute break.
11    (RECESS)
12            THE COURT:    I'm going to give a brief instruction
13    to the jury about deposition testimony.   That's probably
14    standard for y'all.   But we actually don't use much video
15    deposition testimony here in Macon or in Athens.   But I have
16    something here.   So before you begin the deposition I will
17    explain it to them.   You call the witness first by deposition
18    and then we'll go from there.
19            MR. GOWER:    All right, sir.
20            THE COURT:    Bring them in.
21    (JURORS ENTER COURTROOM)
22            THE COURT:    Mr. Gower.
23            MR. GOWER:    Your Honor, we call Mr. Christopher
24    Delbene by a video deposition.
25            THE COURT:    Ladies and gentlemen, you just heard
```

1    Mr. Gower say that he's going to call a witness named Mr.

2    Delbene by deposition.  And I want you to understand that a

3    deposition is a witness's sworn testimony that is taken before

4    trial.  During a deposition the witness is under oath and

5    swears to tell the truth and the lawyers for each party may

6    ask questions.  A court reporter is present and records the

7    questions and answers.

8         The deposition of Christopher Delbene taken on

9    February 8, 2013 is about to be presented to you by

10   deposition.  Deposition testimony is entitled to the same

11   consideration as live testimony and you must not judge -- you

12   must, you must judge it in the same way as if the witness was

13   testifying in court.  Do y'all understand that?  Usually

14   because the witness can't get here for one reason or another.

15   They may be out of state or whatever.  So nothing unusual

16   about this.  You may proceed.

17        MR. GOWER:    Thank you.

18   (VIDEO DEPOSITION OF CHRISTOPHER DELBENE)

19        THE COURT:    Is that it?

20        MR. GOWER:    Yes, sir.

21        THE COURT:    All right.  Ladies and gentlemen, you

22   just heard the video tape deposition.  I want to point out

23   something to you.  You might be a little bit confused about

24   this and that is that you heard a number of objections being

25   made during the course of that deposition.

```
1              I obviously was not there.  I want you to understand
2       that I ruled on those objections before the trial at a
3       pretrial conference, okay.  So don't worry about any of the
4       objection business.  You remember what the lawyers say is not
5       evidence in the case.  All right.
6              Now, Mr. Rogers, I understand you want to present
7       your portion of that deposition in your part of the case; is
8       that correct?
9              MR. ROGERS:   Correct, Your Honor.
10             THE COURT:    That's fine.  No problem with that at
11      all.  Call your next witness.
12             MR. GOWER:   We call Tom Berry, Your Honor.
13             THE COURT:    Y'all stand up just a minute while
14      we're trying to get the witness in here.  Lee Anne is looking
15      out for you.
```

16                          **THOMAS PATRICK BERRY**

17         Witness, having first been duly sworn, testified on

18                          DIRECT EXAMINATION

```
19      BY MR. GOWER:
20      Q    Tom, what do you do?
21      A    Right now I am a certified public accountant in Columbus,
22      Georgia.  I'm a partner in the firm of Albright, Fortenberry
23      and Ninas.
24      Q    Tom, let me ask you, just to go into a little bit of your
25      background so the jury will know something about your
```

1   credentials, you have a Bachelor of Science in general

2   engineering from West Point?

3   A   Yes, sir.

4   Q   And a Master of Science in mechanical engineering?

5   A   Yes.

6   Q   And you have a Bachelor of Science in accounting from a

7   little school over there in Alabama, Auburn?

8   A   Auburn University, yes, sir.

9   Q   And then you have a Master of Accounting from that same

10  Auburn?

11  A   Yes, in taxation.

12  Q   And then you also have a Bachelor of Science -- a Master

13  of Military Arts and Sciences from the Command General Staff

14  College in Kansas?

15  A   Yes, sir.

16  Q   Prior to becoming a CPA were you in the Army for

17  21 years?

18  A   Yes, sir.  I spent a little over 21 years in the Army

19  after graduating from West Point.

20  Q   You went to the Ranger school?

21  A   Yes, sir.

22  Q   And you were airborne, special operations?

23  A   Yes.

24  Q   Did you work in the Pentagon?

25  A   Yes.  The last three and a half years I worked in the

1   Pentagon.

2   Q    Was that with General Colin Powell?

3   A    Yes.  General Colin Powell was the chairman of the Joint

4   Chiefs of Staff at the time.  And I worked for a one star

5   admiral except for a three-month period where myself and

6   another officer were called out on a special project to work

7   directly under Colin Powell.

8   Q    Did you work with Seal Team Six?

9   A    Yes, sir.

10  Q    And did you jump out of airplanes?

11  A    Yes, sir.

12  Q    Were you in charge of the airborne special operations

13  board?

14  A    I was the operations and planning officer at what they

15  called the airborne board up at Fort Bragg.  They later named

16  it the Airborne Special Operations Board.

17  Q    Would it be fair to say that you were in charge of the

18  logistics for the attacks and war back in there?

19  A    Yes.  I was at the operations center on the initial

20  invasion of Granada for the special operations folks that went

21  in early.

22  Q    And you are a retired Lieutenant Colonel?

23  A    (No response).

24  Q    You and I both have a little hard of hearing.  You are a

25  retired Lieutenant Colonel?

1    A    Yes, sir.  I'm a retired Lieutenant Colonel.  I retired

2    in July of 1992.

3    Q    Tom, let's get right to it.  At my request have you

4    reviewed a lot of information in this case?  Can you hear me?

5    A    I'm sorry.  Did I review a lot information?

6    Q    Did you review a lot of information in this case?

7    A    Yes, sir. I reviewed -- when Charlie Gower first asked me

8    to assist him as an expert witness there are seven properties

9    that he asked me to look at.

10        And he brought over to my office -- for each property

11   there was a -- this is an example.  This is just on one

12   property here, he brought over this much information.  And

13   then for each property he also brought a stack that was about

14   seven or eight or nine inches, depending upon the property,

15   tall.

16        Charlie Gower and his office had gone through and

17   separated, as best they could, on these smaller packets.  And

18   he said what I would like for you to do is do an analysis by

19   looking at the numbers and come up with the facts using the

20   numbers that we have for you.  And if there's anything else

21   you need, go through the big stacks if it's not in the small

22   stacks.  And then if there are other documents that you need

23   that we have not given you, please make me a list of them and

24   we'll try and get a hold of them for you.

25        And initially to go through all those fax and set up

1    everything the way I needed them to do my analysis -- well,

2    let me give you the total amount of time.  It was

3    approximately 124 hours that I worked, not including

4    five-and-a-half hours where I had a deposition.  And it is a

5    lot of work because what I wanted to do -- my whole object of

6    this was to see exactly starting with the first mortgage

7    servicing company Taylor, Bean and Whitaker where the

8    McGinnises had a loan that began in 2006.  And I don't know if

9    you knew that, but in late 2009 Taylor, Bean and Whitaker went

10   bankrupt.  And so the servicing of these seven loans went over

11   to a company called American Home Mortgage Servicing,

12   Incorporated, and that's what we refer to AHMSI.  And then

13   later on within a year they changed their name to Homeward.  So

14   we will be using the words AHMSI and Homeward meaning the same

15   company.

16        What I wanted to do was just go through it historically

17   and get a good idea of what happened specifically on a house

18   on 172 Hilton.  172 Hilton was foreclosed on.  And there are

19   some trying times out there and I'm thinking okay, maybe --

20   why was it foreclosed on?  And I looked at it that it might

21   have been property foreclosed on, it might not have been.  So

22   in order to come up to that decision I had to start with

23   Taylor, Bean and Whitaker.  And what I wanted to do was look

24   at every payment that had been made by the McGinnises to

25   Taylor, Bean and Whitaker and then follow it on through AHMSI

1    and see when the payment reached the mortgage servicing

2    company and when the payment cleared the bank.

3         And then I also went back to the original note and from a

4    note -- and this is something that accountants do all the

5    time, helping out our clients.  From the note I just did an

6    amortization schedule.  An amortization schedule and you may

7    have seen an amortization schedule where it's based on a note.

8    And the things you need to know is the original amount of the

9    loan, the term of the loan in months or years and the

10   percentage of interest that is going to be charged during that

11   term of years.

12        An amortization schedule will break down that into

13   monthly payments of principal and interest.

14        And so I ran an amortization -- it will say, let's say

15   for January 1, 2009, interest of $215, principal of $95 and

16   your total in principal and interest would be the combination

17   of those two.  And then it would have reduced the balance on

18   the loan by the amount paid into principal.

19   Q    Let me ask you this, Tom.  Let's just concentrate right

20   now on 172 Hilton Street.  This is the one that we've talked

21   about mostly.

22        By the way you've seen Mr. Delbene's deposition.  I

23   provided that to you and you've seen it?

24   A    Yes, sir.

25   Q    What I want to ask you, Tom, is when Homeward took over

1   this loan from Taylor, Bean and Whitaker was the loan current?

2   Yes or no?

3   A   Yes.

4   Q   Was is treated as current by Homeward when they took it

5   over?

6   A   No.

7   Q   Should it have been?

8   A   Yes.

9   Q   Why?

10  A   It should have been.  And that's when I went through --

11  when I was telling you I went through these documents and I

12  looked at each one of the McGinnises' payments from the day

13  they started making their payments to Taylor, Bean and

14  Whitaker.  Followed it on down to the transition which

15  Homeward took over the loan on October 17th.

16      And the October payment had already been made to Taylor,

17  Bean and Whitaker.  Homeward took it over October 17th and

18  taken it over October 17th the McGinnises began paying them

19  November 2009, December 2009 on.  And as of the time that the

20  loan was taken over by Homeward, the October payment had been

21  paid to Taylor, Bean and Whitaker on time.

22  Q   So let's just make this simple.  I told the jury at the

23  beginning that the problems started right there when Homeward

24  took it over; is that right?

25  A   Yes, that is correct.

1   Q     Would it be fair to say that right off the bat Homeward

2   said that Jane is one month behind when she wasn't one month

3   behind?

4   A     Correct.  And that was part of what I was doing was to

5   see what happened here.  And on the November billing statement

6   it had that the McGinnises were behind -- it said that their

7   payment for November was $843.58.

8   Q     Tom, I don't know if you can see this.

9               THE WITNESS:  Your Honor, can I --

10              THE COURT:    Sure.  Go right ahead.  But you're

11  going to have to have a microphone if you're going to be down

12  there and talk.

13              Does this represent an exhibit?

14              MR. GOWER:    Yes, sir.

15              THE COURT:    Are you going to tender the exhibit?

16              MR. GOWER:    Yes, sir.

17              THE COURT:    You're going to have to tender the

18  exhibit.

19              MR. GOWER:    Yes, sir.  It's P2.

20              THE COURT:    I don't think there's any objection to

21  this exhibit; is that right, Mr. Rogers?

22              MR. ROGERS:   No objection, Your Honor.

23              THE COURT:    It's admitted.  Go ahead.

24              MR. GOWER:    Thank you.

25  BY MR. GOWER:

1    A    THE WITNESS:  I don't think -- you probably can't see the

2    numbers from back there.  This is a typical monthly billing

3    statement from Homeward.  And the statement date on this is

4    November 3, 2009, and it says payment due date November 1,

5    2009.

6    Q    So we've got it up here.  You can see it better.  Tom, we

7    are high tech.

8    A    I like the pointer.  So again, it said the statement date

9    is November 3, 2009, payment due date November 1, 2009.  This

10   is the loan number and the account number.

11       Now this principal balance is just what -- like that

12   amortization schedule I was talking about, that is how much

13   the balance they owe on the loan.  The escrow balance as of

14   the statement date is $260.20.  Now, that is how much that was

15   in the McGinnises' escrow account.

16       An escrow account -- like I was saying with the

17   amortization schedule, you pay principal and interest.  You

18   are paying interest on this balance and you're paying

19   principal against it to reduce it.  The escrow is completely

20   different.  That's when the servicing agency on behalf of the

21   borrower, on behalf of Mrs. McGinnis, says we will pay your

22   insurance premiums and we will pay your property taxes for

23   you.

24       Now in order to do it the insurance premiums and property

25   taxes throughout most of this were due on certain dates.  The

1    insurance was due early in the year.  The taxes were due

2    toward the end of the year.

3        And what a servicing company does is it features out

4    through an escrow analysis how much it needs monthly, along

5    with the principal interest payment, so that it can, on behalf

6    of the borrower, pay the property taxes when they come due and

7    pay the insurance premiums when they come due.  And they're

8    doing it on behalf of the borrower, they're doing it to

9    protect the borrower.  They're doing it to protect themselves

10   and ultimately to protect the owner of the loan.

11   Q    Let me ask -- excuse me.  I don't mean to interrupt you.

12   Can you scoot it up a little bit.

13        MR. ROHWEDDER:   You want to see the bottom part of

14   the document?

15        MR. GOWER:    Yes.

16   BY MR. GOWER:

17   Q    Let me just ask you. I want the jury to understand the

18   point in time we are here.  November 1, '09.  And the day

19   before -- how many days in October?

20   A    Thirty-one.

21   Q    Thirty?  Thirty-one?

22   A    Yes.

23   Q    On October 31, the day before, the day before this

24   statement was issued, according to the record, was Jane

25   current?  One hundred percent was she current the day

1    before?

2    A     The day before she was completely current with Taylor,

3    Bean and Whitaker.  And then one day later this billing

4    statement comes out on November 1, 2009, saying that the

5    current payment is $843.58 and there is the same amount that

6    is past due.

7          Now, how can she be current October 31st, next payment is

8    due in November.  How can she be current October 31st and have

9    a past due payment of 843.58?

10   Q     Were you able to figure that out?

11   A     No.

12   Q     How much money has been paid to your firm for your

13   analysis of all these loans roughly?  Roughly?

14   A     About 25,000.

15   Q     So we have paid you $25,000.  Have you been able to

16   figure out how in the world they could say she is current on

17   October 31st but the very next day she is past due 843.58?

18   Have you been able to figure that out?

19   A     I have not been able to figure that out and that's based

20   on going through every document that the defense could give

21   us.

22   Q     All right, sir.

23   A     And the other thing I haven't been able to figure out is

24   where that number came from, the $843.58.

25   Q     What was the payment the month before in October?

1   A    $605.

2   Q    And 58 cents?

3   A    Yes, 605.58.

4   Q    And the jury just heard the deposition of Mr. Delbene

5   where the escrow was increased.  Were you able to find

6   anything in the world to explain how the escrow increased over

7   -- actually it was over 300 percent?

8   A    The escrow did increase over 300 percent.  The escrow

9   increased from $115 and some odd cents.  I've got it up on my

10  desk.  Up to 453.  Let me get the numbers.

11  Q    353.45?

12  A    Yes.

13  Q    Were you able to determine how in the world they were

14  able to increase the escrow 300 percent in one day?

15  A    (No response).

16  Q    Were you able to hear my question?

17  A    Okay.  The answer to that question, Charlie, the escrow

18  was increased.  The October payment and all the payments prior

19  to that to Taylor, Bean and Whitaker the total payment was

20  $605.58.  Of that, the escrow amount was $115.45.  With the

21  payment going up to 843.58 the only thing that increased --

22  Now, you don't increase the principal and the interest.  So

23  the escrow was the only thing that was increased.  The escrow

24  was increased from $115.45 up to $353.45.  That's a $238 per

25  month increase.

1    Q     And what percentage wise does that account up to?

2    A     Basically on that it's over 300 percent.  Because you

3    take 115 times three and it's less than the 353.45.

4    Q     Did you remember seeing in Mr. Delbene's deposition where

5    he had no explanation for how they came up with that?

6    A     Yes.  On his deposition he had no explanation how they

7    came up with that.  He basically said that, I guess there was

8    maybe an escrow statement that was --

9              MR. ROGERS:     Your Honor.  It's duplicative and it's

10   hearsay.

11             MR. GOWER:     I'll move on.

12   BY MR. GOWER:

13   Q     Were you able to determine how they came up with that

14   figure?

15   A     No, I was not.

16   Q     Let me ask you this, Tom.  I want to keep this -- this

17   may be kind of a simple stupid question.  But if Jane starts

18   out on October 31, '09 current and then the next day Homeward

19   says you are behind one payment, and then they up the escrow,

20   unless she pays what they say, how is she ever going to get

21   caught up?

22   A     In a case like this you never would get caught up.

23   Unless there is talks down the road and people get together

24   and figure out what is wrong.  You're never going to get

25   caught up.

1    Q    And in this case, Tom, if they take the money that she

2    pays every month and put it in a suspense account and wait

3    until they get enough to make the payment they say she should

4    make and if they -- Did they also take out late fees and other

5    fees out of this suspense account?

6              MR. ROGERS:   Object, Your Honor.  This is an

7    opinion that was not disclosed in his deposition.  He said he

8    didn't know if fees were paid.  I'll put that evidence before

9    Your Honor.  This was not disclosed.  So it's in violation of

10   Rule 26.

11             THE COURT:    Come on over here to sidebar.

12   (BENCH CONFERENCE)

13             THE COURT:    Now, he's objecting that it wasn't --

14   the opinion was not expressed in the Rule 26 order.  Now, was

15   it something that came out in the deposition?

16             MR. GOWER:   Yes, sir.

17             MR. ROGERS:   No, sir, it was not.  In the

18   deposition we put the list of the fees in front of him and we

19   asked him what he had to say about those fees.  And he said,

20   well, those are the fees that are in the account payment

21   history.  I don't know if they were paid.

22             The testimony of Delbene that hadn't been played

23   yet, shows that actually the late fees balanced out, what was

24   written off, and his testimony was that the other fees are

25   advanced by the servicer and are not recovered unless the loan

```
 1    is reinstated, which it was not.

 2              So we believe the evidence, Your Honor, is actually

 3    that there weren't fees collected.

 4              But in any event, his opinion, as disclosed, does

 5    not include that.  And when asked specifically in his

 6    deposition he said he didn't know.  And it's a violation of

 7    Rule 26.

 8              THE COURT:   Of course, that's a problem if he was

 9    asked about it in his deposition and he didn't disclose that.

10    Of course, it's very hard for me to know because I don't know

11    -- I don't have the deposition in front of me.  I haven't read

12    it.  So I don't know.

13              MR. ROGERS:   I'll get it for you.

14              MR. GOWER:   That's not even important.  That's

15    really not important so I'll just move on.

16              THE COURT:   Okay.  Well that's good.  I like that.

17    (BENCH CONFERENCE CONCLUDED)

18    BY MR. GOWER:

19    Q    Tom, let me ask you, from the very beginning, did you go

20    through, for example, on the Hilton Street loan, from the very

21    get go, did you look at every single check that Jane wrote and

22    trace it to the books?

23    A    Yes.  I did beginning actually from when the loan first

24    started with Taylor, Bean and Whitaker.  Now, I couldn't look

25    at the checks for Taylor, Bean and Whitaker up through July of
```

1    2009, because what the McGinnises had set up there was a

2    direct debit out of their bank account.

3        And so what I was provided with was the bank statements

4    and I could tell that by looking at the bank statement I could

5    tell that every single month there was a debit for each one of

6    the properties.

7        And you asked about 172?

8    Q    Yes, sir.

9    A    Just like on all the properties with Taylor, Bean and

10   Whitaker there was a debit out of the bank account each month.

11   Q    Let me ask you --

12            MR. GOWER:    David, can you put up Plaintiff's

13   Exhibit 3.  We offer it into evidence, Your Honor.

14   Plaintiff's Exhibit 3.

15            THE COURT:    You don't have any objections to that?

16            MR. ROGERS:    Exhibit 3 is a composite exhibit?

17            MR. GOWER:    Yes.

18            MR. ROGERS:    No, Your Honor.  We do have a problem

19   with this.  Recollection of the Court, that it's an expert

20   report, it's hearsay and so it's not admissible to go back

21   with the jury, Your Honor.  That was what we said in the

22   pretrial conference.  That remains our position.

23            To use it to testify from we have no objection to

24   that, Your Honor.  But in terms of going with the jury we do

25   object very much, sir.

1          THE COURT:    Well, is this part of the information

2     that makes up the 1006 document summary?

3          MR. GOWER:    I don't know what 1006 is.

4          MR. ROGERS:    Your Honor, we don't believe that the

5     records are voluminous enough since they are themselves

6     separate exhibits.

7          THE COURT:    Well, I've looked at the records.

8     I've ruled on that.  I thought this was part of it.

9          MR. ROGERS:    Your Honor, this is the advocacy

10    piece.  You can see the stuff down the side it says no credit

11    past due, no credit breach letter.  That is his conclusion.

12    This is his expert report, Your Honor, it's hearsay and again

13    we take the position.

14         THE COURT:    I'm going to let him testify from it.

15    We'll take up whether it can go out with the jury or not

16    later.  He can obviously testify about what his opinion is.

17         MR. GOWER:    Thank you, Your Honor.

18    BY MR. GOWER:

19    Q    Tom, do you remember what my question was?

20    A    Pardon?

21    Q    Do you remember what my question was?

22    A    Your last question that you were talking about, did I

23    look at every check?

24    Q    Yes.  So from the get go did you look at -- Did Jane make

25    a payment every single month without fail?

1   A    Yes.  A payment on 172 Hilton Street and the other six

2   properties were made every month without fail.  And like I was

3   saying with Taylor, Bean and Whitaker, I'd have to look at the

4   bank statement to determine that.  Because it was a bank debit

5   from the bank that made the payment.

6        The last four payments to Taylor, Bean and Whitaker were

7   made with a check.

8   Q    Okay.

9   A    Then from then on with Homeward or AHMSI the McGinnises

10  were making monthly payments with the check and they sent a

11  check every month.  And not only sent a check but I saw where

12  each check cleared the bank.

13  Q    Tom, on all of the loans when they were transferred over

14  were they all treated as one payment behind?

15  A    All seven loans, once they were transferred over, the

16  first billing statement that was made up by AHMSI had past due

17  on each one of the seven properties.

18  Q    Tom, now, can you tell us on this document, Plaintiff's

19  Exhibit 3, what is this and what did you do?

20  A    I did this document to get in my mind, number one, did

21  the McGinnises pay each month and who did the check go to?

22  Did it go to the mortgage servicing company?  When did the

23  mortgage and service company receive it?  And then when was it

24  deposited into the bank.

25       And that's important for a couple of reasons.  Number

 1   one, did they make the payment?  Number two, did the mortgage

 2   servicing company receive it?  Number three, was it paid on

 3   time?  And number four, what was the amount of the payment?

 4      So what I have done is just -- and I wanted the check

 5   numbers in there.  You can see the second column where I have

 6   the check number.  That was important to me because I looked

 7   at every single check to make sure it did clear the bank and

 8   it was sent to the mortgage company.

 9      And then I just have the mortgage company in there so you

10   can see where Taylor, Bean and Whitaker turned it over to

11   AHMSI.

12   Q    Would you mind telling -- I hate to ask you to do this --

13   but could you get the microphone and step down here and in

14   three words or less can you explain this to us?

15   A    To make this easy -- and that's what I was trying to do.

16   Not only hoping that we'd come to a jury trial, but this

17   little brain up here had to satisfy it.

18      So basically what I was telling you, I got the check.

19   You can see here where it was just bank debits with Taylor,

20   Bean and Whitaker.  Then the last four Taylor, Bean and

21   Whitaker payments were made by check.  And all of the AHMSI

22   payments were made by check.

23      And then what I did is I came up here and I said, okay,

24   now use Taylor, Bean and Whitaker and AHMSI -- actually AHMSI

25   provided us with Taylor, Bean and Whitaker payment history and

1    the AHMSI payment history.  That's where I got these numbers

2    from here, the dates.  These are supposedly when the mortgage

3    servicing company received and posted the check.

4        These dates here are not the date the check was written

5    but the date the check was actually deposited in the bank

6    account.

7        This column is the amount and these two columns were just

8    to keep me -- I told you I did an amortization schedule to

9    show how much principal was owed at the end of each month.

10   And so what I was trying to do here was the amortization

11   schedule -- Now, if all payments are made every month

12   throughout the term of the loan, whether it be a 15 or 30-year

13   loan or not, your amortization schedule balance at the end of

14   the month will be the same as what the mortgage company has.

15   And so what I was doing here was just -- you can see all

16   through here with Taylor, Bean and Whitaker, the amortization

17   schedule principal balance is the same.

18       And then let me explain something up here that's kind of

19   important.  Taylor, Bean and Whitaker, this was for the --

20   July and September.  No August.

21       Adam McGinnis sent a check to Taylor, Bean and Whitaker

22   for the August payment on time.  Taylor, Bean and Whitaker at

23   that time were going through a bankruptcy.  They misplaced the

24   checks.  They let Adam McGinnis know that they misplaced the

25   checks.  Told him to put a stop payment on the checks and

1    reissue a check.  So that's why we do not have anything here

2    for the August.

3        However, you can see here that in September -- on

4    September 17th -- Now this is where Taylor, Bean and Whitaker

5    posted they received two checks in the same amount and they

6    cleared the bank on the 22nd of September.

7    Q    So would this be the August and the September payment

8    were both cleared on September 22, '09?

9    A    Correct.

10   Q    So at that point is the loan current?

11   A    At that point the loan is current through September.

12   Q    But you see over there where the $24.51 late payment.  Is

13   that something that Taylor, Bean and Whitaker added on even

14   though they shouldn't have?

15   A    Yes, sir.  Taylor, Bean and Whitaker added that service

16   charge on and I think that has something to do with the

17   computer.  The computer saw it come in in September rather

18   than August and said -- automatically said -- that's the way

19   computers work.  It said it came in a month late.  There's no

20   human interference there or something and so it just tacked it

21   on and it should not have been there.

22        MR. GOWER:    David, can you go back to the -- blow

23   it up.  There you go.  That's fine.

24   BY MR. GOWER:

25   Q    Now, can you take up the October payment, '09?

1    A    And then in October, this was the last payment that was

2    sent to -- check number 1356 was the last check paid to

3    Taylor, Bean and Whitaker.  It was posted on 10-16.  It

4    cleared the bank on 10-22 in the amount of 605.58.  At that

5    time, that was the last payment to Taylor, Bean and Whitaker,

6    and they were current.

7    Q    Let me just repeat that right now.  Can you put your

8    thing back up there again on October 22, '09?  After that

9    check were they completely 100 percent current?

10   A    Completely 100 percent current.  Now, there was the

11   service charge sitting out there that Taylor, Bean and

12   Whitaker had put on.  But I'm sure if Taylor, Bean and

13   Whitaker had stayed in existence, because it was their fault

14   that the August check was lost, that they would have taken

15   that off.

16   Q    So now let's go back.  Now, Homeward takes over AHMSI,

17   takes over.  What happens now?

18   A    AHMSI and Homeward take over.  This is where the billing

19   statement that we had showed you before -- that billing

20   statement was for the November 2009 payment.  And it stated on

21   there that your current payment is $843.58 and you're past due

22   by $843.58.

23   Q    How could that possibly be?

24   A    It can't be.  They were current right here with this

25   payment.  And then when the November payment came in to AHMSI

1    for the same amount they had them past -- they had them owing,

2    like that billing statement said, owing 843.53 for the month

3    of November but also past due for that month.

4    Q    So that jives up with the $1,711.67?

5    A    Yes.  And that 1,711.67 includes that $24 service charge.

6    Q    Okay.  Would it be simple to say this is where the

7    problem started right here?

8    A    Most definitely.  This is where it started period.

9    Q    How could it ever get straightened out unless Jane just

10   said, okay, I'm just going to give you the money and pay it?

11   A    Well, that would have straightened it out, but to Jane's

12   detriment because she would have paid an extra payment over

13   and above what she probably should have.

14   Q    All right, sir.  Can you tell us what happened next?

15   A    Okay.  Then what happened here is that this $605.58 did

16   not go toward principal, interest or escrow at the time it was

17   received.  It went into what mortgage servicing companies call

18   a suspense account.  And the reason is that AHMSI was saying

19   that Mrs. McGinnis owed $843.58 and she had only given them

20   $605.58.

21       Now, this 605.58 would have covered the principal and

22   interest on the actual loan, but it wasn't enough for that

23   escrow according to AHMSI.  Because they needed -- their

24   escrow went up from $115.45 to $353.45.  So they put the

25   $605.58 into a suspense account.  And then the next month

1    rolls around and another $605.58 is paid.  That money is moved

2    into the same suspense account so there is $1,211.16 in the

3    suspense account.  That 605.58 plus that 605.58, just say

4    1,200 plus dollars in the suspense account, which is greater

5    than what AHMSI is saying is owed for November.  And so they

6    take out 843.58 from the suspense account and they credit it

7    against principal, interest and escrow.

8    Q    Can you take us to the next month?

9    A    Then we come down to January and again the payment by

10   Mrs. McGinnis is 605.58.  And there is still approximately 200

11   about $240 left in the suspense account.

12        So if you take that $240 in AHMSI suspense account, add

13   it to the 605.58 then you have enough to pay what they're

14   saying in January is due.  And in January they are saying that

15   843.58 is due.

16        And so by combining the 605.58 with the approximate two

17   hundred and something dollars that was remaining in the

18   suspense account there was enough to make the payment, apply

19   it to principal, interest and escrow account.

20   Q    What happens the very next month in February?

21   A    Then the next month, now we're talking about February of

22   2010.  Again the McGinnises pay $605.58.  That is not enough

23   money to pay what AHMSI is saying is due, 843.58.

24        So in February of 2010 the 605.58 is put into this

25   suspense account.  And they continually -- they continually do

1    this throughout the remainder of 2010.

2         And the reason -- see, it hit two months later, two

3    months later.  And then it didn't hit until down here again.

4    And the reason being was because AHMSI by then had issued new

5    escrow analyses and reduced this down to $638, I believe.

6         And so this 605 in this timeframe it was easier to cover

7    a shortage of 635 compared down to 605.  So it didn't happen

8    as often.

9    Q    Can you take us, Tom, down to January -- February of '11,

10   check number 1626?

11   A    Here we are in February of 2011.  Check number 1626.

12   This was not posted by AHMSI.

13   Q    No.  Is this a check that Jane wrote to them that they

14   cashed but didn't give her credit for?

15   A    Correct.  They received it, they didn't post it.  They

16   did cash it because I saw where it cleared the bank.  It

17   cleared the bank on March 1st of 2011.

18        Now, this check, 1626, was not posted by AHMSI but they

19   did cash it.  Then they turned around and reimbursed Jane

20   McGinnis for that check.

21   Q    In other words they sent her a check back?

22   A    They sent her a check back in the exact same amount.  So

23   they cashed the money because it cleared and then they sent

24   Jane McGinnis one of their checks for the exact same amount.

25   Q    But according to your record Jane never cashed it?

1    A    And when I looked back at Adam McGinnis's records, Mrs.

2    McGinnis's records at the bank, I could not see where they

3    cashed it nor was it deposited into the business account.

4    Q    What happened then in March of '11?

5    A    Then in March -- again let me go through these three

6    checks here, 1641, 48 and 59.  The McGinnises continued to

7    send monthly checks.  Now they increased the amount beginning

8    in 2011 because of one of the escrow analyses.

9         These three checks were sent by the McGinnises to AHMSI

10   and AHMSI returned all three of them.  And that's where you

11   can see the -- starting right here the principal balance -- if

12   they were paid on time the principal balance would have kept

13   decreasing.  And it stays the same basically here for those

14   months.

15   Q    Tom, was it in June 8th of 2011 when they foreclosed on

16   this home?  Was that the date?

17   A    Yes.

18   Q    And then what happened the very next day?  Did they cash

19   Jane's check?

20   A    Yes.  The foreclosure occurred on June 7th.  The

21   McGinnises sent check number 1761 --

22   Q    1671?

23   A    Yes, 1671, AHMSI received it and posted it on June 9,

24   2011 a day or two after the foreclosure.  It cleared the bank

25   on June 10th.  And so right there what my analysis saw -- I

```
 1    saw that after the foreclosure the McGinnises sent another
 2    check.  They had returned the prior three months checks.  They
 3    refunded the March check and returned the -- that's the
 4    February check that was sent late.
 5         They refunded the February check.  They returned the
 6    March, April and May check.  And why?  I don't know.  They
 7    kept the check that was sent there in June after the
 8    foreclosure.
 9    Q    All right, sir.
10         MR. GOWER:   David, do you have the statement of
11    all the expenses on there?  Do you know what that is?
12         MR. ROHWEDDER:   Yes, sir, I do.  Give me one second
13    and I will pull it up.
14    BY MR. GOWER:
15    Q    And did you do an analysis of the expenses that were
16    charged to this account?
17    A    To the best of my ability.
18    Q    Yes.
19         MR. GOWER:   Do you know which one it is, David?
20         MR. ROHWEDDER:  Yes, I do.  I pulled it up right
21    here.
22    BY MR. GOWER:
23    Q    What is this, Tom?
24    A    This is -- I gleaned this data by the payment summary
25    that was provided by AHMSI.  And what they do is they have
```

1    codes.  First of all they have a date that they will take out

2    any fee.  And then they have codes and what it's for.  That's

3    where I had trouble.  Some of the codes were not -- some of

4    the codes were listed on the payment history and other codes

5    weren't.  But this is the total fees that were taken.

6    Q    And what's the total at the bottom?

7    A    $6,746.77 is what I totaled up.  And that's why I said I

8    tried to do it to the best of my ability.  Because AHMSI had a

9    total that was about $221 less.  But I think that has to do

10   with at times they would assess and take out the money of

11   service fees and other times they would give some of it back.

12        And then was one number, a footnote, along the whole

13   thing that was in 11 that nowhere in the footnotes did they

14   describe what the 11 meant.  It had something to do with the

15   service fee.

16   Q    Let me ask you this.  Did you do the same type analysis

17   on the other six loans that you did on this one we just went

18   through?

19   A    Exactly the same.

20   Q    And did you find the similar type problems on those other

21   six as you did this one?

22   A    Yes.

23   Q    But as we stand here today, would it be simple to say

24   that on all the loans, every month, Jane made a payment?

25   A    Yes, on all the loans every month there was a payment

1   made.

2   Q    And when all the loans were transferred over, all of them

3   were treated as one month behind when they weren't?

4   A    Every one of them, if you look at the billing statement,

5   the first billing statement that came out on every one of

6   the loans, AHMSI had them owing a past due payment plus the

7   current payment for the month of November.  The month of

8   November was the first month that AHMSI took over the loan.

9   Q    And let me ask you, if you would.  I think you did a

10  summary in your analysis which is Plaintiff's Exhibit 37.  And

11  can you tell us, Tom, what is this?

12  A    Okay.  What I would basically do here was trying to come

13  to a summary conclusion showing that, for example, on 172

14  Hilton Street -- and I've got the same thing for each one.

15  172 Hilton Street there were four checks that they weren't

16  given credit for at the time they should have that totaled

17  $2,455.  And AHMSI at the end of the period before foreclosing

18  said there was $2,533.26 past due.

19       Okay, if you take that and subtract it from that you come

20  out with a negative 98.22.

21  Q    Now explain that just in simple terms.  What does that

22  mean?

23  A    And I'm just trying to be simple in here in that -- I

24  think this whole thing could have been solved with a couple --

25  Q    Well, you're not going to be allowed to say that.

```
 1    A     That's right.  What I was simply trying to do here is

 2    show that at the end of the day that the difference was very

 3    small.

 4    Q     And is that the same with all of them?

 5    A     Is the same with all of them.

 6    Q     And if you take all seven loans together what's the very

 7    --

 8          MR. GOWER:   Can you go down to the bottom there,

 9    David, on the second page.

10    BY MR. GOWER:

11    Q     If you put all of them in the bucket what's the

12    difference?

13    A     $266.69.

14          MR. GOWER:   That's all I have at this time, Your

15    Honor?

16          THE COURT:   Your witness.

17          MR. ROGERS:   May I approach, Your Honor?

18          THE COURT:   Yes.

19          MR. ROGERS:   Our exhibits are voluminous and so

20    we've created this to help make it a little easier.  It's most

21    of the exhibits we use.

22                        CROSS EXAMINATION

23    BY MR. ROGERS:

24    Q     Good afternoon, Mr. Berry.

25    A     Good afternoon.
```

1   Q    I want to start by talking just for a minute about the

2   kind of work that you do as an accountant?

3   A    Yes, sir.

4   Q    You prepare tax returns for your clients, right?

5   A    Yes, sir.

6   Q    And you prepare financial statements for your clients?

7   A    Correct.

8   Q    And you advise your clients, right?

9   A    Correct.

10  Q    And sometimes you audit your clients, right?

11  A    Yes, sir.

12  Q    Can you tell us what auditing is?

13  A    Yes.  Now I personally do not -- I work on audits where

14  there is another partner that is auditor in charge.  We have

15  compilations, reviews, audits.  I am partner in charge of some

16  compilations and reviews and financial statements.  I've never

17  been a partner in charge of an audit, but I do work on audits

18  for other partners.

19  Q    Why don't you tell us what audits are?

20  A    An audit is when you look at a company, it can be a

21  business, it can be a nonprofit, it can be a government

22  entity, and basically you go in depth and look at their

23  financials.

24  Q    And very rarely you do what you're doing today, right,

25  testify as an expert?

```
 1    A    Correct.  I have done this four times, but not -- and

 2    that was five, six, seven years ago when I did that.

 3    Q    And all of those kinds of work pay, right?

 4    A    Pardon.

 5    Q    All of those kinds of work pay, right?  You get paid for

 6    all that, don't you?

 7    A    I get paid for working, yes, sir.

 8    Q    And you're getting paid today?

 9    A    Yes, sir.

10    Q    In fact, you said your firm has been paid $25,000, right,

11    for your work in this case?

12    A    Yes, sir.

13    Q    Let's talk about your work experience.  Sir, you've never

14    worked for a bank, right?

15    A    No.

16    Q    And you've never worked for a mortgage lender, right?

17    A    No.

18    Q    And you've never worked for a mortgage servicer, right?

19    A    No.

20    Q    You've never worked for a mortgage company of any sort,

21    have you, sir?

22    A    I have not.

23    Q    You've never audited a bank, have you, sir?

24    A    No.

25    Q    And you've never audited a mortgage lender, right, sir?
```

1    A     No.

2    Q     You've never audited a mortgage servicer, correct?

3    A     Correct.

4    Q     You've never audited a lender of any variety; isn't that

5    right, sir?

6    A     Correct.

7    Q     As an accountant you have a continuing education

8    requirement, don't you?

9    A     Yes, sir.

10   Q     You attend seminars annually to satisfy that requirement,

11   do you not?

12   A     I'm sorry?

13   Q     You attend seminars annually to satisfy that requirement,

14   right, sir?

15   A     Yes.  A minimum of 40 hours continuing education per

16   year.

17   Q     You've not attended any seminar where mortgage loans were

18   the main topic, right?

19   A     Not the main topic but if I may expound on that.

20   Q     Well, the discussion of the loans --

21         MR. GOWER:   Could he expound on that and answer

22   the question, Your Honor?

23         MR. ROGERS:   The expounding would be unresponsive,

24   Your Honor.  I think I may ask the next question which will

25   give him an opportunity to tell me what he was probably about

```
1    to tell us.
2              THE COURT:    Okay.  Go ahead.
3    BY MR. ROGERS:
4    Q    The topics that were discussed about mortgage loans at
5    those seminars related to the tax treatment of mortgage loans,
6    right, sir?
7    A    The tax treatment and which includes tax treatment and
8    includes form 1098 which is the mortgage interest for the
9    year.  And getting into that there was discussion on
10   principal, interest, escrow.  And so it's more than just a tax
11   aspects of a loan.
12   Q    But the discussion of the principal, interest and escrow
13   items related to the tax treatment of those items, right,
14   sir?
15   A    It goes into more depth than that.  It's just not the
16   tax.  You don't understand things fully if you just talk tax.
17   Q    Do you remember when you were deposed in this case,
18   sir?
19   A    I'm sorry?
20   Q    Do you remember when you were deposed?
21   A    Correct.
22   Q    And you were asked the question about whether or not
23   those seminars talked about the tax treatment and mortgage
24   loans, weren't you?  And you said, yes, didn't you?
25   A    Yes.
```

1    Q    You've never given a presentation on a mortgage loan,

2    right, sir?

3    A    No, I have not.

4    Q    Nor have you ever written any articles about mortgage

5    loans, have you?

6    A    No.

7    Q    You've testified as an expert four times before today,

8    right, sir?

9    A    Correct.

10   Q    And all four of those were divorce cases, weren't they?

11   A    No.  They were child custody/divorce.

12   Q    They were family law cases, right, sir?

13   A    Yes, correct, family law.

14   Q    And in each of those cases you testified about the income

15   of your client, right?

16   A    Yes, sir.

17   Q    None of those cases involved testimony about a mortgage

18   loan, did they?

19   A    No.

20   Q    The most recent of those cases was six or seven years

21   ago, wasn't it, sir?

22   A    Correct.

23   Q    I want to talk for a minute about your relationship with

24   Mr. Gower.  You've known Mr. Gower for 15 years, haven't you,

25   sir?

```
1    A    Yes, sir.

2    Q    And you consider him a friend, don't you?

3    A    Yes, sir.

4    Q    And you're his accountant, aren't you?

5    A    Yes, sir.

6    Q    Your firm does monthly financial statements for Mr.

7    Gower's law firm, right?

8    A    Correct.

9    Q    And you do the yearly tax returns for Mr. Gower's firm,

10   right?

11   A    Right.

12   Q    And you're the only partner who works for Mr. Gower's

13   firm, right?

14   A    No.  We've got -- like I told you in the deposition we

15   had a bookkeeper that does the monthly financial statements.

16   Then her boss, a CPA reviews them.  I do the final review.

17   He's my client so I do the final review on that.

18   Q    Mr. Gower is your client, right?

19   A    Correct.

20   Q    You prepare Mr. Gower's individual tax returns, right?

21   A    Yes.

22   Q    And you're the only partner that works on his tax

23   returns, right?

24   A    Correct.

25   Q    And your firm has been doing those taxes for 15 years,
```

1     right?

2     A     No.   The firm has been doing it for more than 15.   I've

3     been doing them for 15.

4     Q     You also do the taxes for another of Mr. Gower's

5     companies, right?

6     A     Yes, sir.

7     Q     That company is Conservative Investments, Inc., right?

8     A     Correct.

9     Q     And the firm has been doing that work for at least

10    15 years, right?

11    A     Correct.

12    Q     Let's talk briefly about escrow accounts if we can.

13    Escrow accounts are intended to provide mortgage companies

14    with money to pay taxes and insurance when due, right?

15    A     Correct.

16    Q     When funds and escrow are insufficient to pay taxes and

17    insurance the servicer may have to advance those funds, right?

18    A     Yes.

19    Q     And if the servicer advances those funds the borrower is

20    obligated to repay that advance, right?

21    A     Yes, sir.

22    Q     You've done escrow analysis before, haven't you?

23    A     Yes, sir.

24    Q     RESPA allows a cushion when collecting an amount for

25    escrow, right, of one sixth?

1    A     They can have a cushion, yes.

2    Q     Up to one sixth, right, sir?

3    A     Up to two months worth, which is one sixth.

4    Q     The amount in escrow -- let's talk about 172 Hilton

5    Street.  The amount in escrow for taxes and insurance in 2009

6    was not sufficient to pay the taxes when due, correct?

7    A     Correct.

8    Q     At the end of 2009 there was an actual shortage in the

9    escrow, right?

10   A     Yes.

11   Q     And there was also a shortage at the end of 2010,

12   right?

13   A     Correct.

14   Q     By your calculation, the escrow shortage at the end of

15   2009 was $663.94, right?

16   A     Correct.

17   Q     You reached that figure by crediting the payments that

18   Ms. McGinnis made the day they were received by the servicer

19   whether they were the amount that was due or not, right?

20   A     Yes, sir.  That's why I entitled that actual escrow.

21   Q     So you're not saying what the monthly payment should have

22   been, right?

23   A     No, I did not.

24   Q     And you have no opinion about what the monthly escrow for

25   172 Hilton Street should have been in November of 2009, right?

1    A    Repeat that please.

2    Q    You did no escrow analysis on the 172 Hilton Street loan

3    to determine the amount the escrow payment ought to have been

4    November 2009, correct?

5    A    Did I do one?

6    Q    Yes, sir.  You did not?

7    A    No, I did not.

8    Q    You performed a similar calculation at the end of 2010,

9    right?  At the end of the 2010 payment history?

10   A    The end of 2010?

11   Q    Your real escrow shortage?

12   A    Okay, rephrase from the beginning.

13   Q    Sure.  I'm talking about the work that you did.  You

14   acknowledge that you calculated an actual escrow shortage at

15   the end of 2009 and you've already confirmed that there was

16   one at the end of 2010?

17   A    Correct.

18   Q    I'm asking was the cumulative shortage at the end of 2010

19   $900.60 based on your calculations?

20   A    Yes, sir.

21   Q    Even Adam agreed the escrow on 172 Hilton Street needed

22   to be increased, didn't he?

23   A    Yes.

24   Q    I want to talk -- as you are testifying today, is it your

25   testimony that Ms. Hilton -- or sorry -- Ms. McGinnis was

1    never ever given any credit for the payment received in

2    November of 2009 on the 172 Hilton Street loan?

3    A    If that's what was interpreted from the deposition -- The

4    $605 went into a suspense account.  And like I pointed out

5    earlier up there, when the next payment of 605 came in those

6    two were combined and so she was given some credit at that

7    time.  And that happened each time.

8         When the suspense account got enough for whatever the

9    arbitrarily escrow total payment to include the arbitrary

10   escrow amount then she would get -- it would be credited to

11   principal, interest and escrow.

12             MR. ROGERS:  Move to strike the non-responsive

13   portion of that answer, specifically the characterization is

14   arbitrary which is something the Court determined at its

15   July 2nd order that he can't say.

16             THE COURT:   I guess I'm a little bit confused

17   about that.  Do you want me to instruct the jury on something

18   about that?

19             MR. ROGERS:  Yes, Your Honor.  I'm hoping you'll

20   give a curative instruction on his characterization of that.

21             THE COURT:    Come on up here.

22   (BENCH CONFERENCE)

23             THE COURT:    The only thing that gave me pause

24   about that testimony was the use of the word arbitrary.  Is

25   there something beyond that?

```
 1              MR. GOWER:    No, sir.  That's it.  That's all.

 2              MR. ROGERS:    You said he couldn't talk about those

 3     kinds of things.  And so I certainly didn't, I think, open the

 4     door to that.

 5              THE COURT:    No, I don't think you did either.

 6     Like I said, I was surprised to hear that.  So, I'm going to

 7     tell the jury to disregard the testimony.

 8              MR. ROGERS:    Thank you, sir.

 9     (BENCH CONFERENCE CONCLUDED)

10              THE COURT:    Ladies and gentlemen, I know everybody

11     needs to go to the bathroom.  The lawyers need to go to the

12     bathroom.  I don't know whether the witness does or not.

13              Anyway, I'm going to let y'all go back there.  I

14     would like to finish this witness.  I usually finish at 5:00.

15     But he's in Columbus.  I'm sure he wants to go home and not

16     have to come back tomorrow.  So if we can get finished with

17     him this afternoon then we're going to do that.  Although I'm

18     not going to let this go on much past 5:30.  That would be the

19     latest.

20              Now he just testified about his opinion about

21     something and he used the word arbitrary.  And I'm instructing

22     you to disregard that testimony as to the degree to which he's

23     talking about Defendant's action as being arbitrary.  Okay.

24     There you go.

25              Go back.  When you're ready -- I'm not going to give
```

```
 1    you 15-minutes.  I'm going to give you as little time as you
 2    need.  How about that.  And y'all go back and then we'll come
 3    back and we'll get this trial over with for the afternoon.
 4    We'll be back in the morning.
 5    (JURORS EXIT COURTROOM)
 6    (RECESS)
 7    (JURORS ENTER COURTROOM)
 8              THE COURT:    All right.  Go ahead.
 9    BY MR. ROGERS:
10    Q    Mr. Berry, as you may recall where we were, we were
11    talking about your work on the 172 Hilton Street loan, and in
12    particular I was talking about the chart that you had prepared
13    that's Plaintiff's Exhibit 3 that you went over and talked to
14    us about over there by the video screen.  Do you remember
15    that?
16    A    Yes, sir.
17    Q    Kelly has put it up there.  All I want to say is -- I
18    just want to make sure I understand your testimony.  When you
19    say no credit by the November 2009 payment, you don't mean
20    that there was never any credit given, right?
21    A    Correct.
22    Q    You're just saying there was no credit given that day,
23    right?
24    A    That there was no credit given that day to the principal,
25    interest or escrow account.
```

1    Q    But eventually all of those funds that went into suspense

2    for the November payment came back out and were, in fact,

3    credited to principal, interest and escrow, right?

4    A    Correct.

5    Q    You said that the whole problem started with the fact

6    that AHMSI had Ms. McGinnis as being behind one monthly

7    payment right from the start, right?

8    A    Right.

9    Q    And that was based on the November 2009 billing

10   statement, right?

11   A    Correct.  The billing statement did show that she was

12   past due.

13   Q    Well, you looked at the payment history and it showed she

14   was current, right?

15   A    Correct.

16   Q    So the only thing that shows that she's past due is the

17   billing statement, right?

18   A    The billing statement and then the fact that the amount

19   of 843.58 -- that escrow analysis has never been found.  The

20   McGinnises did not ever receive it.

21   Q    I'm not asking you about that, sir.  I'm asking you, you

22   said the problem was that AHMSI showed her as being late

23   November 1, 2009, right?

24   A    Correct.

25   Q    And the basis for you to say that AHMSI said that is the

1    November 2009 billing statement, right?

2    A    Correct.

3    Q    So let's look at the November 2009 billing statement.

4    We're going to put up P3 which was the exhibit that was just

5    admitted?

6              THE COURT:    And my request is that it also go up

7    here because I can't see it over there.  So if we could put up

8    the parallel exhibit for the Plaintiff.  It might be easier

9    for the jury to see that one anyway.

10             MR. ROGERS:   I'm happy if they don't mind helping

11   me out.

12             THE COURT:    Okay.  There we go.

13             MR. ROGERS:   I thought I was talking about the

14   right thing but I was talking about the wrong thing.  I want

15   Plaintiff's Exhibit 2 which was also just admitted, the

16   composite exhibit with the billing statements.

17   BY MR. ROGERS:

18   Q    This is the November 2009 billing statement we were

19   talking about, right?

20   A    (No response).

21   Q    Can you tell me what the date of the statement is?

22   A    Statement date November 3, 2009.

23   Q    So the statement was issued November 3, 2009, right?

24   A    Correct.

25   Q    Payments on this loan are due November 1st, right?  They

```
 1    are due on the first of the month, aren't they?

 2    A     Yes.

 3    Q     And what it shows is payment due date 11-1-2009, right?

 4    A     Correct.

 5    Q     So it's saying that the loan is due for the November 1,

 6    2009 payment, right?

 7    A     Yes.

 8    Q     And if you look down at the bottom.  Again it says

 9    payment due date November 1, 2009, right?

10    A     Correct.

11    Q     So it's showing the loan is due for the November 1, 2009

12    payment, right?

13    A     Correct.

14    Q     And that it shows the current payment is $843.58,

15    right?

16    A     Correct.

17    Q     But that was never the payment that was due in October of

18    2009, right?

19    A     No.  That's --

20    Q     The payment that was --

21    A     The current payment is the payment that's due -- payment

22    due date 11-1-09.  So this current payment is due the month of

23    November.

24    Q     As of November 3rd the November 1st payment was late,

25    right?
```

```
1    A    As Nov -- say that again.
2    Q    The payments were due on the first of the month,
3    right?
4    A    Payments were due on the first of the month so --
5    Q    So as of November 3rd --
6         MR. GOWER:   Your Honor he's trying to -- he's kind
7    of like me, he's a little slow in answering.  He's trying to
8    answer but he won't let him answer.
9         THE COURT:   Well, I'm not sure what exactly
10   happened there.  Do you understand the question, sir?  Did you
11   understand the question?
12        THE WITNESS:  Repeat the question, please.
13   BY MR. ROGERS:
14   Q    Payments under the loan are due on the first of each
15   month, right?
16   A    The first of each month.
17   Q    November 3rd is after the 1st of November, right?
18   A    Correct.
19   Q    So, as of November 3rd the November 1st payment is late,
20   right?
21   A    It's not late because it does not have to reach the
22   servicer until the 15th.  They have 15 days in order for it to
23   reach the servicer.
24   Q    That's a grace period, right, sir?
25   A    Correct.
```

1    Q    That's a time when it's late but they're not charging you

2    a late fee, right?

3    A    Okay.

4    Q    Right?  Is that your understanding?

5    A    Yes, sir.

6    Q    So it's late November 3rd, you're just not being charged

7    a late fee, right?

8    A    If that's what the definition of grace period is.  I

9    cannot answer that question.

10   Q    Why don't you look down there and see, what does it say

11   about when the next late charge is going to be assessed?

12   A    The next late charge is to be assessed after -- total

13   payment after 12-16.

14   Q    Which is 15 days after December 1st, right?

15   A    Correct.

16   Q    And you can only be charged one late fee for each

17   payment, right?

18   A    Correct.

19   Q    So it's saying the late charge on the current payment is

20   going to be assessed after December 16, 2009, right?

21   A    Correct.

22          MR. ROGERS:   So why don't we go forward, if we can,

23   please, to the monthly billing statement for July 13, 2010.

24          MR. ROHWEDDER:   Your Honor, it's going to take me a

25   minute to filter through all of them.  Filter through and find

```
 1    exactly what he's talking about.  I think it might be easier

 2    for his paralegal to do it and I might be able to --

 3                THE COURT:    That's fine.  We'll go back over to

 4    that screen then.

 5                MR. ROHWEDDER:   I don't know where his --

 6                MR. ROGERS:   Let's focus on the top, please, Kelly.

 7    BY MR. ROGERS:

 8    Q    Now, if you want to come over here I'll understand that,

 9    Mr. Berry.  But can you tell us what the statement date is for

10    this statement?

11    A    The statement date is July 13, 2010.

12    Q    And what does it show the payment due date to be?

13    A    May 1, 2010.

14    Q    So what the payment due date means is the date that the

15    payment is currently due, the oldest payment due on the loan,

16    right?

17    A    Correct.

18    Q    You said that Ms. McGinnis made a payment every month

19    without fail, right?

20    A    Yes.

21    Q    But she didn't make a payment in February 2011, did she?

22    A    I would have to look at my records.

23    Q    Well, do you remember when I took your deposition?

24    Actually it was Chris Fox took the deposition, but I was

25    sitting there.  Do you remember when we asked you that
```

1    question?

2            THE COURT:    Why don't you try and get by the

3    microphone if you would.

4    BY MR. ROGERS:

5    Q    And Mr. Fox said, "Now, I understand you may disagree

6    with AHMSI's perspective --

7            THE COURT:    Wait just a minute.  Let him get back

8    in his seat so he can pay attention to what you're saying.

9            THE WITNESS:  What was the date?

10           MR. ROGERS:    February of 2011, sir.

11   BY MR. ROGERS:

12   Q    Mr. Fox asked you, "And I understand you may disagree

13   with AHMSI's perspective, but the payment received -- well,

14   actually there wasn't a payment received in February of 2011,

15   was there?"  And your answer was, "Correct, that's the one

16   that was late."  That's true, right?  There's wasn't a

17   payment?

18   A    Correct.  There was one in February of 2011, check number

19   1626 was sent to AHMSI.  AHMSI did not post it, but they did

20   cash it.  It cleared the bank on March 1, 2011.  I will not

21   say that it did not -- that there was not a February check

22   sent.  I don't know when it was sent.

23   Q    Well, that's what you said before, wasn't it?  When we

24   took your deposition you were under oath, right?

25   A    What I was talking about there is that the February check

1    number 1626 cleared the bank on March 1st of 2011.

2    Q    So no payment was received in February of 2011, right?

3    A    You did not -- AHMSI did not post when they received it.

4    March 1st is one day after February 28th.

5    Q    Do you want me to show you your deposition transcript,

6    sir?

7    A    I may have misinterpreted what you were asking.

8    Q    Do you want to see it?  Because I'll tell you what we

9    were asking.  We asked you --

10             THE COURT:    Do you have a copy of it?

11   BY MR. ROGERS:

12   Q    "There wasn't a payment received in February of 2011, was

13   there?"

14   A    Where is it in here?

15   Q    Turn to page 104, line six.

16   A    Which page?

17   Q    104, sir, line six.  And if you would, please, just read

18   line six through line 10.

19   A    Line six through --

20   Q    Line 10, sir, on page 104.

21             THE COURT:    Do you see the line numbers here.

22   Those are the line numbers.

23   BY MR. ROGERS:

24   Q    Would you read it aloud, sir.

25   A    I said, "Correct, that was the one that was late."

1    Q    No.  Would you read lines six through 10, please, to us

2    out loud, sir.

3    A    You said or Mr. Fox said "And I understand you may

4    disagree with AHMSI's perspective, but the payment received --

5    well actually there wasn't a payment received in February of

6    2011, was there?"

7    Q    And then you said?

8    A    And I answered, "Correct, that's the one that was late."

9    And truthfully I would like to retract that now if possible

10   because I don't know when it was received by AHMSI.  It could

11   have very easily been received in February.  It cleared the

12   bank March 1st, and it was for the February payment.  It

13   cleared the bank March 1st so they could have received it the

14   28th or the 27th.

15            MR. ROGERS:   Can we put P3 up, please.

16   BY MR. ROGERS:

17   Q    Sir, would you, looking at this exhibit, tell us what

18   date AHMSI posted the December 2010 payment?

19   A    December 2010 payment was posted on 12-20 of 2010.  It

20   cleared the bank on 12-20 of 2010.

21   Q    Okay.  What date was the January 2011 payment posted?

22   A    On 1-18-2011.

23   Q    And what date did it clear the bank?

24   A    1-18-2011.

25   Q    What date was the March 1 payment?  What date did it

1    clear the bank?

2    A    The March payment was posted on March 12th and cleared

3    the bank on March 15th.

4    Q    Well, then the February payment, sir.  What date was that

5    posted or what date did it clear?

6    A    February 11th it was posted, February 12th cleared.

7    Let's go down to --

8    Q    Are you looking at the February 2011 payment, sir?

9    A    No.  February 11th they said that one was not posted.

10   Q    I asked when it cleared?

11   A    March 1st.

12   Q    While we're looking at this you said that TBW shouldn't

13   have charged the late fee, right?

14   A    Correct.

15   Q    What date was the September payment received?

16   A    9-17.

17   Q    I'm no accountant, but one plus 15 is 16, right, sir?

18   A    Correct.

19   Q    So it wasn't received by the 16th, right, sir?

20   A    Correct.

21   Q    So under the terms of the document, the controlling

22   contract documents, they actually had a right to charge that

23   late charge, didn't they?

24   A    Right.  But one thing I need to bring out on this is if

25   you look at the -- I don't know how good the posting dates

1    are.  If you go down to July of 2010.

2    Q    So now you're telling us your document is not reliable,

3    is that what you're saying?

4    A    No, not at all.  I'm saying that I'm not sure if the date

5    posted is reliable.  Because if you go down to July of 2010

6    the AHMSI document said it was posted on 7-13.  The check

7    cleared on 7-12.

8        In August AHMSI posted the check on August 17th, the

9    check cleared the day before.  Okay, so --

10            MR. ROGERS:   Your Honor, the question I asked was

11   about the TBW late payment.  All of this is testimony that's

12   not responsive to any question, Your Honor, and I move to

13   strike it?

14            THE COURT:   We'll move forward.  If he wants to

15   cover it on redirect I'll let him do that, but go ahead.

16            MR. ROGERS:   But it's struck now, Your Honor.

17            THE COURT:   Right.  Disregard that last testimony.

18   BY MR. ROGERS:

19   Q    You said that the same problem happened on every account,

20   right?  That's what you testified on direct.  Same thing, all

21   seven accounts, right?

22   A    Not exactly the same thing.  It happened to a lesser

23   extent on the other accounts.

24   Q    But it didn't happen at all on the Lenora Drive, 224

25   Lenora, right?

```
 1    A     224 was good.

 2    Q     So the same thing didn't happen, even to a lesser extent,

 3    on every account?

 4    A     Except --

 5    Q     It didn't happen at all on 224 Lenora Drive, right?

 6    A     Except the first billing statement.

 7    Q     The first billing statement we just talked about.  But

 8    every credit that was made -- every payment that was made on

 9    224 Lenora Drive was credited the day it was posted, right?

10    A     Yes, it was.

11    Q     So it wasn't one.  And when you said everything had these

12    problems, Lenora Drive 224 did not, right?

13    A     Correct.

14    Q     With respect to the other five loans, rather than go

15    through all the payment histories --

16    A     Yes.

17    Q     -- I'm hopeful that we can agree that what happened on

18    those loans is the same thing that happened on 172 Hilton

19    Street, right?  Which is to say the payment expected from Ms.

20    McGinnis went up, right?  Ms. McGinnis continued to pay the

21    same amount she had been paying through December of 2010,

22    right?

23    A     Correct.

24    Q     And because that payment was less than what was expected

25    one or more payments, depending on the difference between the
```

1    new payment amount and the old payment amount, wasn't credited

2    the day it was received, right?

3    A    Correct.

4    Q    It was placed in suspense, right?

5    A    Yes.

6    Q    And then it was credited as additional payments were

7    received, right?  So it's not that no credit was ever given,

8    it just wasn't given the day in the month in which it was

9    received, right?

10   A    Yes.  And there was an exception.  A couple of them were

11   your AHMSI's escrow analysis was less than what he had been

12   paying.  He kept paying that additional amount and that

13   additional amount was used to pay off service charge --

14   Q    It was applied to principal, right, sir?

15   A    -- and then went into principal.  Instead of the escrow

16   account it went into the principal account and then later on

17   that caused the problem.  The same exact type problem we are

18   talking about that you just mentioned.

19   Q    Because they weren't paying the monthly payment, right?

20   A    Yes.  After another escrow analysis came out that was

21   higher than what he was paying.

22   Q    But it was the same thing.  They eventually were given

23   credit for those payments, just not in the month it was

24   received, right?

25   A    Correct.

1    Q    You said the foreclosure was on June 8th of 2011, right?

2    A    Yes, 7th or 8th.

3    Q    Do you know what date it was on?  It was on June 7th,

4    wasn't it?

5    A    Okay.

6    Q    I'm asking.  Do you know what date the foreclosure was?

7    A    Okay.  We've got Plaintiff's Exhibit 20 which is a

8    printout from AHMSI and it says completed f/c on 6-8-2011.

9    Q    So the date of the foreclosure was June 8, 2011, right?

10   A    (Witness nodded head affirmatively).

11   Q    Because you said it was both June 7th and the 8th on

12   direct, right?

13   A    Yes.

14            MR. ROGERS:   Subject to recross, Your Honor.

15            THE COURT:   Do you have any redirect?

16            MR. GOWER:   Yes, sir.

17                    REDIRECT EXAMINATION

18   BY MR. GOWER:

19   Q    Tom, this $25,000 we've paid your firm, why did it costs

20   so much?

21   A    It costs so much because the time I spent going through

22   for each property about 8 to 10 inches of documents, sorting

23   them out, and trying to put together something relatively

24   simple that I could present to the jury.

25            I didn't want the jury to have to look at all these

1    voluminous documents that we had.

2        And I was trying to set up something in a chronological

3    order that actually showed the court and the jury what had

4    transpired.

5        But when you go through it for each, do it for each

6    property you have 8 to 10 inches of paperwork to go through,

7    sort it out and then find that some papers, quite a few papers

8    are missing to put the puzzle together.  And so you've got to

9    ask, "Charlie, I'm missing these.  Can you get them for me?"

10       And I'll tell you, with one, two, three days before my

11   deposition -- I was deposed by Mr. Fox in December -- we still

12   didn't have all the paperwork.

13       And then a lot of these documents are very confusing,

14   especially the payment history documents.  Because you

15   probably know a little bit about accounting, but sometimes you

16   put a debit in and a credit in and then you say, oops, it

17   shouldn't go there so you take it out.  Well, every time they

18   did that on their payment history it's noted on the payment

19   history.  It's not a very clean clear document to look at.  So

20   Charlie, it took me a lot of time.

21   Q    Right, sir.  And you and I have been friends for a long

22   time, haven't we?

23   A    Yes, sir.

24   Q    Would you lie for me to this jury?

25   A    Would I what?

```
1    Q    Would you lie for me to this jury?

2    A    Never.

3              MR. GOWER:    Thank you.

4              THE COURT:    All right.  Ladies and gentlemen, I'm

5    going to let you go home.  Thank you for being patient.

6              I want to remind you that you're not to talk to

7    anyone about the case.  Don't discuss it among yourselves.

8              I'm sure your family or friends may be interested in

9    what you did today.  Tell them you were in court and tell them

10   the judge said y'all can't talk about it.

11             Now, I do want you back in the jury room at 9:00

12   o'clock.  We're going to start the trial of the case at 9:00

13   o'clock tomorrow morning.  Thank you very much.

14             Be careful.  Looks like there might be a little sun

15   out there, but the roads are probably still wet.

16   (JURORS EXIT COURTROOM)

17             THE COURT:    Step back up here, sir.  There is just

18   one thing I'd like to clarify for the record.  I want you to

19   put P3 back up there.

20             MR. ROHWEDDER:  I'm sorry, Your Honor.  I just

21   powered this thing off.  Let me turn it back on, I'm sorry.

22             THE COURT:    I just want to make sure that my

23   understanding about this -- have you got it up there.  I don't

24   see it.

25             MR. ROHWEDDER:  Your Honor, it might take a second.
```

1    I powered down the projector.

2         THE COURT:    Well, it's my understanding about this

3    document that you prepared this document because the records

4    were voluminous.  You just talked about that.

5         And it's my understanding that the documents that

6    you used for this were either the records of the Plaintiff or

7    the records of the Defendant; is that correct?

8         THE WITNESS:  I'm sorry, the records?

9         THE COURT:    The records of the Plaintiff or the

10   records of the Defendant?

11        THE WITNESS:  To come up with this spreadsheet?

12        THE COURT:    Yes.

13        THE WITNESS:  I used both.

14        THE COURT:    Okay.  But you said something in the

15   course of your testimony just then about not being clear about

16   the posted dates?

17        THE WITNESS:  Yes, sir.

18        THE COURT:    That wasn't a problem with the

19   specifics of the records; is that correct?

20        THE WITNESS:  It bothered me when Mr. Rogers

21   questioned -- when Mr. Rogers questioned the December payment

22   being on 12-17 and being late.  I don't know if I trust these

23   numbers here on the dates.

24        THE COURT:    Here's my question.  Are those

25   numbers, those dates, dates that you got off of their records?

1          THE WITNESS:  Yes, Your Honor.

2          THE COURT:   All right.  That's all I need to know.

3          THE WITNESS:  Off of AHMSI's record, Your Honor.

4          MR. ROGERS:   Can I asks him a couple questions,

5    Your Honor?

6          THE COURT:    Sure.

7          MR. ROGERS:   The amortization schedule principal

8    balance, that's a number that you calculated, right?

9          THE WITNESS:  I did an amortization schedule based

10   on the note, the original note.

11         MR. ROGERS:   So those numbers that don't come off

12   of any of the documents they show what the amortization

13   schedule principal balance should have been if the complete

14   principal and interest payment had been made every month?

15         THE WITNESS:  Correct, exactly.

16         MR. ROGERS:   And these comments out to the right,

17   those are your comments out to the right, right?

18         THE WITNESS:  Those are comments from AHMSI

19   documents.  But to clarify when I say no credit, it's the way

20   you talked about no credit on that certain day.

21         MR. ROGERS:   Well, I understand.  But the document

22   doesn't say no credit, you said that, right?

23         THE WITNESS:  Correct.  Those are my notes.

24         THE COURT:    All right.

25         MR. ROGERS:   It's an expert report, that's our

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1    position.

2              THE COURT:    Well, it's not an expert report.    That

3    portion of it may be, but I think it's clearly a 1006 summary.

4    I mean, it was based on the records that came from either the

5    Plaintiff, came from the Defendant.    They are y'all's records.

6    Those records have been made available.

7              There's not any kind of question about the

8    authenticity of any of that.

9              So, I think it's clearly -- I mean, I reviewed some

10   of these records and they are voluminous.

11             MR. ROGERS:    Your Honor, with all due respect, as

12   I'm sure you appreciate for the purpose that if we needed an

13   appeal.    We object on the continuing testimony and we object,

14   Your Honor.

15             THE COURT:    Why don't you sit down, I think I can

16   hear you better.    Or stand over there if you'd like to.

17             MR. ROGERS:    We lodge an objection on continuing

18   testimony grounds and on hearsay grounds, Your Honor.    This is

19   an expert report.    It's an advocacy piece.    We don't believe

20   it's appropriate for it to go out with the jury.

21             We understand the testimony.    We never had any

22   problem with that but we object to it going out with the jury.

23   Thank you, Your Honor.

24             THE COURT:    All right.  Very good.  Let me say

25   something.    I thought that the trial went smoothly today and I

```
 1   appreciated that and I appreciated y'all being prepared.  But
 2   the one thing that did come out that I didn't like was the
 3   fact that those objections were still on the video.  I've
 4   never had an experience with that before.  That is not
 5   supposed to be like that.  That can only confuse the jury.
 6           And, of course, I instructed them afterwards because
 7   I was concerned that they were confused.
 8           But those objections need to be taken off of the
 9   next deposition, Sappington.  Isn't that his name?
10           MR. GOWER:   Yes, sir.
11           MR. ROGERS:   And we took them out of our portion of
12   Delbene, Your Honor.
13           THE COURT:   Okay.  That won't do.  All right.
14           MR. GOWER:   Yes, sir.
15           THE COURT:   Anything else?
16           MR. GOWER:   No, sir.
17           MR. ROGERS:   May the unfortunate, Mr. Thomas, stay
18   and get access to whichever set of our exhibits is going to be
19   going with the jury to remove the duplicates, Your Honor?
20           THE COURT:   Again, either over there or there
21   because I didn't --
22           MR. ROGERS:   I'm sorry, Your Honor.  I said, may
23   the unfortunate, Mr. Thomas, get access to whatever set of our
24   exhibits will be going out with the jury to remove the
25   duplicates, Your Honor, to avoid that confusion?
```

```
1              THE COURT:    Yes.  Yes.  We definitely need to do
2       that.
3              MR. ROGERS:    Great.
4              THE COURT:    And I will tell you, so you will
5       understand, is that once I charge the jury Ms. Purvis is going
6       to go over the documents with you.  You will have the
7       opportunity to look at those documents because I want the
8       lawyers to be satisfied that what goes out is what's supposed
9       to go out, and something that's not supposed to go out doesn't
10      go out.
11             So now I don't stay around for that, but if there's
12      a problem Ms. Purvis brings it to my attention.  So that is
13      something that is an important part of the case as far as I'm
14      concerned.  She keeps a record.  She knows what's been
15      admitted.  And if you want to take a look at what she's done
16      today so far, what's been admitted, that is fine, take a look
17      at that.
18             It might be helpful for you to know, especially you
19      Mr. Gower, about what's been admitted.  Because there hasn't
20      been a lot admitted in the case so far.  It's no problem, but
21      I'm just telling you.
22             Now, tell me about tomorrow.
23             MR. GOWER:    Tomorrow, Your Honor, we have Adam
24      McGinnis.
25             THE COURT:    I know it's so hard for y'all to do
```

```
1     this, but it's a tradition in my courtroom for lawyers not to
2     stand up.
3              MR. GOWER:    Tomorrow we have Adam McGinnis, we
4     have Dr. Sappington, by video, we have Jodie Johnson who is
5     her daughter and then Jane.
6              THE COURT:    And can you do all that before lunch?
7              MR. GOWER:    I think so.
8              THE COURT:    That is a lot before lunch.  How much
9     do you think you're going to have to put up, Mr. Rogers?
10             MR. ROGERS:   Well, Your Honor, we've got about an
11    hour's worth of Delbene's deposition to play.  We've got Adam
12    McGinnis under subpoena if you want us to do our, essentially,
13    direct in our case we will do that.
14             I guess I was planning on doing it all during the
15    cross examination.  It does make for a longer cross
16    examination, Your Honor.  So I will do it either way.
17             THE COURT:    I'm a little bit confused.  What makes
18    for a longer cross examination?
19             MR. ROGERS:   Well, there are parts of it, Your
20    Honor, that we were going to do -- we would either do in our
21    case in chief or do it on cross.  We have him under subpoena.
22             I was going to do it all at once.  So there are some
23    things -- I don't know what Charlie is going to do on direct.
24    But there are some things --
25             THE COURT:    So you're worried about being
```

1    restricted on cross examination by the scope of the direct?

2            MR. ROGERS:   Yes, Your Honor.  And we were just

3    going to do it all at once, if there's no objection, so that

4    Mr. McGinnis can be excused.  But we will wait.

5            THE COURT:   No.  I would much prefer it be done

6    all at once.  Because I think the continuity, the problem with

7    the continuity with the jury, you know, I don't think that's a

8    good thing.  So I think it ought to all be done at once.  And

9    I understand your position on that.

10           MR. ROGERS:   Well, then we're unlikely to finish

11   before lunch, Your Honor.

12           THE COURT:   That's fine.  I understand that now.

13   Again, I just don't see how this is going to last three and a

14   half days.

15           MR. ROGERS:   I think we'll be closing on Wednesday

16   morning, Your Honor, but that's my guess.

17           THE COURT:   Have y'all looked over the jury

18   charges?

19           MR. GOWER:   Yes, sir.

20           MR. ROGERS:   Yes, Your Honor.

21           THE COURT:   We spent quite a bit of time on those.

22   Very good.  Thank you very much.  Be back at 9:00 in the

23   morning.

24           Remember that if there is something that you need to

25   bring to my attention, if there are some issues, by all means

1    bring those to my attention before we bring the jury back.

2    Just tell Ms. Purvis and we'll go from there.  Thank you very

3    much.

4    (The proceedings of 8-19-13 were thereby concluded)

5

6              *I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT*
     *TRANSCRIPT TO THE BEST OF MY KNOWLEDGE AND ABILITY FROM THE*
7    *RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.*

8

9                         _____
                         */s TAMMY W. FLETCHER  CCR, USCR*
10                       *UNITED STATES DISTRICT COURT*
                         *MIDDLE DISTRICT OF GEORGIA*
11
                         *DATE:  September 23, 2013*
12

13

14

15

16

17

18

19

20

21

22

23

24

25

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*