```
1                  IN THE UNITED STATES DISTRICT COURT

2                  FOR THE MIDDLE DISTRICT OF GEORGIA

3                          MACON DIVISION

4                  _____

5

6    JANE MCGINNIS,                :
                       PLAINTIFF   :   Case No. 5:11-CV-284
7    VS                            :
                                   :       August 20, 2013
8                                  :
     AMERICAN HOME MORTGAGE        :        Macon, Georgia
9    SERVICING INC.,   DEFENDANT.  :
     _____
10
                             JURY  TRIAL
11
                          Volume 2 of 4
12
             BEFORE THE HONORABLE C. ASHLEY ROYAL
13           UNITED STATES DISTRICT JUDGE, PRESIDING

14   APPEARANCES:

15   FOR THE PLAINTIFF:        CHARLES A. GOWER
                               MIRANDA J. BRASH
16                             DAVID ROHWEDDER
                               P.O. BOX 5509
17                             COLUMBUS, GA 31906

18   FOR THE DEFENDANT:        RUSSELL J. ROGERS
                               ANNA BURNS
19                             KELLY THOMAS
                               THOMPSON HINE
20                             TWO ALLIANCE CENTER
                               3560 LENOX ROAD STE 1600
21                             ATLANTA, GA 30326

22
     _____
23                   TAMMY W. FLETCHER   USCR
                        P. O. BOX 539
24                   MACON, GA 31202-0539
                        (478-752-3497)
25
```

```
1                    P R O C E E D I N G S
2    August 20, 2013
3              THE COURT:    We have an unexpected problem this
4    morning.   One of the jurors came in and advised us that if he
5    didn't come in to work today he had been told by his boss that
6    his boss was going to fire him.   Well, that's a serious
7    problem in Federal Court with firing a juror.
8              And I thought that I would take him back to my
9    office and try to soothe his fears about this and then put him
10   back on the jury and just move on as we had planned to move
11   forward.   Now, that's one way to do it.
12             I suppose that we could let him off if you all were
13   uncomfortable with him staying on.   So I don't know, but those
14   seem to be the only two options.
15             I don't feel comfortable putting him on the jury or
16   bringing him back this morning without talking to him about
17   the situation.   I think that would be a mistake.   I think he
18   will sit over there and he's going to worry about it all
19   morning.   And y'all don't need that, neither side needs that.
20   You need to have him where he can pay attention and comprehend
21   what's going on.
22             And then, of course, we can -- it's a civil jury, we
23   can travel with 11 without any trouble.   That is one of the
24   reasons that we don't have any alternates in civil cases
25   because we can go down to six, I think.
```

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1          So, anyway, I wanted to tell y'all about that.  This

2    is very unusual.  I don't think I've had it come up before.  I

3    know Judge Lawson had it come up recently and he got it worked

4    out.

5          But what do y'all think?  Just tell me what are your

6    ideas about it.

7          MR. ROGERS:   We would rather have all the jurors,

8    Your Honor.

9          THE COURT:   I understand.

10          MR. ROGERS:   So the first option seems like the

11    one.  I don't know if Your Honor is permitted or if you would

12    consider it advisable for you to call the boss.

13          THE COURT:   Well, I don't want to stop the trial.

14    I'm going to have somebody call the boss.  That's going to be

15    done.

16          I've talked to Judge Lawson about it this morning.

17    I've talked to the Clerk of Court about it this morning.  And

18    so somebody is going to call him, it's just a matter of how

19    we're going to do that.

20          MR. ROGERS:   Well, Your Honor, we would request

21    that you do what you had laid out as the first option.  We

22    would like to keep all the jurors.

23          THE COURT:   Mr. Gower?

24          MR. GOWER:   Whatever you want to do.

25          THE COURT:   Okay.  Well, Lee Anne, go back and get

1    that juror and bring him into my office.  I'm not going to put

2    this on the record.  Y'all don't think that's necessary, do

3    you?  We're not going to talk about the case at all.

4    (RECESS)

5              THE COURT:    I talked to him.  I read the statute

6    to him.  The statute, of course, outlines the penalties I can

7    impose on his employer.

8              He seemed to be very calm about it.  He didn't seem

9    to be upset.  I got the distinct impression that he was not

10   going to be distracted.  I asked him about that.  And so I

11   think it's going to be fine.

12             And Greg Leonard, our clerk, is going now to call

13   his boss.  And if I hear any more about it then I will deal

14   with it.  Okay.  So who is your next witness?

15             MR. GOWER:    Adam McGinnis, Your Honor.

16             THE COURT:    Let's bring him in.  Bring the jury

17   in, please.

18   (JURORS ENTER COURTROOM)

19             THE COURT:    Good morning, ladies and gentlemen.  I

20   hope you rested well last night.  And we are ready to proceed

21   with the next witness.

22             This is Mr. Gower's witness.  Go ahead and swear

23   him.

24             COURTROOM CLERK:  (Swearing in of witness).  State

25   your name for the record.

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1              THE WITNESS:      William Adam McGinnis.

2                      WILLIAM ADAM MCGINNIS

3        Witness, having first been duly sworn, testified on

4                       DIRECT EXAMINATION

5    BY MR. GOWER:

6    Q      Do you go by Adam?

7    A      I do.

8    Q      Is this your mom?

9    A      Yes, she is.

10   Q      Have you lived in Monticello all your life, pretty

11   much?

12   A      Pretty much.

13   Q      And that is how far from here?

14   A      Forty-five minutes north.

15   Q      You have a wife and children?

16   A      I do.  My wife is my college roommate and friend and my

17   kids are in school.  My daughter is a senior in high school.

18   Q      And what do you do?

19   A      Right now I'm in the real estate business and real estate

20   appraisal business.  So I sell real estate and I do appraisals

21   for residential and commercial properties; along with some

22   printing.  I have a printing business also.

23   Q      Are you the sole printer?

24   A      I am.

25   Q      So you're the chief cook and bottle washer?  The only

1    one?

2    A    I have to wear a lot of different hats, yes, sir.

3    Q    Have you worked every day of your life?

4    A    Every day of my life I have worked, I feel like.

5    Q    Starting when?

6    A    Well my parents were in the grocery business years ago.

7    And so we pretty much -- it was a family-owned business.  And

8    from a grocery standpoint we -- even after football practice

9    or baseball practice we went and stocked shelves.  I learned

10   how to cut meat and I learned a lot of different trades.

11   Q    And over the years did your momma and daddy accumulate a

12   few houses?

13   A    Yes, they have.

14   Q    Tell us, when did your mom and daddy divorce?

15   A    2005, 2006, yes.

16   Q    Obviously, it was a pretty unpleasant situation?

17   A    It was not easy being around in that small town.  I think

18   small town Georgia would probably understand.

19   Q    And then after that, can you tell the jury, did you take

20   over handling your mother's houses to rent?

21   A    I did.  I took over her -- she had a lot of questions.

22   And even though she had been around it for years she never ran

23   the truly day-to-day operations, the repairs, maintenance,

24   collections and stuff like that.

25        So I stepped in when my printing business was kind of --

1      in 2007 and '8 when the economy kind of turned.

2           I couldn't drive to Atlanta as much and do sales so I

3      pretty much helped her try to start running that and get a

4      handle on it, until I took it over when she moved to Florida

5      for her to run the business.

6      Q    When you say took it over, what do you mean?  What did

7      you take over?

8      A    I took over all aspects of collection, repairs and

9      maintenance, organizing, doing the books.  My wife actually

10     did the books for the company.  And leased properties and

11     cleaned them out.  We did every part of it that we could.  I

12     mean there's a lot to rental property.  There is not just

13     collecting rent.

14     Q    Did your mother, at some point, move to St. Augustine

15     where your sister lives?

16     A    Yes, she did.  She went down to spend some time.  It was

17     a -- to put it easily, in a small town when my mother and

18     father divorced, being in the business, there is a lot of back

19     and forth.  They ran into each other a lot.  My sister asked

20     her to come to Florida.  And so my mother moved to Florida.

21     And so we agreed to -- between my sister and brother, I would

22     run the company, kind of be there with her, keep her in the

23     loop.  If we needed her she was there, but I ran the

24     operations for her.

25     Q    For your momma?

1    A    For my mother.

2    Q    Let's get right to it.  Did you see to it that the

3    monthly mortgage payments were made?

4    A    Absolutely.

5    Q    Let me ask you this, Adam.  Did you ever, ever, once

6    Homeward took over, receive a monthly billing statement?

7    A    I have never, until this day, received a monthly billing

8    statement.  And I have pleaded since 2009 for a monthly

9    billing statement.

10   Q    Why?  Why did you want one?

11   A    Because they were saying I was late when we were not

12   behind on any payments.

13   Q    We are talking about a period from '09 to today, which is

14   2013, August of 2013?

15   A    That's right.

16   Q    That's almost four years.  So are you telling this jury

17   for four years you have never received a monthly billing

18   statement?

19   A    I have never received a monthly billing statement from

20   this company.  The only copy of a monthly billing statement

21   that I ever saw was a mailed letter in June of 2010, after I

22   was disputing all of the properties.  And they sent me

23   documents that I have never seen today.

24   Q    Now, let me ask you.  Let's go right to it.  Let me show

25   you this.  On October 30, '09 -- can you see?

1      A     Yes, sir.

2      Q     From October 30, '09, was that when Taylor, Bean and

3      Whitaker had your mortgage?

4      A     I got a letter October 27th, because that's my birthday.

5      And it stated that Taylor, Bean and Whitaker had turned the

6      account over to American Home Mortgage.  So Taylor, Bean and

7      Whitaker was my, through the end of the month, the following

8      month November would be my -- make my payment to the new

9      mortgage company.

10     Q     Because you weren't in here yesterday when Tom Berry was

11     testifying.  But is it on October 30, '09 with Taylor, Bean

12     and Whitaker were you current on your payments?

13     A     Yes, sir.  I have not missed a payment.

14     Q     The very next day did Homeward say that you were in

15     arrears this amount of money?

16            MR. ROGERS:   Your Honor, hearsay and foundation for

17     that matter.

18            MR. GOWER:   If it please the Court, it's not

19     hearsay, they are the Defendant, Homeward.

20            THE COURT:   I'm trying to understand what the

21     background is for that.  Come on up and let's talk about that

22     outside the jury's hearing.

23     (BENCH CONFERENCE)

24            THE COURT:   You know, the way the question was

25     posed a little bit of ambiguity about how all of it came up.

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

```
1    So I don't know what the circumstances are.  You asked a
2    general question and he gave a general answer.  So what are
3    the details of that?  Did they call him?  Did you have a
4    telephone conversation with him?  Was that part of the
5    conversation?
6              MR. ROGERS:   He just asked him was he late on
7    November 1st.  There's no indication that he knows that
8    because no foundation was laid for how he would have that
9    information.
10             MR. GOWER:   I will lay that foundation.
11             THE COURT:   Okay.
12             MR. ROGERS:   Thank you, Your Honor.
13   (BENCH CONFERENCE CONCLUDED)
14   BY MR. GOWER:
15   Q    Let's go back, if you will, Adam, when the loans were
16   taken out in '06.  Is that when they were taken out?
17   A    Yes, sir.  December of '06.
18   Q    Did y'all make the payments each and every month from the
19   date they became first due until October 30, '09?
20   A    Yes, we did.  I made every payment.  I have documentation
21   of every payment.
22   Q    Do you have here today the canceled checks and bank
23   statements to show every payment that was made from that point
24   through today?
25   A    I have every payment.
```

1    Q     Is there any doubt in your mind that you were 100 percent
2    current on October 30, '09 on your payments?
3    A     There is absolutely no doubt.  I am not behind.
4    Q     Did you subsequently learn from Homeward that they said
5    you were behind?
6    A     Yes.  I started receiving phone calls before I got any
7    documentation of any kind that I was late on payments.  Not
8    for one house, but on seven pieces of property.  My wife and I
9    started receiving --
10   Q     Tell us about those phone calls?
11   A     It really got kind of heated.  They came and told us that
12   we -- they called and said that we did not have -- that we did
13   not make our November payment.  And I said here are the
14   checks, you know.  And they said, we'll we've got returned
15   checks from them and that was some checks that were lost by
16   Taylor, Bean and Whitaker.  When Taylor, Bean and Whitaker
17   quit receiving on-line payments.
18        And I proved to them then that we had made our payment
19   every -- I can just about tell you that it got so annoying
20   through the holidays, through the Thanksgiving holidays and
21   everything else, that we were behind.  That we were behind not
22   only on one but on all the rental properties that I'm supposed
23   to be taking care of.
24        And it was upsetting.  My wife and I could not figure
25   out.  Because we had no documentation and all we were getting

1    is phone calls saying that we were behind.

2    Q    Is this on all seven loans?

3    A    On all seven loans they were saying from the very

4    beginning that we were behind.

5    Q    What did you tell them?

6    A    I was not and I have proof to show you where I have paid

7    you.

8    Q    What did they say?

9    A    Well, you are dealing with people that call -- and I

10   don't know if anybody else has had this experience -- that are

11   not from this country or whatever else, and they are looking

12   at a computer screen and all they want you to do is -- how can

13   you pay me today.  And they want you to pay any way they

14   possibly can.  And I guess that's their job.  But I kept

15   disputing it and disputing and saying, I don't.  Please look

16   at my records.  Please tell me where I've missed a payment.

17   And I got nowhere for a long time until an escrow analysis

18   showed up on December the 17th.

19        And from that escrow analysis it showed that we were

20   behind and they wanted 16, $1,200.  Off the top of my head I

21   can't remember exactly which one it was.  But not only did

22   they want for 172 Hilton a lot of money, for every other

23   property that was there they wanted us to -- I mean, there was

24   a thing so we could -- you know, a coupon that you can mail in

25   your payments.  And it was over $7,000.  With taxes and

1    everything else that's due at the end of the year there is no

2    money.

3         And so for somebody to come out of the blue and asks for,

4    you know, that amount of money on all those different pieces

5    of property it just seemed like something was really, really

6    wrong or the accounting practice had gone just crazy.  There

7    is no other way to explain it.  It is hard to explain.  So I

8    hope I'm doing a good job.

9    Q    We're talking about all seven properties that were

10   mortgaged to Homeward?

11   A    That's correct.  All seven.

12   Q    You mentioned an escrow analysis in December of '09.

13         MR. GOWER:   David, would you bring up Plaintiff's

14   Exhibit 8.

15   BY MR. GOWER:

16   Q    And let me ask you if this is what you're talking about?

17   A    Yes.

18   Q    Is this what you're talking about?

19   A    Yes.

20         MR. GOWER:   Your Honor, we offer Plaintiff's

21   Exhibit 8 into evidence.

22         THE COURT:   It's admitted.

23         MR. GOWER:   David, can you zoom in so we can see

24   it, please, sir, the top part.

25   BY MR. GOWER:

```
 1    Q    Now, is this what you're talking about you received?

 2    A    That's right.

 3    Q    And what does this tell you?

 4    A    Well, the first thing that -- it's my job to look at the

 5    stuff.  And in the real estate business I do have to know it.

 6    And when it says that -- I don't know if you can see that

 7    under payment information.  If it says your present payment --

 8    if y'all can see that.  It says my present payment is $843.58.

 9    Q    What date does it say it's due?

10    A    Payment due date is 11-1-2009.

11    Q    Now, I'm going back to my chart.  We were talking about

12    you were completely current the day before?

13    A    Uh-huh (affirmative).

14    Q    And now, according to this, they're saying you owe how

15    much?

16    A    $843.58.

17    Q    And what was your payment the day before?

18    A    $605.58.

19    Q    Were you ever, to this day today, ever given an

20    explanation of how your payment increased from 605.58 to

21    843.58?

22    A    I do not know and nobody has ever given me any

23    explanation of where that number came from.

24    Q    Did you dispute this payment to them?

25    A    Yes, I did.  Because it is not my present payment.  It
```

1    was not my present payment so I knew that the escrow analysis

2    was wrong.  You can't start off wrong and end up right.  I

3    mean, it's got to have some sort of checks and balances.  So I

4    disputed.

5        I disputed not only that one but all of them.  And I got

6    letters stating that I might be, you know, there might be an

7    erroneous error in the escrow analysis.

8    Q    We're going to get to that in just a second.  But let me

9    ask you this.  Were you ever notified before November 1 that

10   your payment was going up from 605.58 to 843.58?

11   A    No, I was not.  If you start the year at 605 I don't know

12   how in the world that you automatically just go in and throw a

13   $843.58.  It just doesn't -- I mean, it would be like having a

14   car payment or something like that and all of the sudden the

15   next month they show up and say you owe $500 instead of $200.

16   It just didn't make sense.

17   Q    Why didn't you just pay the money?

18   A    We didn't have the money.  I mean taxes are due.  That

19   was not the only issue at the time.  I mean, they were asking

20   for a lot of money.  And it's my job for my mother and what

21   I'm doing in this business, you know, to try to make sure that

22   I do my homework, that I've checked everything that I'm

23   supposed to check.

24       I even asked accountants, my own personal accountant, can

25   there be a problem.  I couldn't get that.

1          I deal with the tax assessor office and I'm a part-time

2     insurance guy.  I know what insurance is.  How it's taken out.

3     What the payment should be.

4          So I couldn't figure it out.  I asked for help and at no

5     time was somebody giving me an explanation, even to today, why

6     that payment is 843.

7     Q    Now, this is the escrow analysis you received dated

8     December 17, '09?

9     A    Yes, sir.

10    Q    Now, you mentioned that you received a letter.

11             MR. GOWER:    And David can you go to P14, please.

12    We offer P14 into evidence.  And is this the letter you're

13    talking about?

14             THE COURT:    Mr. Rogers?

15             MR. ROGERS:    No objection, Your Honor.

16             THE COURT:    It's admitted.

17             MR. GOWER:    Thank you.  David, can you do it where

18    you can read it.

19             THE WITNESS:  I can read it.  I saw it.

20    BY MR. GOWER:

21    Q    Okay.

22    A    That's correct.

23    Q    Can you read it?  Let me just do this.  AHMSI, which is

24    Homeward, recently performed an escrow analysis that could

25    have erroneously reflected an escrow overage or shortage due

1     to missing information.  An error had been noted and a new

2     analysis will be performed.  Is that the letter you were

3     talking about referring to the previous escrow analysis?

4     A    That's correct.

5     Q    Well, what did you think when you got that letter?

6     A    There was obviously -- they realized there was a problem

7     and they're going to fix it.  Something is wrong, maybe they

8     didn't get the information or they typed it in wrong.

9     Q    Let me ask you this, Adam.  If you never got a monthly

10    billing statement and you get a escrow analysis and then you

11    get a letter saying disregard it, how did you know what

12    payment to send in?

13    A    I kept making my monthly payment that I started the year

14    with which was the 605.58.  Until the new taxes and everything

15    else, until the escrow came in, that's what I paid, 605.58.

16    And I knew that that covered principal, interest, taxes and

17    insurance.

18    Q    Did you ever try and cheat them?

19    A    No, sir.

20    Q    Let me look at Plaintiff's Exhibit 15.  I want to show

21    you the very next escrow analysis and ask you if this is the

22    next one you received?

23              THE COURT:    Has this been admitted?

24              MR. GOWER:    We offer Plaintiff's Exhibit 15 into

25    evidence, Your Honor.

```
 1              MR. ROGERS:    No objection, Your Honor.
 2              THE COURT:    Admitted.
 3    BY MR. GOWER:
 4    Q    Adam, this one is dated what date?
 5    A    2-20 of '10.
 6    Q    The previous one was December 17, '09.  So this one is
 7    maybe two months later, February '10?
 8    A    The payment due said February '10.
 9    Q    And you see it's got 843.59.  And now they are reducing
10    your payment to 638.32.  Is that the way you see it?
11    A    My new payment 638.32.  But I still disputed it because
12    my present payment still was not $843.59.
13              MR. GOWER:    David, can you go to the bottom of the
14    page and see what the shortage was in the escrow.
15    BY MR. GOWER:
16    Q    You see the shortage in the escrow is how much?
17    A    $91.72.
18    Q    So at this point are you still paying the 605.58 a
19    month?
20    A    I was at that point because things still were not
21    balanced out.  It did not balance and it did not make sense to
22    me and it wasn't justified, at that particular point, to make
23    a payment based off the information given from the mortgage
24    company.
25              MR. GOWER:    The next exhibit I'd like to look at
```

1   is Plaintiff's Exhibit 23 and we offer it into evidence.  It's

2   the 12-17-09 fax.

3           THE COURT:    Mr. Rogers?

4           MR. ROGERS:   No objection, Your Honor.

5           THE COURT:    Admitted.

6   BY MR. GOWER:

7   Q    Is this the fax that you sent to Homeward on December 17,

8   '09 after you got that escrow analysis?

9   A    That is the information that I sent.

10          MR. GOWER:    David, can you blow it up so we can

11  read it, please, sir?

12          MR. ROHWEDDER:  Yes, sir.  Just a second.

13  BY MR. GOWER:

14  Q    Tell us what is the purpose of your sending this fax to

15  them?

16  A    To show the amount that I have been paying on all their

17  loans that they said my payment was different.  I was making

18  sure that their records indicated what I had been paying and

19  what the previous servicer had sent me.

20  Q    What all is this writing on there?

21  A    That is my wife and I trying to go back through and show

22  them what they were doing.  We put insurance, principal,

23  interest, everything that we had been doing back-and-forth.

24  And we were checking.  I mean, if you want to know the truth,

25  those checks were -- my wife generated it.  I checked it to

1    make sure that we were on the same page.  Because at this

2    point we had already been -- we had been receiving so many

3    phone calls that we were behind and it was getting -- it was

4    upsetting and at the same time we couldn't figure it out.  So

5    my wife and I worked hard to try to generate stuff like this

6    to see exactly what the problem was.

7         And at that point, I mean, the social security numbers,

8    all that kind of stuff, my mother was being -- You know, I was

9    like I don't know what's going on.

10   Q    I'm sorry.  What about your mother?

11   A    At this particular point I was -- my designation on these

12   new accounts -- because once they transferred to one account

13   to another you can imagine calling in on one and they go

14   you're not authorized on that account, where we were

15   authorized before.

16        So we had to go all the way back through every one of

17   those to get authorized on the accounts, since I was a part of

18   the account, part of that, to keep her in the loop to let her

19   know what was happening and what was going on.

20        And to really clarify for myself, my sister and my

21   brother that I wasn't behind.  I don't know what they're

22   saying.  I sent them the same stuff and talked to them.

23   Q    Sent who the same stuff?

24   A    My sister and them were like going, you know, what's

25   going on?  And I go, they say that we're behind and we're not.

```
 1      I don't know how much they bought of it at the time, but they
 2      were far removed from the situation.
 3           But it was really, for me and my wife, we wanted to make
 4      sure we were right.  We didn't want the family thinking that
 5      we were doing something wrong.
 6      Q    Okay.  What did you have that you sent that was attached
 7      to this fax?  Now, what is that?
 8      A    The checks that I had been paying and the ones from when
 9      Taylor, Bean and Whitaker switched over to Homeward or AHMSI.
10      Q    Did that do any good, that fax with all those
11      attachments?
12      A    No.
13      Q    Did you continue to receive phone calls?
14      A    Yes, sir.
15           MR. GOWER:    Can we look at Plaintiff's Exhibit 21
16      that we'll offer into evidence.
17           MR. ROGERS:    As long as they explain the
18      handwriting on it there, Your Honor, no objection.
19           THE COURT:    Well, I mean, that's something that we
20      talked about in the pretrial conference.
21           MR. ROGERS:    It is, Your Honor.  It's been altered
22      from it's original form, but if they explain the handwriting
23      we're not going to object.
24           THE COURT:    Okay.  It's admitted.
25      BY MR. GOWER:
```

1    Q    What is the handwriting Mr. Rogers referred to there?

2    A    From what I can remember that is someone that I finally

3    felt like I got to on the other end of a phone call that was

4    actually going to help us try to resolve this issue.

5    Q    Now, the day of that fax, I believe, is February 15, '10.

6          MR. GOWER:    And can you show the attachment,

7    David, please.

8    BY MR. GOWER:

9    Q    They sent you this.  Did you understand that?

10   A    No.

11         THE COURT:    Wait a minute.  I'm confused.  Is this

12   part of that exhibit that you just showed?

13         MR. GOWER:    Yes, sir.

14         THE COURT:    Okay.  Very good.  Go ahead.

15   BY MR. GOWER:

16   Q    When they sent you this fax is this what was attached to

17   it?

18   A    Yes, it was.

19   Q    Did you understand it?

20   A    I am not an accountant.  I did not understand that at

21   all.  I tried.

22         MR. GOWER:    Let me ask you, if we could, David, go

23   to Plaintiff's Exhibit 10, which we offer into evidence.  It's

24   the consolidated notes logs from Homeward.

25         MR. ROGERS:    No objection, Your Honor.

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1            THE COURT:    Admitted.

2    BY MR. GOWER:

3    Q    Could we go to the entry of February 14, 2010.  What do

4    you understand this is, Adam?  This consolidated notes log of

5    Homeward?

6    A    I have no idea.  It looks like it was the information

7    from Taylor, Bean and Whitaker on our responses back and forth

8    between borrower, I guess.

9            MR. GOWER:    Well, do you find February 24, '10,

10   David?

11           MR. ROHWEDDER:    Yes, sir, I see it.

12           MR. GOWER:    Can you blow up the entry where it

13   talks about them being one payment behind.

14           MR. ROHWEDDER:    Yes, sir.

15   BY MR. GOWER:

16   Q    Can you see there and tell us what you interpret they're

17   saying there in that one?

18   A    You're going to have to point it out.

19   Q    It says, "Is questioning the payments --"?

20   A    "Is questioning the payments as account is still missing

21   a payment."

22   Q    Now that's February 24, '10.  That's the notes of

23   Homeward where they made that entry?

24   A    Yes, sir.

25   Q    So is this where you were talking to them and they were

```
 1    telling you you were still a payment behind?
 2    A     Yes, sir.
 3    Q     To Taylor, Bean and Whitaker?
 4    A     Yes, sir.
 5    Q     And the same --
 6              MR. GOWER:    Can you look at Plaintiff's Exhibit 11
 7    which we offer into evidence.
 8              MR. ROGERS:   No objection, Your Honor.
 9              THE COURT:    Admitted.
10    BY MR. GOWER:
11    Q    Is this a fax that you sent to Homeward on February 24,
12    '10?
13    A    It is.  To a individual that I got to on the phone and
14    spoke with for hours.
15    Q    Sir?
16    A    For a guy, Oscar, ID number PZ40M.  We spoke with him.
17    He and my wife spoke for hours.
18    Q    Hours?  What did you talk about for hours?
19    A    What was going on.  I mean, somebody tell me what was
20    happening.  And I never got a response.  All they wanted was
21    payment.  There was no resolution on why we were one month
22    behind or why that number was $843 when they took over the
23    loan.
24    Q    And why did you send this?
25    A    To give the breakdown, web payments January through July.
```

1    August payments.  And the reason I did that is because we made

2    two payments in September to Taylor, Bean and Whitaker.  When

3    they closed their doors we were making all the payments

4    online, direct deposit.

5        My wife went in to make the payment and when the payment

6    was supposed to be posted it kicked back and said Taylor, Bean

7    and Whitaker no longer accepts on-line payments.

8        So I ran the checks to the post office.  By my mistake, I

9    guess, I put all of them in one envelope and sent them to

10   Taylor, Bean and Whitaker and said, oh, by the way, here's

11   your August payments.

12       And in September of '09 they called and said we have not

13   received your payment.  And so I told them we had sent

14   payments and we sent them on this particular day.  And they

15   said, they never got them.

16       So I went -- My wife and I were confused and kind of

17   going, "What happened?"  The lady at Taylor, Bean and

18   Whitaker, the name I do not recall, told us that there is a

19   lot of crazy stuff happening.  I don't know if your payments

20   got here.  Where it is.  So send a payment in.

21       So we canceled those checks that we sent in August.  So

22   this is an explanation of the August checks.  And I replaced

23   them with two months' checks, a check for September and a

24   check that said replaced August check.  So I've got checks out

25   there that I canceled that nobody knew where they were.  And I

1    wrote two checks in September to cover the August and

2    September payment.  And the lady said that they would, you

3    know, get it and waive the late fee.

4    Q    But they didn't do it?

5    A    No.

6    Q    So is the purpose of this to try and prove to Homeward

7    that you had made all your payments to Taylor, Bean and

8    Whitaker?

9    A    That is true, yes.  I made all payments.

10   Q    Can you look at some of the attachments to this exhibit.

11   What is this?  Is this the bank statements from January of '08

12   forward?

13   A    That actually is '06.

14   Q    Sir?

15            THE COURT:    Does that have an exhibit number?

16            MR. GOWER:    Yes, sir.  That is Exhibit Number 11.

17            THE COURT:    So it's part of that?

18            MR. GOWER:    Yes, sir.

19            THE COURT:    Go ahead.

20   BY MR. GOWER:

21   A    THE WITNESS:    They are copies of the bank statements

22   that I went to the bank -- the girl that was here yesterday.

23   Q    Sir?

24   A    The girl that was here yesterday in the jury.

25   Q    Oh.

1    A    I mean, that bank helped me get it together.

2    Q    Just so the jury -- is this where you sent copies of all

3    the checks?

4    A    Yes, sir.

5         MR. GOWER:    David, if you can just keep on

6    flipping through there.

7    BY MR. GOWER:

8    Q    So that was February 24, 2010.  Did it do any good?  Did

9    they straighten out the situation and say, "You're right."

10   Did they straighten it out?

11   A    No, sir.

12   Q    Did you continue to receive phone calls?

13   A    Yes, sir.  Plenty.

14   Q    Sir?

15   A    Plenty of phone calls.

16   Q    Was your mother aware of what was going on?

17   A    She was.

18   Q    How?

19        MR. ROGERS:    Object to the form, Your Honor, it

20   calls for hearsay.

21        THE WITNESS:   Because I speak with my mother.

22        THE COURT:    Wait a minute.

23   BY MR. GOWER:

24   Q    Was your mother there in Monticello on occasions when

25   these phone calls would take place?

1    A    Yes.

2    Q    Did you keep your mother aware of what was going on?

3              MR. ROGERS:    Object, Your Honor.  It calls for

4    hearsay.

5              THE COURT:    I think he can tell what he told his

6    mother.  I don't understand why that's hearsay.

7              MR. ROGERS:    It's an out-of-court statement, Your

8    Honor.

9              THE COURT:    But he's testifying about it in court.

10   I don't see a problem with that.

11   BY MR. GOWER:

12   A    THE WITNESS:  I'm with my mother -- I want to spend a lot

13   of time with my mother.  Even in Florida I kept her -- even in

14   Florida I would get phone calls on my cell phone saying that I

15   was late.  And I would explain to her.  And she goes, "What

16   was that?"  "It's another one of those phone calls."

17        I've even got recorded phone calls while I'm at her place

18   from people wanting to collect money because we're behind and

19   we're not.

20             MR. GOWER:    Let's go, if we can, to Plaintiff's

21   Exhibit 9 which we offer into evidence.

22             MR. ROGERS:    No objection, Your Honor.

23             THE COURT:    Admitted.

24   BY MR. GOWER:

25   Q    Adam, is this a fax that you sent on May 19th of 2010 to

1   Homeward?

2   A     Yes, sir.  It's the second attempt, too.  In many cases

3   -- I don't know where these -- where they store these faxes.

4   I guess they are so big that where these things go and where

5   they go -- So I usually write the second attempt, third time,

6   whatever it is, just to make sure that you did get it.  I sent

7   it the other time and responding.

8   Q     What is the purpose of this fax?

9   A     Breaking down my payment information from the previous

10  year.  Breaking it down on how the $605 was a calculation of

11  principal, interest, taxes and insurance.

12  Q     Is this also where you're disputing the payment of 843.58

13  a month?

14  A     And I am still disputing the payment.

15  Q     Can you go to the next page.  You see in there where it

16  says, "I know I owe you a little more for the shortage but

17  I --"  Can you read on from there and tell us what that means?

18  Can you see it?

19  A     "... but I have not at any time had a payment for $843.59

20  or forced place insurance on the property with Taylor, Bean

21  and Whitaker or with AHMSI.  I want to pay this loan off ASAP.

22  I will not pay any late fees or any deficiencies in monthly

23  payments.  I have attached everything to clear this up.  I

24  need for AHMSI to come up with the payoffs as of June 1, 2010,

25  and return to me via certified mail along with an e-mail of

1    the same documents to the address of my printing company, so I

2    can have an attorney verify the payoff as to see if we will

3    get a check to them."

4    Q    Can you continue reading there?

5    A    "As should the other six loans we also have with you.

6    The quality of customer service is the worst I have ever

7    experienced; no one can help or seems to want to resolve this

8    issue that are truly on your side of the agreement. I hope we

9    can resolve this issue first and then move on with the other

10   loans which I am also disputing with what you are showing in

11   escrow and other charges that you assume are our problem."

12   Q    Let me ask you now about -- you're saying there that you

13   will pay this loan off in full on June 1, 2010?

14   A    Yes, sir.

15   Q    Where would you get the money to do that with?

16   A    Sell a piece of property.  I had been working with an

17   individual to buy a piece of property that my mother owns.

18   Q    And why didn't you just say, "Okay, we'll pay you all

19   these late fees and all these other fees and the back

20   payments?

21   A    Because I didn't have any additional money.  I mean, if

22   we can sell that there is nothing left.

23        I mean, the business runs on a shoestring budget.  I

24   mean, it's not a lot.  It's my mother's retirement.  That is

25   really what it is.  And it's my job to make sure that there is

1    enough money there for whatever happens and how it works out

2    that we can put this thing through.

3    Q     Did you ever receive a response telling you what the

4    payoff was when they take off all those fees and the extra

5    payments?

6    A     No, sir.

7              MR. GOWER:    Can we go to Plaintiff's Exhibit 12

8    which we offer into evidence?

9              MR. ROGERS:    No objection, Your Honor.

10             THE COURT:    Admitted.

11             MR. GOWER:    Can you blow that up, David, where we

12   can see the first two paragraphs maybe?

13             MR. ROHWEDDER:    Yes, sir.

14   BY MR. GOWER:

15   Q     Is this where they are acknowledging receipt of the

16   letter we just saw earlier where you're asking for the

17   payoff?

18   A     Yes, sir.

19   Q     And they're saying they're going to research it and let

20   you know?

21   A     That's right.

22   Q     But did they ever let you know?

23   A     They never let me know what my payment was or the payoff.

24   But that's where they sent me the copies of the billing

25   statement that I never saw and those sheets of paper that

1    would take a rocket scientist to figure out.

2              MR. GOWER:    Let's look at Plaintiff's Exhibit 18

3    which we offer into evidence.

4              MR. ROGERS:    No objection, Your Honor.

5              THE COURT:    Admitted.

6    BY MR. GOWER:

7    Q    Adam, what is this?

8    A    That was notifying that we were in arrears and that they

9    were foreclosing or in the process of foreclosing.

10   Q    Is this one of the lawyer letters that you received on

11   each one of the loans every month?

12   A    Yes, sir.

13   Q    And this Moss Codilis, LLP, are they the law firm that

14   sent you all these letters?

15   A    I got Moss Codilis and then I also received letters from

16   McCurdy Candler, another law firm in Atlanta.

17             MR. GOWER:    Can you show the whole page again,

18   David.

19             MR. ROHWEDDER:    Yes, sir.

20             MR. GOWER:    Well, that's really hard to see that.

21             MR. ROHWEDDER:    The top half, middle or bottom

22   third?

23             MR. GOWER:    Can we see where it has some figures

24   right there.

25             MR. ROHWEDDER:    Here?

```
1              MR. GOWER:   Yes.

2    BY MR. GOWER:

3    Q    See where they're asking $1,908.56?

4    A    Yes, sir.  That's what they wanted me to pay.

5    Q    Did you get one of these letters for each of the seven

6    loans?  Every time you get one would you get seven?

7    A    The only one that really was not there several times was

8    an address called 224 Lenora.  And that is a piece of

9    property, even though the escrow analysis came in at a

10   different number, my number was a higher present payment than

11   what they were showing.  So I kept paying that one.  So I

12   guess that one kind of was the only one that kind of slipped

13   through the cracks.  Because we were overpaying that one

14   because that's what the present payment was.

15        But to answer your question, those were the -- several of

16   those, with a lot of different numbers, all added up to a lot

17   of money.

18   Q    Well, what did you think when you got all these

19   collection letters and you knew you were making your

20   payments?

21   A    I still thought that we could resolve.  I mean, I thought

22   that there was a way to resolve this.

23   Q    Can you give the jury, over the years, how high, if you

24   stacked all the collection letters together, the letters from

25   the law firms, the various law firms, and from Homeward, all
```

1    the collection letters and dunning letters together, if you

2    stacked them in one pile how high would the pile be?

3    A      Five feet high.

4    Q      That many?

5    A      I've got one full filing cabinet and I would think if you

6    stacked it up it would probably be full.  I tried to keep

7    every documentation of everything that I have ever gotten just

8    thinking that we would never get to this point.  But my gosh,

9    I mean, we're here.  So thank goodness I've got somewhat of a

10   record.

11        And also, Charlie, my family, my sister, my mother and

12   everybody else -- I mean, I didn't want any of them thinking

13   that I did something wrong, you know.  Why would I -- I mean

14   -- I made the payment.  I didn't pocket the payment.  I did

15   what I was supposed to do.  And I know there is some crazy

16   stuff out there, but I kept it just to make sure that

17   everybody else knew what I was doing right.

18             MR. GOWER:   Can we look at Plaintiff's Exhibit 17

19   which we offer into evidence?

20             MR. ROGERS:   No objection, Your Honor.

21             THE COURT:   Admitted.

22   BY MR. GOWER:

23   Q    The date of this is March 2, '11?

24   A    Yes, sir.

25   Q    And is this what you received from Homeward?  And what

1    does the first sentence say, the first two sentences?

2    A    "As you are aware, your above referenced loan has been

3    placed in foreclosure for nonpayment.  As a result of the

4    foreclosure action additional fees will be assessed to the

5    loan."

6    Q    So this is March 2, '11?

7    A    Yes, sir.

8    Q    What did you do?

9    A    I panicked.  If you want to know the truth I panicked.  I

10   mean, I feel like this is -- in between that timeframe and to

11   try to straighten the payment out, once they finally got the

12   $638 payment that they said, which is what it should have been

13   in the first place.  I offered, on a phone call in August when

14   I finally got a lady on the phone, on a cell phone I talked to

15   her for almost an hour and 35 or 40 minutes trying to explain

16   to her, if I make up the payment, the difference or the

17   shortage in escrow that they say, which was a difference of

18   605 and 638, if I paid that starting February through August,

19   plus I made the payment for September, would I be paid up

20   until October?  And everything stemmed back and they got on

21   the phone and they came back and said, "No, you would only be

22   paid up through June of '11."  And I said, "How can that be?"

23   And they said because you had payments of $843 and something

24   cents that you were behind when we started this.

25        So even though he is skipping some timeframe there, it

1     still went on and on and on.  And I tried to resolve it

2     without having to -- before it went to foreclosure, before it

3     got any worse.

4         But I was receiving these erroneous payment requests to

5     make 18, 19 -- it ended up being what, twenty-four hundred and

6     something dollars on this particular piece of property.  I

7     could not figure it out.

8         And so I wasn't the only one trying to figure it out.

9     The banker.  The tax assessor.  The insurance people.

10    Everybody was looking at it and nobody could come up with the

11    answer.

12            MR. GOWER:   Could we look at Plaintiff's Exhibit 13

13    which we offer into evidence.

14    BY MR. GOWER:

15    Q    Once it was turned over to foreclosure and they got the

16    foreclosure lawyers, McCurdy and Candler, is this -- Tell us

17    what happened there.

18    A    I panicked and was really kind of wondering why they were

19    taking this piece of property.  And so I got this -- there was

20    a contact name on one of the letters that I received and her

21    name is Jill Nunn.  And I contacted her and was trying to tell

22    her that they were getting ready to do something wrong.  That

23    there was problems and I don't know where the problems are but

24    I wanted to send her the information for them to stop the

25    process, stop the foreclosure.

```
 1           So I gave all of the information -- I mean, there's
 2   43 pages there, of everything that I had documented, every
 3   payment that I had made to them.  So she took that particular
 4   document and she, on a phone call, said that she saw where I
 5   did it.  But she sent it up to American -- AHMSI, Homeward.
 6   Everybody's confused I'm sure about that.  But she sent it up
 7   to Homeward and got no response.  Two weeks went by.  I called
 8   her back and said, do we have any further response from these
 9   people?  And her last comment to me was, she and her people
10   within there, I guess partners or whatever, could see what I
11   did but they don't work for me.  They work for the bank and
12   there is nothing -- if they don't get a response from them to
13   stop the proceedings to do it any further, that there is
14   nothing that they could do for me.  And that's in turn -- I
15   started researching other options.
16   Q    Is this where you sent them --
17           MR. GOWER:    Can you go back there, David.
18   BY MR. GOWER:
19   Q    What is that right there? One of the attachments there.
20   Oh yeah.  I wanted to ask you this.  Did they start in March
21   returning checks?
22   A    I think the first check was returned in February.  They
23   deposited -- they took my check that I mailed in in February.
24   And then they deposit it.  So they cut me a check back from
25   their place and then that was February.  So then March, April
```

```
 1    and May checks, I mailed them in every month and they kept
 2    returning them.  And that is a copy of the March check.
 3              MR. GOWER:    David, can you go back to the first
 4    two pages of this exhibit?
 5              MR. ROHWEDDER:    Yes, sir.
 6    BY MR. GOWER:
 7    Q    And my question to you is, when we get there is, did you
 8    even have a bank employee sign the bottom of the fax
 9    acknowledging that all of this you were sending was correct?
10    A    I think I did.
11              MR. ROGERS:    Hearsay, Your Honor.
12    BY MR. GOWER:
13    Q    Is that it right there?
14    A    That is the bank employee --
15              THE COURT:    Wait just a minute.
16              MR. ROGERS:    Hearsay, Your Honor.  This is now the
17    statement of some unidentified bank employee.  It's not a
18    party.  It's apparently being offered to say that this is all
19    true.  That's not admissible, Your Honor, that's hearsay.
20              THE COURT:    So it's not an agent or employee of
21    the Defendant?  I understand this is some third-party
22    statement?
23              MR. GOWER:    Yes, sir.  This is the bank employee
24    he went and had sign this.  Which, you know, the exhibit is in
25    evidence.  I'm trying to explain what that is.  It's where the
```

```
1     bank employee signed.
2               THE COURT:   What is the exhibit number on that?
3               MR. GOWER:   13.
4               THE COURT:   Has it been admitted?
5               MR. GOWER:   Yes, sir.
6               MR. ROGERS:   It was not, Your Honor.  He didn't
7     offer it.
8               THE COURT:   Well, Ms. Purvis is in control of
9     that.  Has it been admitted or not?  It has not been admitted
10    in the case.
11              MR. GOWER:   Well, we offer Plaintiff's Exhibit 13
12    into evidence.
13              MR. ROGERS:   I object to that portion as hearsay,
14    Your Honor.
15              THE COURT:   Well, I mean, that seems to me like
16    that is hearsay.
17              MR. GOWER:   David, we can't show that then.
18              MR. ROGERS:   Can we get a cured instruction, Your
19    Honor?
20              THE COURT:   Yes.  Disregard that, ladies and
21    gentlemen, that's hearsay evidence in this case and it should
22    be disregarded by you.  Go ahead.
23    BY MR. GOWER:
24    Q    Let me ask you --
25              MR. GOWER:   David, if we can go to the
```

 1   consolidated notes log, Plaintiff's Exhibit 10.

 2   BY MR. GOWER:

 3   Q    Before we get to that, let me just ask you this.  So

 4   we'll have sort of a chronology here.  You made

 5   your payments.  And then your February payment you sent in and

 6   they cashed and then sent you their check back; is that

 7   correct?

 8   A    Yes, sir.  That's the way I recall it, yes, sir.

 9   Q    And then your March payment you sent in and they sent it

10   back?

11   A    That's correct.

12   Q    And your April payment you sent in and they sent it back?

13   A    Yes, they did.

14   Q    And your May payment you sent in and they sent it back?

15   A    Yes, they did.

16   Q    And then they foreclosed?

17   A    That is true.

18   Q    And then you sent your June payment in and they kept it?

19   A    They kept my June payment that I made after they

20   foreclosed on the property.

21   Q    Now let's go to their notes log, the entry of March --

22   This is already into evidence, Plaintiff's Exhibit 10.  So let

23   me go to March 16, '11.

24        MR. GOWER:  If you can find that.  Can you blow up

25   the entry he's talking about?  How much he had to pay to stop

```
 1    the foreclosure.  March 16, '11.
 2              MR. ROHWEDDER:   Right in the middle?
 3              MR. GOWER:    Yes.
 4    BY MR. GOWER:
 5    Q    Do you recollect a conversation you had with Homeward in
 6    March 16, '11 where they told you it would take $6,000 to stop
 7    the foreclosure?
 8    A    I recall that, yes.
 9    Q    They were scheduled to foreclose in May, but they
10    actually did not foreclose until June?
11    A    Net amount estimate is $6,000 good through 3-16-11.
12    Q    Where do you see that?
13    A    Sale date actually 5-3-11.
14    Q    Where do you see the $6,000?
15    A    They were scheduled to foreclose in May but they actually
16    did not foreclose until June.
17    Q    Well, what did you think when in March of '11 they told
18    you you had to pay $6,000 to stop the foreclosure?  Why didn't
19    you just send them a check?
20    A    Because it's wrong.  Nothing makes sense with this.  It's
21    not right.  There is no way it's right. It's not right today.
22    And it will never be right.  But it is a grab at money.  It's
23    a grab at money.
24    Q    And you said the foreclosure notice -- How many times did
25    the foreclosure notice run in the paper in Monticello?  How
```

1    many months?

2    A    It would have ran a total of four months.  It ran about

3    four months based off the two months prior to the original

4    date and then the date of June.

5    Q    Can you tell us the newspaper there in Monticello, what's

6    the name of it?

7    A    The Monticello News.

8    Q    Sir?

9    A    The Monticello News.

10   Q    And can you tell us on the legal ads -- Can you tell us

11   about how big the paper is?

12   A    Twelve to 16 pages at the most.

13   Q    And when you had your ad running and they did you -- How

14   did that make your momma feel?  Was she aware of all this

15   going on?

16   A    She was in the loop the whole time.  There was no time

17   that she was not.  I didn't keep my mouth shut.  I was worried

18   about it.  I talked to the -- I called the newspaper and said

19   are you running this?  And they told me, yes.

20        Being in the real estate business and appraisal business,

21   I mean, it's kind of like, everybody wanted to know what the

22   situation was.  And not only did I have to deal with the

23   embarrassment from that or my mother had to deal with the

24   embarrassment of that for no reason, but a tenant was

25   receiving letters at her house and she was not happy with us

1    and wanted to know what was going on.  Because letters were

2    generated not only to me but to the address at the home.

3         So she was upset.  She was pretty vocal.  I mean, if

4    you're getting kicked out of a house for no apparent reason or

5    your house is being foreclosed on on the courthouse steps, you

6    got to have some questions on, you know, what am I doing.

7         So, my character and my judgment on what was happening

8    was on the line along with my mother's.

9    Q    So we go now to June of '11 when the home was sold.  How

10   much did it sell for?

11   A    On the courthouse steps is sold for $25,000.

12        MR. GOWER:   Can we offer Plaintiff's Exhibit 50

13   into evidence, Your Honor?  We offer Plaintiff's Exhibit 50

14   into evidence.

15        MR. ROGERS:   There's no foundation that's been

16   laid, Your Honor, that accurately depicts the condition of the

17   premises on a particular date.  So if we could have that, just

18   a date, we wouldn't object.

19        MR. GOWER:   All right, sir.

20   BY MR. GOWER:

21   Q    Adam, when was this picture taken?

22   A    I took that Friday of last week.

23   Q    And is this the home, the 172 Hilton Street that was

24   foreclosed on?

25   A    Yes, sir.

1    Q    Is there anything monkeyed around with on this picture or

2    is this accurate?

3    A    That is 100 percent true.  And the neighbors are to the

4    left and to the right of it are really nice neighbors.  And

5    the grass is not cut.  The weeds are grown up.  It is

6    completely abandoned.  Nothing has happened with the house

7    since the lady was evicted.  And nothing has happened to that

8    house.  It is sitting there.

9              THE COURT:    I'm going to admit it.

10             MR. GOWER:    Thank you, Your Honor.

11   BY MR. GOWER:

12   Q    How has the condition of this house hurt your momma?

13   A    Well, in a small town if you rent the houses or something

14   around there they know who it is.  My son used to cut the

15   grass in the yards for the people that lived there.  You know,

16   they know that we own the house.  And when it comes vacant

17   it's usually one of the first ones that rents.  I mean, it's a

18   great neighborhood.  It is a quiet street.

19        I mean, it's one of those -- it's a real appealing house

20   in Monticello.  It really is.  It has three bedrooms and two

21   baths.  It's a great house.

22   Q    Adam, was it approximately --

23             THE COURT:    Let's stop and take a break at

24   this point.  We've been going for an hour and 20 minutes or

25   so.

```
 1              MR. GOWER:    Yes, sir.

 2              THE COURT:    Ladies and gentlemen, it's time for

 3     the mid-morning break.  I'm going to send you back and take

 4     about 15 minutes.  Just go back and relax.  And remember not

 5     to talk to anyone about the case.

 6     (JURORS EXIT COURTROOM)

 7              THE COURT:    All right.  Now, there was an exhibit

 8     that was objected to in part, but it was actually a long

 9     exhibit.  I think it had 43 pages of attachments to it.  Was

10     it 13?  Was it P13?

11              MR. ROGERS:    Yes, Your Honor.

12              THE COURT:    And that hadn't been admitted yet.

13     And it's unclear whether you wanted it admitted.

14              MR. GOWER:    We do.

15              THE COURT:    And it's unclear whether you have any

16     objection to it, if that part is redacted out, which I

17     instructed the jury to disregard.

18              MR. ROGERS:    No objection, if that part is redacted

19     out, Your Honor.

20              THE COURT:    All right.  So we're going to redact

21     that out.  You got that?

22              MR. GOWER:    Yes, sir.

23              THE COURT:    Now, I thought a good bit about

24     Plaintiff's 3.  And I've identified that as a 1006 summary.

25     But it is, I think, pretty clear at this point that on that
```

1    summary out in the right margin there are some notes that were

2    made by your expert.  The way I understand it, are not part of

3    the summary.  They are just the notes that he made.  All that

4    over there on the right, the very far right.  I think those

5    are essentially comments that he made.

6            Everything to the left of that, all those columns, I

7    think should be admitted.  In fact, I've already admitted

8    that.  But there is an objection from defense counsel in this

9    case about the continuing evidence rule and the fact that

10   those really aren't part of the summary.  And so I'm going to

11   let that go out to the jury with that portion being redacted.

12   All right?

13            MR. GOWER:     Yes, sir.

14            THE COURT:     Okay.  Very good.  Anything else?

15            MR. GOWER:     No, sir.

16            MR. ROGERS:    No, Your Honor.

17   (RECESS)

18            THE COURT:     Are we ready to begin?

19            MR. ROGERS:    Your Honor, I hesitate to raise this,

20   Your Honor.  But it appears there's been a violation of the

21   rules of sequestration of the witnesses.  And I don't know

22   what the remedy for that is, Your Honor.

23            I hate to ask for a mistrial.

24            THE COURT:     Well, I'm not clear.  Of course, you

25   need to tell me what you think the violation is and then I'll

1    give Mr. Gower the opportunity to respond.

2         MR. ROGERS:   Well, I reentered the courtroom, Your

3    Honor, and Mr. Gower was huddled with the witness talking

4    about his testimony.  And I reminded Mr. Gower that the rule

5    of sequestration had been invoked.  And he acknowledged that

6    he had been talking to the witness about the testimony, Your

7    Honor.

8         Maybe I'm confused about the rule of sequestration.

9    But I thought once witnesses were sequestered at the beginning

10   of the trial you weren't supposed to talk about the trial with

11   them.  And I don't know if that's the only time it's occurred

12   or if it's occurred more often, Your Honor.

13        THE COURT:   Mr. Gower?

14        MR. GOWER:   I was talking to Adam during the break

15   right here in the courtroom.  And I know of no prohibition

16   against my talking with Adam under these circumstances.

17        THE COURT:   And were you talking about the case,

18   about his testimony?

19        MR. GOWER:   I asked him if we had all of the bank

20   statements and canceled checks in our folder and when did they

21   start?  And he said that he had given them to me and they

22   started in '08.

23        And then I asked him how his momma was last night

24   and how she was feeling and how he was feeling.

25        THE COURT:   Well, as to the first part of that

1    that seems like merely a proposition of trying to get the

2    evidence, making sure that the evidence is available as

3    opposed to dealing with some substantive issue.

4            As to the second part of that which deals with how

5    his mother was last night and how he was doing, I don't

6    understand why that needs to come into evidence anyway.

7            I'm quite frankly not sure what the rule is about

8    talking to a witness during the course of a trial.  And I

9    would have to research that to find out.  But I don't think

10   that either one of those propositions is sufficient to be

11   prejudicial to the Defendant in this case.

12           MR. ROGERS:  Are those the only two times he's

13   discussed the testimony with this witness since the beginning

14   of the trial, Your Honor, with this witness?

15           MR. GOWER:  Yes.

16           MR. ROGERS:  We object, Your Honor, but we

17   understand your ruling.

18           THE COURT:  Very good.  How much longer are you

19   going to have with this witness?

20           MR. GOWER:  Forty-five minutes.

21           THE COURT:  All right.  Very good.

22           MR. ROGERS:  Can we get a reminder that the rule is

23   invoked, Your Honor.

24           THE COURT:  Right.  Well, I think that's a pretty

25   good reminder right there.

1    (JURORS ENTER COURTROOM)

2           MR. GOWER:    Your Honor, we want to show

3    Plaintiff's Exhibit 7 and offer it into evidence, the Security

4    Deed.

5           MR. ROGERS:    Your Honor, the Plaintiff's copy of

6    Exhibit 7 is incomplete.  We have a complete copy of the

7    Security Deed in our exhibits and we would prefer to see that

8    offered.  It is an accurate copy of it; so much of the

9    Security Deed as they have got a copy of it, it's incomplete.

10           THE COURT:    So what we will do is, I'm going to

11    let him use this with this witness and then we will introduce

12    the complete copy which is your Defendant's Exhibit?

13           MR. ROGERS:    I believe it's 37, Your Honor, but

14    we'll use it on cross.

15           THE COURT:    Well, I'm getting ready to admit it so

16    I'd like to know which one it is.

17           MR. ROGERS:    Fair enough, Your Honor.  It's

18    actually 38, Your Honor.

19           THE COURT:    38 is admitted.  All right.

20           MR. GOWER:    Thank you.  David, can you go to the

21    part of the Security Deed that we yellow lined.

22    BY MR. GOWER:

23    Q    Adam, you understand this is the mortgage on the

24    property?

25    A    I do.

**TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497**

1    Q     And can you read what we have yellow lined in yellow?

2    A     "Lender shall estimate the amount of funds on the basis

3    of current data and reasonable estimates of expenditures of

4    future escrow items or otherwise in accordance with applicable

5    law."

6    Q     It is your understanding that on the escrow analysis that

7    is how they are supposed to compute it?

8    A     Yes, it is.

9    Q     And I believe you previously said that when they

10   increased the escrow from October 30th to November 1,

11   some 300 percent, you never received any analysis at

12   all?

13   A     From the dates of what now?  October?

14   Q     When they increased the payment to 843.58 you never

15   received an analysis of how they did it?

16   A     No, sir.  I never received an analysis of escrow.

17   Q     Let me ask you, if you will, go to Plaintiff's

18   Exhibit 24.

19              MR. GOWER:    Which we offer into evidence.

20              MR. ROGERS:   No objection, Your Honor.

21              THE COURT:    Admitted.

22   BY MR. GOWER:

23   Q     And can you tell us what this is, Adam?

24   A     A letter describing the properties that we have with the

25   particular mortgage servicer and the addresses associated with

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1    it.  And there is a second page, isn't there?

2    Q    And this is June of 12 when you wrote the letter.  And is

3    this where you were asking Homeward specific questions?

4    A    That is correct.

5    Q    Can you read the first paragraph up there?

6    A    "Have you ever given mother credit on any of these loans

7    for the August, 2009 payment to Taylor, Bean and Whitaker?  If

8    so, for what loan numbers and in what amount and on what date

9    was she given credit for the payment?  Please do not attach

10   computer printouts.  Please answer the question."

11   Q    And I think you asked a similar question for each month

12   August, September and October of '09; is that correct?

13   A    That is correct.  When it was with Taylor, Bean and

14   Whitaker.

15   Q    So, putting it simply, is this where you were asking

16   Homeward in June of '12 if they had ever given you credit for

17   your payments to Taylor, Bean and Whitaker for August,

18   September and October of '09?

19   A    Yes, sir.

20   Q    Why did you want to know that?

21   A    The way I looked at it, that's the only way we could

22   figure out when they started the problem?  How could there be

23   an issue because we've made every payment.  I was trying to

24   see where it was actually posted in their system and did they

25   give me credit for that particular month because I had a check

1    showing it.

2    Q    Would you look at --

3         MR. GOWER:    David, can you blow up "If you have

4    not given mother credit for payment --"

5    BY MR. GOWER:

6    Q    Can you read that?

7    A    "If you have not given mother credit for the August,

8    September and October 2009 payments, would my mother's six

9    loans remaining with you have been in current standings to

10   your records as of May 15, 2012 -- exclusive of fees and costs

11   you have charged to her account?  If not, what payments do you

12   contend were not made in and what amounts for what months?  Do

13   not simply attach computer printout.  Please answer the

14   question."

15   Q    Why did you not want all these computer printouts, just

16   wanted to answer the question?

17   A    There is no way I can understand that computer printout.

18   I don't know what program it was generated in.  They have

19   their system of doing things and I guess it's easier for them

20   than actually asking that question or telling me what month it

21   didn't show up.

22        So it looked very confusing on 13, 14, 15 pages of

23   documents and they couldn't tell you what payment was applied

24   to what month or what payment did not get applied to the

25   month.  And I just wanted an answer.  I just wanted a definite

1    could you please tell me that month and date.

2            MR. GOWER:    And can you go to the next paragraph,

3    David.

4    BY MR. GOWER:

5    A    THE WITNESS:  "This is further request that you rescind

6    the sale of 172 Hilton that you foreclosed upon and reinstate

7    everything back to the way it was.  If you will not do so

8    please state why you will not do so."

9    Q    And why did you want them to do that?

10   A    Well, it is an embarrassment for the community.  In the

11   community -- I mean, the area down there where it sets and

12   it's an embarrassment for us to have the property sit there.

13   And people know that we own it and there's nothing that we can

14   do about it.  We don't own the house.  It looks terrible.  And

15   it was not theirs to take.

16   Q    All right, sir.  And then the next paragraph.  "Enclosed

17   is a copy".

18   A    "Enclosed is a copy of a letter my lawyer, Charlie Gower,

19   wrote with the three credit bureaus dated June 12, 2012.  Will

20   you agree today to straighten out my mother's credit?  If not,

21   why not?"

22   Q    And then can you show the next letter.  The letter

23   attached.  And is this the letter I wrote to all three of the

24   credit bureaus?

25   A    Yes, sir.

1    Q    Can you show the second page of the letter?  And

2    basically is this where I'm trying to explain to the credit

3    bureaus that the problem is not with your momma, it's with

4    them?

5    A    That's correct.

6         MR. GOWER:   Can we look at Plaintiff's Exhibit 26

7    which we offer into evidence.

8         MR. ROGERS:   No objection, Your Honor.

9         THE COURT:   Admitted.

10   BY MR. GOWER:

11   Q    Is this the response that I got that they sent to me and

12   I sent it to you?

13   A    Yes, sir, it looks correct.

14   Q    And is this where they simply attached all these computer

15   printouts?

16   A    I think that's the one.

17   Q    Yes, sir.  And do you see where -- can you go to

18   Plaintiff's Exhibit -- Well, did that answer the questions,

19   that's my question to you?

20   A    No, sir.

21        MR. GOWER:   Can we go to Plaintiff's Exhibit 6

22   which we offer into evidence.

23        MR. ROGERS:   No objection, Your Honor.

24        THE COURT:   Admitted.

25        MR. GOWER:   David, can you go through all the

1   pages of this.  Just kind of flip through all these pages.

2   BY MR. GOWER:

3   Q    This is just on one loan, the Hilton Street.  Did you

4   understand any of that?

5   A    No, not really.  I got enough -- I got into it enough to

6   kind of look and see what the Ws and the Ls and all that were.

7   But as far as how they placed the money and why they put the

8   money in certain places, I didn't understand that.

9   Q    And did we get one of these for each of the seven loans?

10  A    Yes, I think we did.

11  Q    And is this part of what we turned over to Tom Berry to

12  try and help us out to figure it out?

13  A    Yes, sir, that is it.

14          MR. GOWER:    Can we go, David, now back to P2-1.

15  If it please the Court, we have P2-1 through the rest of them,

16  like 29 or whatever.  We offer all of those into evidence.

17          MR. ROGERS:    No objection.

18          THE COURT:    Admitted.

19  BY MR. GOWER:

20  Q    Adam, this is the -- we're going back to the monthly

21  billing statements that you never received.

22          MR. GOWER:    And can you go through David and just

23  flip through some of those pages.  Now this is on 172 Hilton

24  Street.  Just stop right there.  Just pick a place and stop

25  it.  Can you go down to the bottom?

```
 1    BY MR. GOWER:
 2    Q    Do you see there where it says past due payment.  Can you
 3    read that amount?
 4    A    Past due payment, $1,687.18.
 5    Q    And the total payment due is how much 2,374?
 6    A    2,374.52.
 7    Q    In looking through all of these statements that you got
 8    after the lawsuit -- When did we get all these statements?
 9    A    After the lawsuit.
10    Q    And in looking through all these statements do every one
11    of these statements show a past due payment?
12    A    Yes, sir.
13          MR. GOWER:    Can we go to Plaintiff's Exhibit 43
14    which we offer into evidence.
15    BY MR. GOWER:
16    Q    Did you go on the computer to try and figure out some of
17    this stuff with Homeward?
18    A    Yes, sir.
19          THE COURT:    Wait just a minute.
20          MR. GOWER:    We offer Plaintiff's Exhibit 43 into
21    evidence.
22          MR. ROGERS:   No objection, Your Honor.
23          THE COURT:    Admitted.  Go ahead.
24    BY MR. GOWER:
25    Q    And is this where you went on the computer to try and
```

```
 1    figure out how Homeward is supposed to compute escrow?
 2    A    Yes, sir.
 3              MR. GOWER:    David, can you go to the question
 4    about escrow there?
 5              THE WITNESS:  We also researched American Home
 6    Mortgage first too to see if, you know, prior to them taking
 7    over servicing.
 8              MR. GOWER:   I think it's number 13, I believe.
 9    Can you go to question 13?
10              MR. ROHWEDDER:   That's all there is to this
11    particular --
12              MR. GOWER:   Well let's go then to Plaintiff's
13    Exhibit 46 which we offer into evidence.
14              MR. ROHWEDDER:   That's 43.  Charlie, this is 13 on
15    43.
16              MR. GOWER:   Okay, this is paragraph 13.  This is a
17    portion of Plaintiff's Exhibit 43, David?
18              MR. ROHWEDDER:   Yes, sir.
19              THE COURT:   Has 43 been admitted?
20              MR. GOWER:   Yes, sir.
21              THE COURT:   Go ahead.
22    BY MR. GOWER:
23    Q    And this is paragraph 13.  On the computer it showed you
24    questions and answers about Homeward on the escrow.  And this
25    is number 13.  Can you read the question?
```

```
 1   A    "If my property taxes go up how much time do I have to

 2   send the additional money?"

 3   Q    And what's the answer?

 4   A    "At the time of your annual escrow analysis you will make

 5   an adjustment, any adjustments to your escrow account to

 6   reflect increases in the real estate taxes.  Upon completion

 7   of the escrow analysis we will inform you of the date that

 8   your new payment will be effective."

 9   Q    And can we go to the question about how you pay it over a

10   period of time?  I think that's down there like 23 or

11   something.  Can you read that one?  Yeah, number 23, can you

12   read that question?

13   A    "What if you have to pay my taxes or insurance premium

14   and there is not enough funds in my escrow account to pay the

15   full amount?  Homeward Residential will pay the full amount

16   due for your taxes and/or insurance premiums even if you are

17   short in your escrow account.  Then we will simply collect the

18   shortage back from you in a small additional monthly

19   installments."

20   Q    Does that seem fair to you?

21   A    Yes, sir.

22   Q    Is that what they did?

23   A    No.

24   Q    Can we go to Plaintiff's Exhibit 46 and can you identify

25   this as a webpage on Homeward?
```

```
 1              MR. GOWER:    Which we offer into evidence, Your

 2    Honor.

 3              MR. ROGERS:   No objection, Your Honor.

 4              THE COURT:    Admitted.

 5    BY MR. GOWER:

 6    Q    And this is where Homeward took over or changed the name

 7    of American Home.  And do you see up there where it says

 8    Coppell, Texas?

 9    A    Yes, sir.

10    Q    Sir?

11    A    Yes, sir.  I do.

12    Q    Tell us what you did when you saw Coppell, Texas up

13    there?

14    A    I actually got the lady on the phone and wanted to

15    resolve the issue.  So much for this thing to be over and for

16    it to go away I agreed to drive to Coppell, Texas and do

17    whatever it took to sit down with somebody and explain to them

18    or at least show them what I had to resolve this issue.  I was

19    willing to drive to Texas.

20    Q    And what did they say?  Did they say come on?

21    A    No.

22    Q    What did they say?

23    A    You don't just show up.  This is, you can send your

24    request in.  You can dispute it.  But you don't go sit down

25    with somebody.  It's not like going to your bank.
```

1    Q    Let me ask you --

2              MR. GOWER:    Plaintiff's Exhibit 47 we offer into

3    evidence.  If it please the Court, we did not blow this up

4    because it's so voluminous.  But Plaintiff's Exhibit 47 are

5    the banks --

6    BY MR. GOWER:

7    Q    Well, let me ask you.  What are these, Plaintiff's

8    Exhibit 47?

9    A    My bank statements for my mother's business.

10   Q    And is this on all the loans?

11   A    Yes, sir.  We had all of them.

12   Q    Sir?

13   A    We've got all of them.

14             MR. GOWER:    We offer them into evidence, Your

15   Honor.

16             MR. ROGERS:    No objection, Your Honor.

17             THE COURT:    Admitted.

18   BY MR. GOWER:

19   Q    So is it fair to say these are all the bank statements on

20   all the loans from January, '08 through today?

21   A    They are all the bank statements.

22   Q    And then Plaintiff's Exhibit 48.  Is that also all of the

23   canceled checks on all of the loans from January '08 through

24   today?

25   A    Yes, sir.

```
 1              MR. GOWER:    We offer them into evidence, Your
 2    Honor.
 3              MR. ROGERS:    No objection.
 4              THE COURT:    Admitted.
 5    BY MR. GOWER:
 6    Q    Adam, do you know anything in the world -- anything in
 7    the world you could have done to have straightened this mess
 8    out other than what you did?
 9    A    There was nothing else I could do.  I was exhausted when
10    I found you.  There was no other way and nobody else would
11    handle it.  Nobody else would look at it and take the case
12    without a bunch of money which we didn't have.
13    Q    Before you got to me though, was there anything else --
14    Well, after you got to me and we filed suit did the situation
15    continue?
16    A    The situation was going on as of two weeks ago.  They are
17    trying to foreclose on -- They are moving towards foreclosure
18    on another piece of property my mother owns that I manage.
19    That's 111 Tucker Circle.
20         And it's to the point now where I'm recording phone calls
21    and have been recording phone calls when they call me and ask
22    me for money.  It's identical to the same thing that happened
23    at 172 Hilton.
24         The only thing that we can figure out is that it just
25    didn't start in November of 2009; it started in February of
```

1    '10.  But every one of those particular scenarios are due to

2    someone not applying a payment and saying that we are one

3    month behind.

4    Q    And did we file this lawsuit in July of 2011?

5    A    Yes, sir, we did.

6    Q    And has the same problem continued until today?

7    A    Yes, sir.

8    Q    Are they returning checks -- it's been taken over by

9    another company called Ocwen; is that correct?

10   A    That's correct.

11   Q    Are they returning checks and threatening foreclosure as

12   of last week?

13   A    As of last week 111 Tucker Circle has not received it.

14   But we did get checks back for 1852 Person.  And then they

15   said the amount was not due -- or the amount that we sent in

16   was not correct.  And at this particular time we were trying

17   to figure out what was going on.  So we put in some money and

18   sent it back to them.  And so far they have accepted those

19   checks.  They have not sent them back.  And I don't know if it

20   has to do with the lawsuit.

21       Because when I call the number on the customer service,

22   the only -- when I call in they refuse to talk to me because

23   of the litigation.  But I still get documentation saying that

24   I'm late.  I still get the other side of it saying you're not

25   paying enough, you don't have this, or you're behind one month

1    in payments.

2         Now, I never get a billing statement.  And so I'm taking

3    those escrow analyses and I'm looking at them and I'm pretty

4    much -- I'm familiar with how to do it.  So it's not like I'm

5    not knowledgeable of that and coming up with what I'm supposed

6    to pay them.  But I'm not getting anywhere with any of them

7    except when they call me.  And they are calling me unbeknownst

8    probably to the law firm that they are calling to collect a

9    debt that we are behind.

10   Q    And when they call you what do they say?

11             MR. ROGERS:   Hearsay, Your Honor.

12             MR. GOWER:    If it please the Court, this is what

13   you've ruled on.

14             THE COURT:    This is the telephone conversations of

15   the people calling to collect the debt?

16             MR. GOWER:    Yes, sir.

17             MR. ROGERS:   Yes, Your Honor.  We have transcripts

18   of those conversations.

19             MR. GOWER:    All right, sir.

20   BY MR. GOWER:

21   Q    Let me ask you this.  Did you record some of these

22   conversations?

23   A    Yes, sir.  I recorded a lot of them.

24   Q    And why?

25   A    Because it is the same scenario over and over again.  And

1    I didn't record the stuff when it was happening in 2009 and

2    '10.  And it's the same process, same scenario, just a

3    different house.

4    Q    And when you talk to them do they tell you they are

5    recording it and then you tell them back you're recording it

6    also?

7    A    Absolutely.

8            MR. GOWER:   Your Honor, we offer into evidence

9    Plaintiff's Exhibit 49 which are the transcripts of some of

10   the recorded conversations.

11           MR. ROGERS:   Your Honor, I'm not sure.  I have to

12   renew my objection.  But, you know, we filed the motion and we

13   think that this is hearsay.  Ocwen is a separate company.  So

14   we object to this on hearsay grounds.

15           THE COURT:   Okay.  Well, I understate your

16   objection.  I've already overruled it.  So, you may proceed.

17           MR. GOWER:   We offer Plaintiff's Exhibit 49 into

18   evidence, Your Honor.

19           THE COURT:   All right.

20           MR. GOWER:   At this time, Adam, we would like to

21   play some portions of these conversations.  If you would

22   proceed.

23       (Audio telephone conversation playing at this time)

24           MR. GOWER:   If you would just stop it there.

25   We've got more but we won't play them.

BY MR. GOWER:

Q    These conversations that we just heard, is this what happened in April and May of this year?

A    Yes, sir.

Q    Can you tell us, Adam, over the years from '09 to today how this has affected your mother?

A    (Pause).  Give me just a second.  My mother has had a lots of things happen to her in the past, say since 2005.  And since 2005 she has battled with some issues that are divorce related, you know, separating herself from where she lived, moving to a new place, really adjusting and making some differences in her life.

The one thing that she didn't ask for is the reason we are here today.  And what that has done to her it's really a compounded interest on what the rest of her life is.

They have worked hard -- she and my dad have worked hard in business all their life to acquire properties.  To do the things that are -- if you don't have a 401(k), if you don't have a retirement plan, that these were the retirement.  And it was entrusted in me to make sure that I did it.

And my mother's physical shape, her spirit, in a lot of ways, has been crushed.  And if I could show you a picture of her just last year.  And she's had some physical ailments.  And she's had some knee replacement surgeries that she has needed.

1          She's a tough lady.  I know she can bust, you know,

2     through this.  But it has taken a lot of her spirit, her

3     energy, when a time when she should be enjoying herself.  You

4     know, for all the things that she has put up with, the things

5     that she has done, this is the time for it to work.  And for

6     some reason it's not working.

7          And I'm not a genius.  I'm not a professional accountant.

8     But I do know what I've done.  And I do know that I did it

9     right for her.

10          And four years of my life, when I should have been

11     concentrating on my own family -- and she is my family -- but

12     my family.  We can move on.  We are young enough we can make

13     -- we can bounce back.

14          But for her and what she's done, what's she done for us

15     as a family and -- this was, I mean, it's my way of paying her

16     back to make sure that this is going to follow through until

17     we get to the resolve, to the answer of why is this here and

18     why are we here.  So the question is, it's taken a toll and it

19     hurts.

20               MR. GOWER:    Thank you.

21               MR. ROGERS:   May I approach, Your Honor?

22               THE COURT:    You may.

23               MR. ROGERS:   Is the screen on, Mr. McGinnis?

24               THE WITNESS:  It is.

25                         CROSS EXAMINATION

```
1    BY MR. ROGERS:
2    Q    Mr. McGinnis, I want to talk about some sort of personal
3    information about you before we get into the loans in
4    question.
5         Sir, you reside at 14618 Highway 83 North, Monticello,
6    Georgia; isn't that right?
7    A    That's correct.
8    Q    And you went to college at West Georgia, right?
9    A    I finished at West Georgia, that's correct.
10   Q    And, in fact, when you finished at West Georgia you got a
11   degree in finance from West Georgia, didn't you?
12   A    That's correct.
13   Q    You own and run a small printing business, right?
14   A    Yes, sir.
15   Q    And you do the books for that business, right?
16   A    My wife does the books for the business.  I do not do the
17   books for the business.
18   Q    You are a certified residential appraiser, right?
19   A    Yes, sir.
20   Q    And you do appraisals for McGinnis Realty and Appraisal
21   Service, right?
22   A    That's correct.  That is my dad.
23   Q    And you do about 70 appraisals a year, right?
24   A    The business does about 70 appraisals a year.
25   Q    Well, do you remember when we took your deposition?
```

1    A    Yes, sir.

2    Q    And do you remember telling us you did about 70

3    appraisals a year?

4    A    That's a lot of appraisals but I'm sure that that's close

5    enough, give or take.

6    Q    JCM Rental is your mother's company, right?

7    A    That's correct.

8    Q    That you helped her organize it, didn't you?

9    A    Yes.

10   Q    And you helped her with the refinance with TBW in 2006,

11   right?

12   A    Yes, we did.

13   Q    At the time she was living in St. Augustine, Florida,

14   right?

15   A    She had just moved one month, yes.  We had been working

16   on the process for almost a year until the close of that.

17   Q    As of October 31, 2006, that's the date the refinances

18   closed, right?

19   A    I think so.  I thought it was December.  But, yes.

20   Q    And at that time your mom was living in Florida,

21   right?

22   A    That's correct.

23   Q    You set it up that the communications about those

24   loans would come to you at 14618 Highway 83 North, right?

25   A    That's correct.

```
1    Q    And you set it up so that you had an automatic draft
2    with TBW to make the payments every month, right?
3    A    Automatic draft was set up.
4    Q    At the time of the refi all seven of the properties
5    that were refinanced were rental properties, right?
6    A    That's correct.
7    Q    And you had not lived in any of those properties,
8    right?
9    A    I have not lived in any of those properties.
10   Q    And your mom had not lived in any of those properties,
11   right?
12   A    No, she had not lived in any of those properties.
13   Q    You knew that AHMSI was taking over the servicing of
14   your mother's loans in October of 2009, didn't you?
15   A    Yes.  That's the letter that I generated the 27th,
16   yes.
17   Q    And you knew that you had to start paying AHMSI
18   November 1, 2009, right?
19   A    My next payment to the mortgage servicer was supposed
20   to be to AHMSI, A-H-M-S-I (spelling).  So my November payment
21   would go towards AHMSI, not Taylor, Bean and Whitaker, yes.
22   Q    And the November payments were due on the first of each
23   -- or the payments were due on the first of each month,
24   right?
25   A    First of each month, late after the normal, 15th or
```

1    whatever.

2              MR. ROGERS:   Can we look at Plaintiff's Exhibit 22,

3    please, which we will move to admit the original of this.  We

4    have highlighted it to get to the parts of it that we are

5    going to discuss.  But we would move to admit P22.  We've got

6    a copy in our own documents.

7              THE COURT:   Do you have an objection?

8              MR. GOWER:   No, sir.

9              THE COURT:   Admitted.

10   BY MR. ROGERS:

11   Q    You received this document, didn't you, sir?

12   A    Yes, sir, I did.

13   Q    And this is a document that you gave to Mr. Gower,

14   right?

15   A    Yes, sir.  This is the same copy that I gave to you.

16   Q    Would you please tell us the date on that document?

17   A    October 27, 2009.

18   Q    That is your birthday, right?

19   A    It is.

20   Q    And did you get this document on or around your birthday?

21   A    I would think so.  If it's dated on that I would think it

22   would probably be right at the end of the month.  You know, a

23   little bit later.  The assumption would be if it was dated the

24   27th I might have gotten it the first or whatever.

25   Q    Why don't you, if you would please, read -- do you see in

```
 1    the first paragraph.  Would you read the highlighted portion

 2    of that, please?

 3    A     "We are pleased to inform you the servicing of the loan,

 4    that is, the right to collect payments from you, is being

 5    transferred from Taylor, Bean and Whitaker to American Home

 6    Mortgage Service effective October 17, 2009."

 7    Q     Would you, in the second paragraph there, would you read

 8    the sentence that starts, "We have also enclosed"?

 9    A     "We have also enclosed the borrower's notification

10    attachment per RESPA."

11    Q     The rest of it, please.

12    A     Payments -- Do you just want me to read that highlighted?

13    Q     I want you to read that highlighted sentence all the way

14    to the end.

15    A     "The account status, notice and AHMSI's policy notice as

16    part of this notice."

17    Q     Now the document that you gave --

18              MR. ROGERS:   Will you put the rest of the pages up

19    there, please.

20    BY MR. ROGERS:

21    Q     What's that page?

22    A     That would be the notification -- the borrower's

23    notification of the RESPA.

24              MR. ROGERS:   Kelly, would you put up the next page,

25    please.
```

1    BY MR. ROGERS:

2    Q     What's that page?

3    A     That's an automatic draft if we wanted to do an automatic

4    draft.

5    Q     And these are the pages that we got from Mr. Gower.  That

6    doesn't include an account status notice, does it?

7    A     No, sir.

8    Q     If you would please, let's go back to the first page.  Do

9    you see the paragraph that says payments?  Do you see the

10   sentence that's highlighted?

11   A     "Use the payment coupon attached when mailing your last

12   payment to AHMSI at P.O. Box 5660029, Dallas, Texas

13   75266-0029."

14   Q     Now, there's no payment coupon attached to this copy, is

15   there?

16   A     No, sir.

17          MR. ROGERS:   If we could, I'd now like to look --

18   BY MR. ROGERS:

19   Q     Let me ask.  We saw that there was an authorization for

20   automatic drafting, right?

21   A     They attached a piece of paper if I wanted to authorize

22   it.

23   Q     But you didn't set up automatic drafting with AHMSI,

24   right?

25   A     Absolutely not.

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

```
 1            MR. ROGERS:   If we would, please, let's go to

 2    Defendant's Exhibit 89.  We will move to admit it, Your

 3    Honor.

 4            THE COURT:    Do you have any objections to that?

 5            MR. GOWER:    No, sir.

 6            THE COURT:    Admitted.

 7            MR. ROGERS:   Kelly, if you would zoom in at the

 8    bottom, please.

 9    BY MR. ROGERS:

10    Q    Do you see the underlined portion just above your

11    mother's name?

12    A    "Please use the attached coupon to remit your payment to

13    American Home Mortgage Servicing."

14    Q    And what do you see below that line?

15    A    "Jane C. McGinnis, account number ending in 1477 with a

16    monthly payment of 843."

17    Q    That is a payment coupon, right?

18    A    That's right.

19    Q    And it shows the amount due to be $843.58, right?

20    A    Uh-huh (affirmative).

21    Q    And that was attached to the original you received,

22    wasn't it?

23    A    I don't recall that.  I never got a payment coupon.

24    Q    Why don't we go to the second page of this exhibit.  What

25    is that?
```

1    A    Account status notice.

2    Q    And that's the account status notice that's referenced in

3    the paragraph that you read to us earlier and your copy of the

4    exhibit, right?

5    A    Uh-huh (affirmative).

6    Q    We sent you a subpoena to appear today, didn't we?

7    A    Uh-huh (affirmative).

8    Q    And that subpoena asked you to bring the original of this

9    document, didn't it?

10   A    Yes.

11            MR. ROGERS:    Your Honor, we would like to mark this

12   as Defendant's Exhibit 419 and have it admitted.

13            THE COURT:    That's different from what is up here

14   on the screen or was it part of that?

15            MR. ROGERS:    This is the original of it, Your

16   Honor.

17            MR. GOWER:    No objection.

18            THE WITNESS:    That was exhibit what?

19            MS. PURVIS:    The number again, please.

20            MR. ROGERS:    419.

21   BY MR. ROGERS:

22   Q    I'm going to hand you, sir, Exhibit 419 and I'll ask you

23   please, is that a document you brought with you?

24   A    It looks like the document that I brought, yes.

25   Q    And that's the original of the welcome letter, right?

1    A     Yes.

2    Q     Why don't you look at the back side of the first page,

3    please?

4    A     Okay.

5    Q     What does it have there?

6    A     It's talking about my account status.

7          MR. ROGERS:   Put that back up, Kelly.

8    BY MR. ROGERS:

9    Q     It looks like that, doesn't it?

10   A     Right.

11   Q     So that wasn't in the exhibit that we got from Mr. Gower,

12   but it is in the original, right?

13   A     Right.

14   Q     And it's in our copy of it, right?

15   A     Right.

16   Q     Will you look at the bottom of the first page.  It's

17   shorter than eight and a half by eleven, isn't it?

18   A     Yes.

19   Q     And it appears to have some perforation at the bottom

20   where something has been taken off there, right?

21   A     Right.

22   Q     Does that refresh your recollection that there was a

23   payment coupon attached just like shown in the copy?

24   A     That's probably -- yes.

25   Q     So you received by November 1st of 2009 a payment coupon

1 from AHMSI saying that $843.58 was due, right?

2 A Here's what I'm going to say with that.  Based off this

3 scenario and the way this thing was handled at the time, my

4 wife handled the accounting, which I've stated earlier.  If

5 this right here was removed and questioned because it's

6 showing it's behind -- it says it's asking for a payment of

7 $843.  That is our dispute.

8 Q But you agree that that was the document that you

9 received by November 1, 2009, right?

10 A Yes.

11 Q And you're saying that your wife may have seen it, but

12 she was the one that was responsible for making the payments,

13 right?

14 A That's right.

15 Q Let's start talking about 172 Hilton Street.  Let's look

16 --

17   MR. ROGERS:   Your Honor, we have Defendant's

18 exhibits that have the billing statements with separate

19 numbers.  Can we clean this up after the end so there's only

20 one copy?

21   THE COURT:   Yes, you can.

22   MR. ROGERS:   So what I want to look at is

23 Defendant's Exhibit 249, which has already been admitted as

24 part of 2, but can we move to admit it again just so that we

25 can put it up on the screen?

```
 1                THE COURT:    Yes.

 2                MR. ROGERS:    And we'll clean it up.  There won't be

 3      extra copies that go out, Your Honor.

 4                THE COURT:    Well, what is the parallel number?

 5      That's what we need to know.

 6                MR. ROGERS:    I believe that this is P2A -- P2-1-A.

 7      It's the November 3, 2009 billing statement.

 8                THE COURT:    Does that look right, Mr. Gower?

 9                MR. GOWER:    Yes, sir.

10                THE COURT:    Well, we will have her make a note on

11      that so there won't be any question about it.  Go ahead.

12      BY MR. ROGERS:

13      Q    Can you tell us the date on this, please?

14      A    It's statement date 11-3-2009.

15      Q    Will you look what the address is there?

16      A    That's my address, 14618 Highway 83 North.

17      Q    That was going to be my question.  That's your address.

18      Can you tell us, please, what amount does it show as due and

19      owing?

20      A    It's showing an $843.58 payment and it says I'm 843 past

21      due.

22      Q    The due date on the payment says the first of the month,

23      right?

24      A    Yes.  First of the month normally.

25      Q    And the statement date on this is the third of the month,
```

1    right?

2    A     Yes, sir.

3    Q     And you haven't yet sent any payment for November of 2009

4    in any amount that had been received by November 3rd, right?

5    A     I wouldn't think that would be true because that was the

6    same month that AHMSI received two payments.  One payment,

7    which I don't know when they got it but it was the August

8    payments that were canceled, plus the November payment.

9          So I don't know when they posted, but there were two

10   payments made in that month because one of the payments we

11   canceled the checks.  So that is the month of November.

12   Q     Neither of those payments have been received by

13   November 3rd, right, sir?

14   A     I do not know that.

15   Q     Well, you have all the checks that you put together,

16   right?

17   A     I don't know when they received the ones that they

18   returned.  So I guess they probably could have ran them early.

19   I don't know when the checks went in is what I'm getting at.

20   Most checks that we write are on the 5th to the 7th of the

21   month.  So they get there before the 15th so they clear

22   without the late penalties and all that other stuff.

23         It still doesn't take into account that my payment -- the

24   biggest problem is my payment is not 843.58.  And that is the

25   dispute.

1    Q    Well, that's what it says, right, sir?

2    A    It says my current payment is 843.

3    Q    And if you would, please -- This is P48 which I believe

4    was just admitted.

5              MR. ROGERS:   Can we put that up, please.

6    BY MR. ROGERS:

7    Q    Can you zoom in on the date.

8    A    I can see it.

9    Q    Can you see it?  What's the date?

10   A    11-8-2009.

11   Q    And that is after November 1, 2009, right?

12   A    Yes, sir, it is.

13   Q    And it's after November 3, 2009, right, sir?

14   A    Yes, sir.

15   Q    Let's go back to D249.  I want to zoom in, if we can, on

16   the important messages.  Would you please read the first two

17   sentences of the important messages.

18   A    "American Home Mortgage Servicer would like to take the

19   opportunity to welcome Taylor, Bean and Whitaker customers.

20   The statement reflects the information provided to American

21   Home Mortgage Servicing, Inc. on the status of your mortgage.

22   Please review carefully -- please review for any discrepancy

23   with your records.  If you should find any information

24   different for your records please contact us at 877-304-3100."

25   Q    Now let's go back, if we could, and look at those checks.

I want to look at P5 which I believe was admitted earlier.

MR. ROGERS:  If it was not we would move to admit it.

THE WITNESS:  What date was that?

MR. GOWER:  We have no objection to it being admitted.

THE COURT:  Admitted.

MR. ROGERS:  Will you please zoom in on that check, Kelly.

BY MR. ROGERS:

Q   Can you tell us the amount of the payment that you made in November of 2009?

A   605.58.

Q   Let's look now at Defendant's Exhibit 74.  Now you discussed this document with Mr. Gower, right?

A   I can't see the top of it.  I assume it's an escrow analysis.  Yes.

Q   And this --

A   Analysis date 12-16-2009.

Q   This is the analysis that you received in December of 2009, right?

A   That's correct.

Q   And what does it show for your present payment?

A   $843.58.

Q   And what does it show for the shortage amount?

```
 1   A     $51.49.
 2   Q     I'm sorry.  I asked a bad question.
 3            MR. ROGERS:   Will you go down to the bottom,
 4   please, Kelly.
 5   BY MR. ROGERS:
 6   Q     What does it show for the shortage amount at the bottom?
 7   A     $617.83.
 8   Q     And you acknowledge that Ms. McGinnis has an obligation
 9   or you have an obligation to repay negative amounts in escrow,
10   right?
11   A     If there has ever been one we've always paid it if it
12   reflected the normal charges.
13   Q     So the answer to that question is yes.  If there's an
14   actual shortage in escrow you have an obligation to repay it,
15   right?
16   A     But the only thing I can say with that is that you can't
17   start with a present payment that I do not have, that I did
18   not start the year with, and get to a correct thing.  So the
19   shortage would be -- yes, our obligation is to pay that, the
20   shortage.
21   Q     Your obligation is to pay the shortage?
22   A     That's correct.
23   Q     Thank you.
24            THE COURT:   Excuse me.  Mr. Rogers, we need to
25   know about this document, the number, because it's not
```

1    admitted into evidence according to Ms. Purvis.  Or if it is

2    we don't know what number it is.

3                MR. ROGERS:   The document that's been admitted,

4    Your Honor, again, we set up this examination with our exhibit

5    numbers.  But the document number that has been admitted is

6    Plaintiff's Exhibit 8, Your Honor.

7                THE COURT:   Okay.

8                COURTROOM CLERK:  Thank you.

9                THE COURT:   Tell him what the problem is.

10               COURTROOM CLERK:  P8 is an annual escrow account

11   statement of 12-17-09.

12               MR. ROGERS:  Yes.

13               COURTROOM CLERK:  This one is 12-16-09?

14               MR. ROGERS:   No.  The statement date is 12-17-09.

15   The analysis date is 12-16-09.  It's the same document.

16               COURTROOM CLERK:   Thank you.

17               THE COURT:   All right.  Go ahead.

18   BY MR. ROGERS:

19   Q    Let's look next at Defendant's Exhibit 253, please.

20               MR. ROGERS:   253, we move to admit this.

21               MR. GOWER:   No objection.

22               THE COURT:   Admitted.

23   BY MR. ROGERS:

24   Q    Can you look at the document and tell us what it is?

25   A    Monthly billing statement.

```
1    Q    And it's addressed to your residence in Monticello,

2    right?

3    A    That's correct.

4    Q    It's dated December 18, 2009, right?

5    A    That's correct.

6    Q    And what does it show the amount due to be?

7    A    Are you talking about my current payment, my past due

8    payment or my total payment?

9    Q    The current payment.  The new payment due?

10   A    Current payment, 843.58.

11   Q    And you called AHMSI on February 6, 2010, right?

12   A    I called AHMSI several times, yes, sir.

13   Q    You were calling about a notice that you had received

14   from AHMSI that you were delinquent, right?

15   A    I returned their call, yes, sir.  Yes.

16   Q    And they indicated that you owed late fees, right?

17   A    Yes.  That's the way it normally went.

18   Q    And you were directed to call customer service about the

19   escrow issues, right?

20   A    That's correct.

21   Q    And you made that call, right?

22   A    Yes, sir.

23   Q    And you indicated that you didn't agree with the new

24   payment amount, right?

25   A    That is correct.
```

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1           MR. ROGERS:   If you would please put Defendant's

2    Exhibit 75 up.  Your Honor, this has previously been admitted

3    as P15.  Is that right?  Because we'll move to admit it if it

4    hasn't been.

5    BY MR. ROGERS:

6    Q    Can you tell us what this document is?

7    A    Annual escrow account.  It's an escrow analysis.

8    Q    And what does it show the existing payment to be?

9    A    The present payment?  Existing payment?  Present payment?

10   Q    Yes, sir.

11   A    843.59.

12   Q    And what does it show the new payment effective April 1,

13   2010 to be?

14   A    $638.32.

15   Q    What does it show of that new payment the portion that is

16   the escrow deposit?

17   A    Escrow deposit on the new payment is 140 -- on the

18   present payment it says my escrow deposit is 353.46.  The new

19   payment says escrow analysis, escrow deposit 140.55 or 58.

20   Q    And the principal and interest between the two payments

21   is the same, right?

22   A    That's correct.

23   Q    And then the rest of the new payment is to make up the

24   shortage, right?

25   A    That's correct.

```
 1    Q     How much is that?

 2    A     $7.84.

 3    Q     And will you look out to the left where it says new

 4    escrow deposit breakdown.

 5    A     Taxes and insurance.

 6    Q     What does it show the hazard insurance disbursement to

 7    be?

 8    A     417.

 9    Q     Now, if we can go back to Exhibit 74.  What does it show

10    the insurance to be?

11    A     392.

12    Q     So the insurance had gone up, right?

13    A     What's the date on this one?

14    Q     That's the December 17, 2009.

15    A     Okay.

16    Q     The insurance had gone up, right?

17    A     Yeah.

18    Q     And if we look --

19          MR. ROGERS:   Let's go back up to the breakdown on

20    the new payment, please, Kelly.

21    BY MR. ROGERS:

22    A     THE WITNESS:   But I think taxes went down.

23    Q     The escrow deposit shown there is 138.46, right?

24    A     Right.

25    Q     And that's less than 140.55, right?
```

```
 1    A    That's correct.

 2    Q    And it went up because the insurance went up, right?

 3    A    Yes, sir.

 4    Q    And what is the shortage amount shown below on the new

 5    payment?

 6    A    $51.49.

 7    Q    Why don't we go down to the bottom and you told us this

 8    before.  This shows the shortage to be $617.83, right?

 9    A    Yes, sir.

10    Q    Now let's go back to 75.  Go down to the bottom.  It

11    shows the shortage to be $91.72, right?

12    A    Yes, sir, that's correct.

13    Q    And if we go back up, the amount that you had to pay to

14    make up the shortage is smaller, right?

15    A    $7.84.

16    Q    So the difference between the 12-17-2009 statement and

17    the February 20, 2010 statement is that the insurance went up

18    and the shortage went down, right?

19    A    That's right.

20    Q    Look at Defendant's Exhibit 88, please.

21              THE COURT:    Let's stop and take a lunch break now.

22              MR. ROGERS:   Thank you, Your Honor.

23              THE COURT:    Ladies and gentlemen, I'm going to

24    send you out to lunch.  I want you back in the jury room at

25    1:00 o'clock.  It gives you a little bit more than an hour.
```

1    Go out and enjoy your lunch.  Please don't talk to anyone

2    about the case.  Thank you.

3    (JURORS EXIT COURTROOM)

4            THE COURT:   We're having a problem here because

5    we've got Plaintiff's exhibits and Defendant's exhibits that

6    are essentially the same exhibits.  And this is why we have

7    joint exhibits.  So we don't have to make a dual entry about

8    P3 being D5 or whatever.  And so it's causing some problems

9    here.  You're going to have to be very careful that we know

10   what you're talking about.

11           And I'll tell you that Ms. Purvis has been having a

12   hard time now for the last 30 minutes, at least, trying to

13   figure out what's going on.  So, that was clearly identified

14   in the pretrial order that we needed to have joint exhibits.

15           And I understand what Mr. Gower said about the

16   problems in terms of his identified exhibits in depositions

17   and the change and all that.

18           But you're going to have to go out of your way to

19   make sure we know what we're talking about.

20           Now, let me inquire about one thing.  In listening

21   to the recorded conversation with the Indian woman, I thought

22   I heard her say to the witness in regard to his claims that he

23   had made all the payments.  She said go back to Homeward and

24   see if a payment was made or something like that.  Did I hear

25   that?  That just seems to me to be one more reason that these

1   ought to be admitted.  I know you have an objection to that.

2   But that seems to be just further indication of some kind

3   of agency relationship or something.  I've already ruled on

4   it.

5          MR. ROGERS:   Your Honor, our position would be

6   that's proof that they're separate companies and that's why

7   there can't be admissions.  But I understand what you're

8   saying.  That's proof they are separate companies, Your Honor.

9   You've got to talk to a separate company about what they did.

10         THE COURT:   Well, I don't think there's proof of

11  that.  I think it shows some kind of agency relationship.

12         MR. ROGERS:   With all due respect, Your Honor.

13         THE COURT:   Anything else?

14         COURTROOM CLERK:   I do not have a number for the

15  recording.

16         THE COURT:   Oh yeah.  We need a number for the

17  recordings.

18         MR. GOWER:   Yes, sir.

19         THE COURT:   Do y'all have one?

20         MS. BRASH:   The transcripts are P49.  So if you

21  want to do P49-1.

22         MR. GOWER:   No, we've already got -- let's make it

23  P51.

24         THE COURT:   The recordings are P51?

25         MR. GOWER:   Yes, sir.

```
 1              THE COURT:    And the transcript is 49?
 2              MR. GOWER:    49, yes, sir.
 3              THE COURT:    That's fine.  Anything else?
 4              MR. GOWER:    No, sir, not from me.
 5    (RECESS)
 6              THE COURT:    Ladies and gentlemen, thank you for
 7    being back on time.  And are you ready to proceed with your
 8    cross examination, Mr. Rogers?
 9              MR. ROGERS:    Thank you, Your Honor.
10    BY MR. ROGERS:
11    Q    How was your lunch, Mr. McGinnis?
12    A    I'm not going back to that place again this week.
13    Jeneane's is good -- advertisement though.
14    Q    But you've had enough Jenenae's?
15    A    That's enough.
16    Q    All right, sir.  We were talking about the 172 Hilton
17    Street loan.
18    A    Okay.
19    Q    And we were into the communications back and forth
20    between you and your mother and AHMSI.  AHMSI called you on
21    January 8, 2010; isn't that right?
22    A    They called multiple times on multiple different
23    properties.  So I'm assuming, yes, 172 would have called
24    possibly that day.
25    Q    And you told them during the course -- well, rather then
```

```
 1    guess at it.  Can we put Plaintiff's Exhibit 10 up, please.
 2              MR. ROGERS:   And I want to look at January 8, 2010,
 3    Kelly.  It's page 23.
 4    BY MR. ROGERS:
 5    Q    Do you see the entry there -- the way these stack they
 6    don't always go together as well as they might.  This actually
 7    does.  Do you see the two entries that show 8KK next to them
 8    for January 8, 2010?
 9    A    I do.
10    Q    Would you, starting with the top entry, would you read
11    those entries to us, please.
12    A    "At work."  I don't know what "HRZD TP: No user comments:
13    SD was disputing the amount."  I'm sure that's me.  "Adam was
14    disputing the amount."  And I was telling them I had power of
15    attorney, is the way I read that.  "And then to fax it over.
16    Was not ready to listen."
17    Q    "SD, don't call back."
18    A    "SD, don't call back.  Hung up.  Abusing."
19    Q    On January 8, 2010, did you get a call in which you said
20    that you were not prepared to talk about the account?
21    A    I do not recall being --
22    Q    Do you have any reason to deny that these notes are
23    accurate?
24    A    I think there is a lot of other notes that are not there
25    on other properties that I might have talked to the same day.
```

1    So I don't have any doubt that this is probably a normal

2    conversation with these people after the eighth phone call in

3    a day's timeframe.

4    Q    Did they call you again on January 13th?  I'm just asking

5    you.  I'll show you the --

6    A    I'm sure it was.  They started calling immediately in

7    November.

8    Q    Did you hang up on them on January 13, 2010?

9    A    Oh I'm sure if I was not -- if it was a call that I was

10   in the middle of something else, yes, sir, and that's what the

11   phone call was.

12   Q    Did you refuse to discuss the account at that time before

13   hanging up on them?

14   A    I do not recall.

15   Q    Why don't we look at the note from January 13th.  Do you

16   see the note there 9WS.  The second one.  It starts "COLL:

17   Borrower Jane McGinnis?"

18   A    Yes.  Party hung up.

19   Q    And refused to discuss account, right?

20   A    Yes.  That one says it called home.  They were calling my

21   home, business and cell phone.

22   Q    Do you deny that you refused to discuss the account and

23   hung up?

24   A    I do not deny that I hung up.

25   Q    They called you again on January 28, 2010, right?

1   A    Yes.

2   Q    And on that call you threatened to sue AHMSI, right?

3   A    Yeah.  I was getting really sick of it and tired of what

4   was going on.  I didn't know what the next step was.  So,

5   yeah, that was a verbal comment made probably.

6   Q    If we could, let's go to Plaintiff's Exhibit 21.  Is this

7   a fax to you from AHMSI, right?

8   A    Uh-huh (affirmative).

9   Q    And this included a payment history, right?

10  A    That's correct.

11  Q    Why don't we look at the last page of the exhibit.  And I

12  want to look at three lines down from the top.  Do you see the

13  entry for 12-10-09?

14  A    I see 12-18-09.  I see 12-10-09, yes.

15  Q    And you see where it says county tax disbursement,

16  right?

17  A    Yes.

18  Q    In the amount of $1,269.49, right?

19  A    That is correct.

20  Q    Do you see where the column says escrow paid/balance?

21  A    Yes, I do.

22  Q    Look down on that 12-10-2009 entry.  What does it show

23  the escrow balance to be?

24  A    On 12-10, $1,009.29.

25  Q    Negative?

```
 1    A    I guess that's -- it doesn't show a negative in front of
 2    it.  It just says 1,009 from what I'm looking at.
 3    Q    But it has that negative sign after it, right?
 4    A    Once they took it away from the 1,269.49, I guess, which
 5    left the 3 -- I'm looking at the line that says escrow
 6    paid/balance the first one says 00.  Then it said escrow
 7    paid/balance 1,009.29.  Mine does not have a negative or a
 8    positive.  And then it shows 1,269.49 and then 1,009.29
 9    negative.
10    Q    Right.
11    A    Okay.
12    Q    And do you see the line above it?  What does that line
13    say?
14    A    1,269.49.
15    Q    No, I'm sorry the line -- what's the name of the line for
16    12-10-09 just above the line you just read us?
17    A    Escrow advance.
18    Q    And what does that show?
19    A    I guess that's 1,009.29.
20    Q    Yes, sir.  The line above that says it's a payment,
21    right?
22    A    Transaction and amount paid.  That's my payment, yes.
23    Q    And it shows the amount of $605.58, right?
24    A    That's correct.
25    Q    But it doesn't show any credit for principal or interest,
```

1    right?

2    A    That's the way I'm reading it, yes, sir.

3    Q    Or escrow, right?

4    A    That's correct.

5    Q    And then it has out to the side here under amount, it's

6    got 605.58, right?

7    A    That's correct.

8    Q    Let's go to the next page.  Down at the bottom, please.

9    Do you see 12-18-09 payment?

10   A    Yes, sir.

11   Q    And it's got something in the principal column, right,

12   71.57?

13   A    Yes.

14   Q    And then it's got 418.56 in the interest column,

15   right?

16   A    Yes.

17   Q    And then it's got 353.45 in the escrow column, right?

18   A    Yes, sir.

19   Q    And then under that is says negative 655.84, right?

20   A    Correct.

21   Q    And then out to the side it says new principal escrow

22   balance, right?

23   A    Yes, sir.

24   Q    And then just above where it says that it says 843.58

25   negative, right?

1    A    That's correct.

2    Q    And if we added 71.57, 418.56 and 353.45 we'd get 843.58,

3    right?

4    A    That looks very close, right.

5    Q    So this is showing a payment in the amount that you never

6    made a payment, right?

7    A    No.  My payment comes in on the left-hand side.  It's

8    like on 1-14 it says 605.  I never made a payment.

9    Q    You never made a payment in the amount of 843.58, right?

10   A    No, sir.

11   Q    So this is showing that money coming out of another fund,

12   right?

13   A    Yes, I would assume that that would be what y'all call

14   your --

15   Q    Suspense fund.

16   A    -- suspense.  Yeah.

17   Q    And if we go up to January 14, just like we were talking

18   about, it shows a payment, right?

19   A    Yes.

20   Q    In the amount of 605.58, right?

21   A    That's correct.

22   Q    And that's the amount you paid, right?

23   A    Uh-huh (affirmative).

24   Q    But it doesn't have any credit for principal, right?

25   A    That's right.

1    Q    Or interest, right?

2    A    It shows that it's not but I think it should be.

3    Q    That's not what I asked.  It doesn't show any credit for

4    interest, right?

5    A    Right.

6    Q    And it doesn't show any interest for escrow, right?

7    A    That's right.

8    Q    But it does show again out in that other column 605.58

9    positive, right?

10   A    That's correct.

11   Q    That is the suspense fund, right?

12   A    Uh-huh (affirmative).

13   Q    And then just above that on January 15, 2010 it shows a

14   payment, right?

15   A    Coming out of suspense the 843 again.

16   Q    It shows a payment in the amount of $843.58, right?

17   A    Right.

18   Q    If we look up to January 26, 2010, the first entry for

19   January 26th, it says hazard insurance disbursement.  Do you

20   see that?

21   A    Yes, I do.

22   Q    And the amount of the disbursement is $417.10, right?

23   A    That's correct.

24   Q    And what does it show as the new principal escrow

25   balance, it's $589.91 negative, right?

1    A    That's correct.

2    Q    And then above that on January 26, 2010, it shows an

3    escrow advance in the amount of $417.10, right?

4    A    That's correct.

5    Q    And let's go back to the first page of this, down at the

6    bottom.

7              MR. ROGERS:   The first page of the exhibit, please,

8    Kelly, with the sticker on it.  Down at the very bottom,

9    please.

10   BY MR. ROGERS:

11   Q    This says that it was faxed to you on February 25, 2010,

12   right?

13   A    That's correct.

14   Q    Do you have any reason to believe that that was not the

15   date that you received this fax?

16   A    No.  That's my handwriting.  I would have received

17   that.

18   Q    You didn't call AHMSI about Plaintiff's Exhibit 21, did

19   you?

20   A    This is 21?

21   Q    Yes, sir.

22   A    Then how would I have gotten it if I didn't call them to

23   inquire?  I'm just asking.

24   Q    You didn't call after you got it, did you?

25   A    Yes, sir.  I spoke with AHMSI about every day.

1    Q    Your testimony is you called about this exhibit after you

2    got it?

3    A    After this exhibit?

4    Q    Yes, sir.

5    A    I don't know about this particular exhibit but I called

6    AHMSI a lot.

7    Q    If the notes reflect that you didn't call about

8    Plaintiff's Exhibit 21 after getting it would you have any

9    reason to deny that?

10   A    No, sir.  Mr. Russell, may I ask a question?

11   Q    Sure.

12   A    This is just one -- I know we are just discussing 172

13   Hilton.

14   Q    Yes, sir.

15   A    So when I refer to additional calls -- okay, where when I

16   said I talked to someone else.  I might have received a phone

17   call about 1852 Persons Street that's saying that I was behind

18   too.

19   Q    What's your question, Mr. McGinnis?

20   A    So my question is is while I have that particular person

21   on the phone calling about that I inquire about all of the

22   loans because all of them were there so whether --

23   Q    What's your question, Mr. McGinnis?

24   A    In other words, regarding this particular account, it

25   could have been addressed through another set of phone calls

1    that I made to another thing.

2              MR. ROGERS:   We're going to move to strike all

3    that, Your Honor.

4              THE COURT:    Disregard that.  That is not

5    responsive.  Go ahead.

6    BY MR. ROGERS:

7    Q    Let's look at Plaintiff's Exhibit 13.  Let's find the

8    check dated March 1, 2010.  What's the amount of that check,

9    sir?

10   A    605.58.

11   Q    And in March of 2010 you paid $605.58, right?

12   A    Yes, sir.  Still in dispute.

13             MR. ROGERS:   Would you please put up Plaintiff's

14   Exhibit P2-7.

15             THE WITNESS:  May I see the top of that statement?

16             MR. ROGERS:   Absolutely, sir.

17   BY MR. ROGERS:

18   Q    This is a monthly billing statement for the 172 Hilton

19   Street loan, right?

20   A    That's what it says, yes, sir.

21   Q    And it's addressed to 14618 Georgia Highway 83 North,

22   Monticello, Georgia, right?

23   A    That's exactly right.

24   Q    And that's your address, right?

25   A    That is correct.

1    Q    It's dated March 16, 2010, right?

2    A    That is correct.

3    Q    And if you look at it it shows a negative escrow of

4    $236.45, right?

5    A    That's correct.

6    Q    And it shows a past due of $1,687.18, which I think

7    probably is at the bottom, right?

8    A    That's correct.

9    Q    And it shows the new payment due of $638.32, right?

10   A    That is correct.

11   Q    Let's go back to Exhibit 13 and the check for April 1,

12   2010, please.  What's the amount of that check, sir?

13   A    605.58.

14   Q    So you paid $605.58, right, sir?

15   A    Yes, sir.  I never got the billing statement for March.

16        MR. ROGERS:   Can we look at Plaintiff's Exhibit

17   2-8, please.

18   BY MR. ROGERS:

19   Q    This is another monthly billing statement, right, sir?

20   A    No.  This is a representation of a printed copy of a

21   monthly billing statement.

22   Q    This is your exhibit, right, sir?  Y'all admitted this,

23   right?

24   A    This is what I got in June of 2010.  Copies of

25   representations of a billing statement.  That those are, yes,

1    dated 4-15-2010.

2    Q    And it's addressed to you at your home address, right?

3    A    That is correct.

4    Q    And you're saying you didn't receive this document in

5    April, you received it in June 2010, right?

6    A    I received these documents all in one package when they

7    sent me the request that I requested to find out what the

8    problem was, which took 60 days to get.

9    Q    And that was in June of 2010 that you received those

10    documents, right?

11    A    Yes, sir.

12    Q    This document shows a past due amount of $1,481.91,

13    right?

14    A    That's correct.

15    Q    And it shows a new payment due in the amount of $638.32,

16    right?

17    A    That is correct.

18    Q    Let's look at the check from May 1, 2010, please.  What's

19    the amount of that check, sir?

20    A    $605.58.

21    Q    So you paid $605.58 in May of 2010, right?

22    A    Yes, sir.

23    Q    AHMSI called you again on May 11th, didn't it?

24    A    I'm sure, yes, sir.

25    Q    And you told them in that call that you didn't understand

```
 1    why your payments were $638.20, right?
 2    A    Probably similar to that but it was more -- yes, to
 3    answer your question directly, absolutely.
 4    Q    And you insisted in that call that your payments were
 5    $605.58, right?
 6    A    I don't know about the insisting part.  But I know my
 7    taxes went to one point and my property taxes went down and my
 8    insurance went up.  There was more than $605 that I owed.  I
 9    told them that I know I owed more than 605.  But I knew that
10    there was a problem with the only escrow analysis that I got
11    still showing the problems with escrow.  So I didn't know if I
12    had a surplus or a shortage.
13    Q    So you told them that you knew you owed more, right?
14    A    Yeah.  I eventually paid the 638 in another month or two,
15    yes.
16    Q    Just listen to my question.  You told them that you knew
17    you owed more, right?
18    A    Yes, sir.
19    Q    And yet you continued to pay 605.58, right?
20    A    With my phone conversation stating that I was disputing
21    the whole thing being past due.  I mean I was still hung up on
22    the past due part, Mr. Rogers.
23    Q    You told them that you owed more and you continued to pay
24    the same amount, right, sir?
25    A    Yes, sir.
```

1    Q    And this is after the February 20, 2010 escrow analysis,

2    right?

3    A    That would be after that, yes, sir.

4    Q    AHMSI called you again on May 17, 2010, right?

5    A    Yes, sir.

6    Q    I suppose the thing to say is, AHMSI spoke to you again

7    on May 17, 2010, right?

8    A    Absolutely, yes, sir.

9    Q    And they explained to you, in the course of that

10   conversation, that your payments were being treated as partial

11   payments and put in the suspense account, right?

12   A    Yes.

13   Q    During the course of that you said, as I recall the note,

14   that you had made all your payments.  That every month you had

15   made a payment, right?

16   A    Prior to them taking over I had made all the payments on

17   time that I had and I had made a payment every month to AHMSI.

18   Q    And they advised you to send written documentation to

19   customer service, right?

20   A    Yes, sir.

21           MR. ROGERS:   Now, let's put up Plaintiff's Exhibit

22   9.

23   BY MR. ROGERS:

24   Q    Would you read the first sentence to us, please, sir?

25   A    "Disputing monthly payment in the amount of $843.59 for

1    the account 1477."  Would you like for me to continue?

2    Q    No, sir.  What I would like, sir, is for you to go down

3    to two, four, five lines from the bottom of that page and read

4    the sentence that starts with "The new total tax".  Do you see

5    that?

6    A    "For the 2009 you have collected from us a total tax and

7    insurance of $1,385 --"

8    Q    No, sir.  Five lines from the bottom where it starts with

9    "The new total tax", sir?

10   A    "The new total tax and insurance is 1,686.59 for the year

11   divided by 12 equals 140.55 per month, plus the $490 is

12   $630.68."

13   Q    Now that's you do a rudimentary escrow analysis,

14   right?

15   A    That's correct.

16   Q    You understand that lenders are permitted to collect

17   cushions, right, sir?

18   A    Up to two months, yes, sir.

19   Q    So in the amount of one sixth, right?

20   A    Isn't that when you start the loan?  I mean, there is a

21   cushion when you create the loan.

22   Q    And you understand they're entitled to maintain that

23   throughout the life of the loan?  You understand that, don't

24   you, sir?

25   A    I would think that.  Absolutely.

1    Q    And they can maintain it in the amount of two months and

2    two is one sixth of 12, right?

3    A    Uh-huh (affirmative).

4    Q    So you understand they can maintain a cushion in the

5    escrow in the amount of one sixth through the life of the

6    loan, right?

7    A    Yes, sir.

8    Q    This calculation that you've done doesn't include

9    anything for the cushion, right?  It's just principal,

10   interest -- or rather taxes and insurance, right?

11   A    It's a rudimentary way of trying to explain it to someone

12   that I really didn't think understood it.  And not that I

13   understand more.  I mean, I'm trying to break it down to the

14   enth.

15   Q    630.68 is more than you were paying every month, right?

16   A    That's correct.

17           MR. ROGERS:   Now, I want to go back to the escrow

18   analysis from February 20 of 2010, please, Kelly.

19   BY MR. ROGERS:

20   Q    Now this is the escrow analysis that we looked at

21   earlier.  What does it show the escrow deposit to be?

22   A    $140.55.

23   Q    And let's go back to Plaintiff's Exhibit 9 and your

24   rudimentary analysis?

25   A    $140.55.

1    Q    It's the same, right?

2    A    Yes, sir.

3    Q    So if we go back to the escrow analysis from February 20

4    of 2010 the difference between your calculation and their

5    calculation is the amount every month seven dollars and -- my

6    eyes aren't that good.  What does it say?  7.64?

7    A    7.54, I think.

8    Q    Anyway.  The difference between your calculation and that

9    calculation is that number, right?

10   A    $7, yes, sir.

11           MR. ROGERS:   Let's go to the second page of

12   Plaintiff's Exhibit 9, please, sir.

13   BY MR. ROGERS:

14   Q    Let me read to you, starting at the end of that first

15   line.  "I know I owe you a little more for the shortage in

16   escrow, tax and insurance."  Did I read that correctly,

17   sir?

18   A    I don't have that on here, but yes.  Okay.  I know,

19   that's right.

20   Q    That's what you wrote, right, sir?

21   A    That's correct.

22   Q    I want to go to the TBW escrow statement from 2008, which

23   is one of the exhibits that you have in this fax that you

24   sent.

25           COURTROOM CLERK:    What number?

```
 1              MR. ROGERS:   It's the same exhibit, P9.
 2    BY MR. ROGERS:
 3    Q    Now, do you see this, sir?  This is a document you got
 4    from TBW, right?
 5    A    Yes, sir.
 6    Q    And it's dated August 22, 2008, right?
 7    A    That's correct.
 8              MR. ROGERS:   Let's go to the second page of this
 9    document, please, Kelly.
10    BY MR. ROGERS:
11    Q    This shows the Taylor, Bean and Whitaker escrow analysis
12    from August of 2008, right?
13    A    Yes, sir.
14    Q    And what does it show the new payment effective date to
15    be?
16    A    10-1-08.
17    Q    Now, let's go down to the bottom.  There is some
18    handwriting down there.  Do you recognize that handwriting?
19    A    That is my handwriting.
20    Q    Why don't you read that to us, please?
21    A    Good through 9 of '09.
22    Q    Well, just read the whole thing.
23    A    This is where the payment of 605 came from and is
24    accurate until AHMSI took over until at that time.  Good until
25    9/9.
```

1    Q    And it was Taylor, Bean and Whitaker's practice to do

2    escrow analyses in August, wasn't it?

3    A    That's right.

4    Q    And so the payments would change every year in October,

5    right?

6    A    Yes.

7    Q    AHMSI called you on May 24th, right?

8    A    Yes.

9    Q    2010.  AHMSI spoke to you on May 24, 2010, right?

10   A    Yes.

11   Q    And in that call you explained to them that you knew that

12   the payments were being placed in suspense, right?

13   A    When they explained it to me I knew what some of the

14   problem was, yes, sir.

15   Q    So you came to understand that by the latest in May of

16   2010, right?

17   A    I came to understand that as of that timeframe based off

18   the suspense account, yes.

19            MR. ROGERS:   Let's put up Plaintiff's Exhibit 19,

20   please.

21   BY MR. ROGERS:

22   Q    Let's look at the first paragraph.  This is a letter you

23   discussed with Mr. Gower.  It's a June 30, 2010 letter to you

24   or to Ms. McGinnis, to your mom, from AHMSI, right?

25   A    Yes, sir.

```
1    Q    Would you read those first two paragraphs to us, please,
2    sir.
3                 COURTROOM CLERK:   It's not been admitted.
4                 MR. ROGERS:   Well, then we'll move to admit
5    Plaintiff's Exhibit 19.
6                 MR. GOWER:   No objection.
7                 THE COURT:   Admitted
8    BY MR. ROGERS:
9    A    THE WITNESS:  "This letter is in reference to the
10   correspondence received by AHMSI on the above-mentioned loan
11   number and forwarded to my attention for research and
12   resolution.  I would like to thank you for giving the
13   opportunity to address your concerns.  We received
14   correspondence from Adam McGinnis.  However, no address was
15   mentioned in the inquiry, hence we are forwarding a response
16   to you."
17   Q    This is in response to your May 19 fax, right, sir?
18   A    That is correct.  I failed to put the return on the fax.
19   Q    And this is the letter that you said included the billing
20   statements, right, sir?
21   A    I think that was it, yes, sir.
22   Q    The second page of the document, if you would please,
23   sir, just read the highlighted paragraph to us?
24   A    The account is currently due for April 1, 2010.  Payment
25   and subsequent payments in the amount of $1,914.96 with
```

1    outstanding late fees of $73.53.  Additional funds in the

2    amount of $497.13 are in the suspense account.  Therefore, the

3    total amount due on the loan is $1,491.36.

4         A suspense account is utilized until sufficient funds are

5    received to post the full payment amount due on the loan.

6    Q    Rather than go through each of the checks.  All of the

7    payments you made in 2010 on the 172 Hilton Street loan were

8    in the amount of $605.58, right, sir?

9    A    For the whole year of 2010?

10   Q    Yes, sir.

11   A    No, sir.  I changed to 638 later on in the year.

12   Q    Well, let's look at the December check for 172 Hilton

13   Street.

14   A    Mr. Russell, may I interject.

15   Q    We'll look at the check.  That's the December 20, 2010

16   check, right?

17   A    That's right.

18   Q    What's the amount?

19   A    605.58.

20   Q    Does that refresh your recollection that every payment

21   you made on the Hilton Street loan in 2010 was in the amount

22   of 605.58?

23   A    It is.  But that's why I'd like to interject if I could.

24   Q    I'm sure your counsel can ask it.

25            MR. GOWER:    Your Honor. Could he explain his

1    answer.  I think that's what he's trying to do.

2              THE COURT:    Well, he wants to interject something.

3    It sounds to me like he's going to say something

4    nonresponsive.  So I'll let you redirect him on that.  That

5    will be fine.

6    BY MR. ROGERS:

7    Q    You called AHMSI about the June 30 letter, right?

8    A    Yes.

9              MR. ROGERS:   Why don't we go ahead and look at the

10   note from that.

11   BY MR. ROGERS:

12   Q    While he's putting that up there, I'll say the part that

13   you do remember.  You told them you had made a payment every

14   month, right?

15   A    I made a payment every month.

16   Q    That's what you told them, right, sir?

17   A    Oh I had made a payment every month.

18   Q    And they told you that your payment had increased

19   effective November 2009, right?

20   A    That's correct.

21   Q    Your representative also advised you that your escrow

22   account had gone negative in December of 2009, right, sir?

23   A    Yes, sir.

24   Q    And you said you wanted to make a payment to get caught

25   up but only if the escrow account was removed, right?

1    A     I was trying to resolve the problem, yes, sir.  I did.  I

2    felt like the problem resolved within the escrow.

3    Q     And the representative advised you that the account did

4    not qualify to have the escrow removed, right?

5    A     No.  They said that the account must be up to date and

6    current.

7    Q     To have the escrow removed, right, sir?

8    A     To have the escrow removed.

9    Q     So they told you because the account wasn't current the

10   account didn't qualify to have the escrow removed, right,

11   sir?

12   A     Only because the 843.53 payments were still showing up.

13   Q     It's a yes or no question, sir.  They told you that the

14   account did not qualify to have the escrow removed because --

15   A     Because it must have been paid up, that's correct.

16   Q     They transferred you to another representative, right?

17   A     I'm sure, yes, sir.

18   Q     And that representative said that she would research this

19   issue and get back to you, right?

20   A     Yes.  We have several of those.

21            MR. ROGERS:   This is P10.  The call log.

22   BY MR. ROGERS:

23   Q     And she called you back on July 28, 2010, and left you a

24   message, right?

25   A     I don't see that.  Yes.  July but I don't see it on this

1   piece.  July 20 of '10.  Is that July 20 of '10?

2   Q     Do you see it says SER out to the side was servicing 7-

3   28?

4   A     That's correct.

5   Q     That's the bottom entry from M2R.  Can you read that to

6   us?

7   A     "He knows he does not owe over $2,000 in taxes.  I add,

8   V, I would be more than happy to revisit the issue but will

9   need at least 48 to 72 hours to give him a call back and

10  update.  Also advise once research is complete he is going to

11  pay off his accounts as long as they are -- the numbers are

12  right."  Call back.  That's my cell phone.  "Taylor, Bean and

13  Whitaker account disputing payment.  Increase due to loan

14  being transferred to AHMSI."

15  Q     I don't know where you're reading, sir.  Can you look up

16  at the top of the page.  What I was asking you to read was the

17  fourth entry down, 7-28-10 from M2R starts with "***** SUP

18  call update, outbound call."  Do you see that?

19  A     Yes.  "Outbound call stated (706) 468-2044."  It's dated

20  -- is that it?

21  Q     Yes, sir.

22  A     "Miranda and left message for Mr. McGinnis to call and

23  received account.  After analysis.  Borrower's new payment in

24  the amount of 638.32 was due 3-1-10.  After a new escrow

25  analysis was performed a letter of this change was sent to the

1    borrower 1-15-10.  Borrower continued."

2    Q    Well, actually you have to go.  The way these are stacked

3    you've got to go back up.  So it says, "Sent to the borrower

4    on 1-15.  Borrower continued -- Yes."  Keep reading.  "To send

5    --".

6    A    "Old payment in the amount of 605.58.  Needs $173.93 to

7    justify his new payment.  Then will have to make June and July

8    to bring account up to date."

9    Q    Does it actually say it needs $173.93 to satisfy his May

10   payment and then we'll have to make June and July to bring

11   account up to date?  That's what it says, right, sir?

12   A    I'm taking that as June and July payments are still

13   behind.

14   Q    You got that message right, sir?

15   A    Yes, sir.

16   Q    And then if you just follow M2R.  Let's go to the next

17   page, please.  She called you again on August 3, 2010, right?

18   A    Left message.  The bottom one?

19   Q    Yes, sir.  I'm just asking you to confirm that occurred.

20   She called you on August 3, 2010 and left you a message,

21   right, sir?

22   A    That's correct.

23   Q    And she called you again on August 6, 2010, right, sir?

24   A    That's correct.

25   Q    Let's go up to August 9th.  She called you again on

1   August 9, 2010, right?

2   A      That's correct.

3   Q      On August 10, 2010, she spoke to you, right?

4   A      Yes.

5   Q      And you requested a payment history and copies of the

6   bills, right?

7   A      Payment history and billing statements, yes, sir.

8   Q      And the representative told you that she checked the

9   computer and the bills had been mailed to you, right?

10  A      That's what she said.

11  Q      Let's see.  Called you on August 13th, right?

12  A      That's right.  I'm with a client and can't talk right

13  now.

14  Q      So you told her you couldn't talk?

15  A      That's right.

16  Q      And then she called you again on August 17th, right?

17  A      That's correct.

18  Q      And on August 18th you spoke with her again, right?  This

19  was Miranda, wasn't it?  Was that her name?  Monica?  Does

20  that ring a bell?

21  A      That's right.  I think it is, yeah.  And she called me

22  during regular business hours at my work.

23  Q      She spoke to you on August 18th, right?

24  A      Yes.

25  Q      And you told her you knew that you owed the difference

1    between the projected taxes and insurance and the actual taxes

2    and insurance, right?

3    A    That's absolutely right.

4    Q    And you told her that you knew your payment had changed,

5    right?

6    A    That's right.

7    Q    And you indicated that you believe you would be paid up

8    through August if you paid $1,291.12?

9    A    That's right.

10   Q    But she told you it was going to take $1,483.31 to bring

11   the account current, right?

12   A    I remember some numbers.  That's right.

13   Q    You disagreed with that, right?

14   A    I was trying to make sense of what they were actually

15   asking me to pay and there was a discrepancy on what we were

16   paying.

17   Q    You disagreed with what she said, right?

18   A    Until she could prove it, yes, I disagreed.

19   Q    And you didn't pay $1,291.12, right?

20   A    No, sir.  Because that would only make me current up til

21   June.  They still said I'm behind until June/July, I mean, my

22   next payment.  And that was where I was going a minute ago.

23   But I understand where you are going.  But yes, sir, I see

24   what that states.  But that says that my payment --

25   Q    Let's look --

```
 1          MR. GOWER:    Excuse me, Your Honor.  He's trying to
 2   explain.  Would he please be allowed to do that?
 3          MR. ROGERS:    He's already explained it.  Now he's
 4   volunteering information, Your Honor.
 5          MR. GOWER:    He's trying to explain, Your Honor.  I
 6   respectfully --
 7          THE COURT:    It does sound to me like he was trying
 8   to explain what he just said.  The previous occasion I didn't
 9   think he was.  So I'm going to let him go ahead and explain.
10   BY MR. ROGERS:
11   A    THE WITNESS:    I felt like I finally got somebody on the
12   phone that I could talk to.  In the course of our
13   conversations and me explaining that I am short on escrow,
14   going back and forth with them, I explained to her I will be
15   willing, more than happy, to pay the difference between the
16   605.58 and the 638 and the next month's payment if I was
17   caught up until October.
18        So the next month if that's August and I paid the
19   September payment then I would be paid up through October.
20   They told me I would not be paid up until June. So I'm still
21   showing in arrears even though this other stuff is clear, I'm
22   still in arrears with them and my next payment would be
23   applied to June, not October.
24   Q    So the answer to the question is you did not pay
25   $1,291.12, right, sir?
```

1    A    I would still be behind according to their records.  I

2    did not pay.

3    Q    Yes or no, sir, did you pay?

4    A    No, sir, I did not.

5    Q    With respect to the rest of what she said, would you

6    please read -- Do you see where I'm pointing?  "He believes he

7    should be due."  Do you see that?

8    A    "I believe that I should be due for September."

9    Q    Keep going.

10   A    "If he pays 1,291.14."

11   Q    It's 12, isn't it?

12   A    1,291.12.  "I advised him his TAD is 1,483 and that this

13   will bring him current."

14   Q    Until?  And then if you go up because it stacks down.

15   Until?

16   A    August.  "Borrower does not agree.  He has continued to

17   pay payments, history and billing statements and other

18   accounts by mail to him via overnight."

19   Q    That's what I wanted you to read.  The representative

20   called you back on September 8, 2010, right?

21   A    Yes, sir.

22   Q    And she called you again on September 15, 2010, right,

23   sir?

24   A    Yes, sir.

25   Q    And she called you again on September 15, 2010, right,

1    sir?

2    A    Yes, sir.

3    Q    And she called you again on September 21, right, sir?

4    A    Yes, sir.

5    Q    And finally on September 27 she sent you a letter saying

6    she had been trying to call you but couldn't reach you and she

7    was going to close this matter at this point, right?

8    A    I guess is where we are at right now.

9    Q    No.  I'm talking about a letter.  I'm not talking about

10   that anymore.  She sent you a letter.  Do you remember getting

11   a letter?  She sent you a letter saying she was trying to

12   reach you and couldn't reach you and she was going to close

13   it, right?

14   A    I don't remember all that, but if you can produce it I'll

15   be glad to look at it and see if I recall.

16            MR. ROGERS:   Well, Your Honor, someone has moved my

17   document.  That someone was me.  Permission to approach, Your

18   Honor.

19   BY MR. ROGERS:

20   Q    Let me hand you sir, what's been marked D420.  And I'm

21   going to move to admit this document at this time.

22            MR. GOWER:    No objection.

23            THE COURT:   Go ahead.  It's admitted.

24   BY MR. ROGERS:

25   Q    Sir, would you please read the letter to us?

1    A    "This letter is in reference to the call received by

2    American Home Mortgage Servicing on the above-mentioned loan

3    number."  There are several loan numbers up there.  So I'm

4    just making sure that's a total of -- there are six different

5    loan numbers on there.  So I'm making sure I've got the right

6    -- "On the above mentioned loan number and forwarded to my

7    attention for research and resolution.  I would like to thank

8    you for giving me the opportunity to address your concerns.

9    We have attempted to contact you at the phone number listed on

10   your account regarding the recent call we received.

11   Unfortunately we have been unsuccessful in any attempts.  If

12   you still require assistance please contact me directly at the

13   number listed below.  AHMSI is dedicated to providing superior

14   service to all our customers.  Should you have any further

15   questions or concerns please do not hesitate to call me

16   directly at 1-877-304-3100, extension 75380.  Monday through

17   Friday 7 a.m. to 4 p.m. central time."

18   Q    Thank you, sir.  And the one at the end of the line up

19   there in re:  AHMSI loan number, 1477, that's the loan for 172

20   Hilton Street, right, sir?

21   A    1477 is that loan number.

22   Q    Let's look at Plaintiff's Exhibit 18, please.  This is a

23   document also that you discussed with Mr. Gower.  I would like

24   you to look, if you would please, at the first paragraph.  No,

25   rather the second paragraph of the letter.  Starting you are

1   hereby provided?

2   A    "Formal notice by the servicer, AHMSI, as authorized by

3   the creditor and the above referenced home loan that you are

4   in default under the terms and conditions of the note and

5   security instruments.  IE, deed of trust, mortgage or failure

6   to pay required installments when due."

7   Q    Would you read the next paragraph, please?

8   A    "This letter serves as formal notice that AHMSI intends

9   to ensure the provisions of the note and security instruments.

10  You must pay the full amount of default in this loan by the

11  35th day from the date of this letter which is 10-25 of '10 or

12  if said date falls on a Saturday or legal holiday then the

13  first business day thereafter.  If you do not pay the full

14  amount of the default our client shall accelerate the entire

15  sum of both principal and interest due and payable and invoke

16  any remedies provided for in the note and security

17  instruments, including but not limited to the foreclosure sale

18  of the property.  If you receive a bankruptcy discharge which

19  includes this debt, this notice is not intended and does not

20  constitute an attempt to collect a debt against you

21  personally.  Notice provisions may be contained within your

22  mortgage deed or trust which requires this notice prior to

23  foreclosure."

24  Q    You told Mr. Gower this is a document you received,

25  right?

```
1    A    Yes.
2    Q    In fact, you said you received other letters like this
3    one, right?
4    A    On other pieces of property.
5    Q    Did you receive other letters like this one on the Hilton
6    Street property, sir?
7    A    Yes, sir.
8    Q    I want to look at another document that you talked with
9    Mr. Gower about which is P17.  Sir, you read the first
10   paragraph, Mr. McGinnis.  You see that second paragraph
11   starting with here are some -- Do you see that?
12   A    Yes, sir.
13   Q    Would you read just -- you don't have to get into the
14   numbers and stuff, just read that sentence to us, please.
15   A    "Here are some possible solutions that you may be able to
16   offer -- that we may be able to offer you that could
17   potentially help you avoid a foreclosure sale and bring your
18   loan current."
19   Q    And then it says, one, repayment plan, right?
20   A    Uh-huh (affirmative).
21   Q    Two, loan modification, right?
22   A    Right.
23   Q    Three, short sale or pre-foreclosure sale, right?
24   A    Yep.
25   Q    And four, deed in lieu of foreclosure, right?
```

1    A    That's correct.

2    Q    None of those four occurred, right, sir?

3    A    No, sir.

4    Q    Eventually the Lender did foreclose on the property at

5    172 Hilton Street, right?

6    A    That is correct.

7    Q    What was the date of that foreclosure, sir?

8    A    6-6-2011.

9    Q    So June 6 of 2011?

10   A    Yes, sir.

11   Q    You had someone at the foreclosure sale when it was

12   cried, right, sir?

13   A    I was there.

14   Q    You were there when it was cried?

15   A    Uh-huh (affirmative).

16   Q    And what was the sale price, sir?

17   A    25,000.

18   Q    Before the Lender foreclosed you got notice of the intent

19   to foreclose, right?

20   A    Yes, it was postponed, so we got many notices.

21   Q    And the notice included a reinstatement amount, right?

22   A    An amount to reinstate it?

23   Q    Yes.

24   A    Yes, sir.

25   Q    And you didn't pay the reinstatement amount, correct,

```
 1    sir?

 2    A    No, sir.

 3    Q    No one has come to you looking to collect the balance due

 4    on the 172 Hilton Street loan since the foreclosure, right,

 5    sir?

 6    A    No, sir.

 7    Q    June of 2000 was the same month your mother began paying

 8    you a $2,000 monthly management fee, wasn't it?

 9    A    That was June of when?

10    Q    2011, sir.

11    A    I think that was '10 or '11.  We had reduced that since

12    then.  But yes we worked out a management fee.

13    Q    It was originally $2,000, right?

14    A    That's right.

15    Q    Now it's $1,000 a month; is that right?

16    A    That's correct.

17    Q    Let's look to Defendant's Exhibit 54, please.  This is a

18    letter that's addressed to your mother, right?

19    A    That's correct.

20    Q    At your address, right, sir?

21              MR. ROGERS:   Can we move to admit this, please?

22              THE COURT:    You don't have any objection to that?

23              MR. GOWER:    No, sir.

24              THE COURT:    Admitted.

25    BY MR. ROGERS:
```

1   Q    It's addressed to you at your mother's address, right,

2   sir?  Or addressed to your mother at your address, right, sir?

3   A    It's my address, addressed to my mother.

4   Q    And this is about the Persons Street, property, right,

5   sir?

6   A    This is about the 548 Persons Street, that's correct.

7   Q    And would you please look at the paragraph at the bottom

8   that says, "Please be advised."  Would you read that?

9   A    "Please be advised that the monthly billing statements

10  are automatically generated each time a payment is applied,

11  reversed or a late charge is assessed to the account."

12  Q    Keep going, please.

13  A    "Currently the monthly billing statements are being

14  mailed to the address mentioned above.  Please contact our

15  customer care department to update your mailing address if the

16  mailing address on file is incorrect.  In addition monthly

17  billing statements are not necessary to remit the monthly

18  payments due.  It may be forwarded -- you may forward the

19  payments to the address listed below."

20  Q    I want to talk about a few other things that you talked

21  about with Mr. Gower.

22  A    Mr. Rogers, I don't own 548 Persons Street.

23  Q    You received this letter, right, sir?

24  A    But I do not own 548 Persons Street.

25  Q    You received this letter, right, sir?

1    A    Yes, sir.

2    Q    Can we go now to Plaintiff's Exhibit 14, please.  Now,

3    this is the letter that you talked about with Mr. Gower about

4    the escrow analysis from December 17, 2009, right?

5    A    Yes, sir.

6    Q    And why don't you just read that first sentence, that

7    first paragraph to us?

8    A    "AHMSI recently performed an escrow analysis on your loan

9    that could have erroneously reflected either an escrow overage

10   or shortage due to missing information."

11   Q    That's a generic letter, isn't it, sir?

12   A    I think that's a generic letter.

13   Q    And that generic letter told you to continue paying the

14   amount set forth in your billing statements, right, sir?

15   A    Yeah, but no billing statements were received by me at

16   the address, sir.

17   Q    And you then didn't call to get a billing statement; is

18   that what you're saying?

19   A    No, sir.  When I dialed the phone number 1-877-304-3100

20   to get the answer we were always told that we were in arrears

21   and behind.  So the question is is I never received a billing

22   statement.  I told them I never received a billing statement

23   and I wanted to know why I was late and I'm making my other

24   payment.

25   Q    You had received the December 17, 2009 escrow analysis,

1    right?

2    A     That's right.

3    Q     And it told you what your current payment was, didn't it?

4    A     My previous payment wasn't right so how can it be really

5    for real.

6    Q     The December 17, 2009 escrow analysis told you what your

7    present payment was, right?  It said it was 843.58, didn't

8    it?

9    A     It said my previous payment was 843?

10   Q     It said your current payment was?

11   A     That's what it said my current previous payment was but

12   that was not what I had been paying.

13   Q     Let's go back to Plaintiff's Exhibit 23.  Let's not do

14   that.  I just want to talk about Plaintiff's Exhibit 50.  That

15   was a picture, right?

16   A     Which one?

17   Q     That photograph?

18   A     Yes.

19   Q     You took that photograph, right?

20   A     Yes, sir, I did.

21   Q     And you took it Friday of last week, right?

22   A     That's correct.

23   Q     And that was August 16, 2013, right?

24   A     I think that's right.

25   Q     AHMSI wasn't handling the loans or the property at that

```
 1    point, right?

 2    A     The city tax assessor, the note on the door, nobody knows

 3    who owns that house.

 4    Q     You know that AHMSI stopped doing business under the name

 5    Homeward and Ocwen took over, right?  You got notice of that,

 6    didn't you?

 7    A     That's correct.

 8              MR. ROGERS:   And if we look at Plaintiff's

 9    Exhibit 44, which we will move to admit, Your Honor?

10              THE COURT:   Mr. Gower.

11              MR. GOWER:   No objection.

12              THE COURT:   Admitted.

13              MR. ROGERS:   Would you zoom in on the first

14    paragraph, please, Kelly.

15    BY MR. ROGERS:

16    Q     Would you please read that paragraph.

17    A     Starting effective 3-1?

18    Q     Yes, sir.

19    A     "Effective 3-1-2013 Homeward Residential will transfer

20    the servicing of your account to Ocwen Loan Servicing.  The

21    transfer to the servicing of your account does not affect any

22    terms of the conditions of your financial agreement other than

23    the terms directly related to the servicing of your account.

24    Your loan number will change and the new number below -- the

25    new loan number is noted above."
```

```
1    Q    You got that letter, right, sir?

2    A    Yes, sir.

3         MR. ROGERS:   And why don't you go up, please,

4    Kelly, the date of that letter.

5    BY MR. ROGERS:

6    Q    The date of that letter is February 13, 2013, right?

7    A    Uh-huh (affirmative).

8    Q    And that letter informed you that Homeward was not going

9    to be working on any of these loans anymore, they were all

10   going to go to Ocwen, right?

11   A    But the foreclosure took place in June of '06.  Are we

12   getting there?

13   Q    I'll make that point myself in just a second.

14   A    Yes.  They took over the loans.

15   Q    On March 1, 2013, right?

16   A    Yes, that's right.

17   Q    Which is almost six months before you took that photo

18   that's Exhibit 50, right?

19   A    Six months before?

20   Q    Yes, sir.

21   A    That's right.  I just that -- So this would be February

22   -- yeah, six months.

23        MR. ROGERS:   Put up D38, please, Kelly.

24   BY MR. ROGERS:

25   Q    You read a sentence from the Security Deed from Mr.
```

1    Gower.  I just want you to read that whole paragraph.

2    A    To have and to hold or do you want the one that's

3    highlighted?

4    Q    I want paragraph 3 --

5              THE COURT:    What exhibit number?

6              MR. ROGERS:    This is Defendant 38, Your Honor, the

7    Security Deed.

8              COURTROOM CLERK:  Is that P7?

9              MR. ROGERS:    No.  We objected to P7.  It's D38

10   that's going to be admitted because P7 is a partial copy.

11   BY MR. ROGERS:

12   Q    If you would read, please, the paragraph that is

13   highlighted.

14   A    Number three, the funds, the escrow?

15   Q    No.  Lender may at any time --

16   A    "Lender may at any time collect and hold funds in an

17   amount sufficient to permit Lender to apply the funds at the

18   time specified under RESPA.  And not to exceed the maximum

19   amount a Lender can require under RESPA.  Lender shall

20   estimate the amount of funds due on the basis of current data

21   and reasonable estimates of the expenditures of future escrow

22   items and otherwise in accordance with applicable law."

23   Q    You read the second sentence for Mr. Gower.  The first

24   sentence says that the Lender can collect that cushion we were

25   discussing earlier, doesn't it?

1    A    Yes, it does.

2    Q    You told Mr. Gower that you offered to drive to Texas,

3    right?

4    A    That's right.

5    Q    And that was in 2012, right?

6    A    I think that's right, yeah.

7    Q    This lawsuit had been filed in July of 2011, right?

8    A    No.  We did it in 2000 -- when I -- 2011 is when I

9    offered to drive.  Before the foreclosure I offered to drive.

10   So it would have been in '10 I offered to go and clear things

11   up.  We researched the process for years, okay, to try to

12   figure out who was what and how to resolve this.

13       My question is the time and date when I wanted to drive

14   to get it straight on all my loans that we still had with

15   them?  2012, 2011, 2010.

16   Q    I don't understand the answer, I don't guess, sir.  But

17   who were you talking to when you made that offer?

18   A    Homeward or AHMSI which is one in the same, right?

19   Q    Homeward and AHMSI are the same, yes.

20   A    AHMSI.  They're all the same.

21   Q    Well, they're not all the same because Ocwen is not the

22   same.  AHMSI and Homeward are the same, yes, sir.

23   A    So that would have been Homeward.  I would assume that's

24   Homeward.  And Coppell is Homeward, right?

25   Q    Coppell, Texas.  No, I'm asking specifically who were you

1    talking to, sir?  Were you talking to a customer service

2    representative?

3    A    A customer service representative at the number that was

4    required.  If you have a question call.

5    Q    If that note is not reflected in the call log would you

6    have any explanation for that?

7    A    Absolutely not.  But once again, Mr. Rogers, there is

8    multiple -- just like the letter you showed me a minute ago.

9    There were six different loans.

10        So what I'm saying to you at oath here is that I could

11   have said that on another call log with another piece of

12   property saying I've got these problems.  Are those call logs

13   noted as well?

14   Q    You don't know the date on which you said that, right?

15   A    I do not know the date that I said that.

16   Q    Let's talk about the calls that you recorded with the

17   Ocwen folks.  Those were calls with Ocwen Loan Servicing,

18   right, sir?

19   A    Yes, sir.

20   Q    Those were not calls with AHMSI or Homeward, right,

21   sir?

22   A    That's right.

23   Q    And as we looked at the document before you knew that

24   those companies had changed responsibilities March 1, 2013,

25   right, sir?

```
 1    A     That's correct.

 2    Q     Those calls were not about 172 Hilton Street, right?

 3    A     No, they were not.

 4    Q     They were calling you about 111 Tucker Circle, right?

 5    A     That is correct.

 6          MR. ROGERS:   Let's look at the call log, Kelly, for

 7    May 11, 2010.

 8    BY MR. ROGERS:

 9    Q     Those calls were with folks from India, right, sir?

10    A     Yes, sir, I would assume that to be.  But I also got

11    calls from Mexico.  I got other calls.  So I'm assuming that

12    those were from --

13    Q     We listened to them.  Did they sound like people from

14    India?

15    A     In 2010?  You said 2010?

16    Q     Sir, I said those calls that we played earlier that you

17    recorded those were with people from India, right, sir?

18    A     Yes.  The recent calls were those from India regarding

19    111 Tucker Circle.

20    Q     Would you please look for us -- start with the A5P, not

21    the one at the very bottom which has the blacked out account

22    numbers, not the one next above that, but the last line of the

23    one just above that. It starts with "Borrower did, however,

24    state-- " Do you see that?

25    A     "Borrower did however state that he --"
```

1    Q    And then keep reading it.

2    A    Going up, right?  Or do I go below?

3    Q    No.  Going down.

4    A    "Felt more comfortable speaking with representatives

5    within the United States."

6    Q    And then?

7    A    "Changed all seven accounts to US calls and also pending

8    TSK NDD to update POA on loan numbers."

9    Q    That second call, that was also a call with Ocwen, right,

10   sir?

11   A    Yes.

12   Q    The second call that we played earlier?

13   A    Yes, sir.

14   Q    And it wasn't with AHMSI or Homeward, right, sir?

15   A    That's right.

16   Q    And it wasn't about 172 Hilton Street, right, sir?

17   A    That is correct.

18   Q    In 2011 five of the seven properties were rented, right,

19   sir?

20   A    In what year?  2011?

21   Q    Yes, sir.

22   A    Five of the seven?  That's probably about average, that's

23   right.

24   Q    And that's right, right?  Your average historic vacancy

25   rate is right about there, right, sir?

```
 1    A     Yes, sir.
 2    Q     As of December 2012 all six of the properties were
 3    rented, right, sir?
 4    A     Yes.
 5    Q     And you get tenants to sign leases when you rent them
 6    properties, right, sir?
 7    A     On occasion, yes.  I should, but yes sometimes I pass
 8    that.
 9    Q     You understand that when they do sign a lease that's a
10    contract, right?
11    A     Oh, yes, sir.
12    Q     And you collect the monthly payment, right?
13    A     That's right.
14    Q     And if somebody doesn't pay for long enough you will
15    evict them, right, sir?
16    A     Yes, sir.  I don't have a very good eviction rate because
17    I usually work it out.
18    Q     But you will evict them, right, sir?
19    A     I don't think --
20    Q     You just said yes, didn't you, sir?
21    A     I'm going to tell you that in five years I don't evict
22    people.  They want to go, I make it where it's a reasonable
23    separation because I believe in doing everybody right.
24          So have I asked somebody to leave, yes, sir.  And if you
25    call that evicting, yes, sir, I have.
```

1    Q     You told them to leave the property because they hadn't

2    paid, right, sir?

3    A     I have what now?

4    Q     Told them to leave the property because they hadn't paid,

5    right, sir?

6    A     Not in those specific terms.  I would like for them to

7    vacate so they could find a better place that might suit them

8    with the money that's needed.

9    Q     And you say that because they haven't been making the

10   payments, right?

11   A     That's right.

12             MR. ROGERS:    Subject to recross, Your Honor, that's

13   what I have.

14             THE COURT:    Mr. Gower.

15             MR. GOWER:    Your Honor, would it be possible to

16   take a two-minute bathroom break?

17             THE COURT:    Sure.  We will take a short break.

18   Go on back there, ladies and gentlemen, and relax.

19   (JURORS EXIT COURTROOM)

20             THE COURT:    How long do you think your redirect is

21   going to last?

22             MR. GOWER:    Not long.

23             THE COURT:    And who is your next witness?

24             MR. GOWER:    It would be Dr. Sappington by video.

25             THE COURT:    Okay.  Now, are you going to play

```
 1    yours as a part of this or are you going to save it, like you

 2    did with Delbene?

 3              MR. ROGERS:   Oh.  We don't have any part of this,

 4    Your Honor.  It was a trial preservation deposition.  Our

 5    understanding is it's just the testimony just like it would

 6    be.  So our cross is part of it.

 7              MR. ROHWEDDER:   All of it's combined, Your Honor.

 8              THE COURT:   It's what?

 9              MR. ROHWEDDER:   It's going to be played all at the

10    same time.  Play all the video and be done.

11              MR. ROGERS:   Better answer.

12              THE COURT:   Very good.

13    (RECESS)

14              THE COURT:   How long is the video going to last?

15              MR. ROHWEDDER:   It's about an hour.

16              THE COURT:   Okay.  I've read it but I didn't know

17    how long it was going to take.  Bring the jury in.

18    (JURORS ENTER COURTROOM)

19                         REDIRECT EXAMINATION

20    BY MR. GOWER:

21    Q    Adam, before the break you were asked by Mr. Rogers about

22    548 Persons Street, do you remember that?

23    A    Yes, sir.

24    Q    Sir?

25    A    Yes, sir, I do.
```

```
 1    Q    Could we ask --
 2              MR. GOWER:   If you would please, if you could put
 3    up Defendant's Exhibit 54 that you questioned about.  That Mr.
 4    Rogers was questioning you about, please, sir.
 5              MR. ROGERS:   Kelly, would you put that up, please.
 6    BY MR. GOWER:
 7    Q    I know you've got a screen up there, but we don't have a
 8    screen back here.  So you can see it better than we can.  Can
 9    you see that, where the mortgage company is writing you
10    concerning 548 Persons Street?
11    A    Yes, sir.
12    Q    And the date of that letter is what?
13    A    April 21, 2011.
14    Q    Does your mother own property on 548 Persons Street?
15    A    No, sir.  We sold that house in 2007.
16    Q    Can you explain to this jury why they are writing you in
17    April of 2011 about a loan on property at 548 Persons Street?
18    A    It basically says that we are not up to date.  This
19    particular contractual loan document is in the system for the
20    loan documents only.
21    Q    But my question, why are they writing you about a loan on
22    property that you sold in 2007?
23    A    They are paying -- the escrow is paying taxes -- I mean,
24    the escrow on 1852 Persons Street, which we do own, is being
25    paid to 548 Persons Street.  My mother owned two houses on the
```

1    same street.  We sold one.

2    Q    Is the bottom line that they just simply had it messed up

3    and have had it messed up for years?

4    A    Yes, sir.

5    Q    And the property y'all own, your momma owns, is on 1852

6    Persons Street?

7    A    That's correct.  And the escrow on that particular

8    account regarding insurance has never been paid out of escrow.

9    I pay that out of our pocket ourselves every year to make sure

10   it's covered.  Because they don't recognize 1852 as our

11   insurer.  So the premium that's supposed to go to 1852 Persons

12   Street never gets applied.  So I'm being paid every month --

13   or I'm paying every month for something that they are not

14   sending.

15   Q    Explain that?

16   A    Taxes and insurance paid monthly X-number of dollars.  We

17   end up putting -- the end of the year we have other properties

18   besides this.  We get an insurance premium to kind of help us

19   out.  We're always shopping insurance to improve our bottom

20   line.  And we turn in the premium to be paid for 1852 Persons

21   to the mortgage holder.  Whether it's Ocwen, Homeward or

22   whoever and they never -- when they reimbursed the insurance

23   company they never put that money in to cover that.  So we end

24   up having to pay all of the insurance premium for that.

25   Q    Let's go back to 1852 Persons Street.  Is this the one in

```
 1    April of this year that they are returning checks on?

 2    A    That's correct.

 3    Q    And threatening foreclosure?

 4    A    That's correct.  But for some reason it just went away.

 5    And I don't know if it's because of this lawsuit or whatever.

 6    It's just in limbo.

 7              MR. ROGERS:   Charlie, can I see what you're holding

 8    up, please?

 9              MR. GOWER:    Yes, sir.

10    BY MR. GOWER:

11    Q    All right, sir.

12    A    Now, being in limbo I'm still -- I'm under oath -- and

13    I'm telling you I do not receive -- that is my address.  I get

14    every other document when it comes to any kind of

15    correspondence about the loan, but I do not and have not ever

16    received billing statements.

17         So I am strictly taking my rudimentary math skills that I

18    know through my profession and doing the best job I can to

19    come up with something and if it's short by a little bit or

20    overage a little bit I try to cover it.  But due to the point

21    that they say I don't -- I'm behind on payments when they send

22    the escrow analysis to me, which is what I go by, they will

23    actually say that I have an overage of 300, 400, $500 in an

24    account that I have overpaid escrow.

25         And then they turn around and say the only reason they
```

1    can pay that is if I'm current on my loan.  And so my loans

2    are not showing current and there is a surplus in many, many

3    of these loans that I am not getting credit for.

4    Q    All right, sir.

5              MR. ROGERS:   I move to strike the last part of that

6    as nonresponsive and also hearsay.  It's talks about those

7    escrow analyses which aren't in evidence, Your Honor.

8              THE COURT:   Well, I wish you would make the

9    objection before he just goes on and on.  You stood up and you

10   just stood there.

11             MR. ROGERS:   I didn't want to interrupt him, Your

12   Honor.  And I didn't know he was going to go on and on until

13   he did.

14             THE COURT:   Well, the whole point is you don't

15   want to interrupt him but you want me to tell the jury now not

16   to pay attention to what he just said.

17             MR. ROGERS:   Yes, Your Honor.

18             THE COURT:   And so I think it gets confusing when

19   he talked there for -- I don't know how long and he was

20   talking about several things.  And what am I supposed to tell

21   the jury that they're supposed to disregard.

22             So I wish you would -- when it's going the wrong way

23   -- stand up and make the objection immediately and don't let

24   it run on.  Because that makes it harder for me to do my job.

25             MR. ROGERS:   I'll interrupt him in the future, Your

```
 1    Honor.  I'm sorry.
 2              THE COURT:    All right.
 3    BY MR. GOWER:
 4    Q    Let me ask you, Adam, about this photograph of 172 Hilton
 5    that you took last week.  Do you remember that one?
 6    A    Yes, sir.
 7    Q    Can you show that, number 50.  Is this the same way it
 8    has looked ever since they have foreclosed on the house?
 9    A    I think the property has been cut a total of three times
10    since 2011, the grass has been cut.  I don't know the
11    condition inside.
12    Q    Let me ask you, do you remember Mr. Rogers was
13    questioning you about the October 27, '09 hello/goodbye letter
14    that you got from Homeward?
15    A    Yes, sir.
16              MR. GOWER:    Can you put that up, David, the
17    hello/goodbye letter.  Do you know which exhibit it is?  Do
18    you know?
19              MR. ROHWEDDER:    We're looking for it.
20    BY MR. GOWER:
21    Q    This is on October 27, of '09 when you received the
22    letter saying that they are taking over?
23    A    Yes, sir.
24    Q    And Mr. Rogers showed where the original had a payment
25    coupon at the bottom for $843.58, remember that?
```

1    A    Yes, sir.

2    Q    My question is, why didn't you pay the $843.58 that came

3    with that coupon?

4    A    It's not representative of principal, interest, taxes and

5    insurance.

6    Q    Did you owe it?

7    A    No, sir, I did not owe that amount.

8    Q    Why not?

9    A    Because the amount of taxes and insurance divided by 12,

10   even with a cushion of what we've talked about before, does

11   not equal up to my principal plus the overage.  There cannot

12   be.

13       We eventually -- I would have to say that eventually

14   after three different escrow analyses they finally got down to

15   something that actually made sense.  I said 630/638 with the

16   two additional months, you know, added or the cushion added in

17   there.  But it wouldn't have mattered because they are still

18   saying I'm past due because I did not pay 843.  I don't know

19   where that number came from and I can't get anybody to tell

20   me.

21            MR. ROGERS:   May I see it, Mr. Gower?

22            MR. GOWER:   Yes, sir.

23            THE COURT:   May I see it, Mr. Gower?

24            MR. GOWER:   Yes, sir.

25            THE COURT:   All right.

1          MR. GOWER:   I guess we need to put it up on the

2     board.  P8.  Can you blow up that top part.

3     BY MR. GOWER:

4     Q    Adam, you see there where it says the escrow of 353.45 a

5     month?

6     A    Yes, sir.

7     Q    If you take 353.45 a month times 12.  I did the math.

8     It's $4,241.40 a year?

9          MR. ROGERS:   Leading, Your Honor.

10         THE COURT:   Yes, that is leading.

11    BY MR. GOWER:

12    Q    Well, can you do the math?  Do you want my calculator?

13    353.45 times 12 and see what you come up with.

14    A    $4,241.40.

15    Q    Now, if you had paid what they told you to pay that's how

16    much you'd be paying per year in escrow, right?

17    A    Yes, sir.

18    Q    And can you look -- -

19         MR. GOWER:   David can you show on the left-hand

20    side.  Move it over.

21    BY MR. GOWER:

22    Q    But the total amount of tax and insurance you'd owe for

23    the whole year wouldn't be but $1,661.49; is that right?

24    A    That's correct.

25    Q    So is it fair to say you'd be paying three times what you

1    should have been paying?

2    A    Two-and-a-half to three times.

3    Q    Is that what you were trying to explain to them in all of

4    these phone calls?

5    A    Yes, sir.

6    Q    Were you trying to cheat them and not pay your escrow?

7    A    No, sir.

8    Q    Well, why didn't you just pay what they said pay?

9    A    It's not right and somebody --

10           THE COURT:    You've already covered that with him.

11   You've covered him on direct and now you're covering on

12   redirect.

13           MR. GOWER:    Right, sir, I agree.

14           THE COURT:    And you don't need to go back over the

15   same material again, please.

16           MR. GOWER:    Yes, sir.

17   BY MR. GOWER:

18   Q    Remember Mr. Rogers asked about occasions where you just

19   flat hung up on them when they called you on the phone.  Why

20   did you do that?

21   A    Frustrated.  I was frustrated and I have another job and

22   it's -- if my phone rings I have to answer it and I don't have

23   time to spend hours upon hours answering questions from seven

24   different people about seven different loans that are

25   somewhere and somehow misapplied funds.

1    Q     Thank you, sir.

2              THE COURT:     Recross.

3              MR. ROGERS:    Yes, Your Honor.  I know that's not

4    the answer you were hoping for.

5              THE COURT:    It's up to you.

6                      RECROSS EXAMINATION

7    BY MR. ROGERS:

8    Q    Let's look at D54, please.  D54 is the letter from April

9    21 about the Persons Street property.  You remember that

10   letter, right, sir?

11   A    Yes, sir.

12   Q    Do you see where it has a loan number there that ends in

13   1337?

14   A    That's right.

15   Q    That is one of your mom's loans; isn't it, sir?

16   A    Yeah.  That's AHMSI's loan number.  I recall.

17             MR. ROGERS:    Let's look at Defendant's Exhibit 7,

18   which we will move to admit.

19             THE COURT:     Mr. Gower?

20             MR. GOWER:    Let me see what it is.  No problem.

21             THE COURT:     Admitted.

22             MR. ROGERS:    Put the third page up there, would

23   you, Kelly.

24   BY MR. ROGERS:

25   Q    Do you recognize that signature?

```
 1    A    That's my mother's signature.

 2              MR. ROGERS:   Why don't you put the first page up

 3    there, Kelly.

 4    BY MR. ROGERS:

 5    Q    This is a note, right, sir?

 6    A    Yes, sir.

 7    Q    What's the address on there?

 8    A    That says 548 Persons Street dated October 31, 2006.

 9    Q    That's a TBW document, right?

10    A    That's correct.

11    Q    And that's the same address that was on that letter we

12    were just looking at, right?

13    A    That's correct.

14              MR. ROGERS:   I'm going to look at Defendant's

15    Exhibit 8 and move to admit it, please.  I move to admit this,

16    Your Honor.

17              MR. GOWER:   No objections.

18              THE COURT:   Admitted.

19    BY MR. ROGERS:

20    Q    That is a Security Deed for one of the TBW loans with

21    your mom, right?

22    A    Yes, sir.

23              MR. ROGERS:   Let's look at the third page of it,

24    Kelly.

25    BY MR. ROGERS:
```

```
1    Q    Can you see the address?

2    A    548 Persons Street.

3    Q    That's the same address that was on that April 21 letter,

4    right, sir?

5    A    Yes, sir.  What is this dated?

6    Q    Well that's the October 31, 2006, Security Deed, right,

7    sir?

8    A    Yes, sir.

9    Q    The letters that Mr. Gower held up in front of the jury

10   about 111 Tucker, do you remember those?

11   A    The letters?

12   Q    These big blowup letters?

13   A    Yes, sir.

14   Q    Those were letters from Ocwen, right?

15   A    Yes.

16   Q    They weren't letters from AHMSI/Homeward, right, sir?

17   A    They were Ocwen letters.

18   Q    Mr. Gower had you do a calculation -- put up P8 please.

19   Mr. Gower had you do a calculation.  Do you remember 353.45

20   times 12, right?

21   A    Yes, sir.

22   Q    And that was the amount that you started being asked to

23   pay in November 2009, right?

24   A    Yes, sir.

25   Q    And we're looking at the escrow analysis, that's what
```

```
 1      Plaintiff's Exhibit 8 is, right?

 2   A     Yes, sir.

 3   Q     And it's dated December 17, 2009, right, sir?

 4   A     Yes.

 5   Q     And what does it show as the effective date on the new

 6   payment?  On the new payment?

 7   A     2-1 of 2010.

 8   Q     So you weren't being asked to pay 353.48 for 12 months,

 9   were you, sir?

10   A     For 12 months?

11   Q     Yes, sir.

12   A     Not at this point, no.

13   Q     And you were only being asked to pay it for November,

14   December, January and February?  Well, not even February,

15   right, sir?  November, December and January, right, sir?

16   A     According to this, but it's not what I owe.

17   Q     I understand you're saying that, sir.

18   A     Because it's not collected.

19   Q     There were only three months that you were being expected

20   to pay that amount, right, sir?  Then it was going to change

21   February 1, 2010, right?

22   A     That's correct.

23              MR. ROGERS:   I think I am done, Your Honor.

24              MR. GOWER:   I'm done.

25              THE COURT:   All right.  Can we excuse this
```

1    witness?

2         MR. ROGERS:   Your Honor, we have him under subpoena

3    for our case in chief.  I don't expect that we will call him

4    but I don't know what the next witnesses are going to say.

5         MR. GOWER:   He's going to stay here.

6         MR. ROGERS:   So can we keep him?

7         THE COURT:   Sure.  He can't be excused.  But you

8    have to leave the courtroom until you're invited back.  Now,

9    what's next?

10        MR. GOWER:   Next is Dr. Sappington by video, Your

11   Honor.

12        THE COURT:   Now, this is going to be another video

13   deposition.  I told you about that yesterday.  The same rules

14   apply.  Do y'all remember or do you want me to tell you again?

15   Just like he's in court, under oath.  The court reporter took

16   it all down, subject to cross examination.

17   (Video deposition played of Dr. Sappington)

18        THE COURT:   Ladies and gentlemen, I want y'all to

19   step back in the jury room for just a minute and then we'll

20   finish out the afternoon.  We'll try and finish up by 5:00

21   today.  But I want to give you a break after that video and

22   let you move around a little bit.  And then have your next

23   witness ready.

24        MR. GOWER:   Thank you.

25   (JURORS EXIT COURTROOM)

```
 1              THE COURT:    How long do you think you're going to
 2      take with this witness?
 3              MR. GOWER:    Very short.
 4              THE COURT:    What about you?
 5              MR. ROGERS:   It's Ms. Burns.  We don't know.
 6      Probably not much.
 7      (JURORS ENTER COURTROOM)
 8              THE COURT:    Okay.  Swear the witness, please.
 9              COURTROOM CLERK:  (Swearing of witness).  State your
10      name for the record, please.
11              THE WITNESS:  Jodie Johnson.
12              COURTROOM CLERK:   Spell your first name?
13              THE WITNESS:  J-O-D-I-E (spelling).
14                          JODIE JOHNSON
15        Witness, having first been duly sworn, testified on
16                        DIRECT EXAMINATION
17      BY MR. GOWER:
18      Q    Jodie, is this your momma?
19      A    Yes, sir.
20      Q    And Adam is your brother?
21      A    Yes.
22      Q    You have another brother?
23      A    Yes.
24      Q    And where do you live?
25      A    Okay.  I'm very nervous, sorry.
```

```
1    Q    Are you scared?

2    A    I'm not cold anymore.

3              THE COURT:    You will be.

4              THE WITNESS:  I know I will be.

5    BY MR. GOWER:

6    A    THE WITNESS:  Yes, I do have a younger brother, Jason.

7    Adam and Jason.

8    Q    Are you married?

9    A    I am.

10   Q    And what does your husband do?

11   A    I'm so sorry.  We have a charter fishing business.  We

12   are a mom and pop.  And we've had the business for 22 years.

13   And I also teach school.  And I have done that for 17 years

14   total.

15   Q    Do you have children?

16   A    I have two children, yes.  They are 14 and 16.  One just

17   started ninth grade.

18   Q    Let me ask you.  When you were little can you tell the

19   jury how your mother and your daddy were able to accumulate

20   properties?

21   A    Work.  All they did was work, work, work.  We had a very

22   small grocery store.  It was called the Clover Farm.  And they

23   had a deer cooler, because Jasper County is a self-acclaimed

24   deer capital of the world.  And they had that for -- it was a

25   grocery store, meat market.  You know, we would process deer
```

1    during deer season.  They had that for 20 years.  They worked.

2    I mean, it was a seven -- We were open on Sundays.  When

3    Publix wasn't, we were.

4        And then after that they sold that and my mother got into

5    the -- she bought a flower shop, Catherine's Flowers.  And my

6    father got into real estate.  And they just worked, worked,

7    worked.  That's all they did was work.  We all worked.

8    Q    Let me ask you.  Shortly around the time your mom and dad

9    were divorced, Adam took over at some point handling your

10   mother's rental houses?

11   A    Yes.

12   Q    Did you learn some time about a problem that they had

13   with their mortgage company?

14   A    Yes.

15   Q    Tell us what you learned and how you learned it?

16   A    Well, I talked to my mother every day.  She lives in St.

17   Augustine now.  I check on her and we talk.  I mean, this was

18   a big thing.  This was very big.

19   Q    Tell us what did you learn was the problem or did you

20   ever figure out what the problem was?

21            MS. BURNS:    Objection, Your Honor, it calls for

22   hearsay.

23            THE COURT:    I can't hear you.  You're going to

24   have to stay seated.  Just stay seated and pull the microphone

25   over to you, if you would.

```
 1              MS. BURNS:    Objection, Your Honor.  It calls for
 2    hearsay.
 3    BY MR. GOWER:
 4    Q    My question was, did you learn what the problem was?
 5    A    Yes.
 6    Q    What was the problem?
 7              THE COURT:    I'm going to overrule the objection
 8    and let her testify.  Go ahead.
 9    BY MR. GOWER:
10    A    THE WITNESS:  The rental properties that she acquired in
11    the divorce, which would provide for her.  That's how she was
12    to -- she didn't have an IRA.  She didn't have a 401(k)
13    because they had always been self-employed.  They had worked
14    for themselves all their life.
15         So as part of the divorce, after we split the pie again,
16    after the divorce she was given properties.  And the rental
17    properties -- she moved to St. Augustine because I asked her
18    to move to St. Augustine.  It was to get out of the -- you
19    know, to let things settle down after the divorce.  And then
20    -- but the rental properties there was a problem with one of
21    the houses and she kept getting notices about the property
22    being behind.
23    Q    Who was supposed to be looking out for your momma?
24    A    Adam.  He was there.  He's in Monticello.  So he did it
25    for her.  It is for her.  It's her retirement.  It's for her.
```

1    It's to take care of her.

2    Q    Did this problem with the mortgage company go on for

3    years?

4    A    Yes.

5         MS. BURNS:    Objection, Your Honor, lack of

6    foundation.  She is not stating how she knows any of this and

7    I believe that the answer, the response will call for hearsay

8    if she does.

9         THE COURT:    Do you know about your mother's

10   problems with the mortgage company?

11        THE WITNESS:  Yes, I do.

12        THE COURT:    I'll overrule your objection.  Go

13   ahead.

14   BY MR. GOWER:

15   Q    How many years has this problem been going on with the

16   mortgage company?

17   A    As of right now I would say almost four years.

18   Q    Can you tell us in your conversations with your mother

19   what have you learned about how this has affected your momma?

20   A    Oh my goodness.  At 71 she shouldn't have to be worrying

21   about stuff like this.  (Crying).

22        Her health has gone down.  She's not as active as she

23   used to be.  She is upset.  She throws up.  She has to go to

24   the doctor.  She is sick.  But stress will do that to you.

25   Especially when you have -- you feel like there is no control.

1          Good grief.  I'm sorry.  There is just no control.  No

2     one could fix the problem.  It was like a black hole.  You are

3     just falling and nobody can answer a question.  Why did the

4     payment change from this to this?  It's very simple.  I have a

5     mortgage.  I get it.  If they change the payment whatsoever

6     they have to provide an escrow.  It's that simple.  We're

7     going up on your payment because.  Here, here it is.

8               MS. BURNS:    Your Honor, this is nonresponsive.  I

9     object.

10              THE COURT:    I think that is nonresponsive.  So try

11    and stay focused on the question.

12    BY MR. GOWER:

13    Q    Let me ask you this.  Does your momma want to -- when she

14    goes to visit Adam in Monticello where does she stay?

15    A    In the barn, which is the -- it's like over the garage at

16    Adam's house.

17    Q    Is it an apartment?

18    A    It's like a little apartment, yes.

19    Q    From what you have learned from your mother does she want

20    to go back to Monticello or feel like she can go back?

21    Explain to us what --

22    A    Yes.  That is her home.  That's where she has lived for,

23    oh, my gosh, since I was first grade.  And that has been a

24    long time ago, 60 years.  So that's her home.  She knows the

25    people.  They know her.  That's where she has worked all her

1    life.  Yes.

2    Q    Have you learned from your mother that she is concerned

3    about what people think about her in Monticello?

4    A    Yes.  Yes.

5    Q    What is she concerned about?

6    A    Well there is foreclosure notices in the paper.  There

7    are signs in front of the houses that she owns.  It is a small

8    town.  Everybody talks.  And so they look at her and they

9    think that she has done something wrong.

10           MS. BURNS:    Objection.  Speculation, Your Honor.

11   BY MR. GOWER:

12   Q    Is that what your momma thinks?

13           MS. BURNS:    Speculation, Your Honor.

14           THE COURT:    I'm going to overrule the objection.

15   This woman lives in St. Augustine, right?

16           THE WITNESS:  Yes, sir.

17           THE COURT:    And your mother lives down there and

18   she's lived down there for the last four years?

19           THE WITNESS:  Right.

20           THE COURT:    And do you see your mother on a

21   regular basis?

22           THE WITNESS:  Yes.

23           THE COURT:    And have you talked to her about all

24   this?

25           THE WITNESS:  Yes.

```
 1                    THE COURT:    Overrule the objection.  Go ahead.
 2                    MR. GOWER:    Thank you.
 3      BY MR. GOWER:
 4      Q    What is your momma's concern about what people
 5      think?
 6      A    She thinks that they are talking about her and her
 7      reputation.  And that's all she has.  You know, she has built
 8      her reputation, she's been there, she's worked hard and
 9      everybody knows her.  And now all of a sudden this has come up
10      and they're looking at her, and she is embarrassed.  She is
11      embarrassed because she can't -- she wants to explain it.  But
12      if it was you or me, I mean, people who are looking go, oh
13      yeah, right.
14                    MR. GOWER:    Thank you.
15                    MS. BURNS:    No questions, Your Honor.
16                    THE COURT:    Now, do you want to excuse her or do
17      you want to keep her around?  What's the plan?
18                    MR. GOWER:    Excuse her, please.  Were you asking
19      me?
20                    THE COURT:    No, I'm asking you.  He doesn't have
21      any questions.
22                    MR. GOWER:    I don't have any questions.
23                    THE COURT:    You're excused.  Thank you.  Call your
24      next witness.
25                    MR. GOWER:    We call Jane.
```

```
 1              COURTROOM CLERK:   (Swearing in of Plaintiff).
 2     State your name for the record.
 3              THE WITNESS:  My name is Jane McGinnis.
 4                          JANE MCGINNIS
 5        Witness, having first been duly sworn, testified on
 6                        DIRECT EXAMINATION
 7     BY MR. GOWER:
 8     Q    Jane, to skip a lot of the background, since we've heard
 9     from Adam at length, and now your psychologist and your
10     daughter, let's just get right down to it.  When you first
11     learned of the problem with the mortgage company tell us how
12     you felt and what you did?
13     A    It just was a mistake somewhere.  I saw the checks and
14     the bank statements and I knew.  I mean, I'm looking at it.
15         And I think about paper as proof, okay.  You can't prove
16     you were born without a piece of paper.  You can't prove
17     you're dead until it's filed in the court.  I don't know that
18     this man is a judge unless he has a piece of paper.
19              MR. GOWER:   No.  He's got a robe.
20              THE WITNESS:  Okay.
21     (Laughter)
22     BY MR. GOWER:
23     A    THE WITNESS:  I'm just saying that there had to be some
24     mistake somewhere.  I had the proof.  It just kept going on.
25     It was like -- it started off with just a little ball, you
```

1    know, it's just a mistake and we'll get it straightened out.

2    And before you know what's happening it doesn't go away.  You

3    can't talk to anybody.

4    Q    Explain what you mean by that?

5    A    You can't talk to anybody.  I'm in Monticello and I'm

6    sitting in the office and the number's there and Adam is busy

7    doing something.  So I pick up the phone and I'm thinking,

8    okay, I'm going to talk to somebody today.  We are going to

9    get into this.  You dial the number.  Well, it's a recording

10   or it's this guy from South Africa.  I don't know where he is

11   from.

12        And he says, well, you know, he keeps rapping on.  And I

13   say, I want to talk to your supervisor.  Put me in charge of

14   somebody that can speak to me and talk to me about this.

15        Well, okay, he transfers you.  It goes to another

16   recording.  For years this has been going on.  Another

17   recording.

18        We are promised that we will be back with you by 5:00

19   o'clock this afternoon at the end of this business day.

20        I don't know who they are.  I don't know how to pay off

21   this man or these people.  You don't know what the balance is.

22   You say, okay -- you heard Adam, what is the balance?  We'll

23   pay you off.

24        MR. ROGERS:   Your Honor, objecting to

25   nonresponsiveness.  She has strayed.

1          THE COURT:   Yes.  You don't need to refer back to

2    what another witness said.  That's one problem.  And stay

3    focused on the question.

4    BY MR. GOWER:

5    Q    Let me ask you this, Jane.  Let's just talk about these

6    collection letters.  Do you remember the letters you got from

7    the lawyers and from the mortgage company saying you were past

8    due and they were going to foreclose?

9    A    Yes.

10   Q    How many of those letters did y'all get?

11   A    Thousands over the four years.

12   Q    Well, tell me how that made you feel when you got these

13   letters?

14   A    Well, by this time I realized that I didn't have any

15   credit anymore.  And in my --

16          MR. ROGERS:   Nonresponsive, Your Honor.

17          THE COURT:   How it made her feel?

18          MR. ROGERS:   Yes, sir.

19          THE COURT:   I think she's getting ready to explain

20   that.  Go ahead.  Overruled.

21          MR. GOWER:   Thank you.

22   BY MR. GOWER:

23   A    THE WITNESS:  For 65 years I worked and Allen worked to

24   build up our credit and our reputation.  I bought houses off

25   of the courthouse step because my credit was immaculate.  And

1    all of a sudden I don't have any credit anymore.  I'm getting

2    these letters that say you haven't paid.  And I'm looking at

3    the check and the bank statement.

4        Well, you know what, the big joke is on me, I guess,

5    because I don't have any credit and I owe his company God

6    knows how much.  I can't refinance.  There's not -- as I told

7    in the deposition --

8              MR. ROGERS:   Objection, Your Honor.  He asked how

9    she felt.

10             THE WITNESS:  Okay, I feel terrible.

11             MR. ROGERS:   We're getting into credit, we're

12   getting into refinancing.

13             THE COURT:    Yes.  Rather than letting her give a

14   narrative it needs to follow the standard procedure of asking

15   questions and let her answer.  Okay?

16             MR. GOWER:    Yes, sir.

17   BY MR. GOWER:

18   Q    Jane, what we have to do is I have to ask a question and

19   you have to --

20   A    Okay, sir.

21   Q    The question is -- we were talking about all these

22   collection letters.  And the letters -- were you there on

23   occasions when Adam would talk with the mortgage company over

24   the phone?

25   A    Oh yeah.

```
 1   Q    And have you even heard recent phone conversations?  Have

 2   you been on recent phone conversations with the mortgage

 3   company?

 4   A    Yes.  I went to Georgia to help file.  There were so many

 5   papers.  And I had to try to organize and file things so that

 6   if we were asked a question we could go straight to the

 7   source.  And the phone is ringing off the hook.

 8   Q    When these folks would call from the mortgage company

 9   what would be the purpose of their call?

10   A    We were behind on our payments.

11   Q    And what would y'all say?

12   A    No.  No.  We have our checks.  You're taking our money

13   and it's coming out of our account.  I don't know what you do

14   with the money but we are paying.  We are not behind.  I don't

15   know where the money is.

16   Q    Well, over these four years can you tell us how many

17   phone conversations that y'all have had with these folks?

18   A    No.  There is no way.  Every day.  Adam and the family

19   came to St. Augustine one weekend and we --

20             MR. ROGERS:  Objection, Your Honor,

21   nonresponsiveness.  He asked how many conversations she's had.

22   Now we're hearing about Adam's visit.

23             THE COURT:  I think we have moved on to a

24   different topic.

25             THE WITNESS:  I'm sorry.  It's about the phone.
```

```
 1              THE COURT:    If it's about the phone go ahead.
 2              THE WITNESS:  It's about the phone conversation.
 3              THE COURT:    Go ahead.
 4    BY MR. GOWER:
 5    A    THE WITNESS:  At 8:30 at night the phone rings.  And
 6    Adam looks at the number.  Here they are again.  I set the
 7    timer on my stove.  An hour and seven minutes we tried to talk
 8    to this person.  And we tried to explain that, no, we were not
 9    behind because you're taking our money, you're cashing it.
10    An hour and seven minutes at 8:30 at night on Saturday night.
11    Q    And when was this?
12    A    Oh, a --
13    Q    Was this when he was in St. Augustine?
14    A    Yes.  They just came for a visit.  Probably nearly a year
15    ago now, eight or nine months ago.
16         But at home in the office -- and he is trying to -- he
17    has clients come in and that phone is ringing.  And I've heard
18    him say, I cannot -- I can't discuss this with you right this
19    minute.
20    Q    Let me ask you this, Jane.  You sat through the
21    deposition of Dr. Sappington?
22    A    Yes.
23    Q    Where he says you are a tough old bird?
24    A    Yeah.  He's a great guy.
25    Q    As a tough old bird, why can't you just shake this off
```

1   and say, "Well, I will suck it up"?

2   A    Well, I am too old to start over.  They have taken my

3   life from me.  I am too old to start over.  I can't.  I have

4   no credit to start over with.  I am nothing.  But my family,

5   and I thank God every day.

6        But they've taken my blood.

7   Q    Well, let me ask you this.  Are you really worried about

8   how this has affected Adam?  Does that worry you?

9   A    Oh absolutely.

10  Q    Explain that to the jury.

11  A    I don't care what you do to me.  They've already done it.

12  But Adam is young and he is one of the most outgoing, finest,

13  Christian boys I have ever -- and it's not because he is mine.

14  He loves people.  And his life is to help somebody.  And his

15  whole life is ahead of him.

16       But Monticello is not much bigger than this courtroom,

17  this building.  And everybody knows your business.  And that

18  boy is struggling to try to keep up his reputation.

19       And there has been some things happen that he's had to

20  fight twice as hard.  Through the divorce.  It was a shocker

21  through Monticello.  Nobody knew that this was coming.  We

22  were the ideal little couple.

23       But I made a deal with God in June of '62 that I had made

24  a mistake and if he would help me I'd stick by, raise my

25  children, make sure they had a roof over their head, food,

1    clothes and an education so they could make their own way.

2    And that deal ran out eight years ago.  It was time for me to

3    walk, and I did.

4    Q    What would you -- if you could ask this jury, what do you

5    want?

6    A    I want you to save Adam's life.  I want you to clear his

7    name.

8         I would love to see a full page ad in the Monticello news

9    that said, "We made a terrible mistake.  We took something

10   that didn't belong to us."  What do I want?  What if it was

11   you?

12   Q    Well, let me ask you this.  When you talk about a

13   full-page ad, are you saying you want the mortgage company to

14   put a full-page ad?

15   A    I think it would be wonderful.  I don't care if it was

16   the whole newspaper.

17        My problem is that while we are sitting here they are

18   taking the rest of my properties.  So it took how many years

19   to take that first one.  Well, now we're going after the other

20   one.

21        So it's going to take -- I'm going to have to go through

22   this for 10 or 15 more years because they're going to take

23   them one at a time.

24        You can't talk to anybody.  They don't know how much

25   you owe.  They don't know what the payoff is.  They can't

1    tell you that.

2         As Jodie said, it was a black hole. It is just something

3    that is sucking -- it won't go away.  It just won't go away.

4    I don't know how to make it go away.  Do you know how to make

5    it go away?  Do it for me and for you --

6              MR. ROGERS:   Objection, Your Honor.

7              THE WITNESS:  -- if you happen to be sitting up here

8    in this stand one day.

9              THE COURT:    Wait a minute.  Stop.

10             MR. ROGERS:   It's improper to ask the jury to put

11   themselves in her shoes.  It's also improper to plead with the

12   jury to make it go away, Your Honor.

13             THE COURT:    Well, both of those things that you

14   just said are correct.  So I sustain the objection and tell

15   the jury to disregard that.

16   BY MR. GOWER:

17   Q    Jane, I know you are upset.

18   A    I'm sorry.

19   Q    Are you upset?

20   A    Yes.

21             MR. GOWER:    Thank you.

22             THE COURT:    Your witness.

23                      CROSS EXAMINATION

24   BY MR. ROGERS:

25   Q   Ms. McGinnis, you graduated from high school, didn't

1    you, ma'am?

2    A    Yes, sir.

3    Q    And you attended a business school, didn't you,

4    ma'am?

5    A    Yes, sir.

6    Q    And while you were in business school you worked for a

7    lawyer, didn't you?

8    A    Yes, sir.

9    Q    And you received a certification in business upon your

10   completion of those classes of business school, right?

11   A    Yes, sir.

12   Q    After you finished business school you got married and

13   you and your husband opened a grocery store, correct?

14   A    Yes, sir.

15   Q    And you ran that grocery store, didn't you?

16   A    Pretty much.

17   Q    And you and your ex-husband opened car washes and

18   laundromats, didn't you?

19   A    Absolutely.

20   Q    And you helped run those businesses, also, didn't you?

21   A    Yes, sir.

22   Q    And you ran a flower shop, right?

23   A    I bought a flower shop after we sold the grocery store.

24   I owned the flower shop for like ten years.  I ran that for

25   like ten years.

1    Q    And you also owned a tea room and sandwich shop, right?

2    A    Yes.  And while I was in the flower shop I also went to

3    school and learned to frame pictures and I ran that out of the

4    flower shop.  And then I ran the tea room while I was not

5    burying the dead or marrying off women.  Whatever. I did all

6    that.  Yes, I did.

7    Q    And you and your ex-husband began buying properties in

8    Monticello 35 to 40 years ago?

9    A    Oh, definitely.  We just knew from the get go that that

10   would be how we would retire.  And he had that ability to --

11   he could just see a house and say, that will be a good

12   investment or nah, which I didn't know.

13        When we would buy it I'd go paint and clean and whatever

14   it took to get it ready to rent or "sale", whichever.

15   Q    You bought properties at foreclosure, right?

16   A    I did some, yes.

17   Q    And you helped work on the real estate investment

18   business, right?

19   A    Absolutely.

20   Q    And y'all collected rent from those tenants, right?

21   A    Yes.

22   Q    You currently own JCM Rental, LLC, right?

23   A    That's right.

24   Q    And you founded that company eight years ago, didn't you?

25   A    Yes, at the time of the divorce.

1    Q    As part of JCM Rental you owned both commercial and

2    residential properties, right?

3    A    Uh-huh (affirmative).

4    Q    Unlike the previous businesses though, you don't run JCM

5    Rental, right?

6    A    Not -- I turned it over to Adam.

7    Q    Was that at the time that you moved to St. Augustine?

8    A    Yes.  The kids got behind my back and decided that Adam

9    was there and he could take care of the rental property.  Put

10   him on the payroll and for me to go down and be with Jodie and

11   help raise her children and be with her.

12   Q    JCM Rental is run out of Adam's house, right?

13   A    He has an office called McGinnis Realty.

14   Q    But the address that got given to the mortgage --

15   A    Yes.

16   Q    -- company is his house, right?

17   A    Yes.  I'm sorry.  That's the legal address.

18   Q    And after you had moved to Florida and turned over the

19   management of JCM Rental to Adam you and Adam made the

20   decision to refinance certain of your properties with TBW,

21   right?

22   A    Yes.  We had an attorney in Monticello.  And after a

23   lengthy discussion we decided that that's what we needed to

24   do.

25   Q    And you did that because you had loans with the local

```
1    back, with McIntosh, that were at rates that were too high,

2    right?

3    A    Very high.

4    Q    You refinanced a total of seven properties, right?

5    A    Right.

6    Q    And all of those were investment properties, weren't

7    they?

8    A    Yes.

9    Q    And you got all those properties in the divorce, right?

10   A    Yes, I did.

11   Q    Some of the properties were paid off at the time and some

12   had mortgages, right?

13   A    Right.

14   Q    You got cash out from the refinancings, right?

15   A    Right.

16   Q    You never lived in any of those houses secured by the TBW

17   loans, right?

18   A    Not by TBW, no.  I lived in a rental house.

19   Q    But none of the loans that were the subject of the TBW

20   loans are houses that you had lived in, right?

21   A    No, no, sir.

22   Q    And you didn't live in 172 Hilton Street, right?

23   A    No, I did not.  We built that house.

24   Q    Why don't we look, if we can, at Defendant's Exhibit 37.

25        THE COURT:    Has that been admitted?
```

1        MR. ROGERS:   Actually I think D37 has not, Your

2    Honor.  We would move to admit that document.

3        MR. GOWER:    No objection.

4        THE COURT:   Admitted.

5    BY MR. ROGERS:

6    Q    Can you see that document, Ms. McGinnis?

7    A    Yes, sir.

8    Q    This is the note for the property located at 172 Hilton

9    Street, right?

10   A    Yes, sir.

11   Q    And the note is dated October 31, 2006, right?

12   A    Right.

13   Q    And under the note you were loaned $72,750, right?

14   A    Uh-huh (affirmative).

15   Q    Why don't you, if you would, would you zoom in on section

16   3, please.  Will you read for us -- Do you see where the

17   highlighted portion is?

18   A    Yes.

19   Q    Will you read that for us, please.

20   A    "I will make my monthly payments on the first day of each

21   month beginning on December 1, '06."

22        MR. ROGERS:   Let's go down to section 6, Kelly.

23   BY MR. ROGERS:

24   Q    Would you please, ma'am, read 6(A) to us.  It starts, "If

25   the note holder".

1    A    "Late charge for overdue payments.  If the note holder

2    has not received in full amount of any monthly payment by the

3    end of the day of the day due, I will pay late charges to the

4    note holder.  The amount of the charge will be 5 percent of my

5    overdue payment of principal and interest.  I will pay this

6    late charge promptly but only once on each late payment."

7    Q    Thank you, ma'am.  Would you now read (B) for us?

8    A    "If I do not pay the full amount of each monthly payment

9    on the date it's due I will be in default."

10   Q    How about (C)?

11   A    "If I am in default the note holder may send me a written

12   notice telling me that if I do not pay the overdue amount by a

13   certain day the note holder may require me to pay immediately

14   the full amount of principal, which has not been paid and all

15   the interest I owe in that amount.  The date must be at least

16   30 days after the date on which the notice is mailed to me or

17   delivered by other means."

18   Q    Thank you, ma'am.  Let's look at Defendant's Exhibit 38,

19   which is the Security Deed.

20        MR. ROGERS:   And I believe it has been admitted,

21   ma'am; is that correct?

22        COURTROOM CLERK:   D38?

23        MR. ROGERS:   Yes, ma'am.

24        MR. GOWER:   I have no objection.

25        THE COURT:   It's admitted then.

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1                   MR. ROGERS:   P38 is admitted then.

2                   COURTROOM CLERK:   D.  Yes.

3                   MR. ROGERS:   Thank you very much.

4       BY MR. ROGERS:

5       Q    This is the Security Deed for the 172 Hilton Street

6       property, right?

7       A    Yes.

8       Q    And when you signed it you understood this was a

9       contract, right?

10      A    Yes.

11                  MR. ROGERS:   Why don't we look at section one,

12      Kelly.

13      BY MR. ROGERS:

14      Q    Are you able to read that, Ms. McGinnis?

15      A    "Payment of principal, interest, escrow items, prepayment

16      charges and late charges, Borrower shall pay when due the

17      principle of, and interest on, the debt -- by the Note and any

18      prepayment charges and the late charges due under the Note.

19      Borrower shall also pay funds for escrow items pursuant to

20      Section 3."

21      Q    Thank you.

22                  MR. ROGERS:   Let's go to section 3, the first page

23      of section 3, please, Kelly.

24      BY MR. ROGERS:

25      Q    Would you please read for us the highlighted section

1    through A, taxes and assessments?

2    A    "Borrower shall pay the Lender on the day periodic

3    payments are due under the Note until the note is paid in

4    full, a sum, (the funds) to provide for payment amount due for

5    a) taxes and assessments."

6    Q    And then would you skip down also, it says, "and (d)".

7    Would you start with the "and".

8    A    "And not to exceed the maximum amount a lender can

9    require RESP --"

10   Q    No, ma'am, I'm sorry.  You skipped down to the next

11   highlighted portion, which I can completely understand why you

12   might do that.  What I'm saying is in that sentence you were

13   just reading you read through (a), right, taxes and

14   assessments?

15   A    Yes.

16   Q    If you look over to the left, down two lines you see

17   where it says, "and (d)".  Actually I don't even want that.

18   I'm glad that you called this to my attention.  Would you look

19   up at (c), please.

20   A    "Premiums of any --" is that what you want?

21   Q    Yes, ma'am.

22   A    "Premiums for any and all insurance required by Lender

23   under Section 5; and mortgage insurance premiums, if any, or

24   any sums payable by Borrower to Lender in lieu of payments of

25   mortgage insurance premiums in accordance with the provisions

1    of Section 10."

2    Q    Your son actually read that other highlighted sentence to

3    us, right?  So I don't think we need to look at that.

4                MR. ROGERS:    Would you please turn to Section 14,

5    Kelly.

6    BY MR. ROGERS:

7    Q    Could you, please, read that?

8    A    "Loan charges, Lender may charge Borrower fees for

9    service performed in connection with Borrower's default, for

10   the purpose of protecting Lender's interest in the property

11   and rights under this Security Instrument, including but not

12   limited to attorneys' fees, property inspections and valuation

13   fees."

14               MR. ROGERS:    Let's go back up to the second page of

15   section 1, please, Kelly.

16   BY MR. ROGERS:

17   Q    And I will read this and you can just tell me if I've

18   read it correctly.  We'll take a turn, if that's all right

19   with you.  I'm going to start at the end of that first line at

20   the top of the page.  And you tell me, Ms. McGinnis, if I've

21   read this correctly.

22        "Lender may accept any payment or partial payment

23   insufficient to bring the loan current without waiver of any

24   rights hereunder or prejudiced to its rights to refuse such

25   payment or partial payments in the future.  But Lender is not

1    obligated to apply such payments at the time such payments are

2    accepted.  If each periodic payment is applied as of its

3    scheduled due date then Lender need not pay any interest on

4    unapplied funds.  Lender may hold such unapplied funds until

5    borrower makes payment to bring the loan current."  Did I read

6    that correctly, ma'am?

7    A    Yes.

8           MR. ROGERS:   Now, if we could, Kelly, would you put

9    up Section 22.

10   BY MR. ROGERS:

11   Q    And if it's all right with you, Ms. McGinnis, I'll read

12   this again so that you don't have to read it. I'm going to

13   start at the top, Ms. McGinnis, so 22.

14         "Acceleration; Remedies.  Lender shall give notice to

15   Borrower prior to acceleration following Borrower's breach of

16   any covenant or agreement in this Security Instrument, but not

17   prior to acceleration under Section 18 Applicable Law provides

18   otherwise."

19         Then it includes some details, if you skip down, about

20   what the notice shall say.  Skip down 1, 2, 3, 4, 5, 6 lines

21   and do you see where it says, "If the default is not cured"?

22   It's actually highlighted.  Do you see that, ma'am?

23   A    Uh-huh (affirmative).

24   Q    "If the default is not cured on or before the date

25   specified in the notice, Lender, at its option may require

```
 1    immediate payment in full of all sums secured by this Security
 2    Instrument without further demand and may invoke the power of
 3    sale granted by Borrower and any other remedies permitted by
 4    Applicable Law."  Did I read that correctly, ma'am?
 5    A    Yes.
 6             MR. ROGERS:   Why don't we put up Defendant's
 7    Exhibit 42, Kelly, which we will move to admit.
 8             THE COURT:    Mr. Gower.
 9             MR. GOWER:    I'm sure I don't have an objection but
10    I don't know what it is. (Showing exhibit)  No objection.
11             THE COURT:    Admitted.
12    BY MR. ROGERS:
13    Q    Can you see this document, ma'am?
14    A    Yes.
15    Q    This is the application for the 172 Hilton Street loan,
16    right?
17    A    Yes, it is.
18    Q    And that's your signature there; isn't it?
19    A    Yes, it is.
20    Q    I would like for you, please if you would, to look down
21    where it says -- you see the box that has in cursive above it
22    or italics above it, "Complete this line if this is a
23    refinance loan"?
24    A    Okay.
25    Q    That line shows that you bought the property at 172
```

```
1     Hilton Street in 2004, right?

2     A     Okay.

3     Q     Is that what it says, right?

4     A     Yes, sir.

5     Q     And it shows that you paid $46,800 for it, right?

6     A     Yes, sir.

7     Q     And it shows that at this point the amount of existing

8     liens is zero, right, there's nothing there?

9     A     Right.

10    Q     So the purpose of the loan is shown cash out, right?

11    A     Yes.

12    Q     And then if you go down it says, "Source of down payment

13    settlement charges and/or subordinate financing, explain."  Do

14    you see that?

15    A     No.  Okay.

16    Q     And there it says "Equity from the subject", right?

17    A     Right.

18    Q     And then if we skip forward to page three of five where

19    it says, "Schedule of real estate owned".  Do you see that?

20    A     Yes.

21    Q     And that's got what, 1, 2, 3 properties, right?

22    A     Right.

23    Q     And then it says, "See continuation sheet"?

24    A     Yes.

25    Q     So if we go to the continuation sheet.  We are at the
```

1    continuation sheet, right?

2    A    Yes.

3    Q    It shows 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12

4    properties, right?

5    A    Right.

6    Q    And the last of those is actually your condo in St.

7    Augustine; right?

8    A    That's right.

9    Q    The others are investment properties, right?

10   A    Right.

11   Q    So far we've seen 14 investment properties and if we turn

12   the page we see a 15th investment property, right?  No, it's

13   the last page of the exhibit.  And that shows the 15th

14   property, right?

15   A    Yes.

16   Q    So is it the case that you got 15 properties in the

17   divorce with your husband?

18   A    Yes.

19   Q    After you took the loans from TBW you gave Adam power of

20   attorney, right?

21   A    Yes, sir.

22   Q    And your son was in charge of making the payments on the

23   loans, right?

24   A    Yes, sir.

25   Q    And he received all the correspondence regarding those

```
 1    loans at his home address, right?

 2    A     Right.

 3    Q     None of the correspondence went to you in Florida,

 4    right?

 5    A     No.

 6    Q     And the calls, the numbers that the mortgage companies

 7    had, were Adam's numbers, right?

 8    A     Yes.

 9    Q     They didn't call you directly in Florida, right?

10    A     No.

11    Q     We saw Dr. Sappington's video deposition and you see Dr.

12    Sappington in Florida, right?

13    A     I do.

14    Q     And you didn't begin to see him until May of 2011,

15    right?

16    A     It's about then.  Whatever the notes say.  I'm not real

17    good with dates, but whatever he said.

18    Q     You had seen a psychiatric counselor before, right?

19    A     When I divorced I did have a lady that was there in

20    Monticello, a Mrs. Ballard, yes.  She was a great deal of

21    help.

22    Q     I want to talk just about a few things that you said.

23    You were talking about when you went to Georgia to help

24    organize the files.  When was that?

25    A     I went all the time.  But the last time was probably --
```

1    okay, I've had knee surgery since then.  So I would say it's

2    probably been four months.  Because I tried to get everything

3    ready for when I went into the hospital.

4    Q    So it was probably in April?

5    A    Yes, something like that.  I don't know.

6    Q    You understand that Ocwen Loan Servicing has taken over

7    the servicing of your loans, right?

8    A    Yes, I do.

9    Q    And you understand that happened as of March 1, 2013,

10   right?

11   A    Yes, I do.

12   Q    When was it that Adam visited with the children that you

13   were talking about?  Do you remember when that was?

14   A    When Adam --

15   Q    You were saying that Adam visited with the children and

16   you got a call at 8:07 at night, I think it was?

17   A    Adam and his wife and family came to St. Augustine.

18   Q    Yes, ma'am.

19   A    It's been about nearly a year, I guess, or eight or nine

20   months ago.

21   Q    You say you're very concerned about Adam's reputation,

22   right, ma'am?

23   A    Yes, sir.

24   Q    Adam has had his own property foreclosed on, hasn't he?

25   A    Yes, he did.

1    Q     And your ex-husband has filed bankruptcy, right?

2    A     That's what I hear.  I read it in the paper.

3              MR. ROGERS:   I think I'm probably done.  Thank you,

4    ma'am.

5                        REDIRECT EXAMINATION

6    BY MR. GOWER:

7    Q     Well, let's talk about this foreclosure that Adam had on

8    his property that he brought up.  Tell us about that?

9    A     Well, Charlie, I was in and out of it all the time and I

10   would have handed them that house back on a platter but he did

11   everything to try to get it refinanced.  It just -- he did

12   that just like he has worked with my properties and it was

13   just -- they were not interested in helping him in any way

14   whatsoever.  And I finally just saw him give up and say, you

15   know, I don't know what else to do.

16   Q     Matter of fact, that was Ocwen, wasn't it?

17   A     You know, I think it was Charlie.  You know, you just

18   rang a bell.  I think that was.

19   Q     Is this property that was foreclosed on, is this where

20   Adam used to live?

21   A     Oh yeah.  It's the oldest wooden structure in Jasper

22   County.  It's a little wooden house.  And what he did, how he

23   redid it was just phenomenal.  But it was little and it was

24   right on the street and the baby started to come along and

25   they decided to build in the country and rent that house.

1    Q    Okay.  Let's talk about this house since Mr. Rogers has

2    brought this up.  On this home, what all did Adam do to keep

3    from having it foreclosed on?

4            MR. ROGERS:    Relevance, Your Honor, plus it's

5    hearsay.  She has no foundation.  She didn't do it all.  She

6    knows what Adam told her which is hearsay.

7            MR. GOWER:    If it please the Court, he brought

8    this up and we've got to clear it up.  They are trying to

9    paint this picture and he's asked her about Adam's foreclosure

10   and I want to be able to show that Adam is not a dead beat.

11           THE WITNESS:   No.

12           THE COURT:   That's too far afield.  I think that

13   is too remote under the circumstances of this case.  This is

14   her case.  It's not Adam's case.

15           MR. GOWER:    Right, sir.  But he's the one who

16   brought it up.

17           THE COURT:   Well, I understand that part of it.

18   But she was the one that actually brought it up on direct when

19   she talked about Adam.  And so he certainly had the right to

20   cross examine her about that.  But I think you are going too

21   far afield now.

22           MR. GOWER:    Thank you, sir.

23   BY MR. GOWER:

24   Q    Let me ask you about the other thing he brought about.

25   Is your ex-husband filing for bankruptcy?

1   A    Yes.   And, you know, I'm really sorry about that.   He is

2   married to a girl now that is the same age as our daughter

3   that you just met.   He's is married to her and I -- he just

4   couldn't buy enough property for them.   They were going to

5   develop and do all this.   I knew that that was a train wreck,

6   but you know what, it wasn't any of my business.   I had enough

7   on my plate.   Let him go.

8   Q    Mr. Rogers asked you about he put up your loan

9   application --

10  A    Yeah.

11  Q    -- about properties that you owned and we talked about a

12  condominium in St. Augustine?

13  A    Yeah.

14  Q    Tell us about that?   Is that a condominium that you owe

15  more on than it's worth?

16  A    You got it.   That is one of the big mistakes I've made in

17  my life.   And I am 40 or $50,000 in the hole now.   But I was

18  in that mode.   I was still in that renting mode and flipping

19  and redoing and selling it.   And when I went to Florida that

20  was still in my blood.

21       So I go in there and I paint, I redo, I fix it up.   It

22  looked like a little thousand-square-foot matchbox which is

23  what it is.   And just as I got ready to turn it over we all

24  know that the economy just bottomed.   And right now the

25  condominium right beside me, the same design, just sold for

1    $120,000.

2    Q     And how much do you owe on it?

3    A     I owe 148,000 on mine.

4    Q     Let me ask you, Mr. Rogers also talked about all

5    this valuable commercial property you own.  Tell us about

6    that?

7    A     It's just what Allen and I bought.  We've had it for

8    years.

9    Q     What is it?

10   A     We sold one piece and I had it rented to a guy that had a

11   liquor store in it.  And then there is Dave's restaurant.

12   Many, many, hundred years ago it was a parts place.  And this

13   guy came in and cleaned it out and made a restaurant out of

14   it.  As a matter of fact the movie "My Cousin Vinnie" is

15   filmed in that restaurant in Monticello.  And my flower shop

16   is in it.  And I've got that.

17        And then when I was in the flower shop I purchased a

18   building on the square.  It was like two buildings with a

19   brick wall between it.  I bought it together but it had a

20   brick wall between it.  My flower shop was on one side and the

21   realty building was on the other side.  I have hence sold what

22   was the flower shop to Adam and that's where McGinnis Realty

23   is now.

24        And the other part, he worked with this family -- I don't

25   know if you know what I mean by Mennonites.  They are --

1    that's kind of like Amish people.  There's a large group of

2    them in Monticello.  They have come in and opened up a

3    sandwich shop there and it is phenomenal.  I am so proud of

4    them.  So that's the other piece.

5    Q    Let me ask you this.  Remember all those documents, legal

6    documents Mr. Rogers was asking you to read from?

7    A    Yes, sir.

8    Q    Would you look at this jury.  Have you tried to beat this

9    mortgage company out of a single penny?

10   A    Well, it's like I told you while ago, I have the paper.

11   I have the copies of the canceled checks.  I have copies of

12   the bank statements.  I don't know what else to say to you.  I

13   don't know what else to say.  I have the copies.  I have the

14   proof.  They drew it out of the account.  I didn't even have

15   to send them a check.

16   Q    Is all you wanted them to do is just take your money and

17   apply it correctly, is that all you wanted them to do?

18   A    That's what I understood --

19            MR. ROGERS:   Objection, leading, Your Honor.

20   A    -- it was supposed to be, supposed to happen.

21            THE COURT:   Don't lead your witness, please.

22   BY MR. GOWER:

23   Q    Jane.

24   A    Sir.

25   Q    I forgot what I was going to ask you.

1          MR. GOWER:    That's all I have.  Thank you.

2                      RECROSS EXAMINATION

3    BY MR. ROGERS:

4    Q    Just one question, ma'am.  Do you know the date of the

5    foreclosure on 172 Hilton Street?

6    A    June -- you know what, I want to say June 9th. It's in my

7    note.  Like I said, I have a hard time with birthdays.

8          MR. ROGERS:    Thank you.

9          THE COURT:    Very good.  Ladies and gentlemen, I'm

10   going to send you home now.  It's 5:00 o'clock.  And I want to

11   remind you again not to talk to anyone about this.  Remind you

12   not to try to do any of your own research or anything like

13   that.

14         And I want you to be back in the jury room at 9:00

15   in the morning.  I think that I can say that we'll be finished

16   with the evidence in the morning without any trouble.

17         So the case is moving along well.  And we'll be able

18   to have the closing arguments and the jury charge tomorrow and

19   I think you'll be able to begin your deliberations tomorrow

20   too.  So y'all have a good evening.  Thank you very much.

21   (JURORS EXIT COURTROOM)

22         THE COURT:    Is that all your evidence?

23         MR. GOWER:    Yes, sir.

24         THE COURT:    And so you rest?

25         MR. GOWER:    Yes, sir.  Subject to our exhibits

1    coming in.

2              THE COURT:    We'll get the exhibits straightened

3    out.  I'm not worried about that.

4              MR. GOWER:    Yes, sir.

5              THE COURT:    We're going to take a short break and

6    we'll come back and do the jury charge.

7              MR. GOWER:    Yes, sir.

8              MR. ROGERS:    I'm going to make a motion for

9    judgment, Your Honor.

10             THE COURT:    That's fine.  I'll give you the

11   opportunity to do that but I want to do the jury charge first.

12             MR. ROGERS:    That's not a good sign about my

13   motion.

14   (RECESS)

15             THE COURT:    First thing we're going to do is go

16   through what we have come up with that we think ought to be

17   charged.

18             And I'm looking at instruction number 1.  It's on

19   page two.  Now, this is a standard charge we give.  So there

20   shouldn't be any question about that.

21             Instruction number 2 is a standard charge we give.

22   There shouldn't be any question about that.  It deals with

23   direct and circumstantial evidence and explaining to the jury

24   the difference.

25             Credibility of witnesses is a standard charge that

1    we give.

2            Impeachment.  I think there is sufficient basis in

3    this case for the jury to be charged.

4            Instruction number 4, again that's the standard

5    charge.

6            Instruction 5, that's a standard charge.

7            Instruction 6 deals with the preponderance of the

8    evidence.  And this is a little bit different because we do

9    have a punitive damage claim in this case.

10           And then 7 is just an introduction to the claims.

11           And then what follows thereafter is really what I

12   call the operative charges.  Those charges that apply to the

13   particular case as alleged in the complaint.  And then what

14   I've refined and put as the final theories of the case in the

15   pretrial.  So does anybody have any objections to 8?

16           MR. ROGERS:   Yes, Your Honor, we do.  First, Your

17   Honor, we would request that Defendant's proposed instruction

18   number 10, which deals with the duty element of the wrongful

19   foreclosure claim, be included just to elaborate on what the

20   duties are.

21           THE COURT:    Okay.

22           MR. ROGERS:   We base that charge largely -- well at

23   least not largely, but in large part, on what Your Honor

24   ordered in the July 2nd order, and we just think that bears

25   some further discussion.

1          On page 12, Your Honor, and we understand and it's

2    obvious how hard y'all worked on this and they've got to be

3    adapted to the case and we understand that.

4          THE COURT:    Right.

5          MR. ROGERS:   But the paragraph that starts at the

6    bottom talks about whether or not our acts caused the default.

7    And our concern with that, Your Honor, is that the cases talk

8    about --

9          THE COURT:    Wait just a minute.  I'm not with you.

10         MR. ROGERS:   Okay, Your Honor.  Partial paragraph

11   bottom of page 12.  You may also consider.

12         THE COURT:    Okay.

13         MR. ROGERS:   And again we appreciate that you're

14   trying to adapt the charge.  Our point, Your Honor, is that

15   the cases say that the Defendant's acts have to cause the

16   foreclosure, not the default.

17         And it may seem like a subtle difference but it's a

18   significant difference.  This is unsupported by the case law,

19   we believe, Your Honor.

20         The two cases or three cases cited at the end of

21   this was Heritage Creek and the Green Tree Servicing case.

22   Your Honor, both of those are cases that we routinely cite for

23   the proposition that if the Plaintiff is in default then

24   that's the cause.  So I'm highly conversant on those cases as

25   a general matter and it doesn't support this charge.

1          The case that I think y'all are looking at is that

2     Brown V. Friedman case.  And I've read that case a couple of

3     times, Your Honor.  And what that case talks about is that you

4     have to exercise the right in good faith.  That is really the

5     big take away that everybody talks about from that case.

6          And then it goes on to say that what you have to

7     have for a wrongful foreclosure claim is a foreclosure that

8     isn't at an adequate price, so it doesn't bring enough money.

9     And then you have to have one of these other elements that

10    causes the inadequate return on the sale, Your Honor.

11         So again it's focusing on the foreclosure.  And our

12    point is that we understand that it has to be adapted.  We

13    understand they have said we did bad things.

14         If it were to say they did bad things and if you

15    conclude that Defendant's bad things caused the foreclosure

16    then we wouldn't have any concern whatsoever with that part of

17    the charge, Your Honor.

18         THE COURT:    Well, are you telling me that if I

19    take out default and put in foreclosure that satisfies it?

20         MR. ROGERS:    It may be just that simple, Your

21    Honor.  But yes, Your Honor, that's what we want.

22         If the concept is the Defendant's bad acts caused

23    the foreclosure that's the law, Your Honor, as we understand

24    it.

25         MR. GOWER:    I disagree a hundred percent.  The

1    whole thing about this thing is they have no right to exercise

2    the power of sale unless there is a default.  They cannot

3    first cause the default and then say, well, you're in default

4    so we have the right to foreclose.  That's what he's trying to

5    get you to do.  And the way you've got it makes sense and is

6    correct.

7              MR. ROGERS:   It's not supported by the case law,

8    Your Honor.  That's our point.

9              MR. GOWER:    It's supported by the common sense.

10             THE COURT:    Okay.  I will consider that.

11             MR. ROGERS:   Thank you, Your Honor.

12             THE COURT:    Is there anything else about that?  I

13   know you want to add your 10 and we'll go look at that in just

14   a minute.  But I want to go through.  I like to find out what

15   I need to do to clean up what we have proposed and then we go

16   from there.  So, anything else about 8?

17             MR. ROGERS:   Not from us, Your Honor.

18             THE COURT:    What about nine.  Nine is a conversion

19   charge.

20             MR. ROGERS:   Your Honor, we think -- two things

21   about -- well, maybe three things about it.

22             The first one is the second part of the elements.

23   We think that's probably just a typo.  I think it ought to be

24   that the Defendant actually possessed the loan payments rather

25   than lawfully possessed the loan payments, Your Honor.

```
 1              If anything it would make more sense to say
 2   unlawfully possessed the loan payments in the context.  I
 3   think it's the charge.  And as we submitted it on number 18
 4   it's actually.  So I think it's just a typo, Your Honor.
 5              THE COURT:   You see a problem with actually?
 6              MR. GOWER:   No, sir.
 7              THE COURT:   I really try to work out an agreement
 8   on these things if possible.  It works better that way.  What
 9   else?
10              MR. ROGERS:   I think, Your Honor, that 3 is a
11   little confusing.  And again I understand you're trying to get
12   away from the demand element, which is harder in this case
13   where they have the obligation to pay.  And so you're trying
14   to adapt the elements to the case.  I appreciate what's going
15   on here.
16              But I think that the way it ought to be adapted
17   would be the Defendant acted in a manner inconsistent with the
18   Plaintiff's interest or rights in the money.
19              To say that Defendant acted inconsistent with the
20   Defendant's rights, I think it just gets confusing, Your
21   Honor.
22              The Plaintiff ultimately is the one who has the
23   right to enforce the contract and compel whatever performance
24   under the contract with respect to the handling of those
25   funds.
```

1          And so I just think it's clearer for the jury.

2          THE COURT:     You don't have a problem with that, do

3     you?

4          MR. GOWER:     No, no problem.

5          THE COURT:     I didn't think so.  What else?

6          MR. ROGERS:     Let's see, Your Honor.  We had a

7     couple of ours that you didn't put in.

8          THE COURT:     No.  We're not going there yet.

9          MR. ROGERS:     The only reason is when you get to

10    adapting the charge, Your Honor, we feel like you've adapted

11    the charge for their purpose but you haven't included ours in

12    there.

13          And so we had cited you to a case where if the loan

14    payments were applied properly it can't support a conversion

15    claim.  That was our charge number 20.  And we would just ask

16    that the Court consider including that in its effort to adapt.

17          THE COURT:     Well, we're going to do that in just a

18    minute.  We're going to come back.  But I'll make a note here.

19    Charge number 20 for the Defendant by number 9.  And so we'll

20    come back to that.

21          MR. ROGERS:     And then there is essentially the same

22    paragraph that we were just talking about with respect to the

23    default on the next page on 15.  And the foreclosure -- and

24    this kind of gets to the last thing that we think is missing

25    from this is, that the foreclosure is irrelevant, Your Honor.

1    You can't have conversion for real property.  You can only

2    have conversion for personal property.  So it gets confusing

3    for you to put the stuff in here about that, Your Honor.  And

4    we would propose that that be removed.  And we would ask that

5    you consider including Defendant's proposed instruction 21

6    that just says you can't have a claim for conversion on real

7    property.

8             THE COURT:    Let me make sure because I'm not sure

9    where you're talking about particularly on page 15.  Where are

10   you talking about?

11            MR. ROGERS:    15 where it says if you conclude the

12   Plaintiff was either not in default or that her default was

13   caused -- It's similar to --

14            THE COURT:    Okay.

15            MR. ROGERS:    I think the easiest way to handle it,

16   Your Honor, if you just include the part that says you can't

17   get real property, that it can't be about real property, then

18   I don't have any problem really with that paragraph.

19            I just think because it comes straight after the

20   wrongful foreclosure, because it's essentially the same as the

21   wrongful foreclosure and it talks about these kinds of default

22   issues.  That it's going to suggest that the foreclosure could

23   support the conversion claim which it can't.

24            MR. GOWER:    I don't think so.  No, because page 14

25   you talk about unauthorized fees from monthly mortgage

```
 1    payments and not applying the monthly mortgage payments to

 2    accounts.  So that's clear.

 3            MS. BRASH:    There's nothing talking about real

 4    property in here.

 5            MR. ROGERS:   I think Your Honor should put in there

 6    that it's not about real property.  That's our request.  And

 7    unless Mr. Gower is going to ask for it for real property I

 8    can't imagine why he has a problem with that.

 9            MR. GOWER:    Because it makes sense like it is.

10    You're just making it more complicated than it need be.

11            THE COURT:    All right.  What else?  Anything else

12    on number 9?

13            MR. ROGERS:   Not from us, Your Honor.

14            THE COURT:    Number 10 deals with interference with

15    property rights.

16            MR. ROGERS:   Our only comment on that, Your Honor,

17    is we think there should be a causation element in the charge.

18    That element three of the cause of action is a causation

19    element.

20            THE COURT:    And so you would propose a third that

21    says that Defendant's actions caused Plaintiff's harm or

22    something like that?

23            MR. ROGERS:   Yes, Your Honor, that's all.  And to

24    cut to the chase, Your Honor, that's our last comment on any

25    of the charges.
```

1          THE COURT:    You don't have a problem with that, do

2   you?  So nothing on 11?

3          MR. ROGERS:    No, Your Honor.

4          THE COURT:    Nothing on 12, damages.  Nothing on

5   12.

6          And then 13 is a standard charge, duty to

7   deliberate.

8          And then 14 is essentially a refresher on

9   notetaking.

10         Fifteen is about how they deal with the court and

11  not trying to do their own research.

12         Sixteen deals with the instruction for their

13  deliberations and explaining the verdict form.

14         Now, you didn't say anything, Mr. Gower.  Do you

15  have any questions about any of this?  I mean, obviously

16  you've said a couple of things in response to what he said.

17  Do you have any of your own objections?

18         MR. GOWER:    Can I just say something.  This sounds

19  crazy, but I'm saying this not because of any criticism I have

20  of these charges, but in case I'm quoted in the future about

21  what I said today in another case.  Does that make any sense?

22  I just want to say something for the record.

23         What I want to say for the record is this.  I take

24  the position that on the charge for -- on the cause of action

25  for wrongful foreclosure, that in order to recover emotional

```
1    damages that all the Plaintiff has to prove is that it was an
2    intentional wrongful foreclosure.  And that you do not have to
3    go further and prove the tort of intentional infliction of
4    emotional distress within the tort of wrongful foreclosure.
5          The reason I say that is, I've taken a position in
6    other cases similar to this, that whenever you have an
7    intentional tort of whatever nature, you are entitled to
8    recover emotional damages that are proximately caused.
9          And I think that the Georgia Court of Appeals --
10   Your Honor, here I shouldn't be saying all this, but they got
11   it wrong.  There are cases that say, I think wrongfully, that
12   in order to recover emotional damages from the tort of
13   wrongful foreclosure you have to also prove the tort of
14   intentional infliction of emotional distress, which I think is
15   wrong.
16         THE COURT:   Well, do we have it wrong in here
17   according to you?
18         MS. BURNS:   Well, I think we might want to also
19   point out what he is saying relates to an opinion Judge Land
20   --
21         THE COURT:   I'm familiar with the opinion.  I know
22   what Judge Land held.
23         MS. BURNS:   Okay.
24         THE COURT:   Judge Land held what you just said.
25         MS. BURNS:   Right.
```

1          MR. GOWER:    I think you have got it wrong.  But on

2    the damages charge on page 23, the charges.  But I understand

3    why you put it in here.  But I think it's wrong.

4          And I know that sounds crazy but you, in here on

5    page 23 that there is -- that in order to recover emotional

6    damages for the tort of wrongful foreclosure --

7          THE COURT:    Wait a minute.  Now where are you?  On

8    page 23?

9          MR. GOWER:    I'm sorry.  On page 23 under the

10   damages charge.

11         MS. BRASH:    The second paragraph.

12         MR. GOWER:    The second paragraph.

13         THE COURT:    Okay.

14         MR. GOWER:    And what my point is, is that if in

15   the charge as to wrongful foreclosure, if you put in there,

16   "if you find that they intentionally wrongfully foreclosed."

17   In other words they've got to find intentionally wrongfully

18   foreclosed.  If they did that then you can recover emotional

19   damages.

20         Because you can have a wrongful foreclosure that's

21   not intentional.  But if it's intentional -- Does that make

22   sense?

23         THE COURT:    Well, I mean the word intentional is

24   used several times in there.  It's used in the first element,

25   right below that describing what it is.  I guess I'm a little

1    bit confused.

2            I guess I need to understand what your remedy is for

3    this.

4            MR. GOWER:   That's a good question.  In a perfect

5    world, what I would like is on page 11.

6            THE COURT:   Eleven?

7            MR. GOWER:   Yes.  Of your charge, going back to

8    wrongful foreclosure.  Where it says second, say that the

9    Defendant, and I'd put in the word intentionally, breached

10   this legal duty.

11           And then go back to page 23 on damages and take out

12   that part that says there are additional restrictions from

13   recovering emotional distress damages from the Plaintiff's

14   wrongful foreclosure claim.

15           THE COURT:   I didn't follow that.  You'll have to

16   tell me where that is again now.  There are additional

17   restrictions.

18           MR. GOWER:   Yes, sir.

19           THE COURT:   Oh, I do see that.  Mr. Rogers, do you

20   want to comment about either one?

21           MR. ROGERS:   Yes.  We disagree, Your Honor.  I

22   think it's inconsistent with Georgia Law.

23           And, you know, I think that Mr. Gower acknowledged

24   that when he said the Court of Appeals got it wrong.  The

25   Court of Appeals has said that this is the standard for

1    emotional damages.  We cited those cases in our proposed

2    instructions.

3            I'm not aware of a holding from the Court of Appeals

4    that says that you can get emotional damages for an

5    intentional wrongful foreclosure.

6            So I don't think that is consistent with Georgia

7    Law, Your Honor.  And I think maybe this would ultimately

8    redound to my benefit, but Mr. Gower is now trying to turn

9    wrongful foreclosure into an intentional tort which would

10   require a specific intent presumably.  And just to be honest

11   there isn't any evidence of specific intent in this case.

12           Mr. Delbene testified that the computer spat out a

13   list and somebody confirmed that the payment hadn't been made

14   required to bring it current.

15           So, you know, I think that the wrongful foreclosure

16   claim is -- my motion starts sounding better if you include

17   the intentional element in there, Your Honor.  It's just not

18   an intentional tort.

19           So I just think that this turns Georgia law on its

20   ear to make all these changes, Your Honor.  They got it right

21   the first time.

22           THE COURT:   I'll try to figure this out between

23   now and the time we charge the jury.  Anything else, Mr.

24   Gower?

25           MR. GOWER:   No, sir.

1           THE COURT:     Anything from your charges you want me
2    to charge?
3           MR. GOWER:     No, sir.
4           THE COURT:     Let's talk about the Defendant's
5    charges then.  There were several that you mentioned.
6           All right.  The first one you raised was on
7    instruction number 8 and it was your number 10.  And you are
8    just asking that I add this, correct?
9           MR. ROGERS:    Yes, Your Honor.  And I think, to be
10   frank, the concept is not entirely absent from this charge.
11   I'm not trying to suggest that it is.  We would just request
12   that something like this be sent directly, that in order to
13   show a breach of duty you have to show that they violated the
14   loan as to Georgia Law.
15          COURT REPORTER:  I'm having a hard time
16   understanding you.
17          THE COURT:     Why don't you go back over there, if
18   you would.
19          MR. ROGERS:    I think that when you talk about
20   causation that these issues are in there, Your Honor.  And
21   we're just asking that they be called out as part of the duty
22   definition, that's all.  I mean it's not that the concept is
23   entirely absent, we're not meaning to suggest that.
24          THE COURT:     Well, it's unclear to me why this
25   would be a problem of putting that last long clause in there.

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1    Plaintiff must establish by a preponderance of the evidence

2    that the Defendant's foreclosure of Plaintiff's property (a),

3    violated the provisions of the loan instruments or violated

4    Georgia Law.  What's the problem with that?

5         MR. GOWER:    I wouldn't have a problem as long as

6    we can put in our charge number 6 that would follow that.

7         THE COURT:    All right.  I'm having trouble keeping

8    all this -- Number 6 dealing with the escrow account?

9         MR. GOWER:    Yes, sir.

10        MR. ROGERS:    Your Honor, part of that charge is

11   based on RESPA, Your Honor.  The regulations promulgated under

12   RESPA and RESPA doesn't apply to investment properties, Your

13   Honor.  That's the reason we object to that charge.

14        MS. BURNS:    But they argued that in this instance

15   because it was incorporated into the Security Deed that that's

16   how they were calculating the amount of escrow was based on

17   RESPA, but for purposes of that this applies.

18        MR. ROGERS:    The calculation of the escrow is one

19   thing, Your Honor.  This charge strays into how that shortage

20   can be collected.  The contract document speak to it.  And

21   you've already given a summary judgment on RESPA.  It doesn't

22   apply.  So we did say that we would calculate the amount

23   consistent with RESPA, but the rest of this charge, Your

24   Honor, is inappropriate.

25        And frankly the rest of it is just reading the

```
1        contract to the jury which we don't think is appropriate
2        either since we'll handle that in closing.
3                   THE COURT:   Well, I think this is a little bit
4        problematic.  I guess the Code of Federal Regulations you're
5        citing here is the RESPA sections?  What you're citing here
6        for the basis for this charge, charge number 6?
7                   MR. GOWER:   Yes, sir.
8                   THE COURT:   24 CFR 35 under 17(c).  All right.
9        Well, take a look at -- well, I'll consider both of these.
10       Let me mark these.
11                  And next was instruction number 9 and you were
12       wanting me to charge your number 20 and 21.  And this is,
13       under Georgia Law there can be no conversion claim based on
14       the possession of real property.  Instead, conversion only
15       applies to the unauthorized possession and refusal to return
16       personal property.  And the personal property, I assume in
17       this case, would be the fees and other things, right?
18                  MR. GOWER:   Yes, sir.  I think it's not only
19       refusal to return it, but to properly apply it.
20                  MR. ROGERS:   I think that's fair, Your Honor.
21                  THE COURT:   Well, either way.  That would be a
22       conversion too.  I think that the jury ought to know that you
23       can't have conversion for real property.  I think they could
24       be confused about that.  And I think it would be worthwhile to
25       add that in there.
```

1          We really try not to confuse these juries and to

2     give them as much help as we can.  Because if we don't then

3     they're just going to keep coming back in here with notes

4     asking us about the law and what they're supposed to do.  So

5     it's much better to get it right the first time.

6          And then the other is 21.  Well, that was 21.  The

7     other was 20.  Where the Defendant has the legal right to

8     apply loan payments in a certain manner and Defendant implies

9     that loans payments -- there can be no claim for conversion.

10         MR. ROGERS:   We think that's just sort of the flip

11    side of what's in there now.  We would just like to see it

12    adapted to the defense as well.

13         THE COURT:    Again, I don't see any problem with

14    that.

15         MR. GOWER:    I don't see the flip side of it.

16         THE COURT:    What?

17         MR. GOWER:    I don't see the flip side to number

18    20.  Where it says if they wrongfully applied then it is

19    conversion.

20         THE COURT:    Well, in order for the Defendant to

21    have acted in a manner inconsistent with his right of

22    possession then its actions must be contrary to the terms and

23    conditions of the promissory note and security deed.

24         MR. ROGERS:   What I was referring to, Your Honor,

25    is where it talks about if you conclude that the Defendants

```
 1    caused the default and the fees.  I'm just saying that's
 2    adapted to the facts of the case and frankly seems adapted to
 3    the facts of the Plaintiff's version of events and we would
 4    just like the one for ours.
 5              THE COURT:    All right.  Anything else?
 6              MR. GOWER:    Not from me.
 7              MR. ROGERS:   Not for me, Your Honor.
 8              THE COURT:    Now, I haven't forgotten your motion.
 9    How long is it going to take you to put up your case
10    tomorrow?
11              MR. ROGERS:   Well since the -- I think now since
12    Adam's foreclosure was undenied and it's in front of the jury
13    that we don't need to call Adam for any reason that I can
14    think of.  So we're just going to play about an hour and five
15    minutes of our portion of the Delbene deposition and then
16    probably move to admit the rest of our exhibits and we're
17    done.
18              THE COURT:    Are you expecting to have anything on
19    rebuttal?
20              MR. GOWER:    Not that I can think.
21              THE COURT:    I can't imagine you would.  Mr. Gower,
22    I want you to make sure that you have all of the exhibits that
23    you want to get in.
24              MR. GOWER:    Yes, sir.
25              THE COURT:    You can talk to Ms. Purvis.  Matter of
```

1       fact, maybe she can make you both a copy of --

2               COURTROOM CLERK:  I already have.

3               THE COURT:   She already has.  So she's made you

4       both a copy of what's in.  And I would encourage you to make

5       sure that you have in whatever you want in.

6               Are you ready to explain to me why I should dismiss

7       the Plaintiff's case?

8               MR. ROGERS:   I certainly am, Your Honor.  I won't

9       belabor the point, Your Honor.  I'm sure you're familiar with

10      the standard under Rule 50.

11              THE COURT:   I am.

12              MR. ROGERS:   We would start with the conversion

13      claim, Your Honor.  At this point, Your Honor, there's no

14      evidence that's been presented by the Plaintiff that AHMSI

15      acted inconsistent with its legal right.  The contract

16      provisions were read into evidence.  Provision Section 1 of

17      the Note, Section 3 of the Note, authorized late fees and the

18      recovery of costs associated with default.

19              Section 14 of the Security Deed authorizes the

20      imposition of fees for property inspections, for valuations

21      and for attorney's letters, and then generally for other fees

22      that are associated with the default.

23              All of the fees that have been itemized fit into

24      that category.  The default, Your Honor, which I'll talk about

25      in a moment with the wrongful foreclosure claim, but the

1    default itself is undeniable, Your Honor.  And I suppose

2    that's as good a point as any to move to the wrongful

3    foreclosure claim.

4              THE COURT:    Wait just a minute.  My impression

5    from the evidence in the case is that the -- is that Adam

6    testified that all the money he sent in he thought was due.

7    Isn't that the essence of what he said?

8              MR. GOWER:    Are you asking me?

9              THE COURT:    Yes.

10             MR. GOWER:    That it was due?

11             THE COURT:    Yes.

12             MR. GOWER:    Yes, sir.

13             THE COURT:    In other words, he never disputed that

14   the money that he sent in he didn't need to send in?

15             MR. GOWER:    No, sir.

16             THE COURT:    Well, what's your response on the

17   conversion claim?

18             MR. GOWER:    The conversion claim is that they

19   misapplied it and that they took fees out of the money that he

20   did send in, which was unauthorized.  And Mr. Delbene himself

21   says that they put this money in a suspense account and then

22   they took fees out.  That's the conversion right there.

23             MR. ROGERS:    But the point, Your Honor, is -- and I

24   think now after the cross examination of Mr. McGinnis they

25   knew before they ever wrote the first check in November of

1    2009 what they were being asked to pay, $843.58.  It was the

2    remittance coupon that was attached to the welcome letter that

3    he acknowledged getting by November 1st.

4         He got it again December 17th.  He says he didn't

5    get the billing statements.  Our records showed they were

6    mailed.  We don't know that truth of that.  Don't need to know

7    the truth of it.

8         He acknowledges knowing what they needed to pay

9    before they ever wrote the first check.  He acknowledges

10   getting a document telling him in December.  He's contesting

11   it by December.

12        He's having the conversations.  He knows he's being

13   asked to pay more and he just insists I'm going to pay 605.58

14   because I don't understand why you're asking me to pay that

15   amount.

16        That doesn't mean it's not a default, Your Honor.

17   He owes the full amount due.  She owes the full amount due and

18   it's not being paid.

19        Under the plain terms of the agreement, if you don't

20   make the full payment you are in default.

21        If you don't make the full payment under the plain

22   terms of the Security Deed they don't have to apply it.  They

23   don't have to apply it at all.  They can send it back.  That's

24   what they did later.  They just put it in suspense, which is

25   what they did, and then you're late.  The fees were

1    authorized, Your Honor.

2            And as we discussed with Mr. Berry's testimony, I

3    don't think there's any evidence that those fees were paid.

4    Certainly the foreclosure fees -- there's no evidence those

5    were recovered.  And the portion we'll play for Mr. Delbene

6    tomorrow which can't have anything to do with the decision on

7    this, will say that they weren't.  They would have been

8    recovered if they had paid the $6,000 to reinstate it but they

9    didn't.

10           So, Your Honor, the point is they were explicitly

11   authorized to apply all those fees because of the partial

12   payment and, therefore, the element of acting inconsistent

13   with legal right hasn't been shown.

14           THE COURT:    You want to respond to that?

15           MR. GOWER:    Yes, sir.  Number one, Mr. Delbene

16   flat out said, and there's no dispute about it, that they

17   collected the fees out of the suspense account and put it into

18   income.  He made a distinction between assessing them and

19   collecting them.  And he said assessed on such and such a date

20   and we collected on such and such a date.  That's conversion.

21           The real problem here when he talks about this

22   843.58 is they said that they were behind from the get go when

23   they never were.

24           THE COURT:    Well, I think -- if I understand Mr.

25   Rogers, he's saying the get go is when they were supposed to

1        pay $843; is that right?

2              MR. ROGERS:   He had notice before he ever wrote the

3        November check, Your Honor.

4              THE COURT:   That was when the get go was?

5              MR. GOWER:   Which was wrong because they did not

6        owe 843.58.  They have to send an analysis of how they arrived

7        at the escrow and they never sent one.  They weren't even

8        notified.

9              THE COURT:    Where does it say they have to send

10       that?

11             MR. GOWER:   The Security Deeds says that.  And

12       here's the thing about it is, they were never -- the 605.58

13       was the amount that they had been paying to Taylor, Bean and

14       Whitaker.  They don't have a right to just raise the escrow as

15       they did in this case without doing it appropriately.  And the

16       appropriate way to do it is under the Security Deed where they

17       outline -- you take the amount you're supposed to pay over the

18       next 12 months, based on a reasonable estimate, and divide it

19       by 12.

20             That's what the Security Deed said and their own

21       escrow statement itself, on the second page says, we will make

22       you pay it -- we'll make you pay it over 12 monthly

23       installments.

24             And what they did here is just the opposite.  They

25       actually arbitrarily, because they don't know how they came up

1     with the increase between 605 and 843.58.  Somehow or another

2     they came up with that figure, which nobody can explain.

3     Which shows that it was wrong because it wasn't done in

4     connection with the terms of the Security Deed.  And they said

5     you've got to pay it because that's an increase in escrow that

6     we have determined somehow or another that you owe, and then

7     rather than saying you can pay it over 12 months, according to

8     this right here, their own document.  It says in here shortage

9     would be paid over 12 months.  They required it to be paid

10    over four months.

11             THE COURT:     You want to respond to that?

12             MR. ROGERS:    I don't think it has anything to do

13    with the fees, Your Honor, and whether or not the partial

14    payments were going to be suspensed and whether you would then

15    be late and fees would be authorized.  So I don't think it

16    speaks to whether or not the motion ought to be granted on

17    conversion.

18             I'm not aware of anything in the contract that says

19    that they have to send an escrow analysis to increase or

20    decrease the payment.

21             Frankly, Your Honor, I'm not aware of anything that

22    says that it was AHMSI that increased the payment.  You know,

23    he badgered Mr. Delbene, who said again and again and again, I

24    don't know, I don't know, I don't know.  And then badgered him

25    into saying one was done but he never said we did it.

1          And based on the cycle for the escrow analyses, Your

2     Honor, which was they were good through September, TBW would

3     have done another escrow analysis in August and the initial

4     monthly bill says this is based on the information we got from

5     TBW.

6          So as far as I know, Your Honor, I actually think

7     TBW did the escrow analysis.  But whoever did the escrow

8     analysis -- the escrow analysis is -- they are permitted by

9     the Security Deed to collect an amount consistent with RESPA.

10    It doesn't say they have to send any kind of an analysis with

11    it.  They can collect the amount.

12         I think I have some sympathy for Mr. Gower's

13    argument that it's common sense that you tell somebody what

14    they owe you.  But they did that in the welcome letter.  And

15    said here's what the payment has to be made.

16         And then as that evolves we see that because the

17    escrow analysis was wrong and escrow needed to be increased, a

18    thousand dollars gets advanced.

19         Even Mr. Berry acknowledges that there was an actual

20    deficiency over $600.

21         Mr. McGinnis admits, Mr. Berry admits.  They had to

22    repay that.

23         This is not a contract document.  The contract

24    document says, in no more than 12 months.  So it can be

25    recovered in less.  It just can't be recovered in more.

1          They had three months where they were paying higher

2     and then they went to a 12-month for the remainder of the

3     shortage.

4          And nobody ever asked them to pay anything they

5     didn't owe.  All the money went either to taxes and insurance

6     or to repay the deficiency for taxes and insurance.

7          So, Your Honor, I don't think anything they did in

8     connection with the escrow was at all inconsistent with the

9     contract documents.  I will start there.

10         I hadn't moved on to the wrongful foreclosure.  But

11    I don't think -- whoever did that analysis, Your Honor, was

12    within their right.  They had a right to recover that amount

13    in shorter than 12 months.  Because again the 12-month

14    requirement is RESPA.

15         This is an investment property.  It's not their --

16    an owner-occupied financing so RESPA doesn't apply.  They can

17    recover it in fewer than 12 months.

18         That's all I have to say about that.

19         THE COURT:   All right.  Do you want to say

20    anything further about that?

21         MR. GOWER:   Yes, sir.  For example, on Plaintiff's

22    Exhibit 43, which is their website thing to frequently asked

23    question number 13.  It talks about the escrow.  It says, "At

24    the time of your annual escrow analysis we will make any

25    adjustments to your escrow account to reflect increases.  Upon

1    completion of the escrow analysis we will inform you of the

2    date that your new payment will be effective."  And what we've

3    got here is an increase with no explanation as to how it was

4    --

5         THE COURT:    What you've just read to me doesn't

6    require an explanation.  It just requires notice.  What the

7    new payment would be.

8         MS. BRASH:    I think that it requires that an

9    annual escrow analysis was conducted.

10        And as far as the evidence in this case has shown,

11   as of October 2009, when they increased -- when Homeward

12   increased the payment we have seen no October 2009 escrow

13   analysis to support that drastically increased payment.

14        MR. GOWER:    Our point is there was no analysis.

15   It was just an up amount that they had no --

16        THE COURT:    Well, if I understand what Mr. Rogers

17   is saying, he's saying that no analysis, like what y'all are

18   talking about, is required.  And then you read something to me

19   and I didn't read that or I didn't understand that to say that

20   it was required.

21        So what is it that requires the escrow analysis?

22   Something that, you know, that goes out and says the taxes

23   have gone up $2,000 and so the escrow account -- the payment

24   in the escrow account is going to have to go up.

25        MR. GOWER:    The terms of the Security Deed say

1    that the analysis must be reasonable.  That when you make your

2    -- the Security Deed itself says, when you are estimating the

3    escrow and setting it, it has to be reasonable.  And that was

4    one of the -- in Plaintiff's Exhibit 7, and one of the things

5    that we showed to the jury.  And that's the reason I asked Mr.

6    Delbene was it reasonable and how did you come up with it?

7    Because it has to be reasonable.  And he says he never heard

8    the term reasonable.

9              THE COURT:    And so where is that provision you're

10   talking about in the Security Deed?

11             MS. BRASH:    In Section 3.

12             MR. GOWER:    This is on Section 3.

13             THE COURT:    What exhibit is it?

14             MR. GOWER:    Plaintiff's Exhibit 7 on page -- the

15   third page, fourth page of Exhibit 7.  And paragraph three

16   talks about funds for escrow items.  And the second paragraph

17   of it, the last sentence says, "Lender shall estimate the

18   amount of funds due on the basis of current data and

19   reasonable estimates of expenditures of future escrow items or

20   otherwise in accordance with applicable law.

21             So it's got to be based on reasonable estimates.

22   And that's the crux of what I was questioning Mr. Delbene

23   about is where can you show, how can you show that this is

24   reasonable when you have no basis to come up with the increase

25   in escrow of 300 percent.

1        And he says, I don't know.  But you've just got to

2   pay it.

3        THE COURT:    Do you want to respond to that?

4        MR. ROGERS:    Sure, Your Honor.  The first sentence

5   of that section, which I think is important, says, "Lender

6   may, at any time, collect and hold funds in an amount (a)

7   sufficient to permit Lender to apply the funds at the time

8   specified under RESPA, and (b) not to exceed the maximum

9   amount a Lender can require under RESPA.

10        Then it says, "Lender shall estimate the funds and

11   that it has to be based on a reasonable estimate."

12        In this case, Your Honor, what the evidence shows is

13   the taxes went up, their insurance went up.  We looked at the

14   escrow analysis.  And escrow had to go up.

15        Plus there was a deficiency of -- their expert says

16   -- over $600.  Our records say over thousand dollars.  So they

17   had to collect an increased amounted to cover 2010's insurance

18   and taxes and they had to collect between six and a thousand

19   dollars, depending on who you're listening to, for the last

20   period, for 2009.

21        So, Your Honor, there is a lot of money being

22   collected right there.  You're talking about 22 to $2,300.  I

23   haven't done the math. But the point is, it can be collected

24   in fewer than 12 months.  And they weren't asked to pay

25   anything that wasn't either the historic insurance and taxes

219

1    or the prospective insurance and taxes.  So the amount is

2    reasonable.

3            And I want to say one other thing about this

4    provision, Your Honor, it's the point you made.  It doesn't

5    say you have to send an analysis at all.  It just says it has

6    to be a reasonable estimate.  The estimate was reasonable.  We

7    saw what it was based on.  It was based on the actual numbers.

8    Then they can take a cushion for one sixth.

9            THE COURT:    What's your next?  Move on to whatever

10   your next item is?

11           MR. ROGERS:    Unwrongful foreclosure, Your Honor.

12   The law -- and we've just been discussing the charges -- is

13   that if the default was the cause of the foreclosure then the

14   foreclosure was not wrongful.  There's no question in this

15   case that there was a default.  They had to pay more.  They

16   were asked to pay more.  They were told to pay more.  They

17   refused to pay more.  Mr. McGinnis acknowledged he never

18   increased his payment.  He paid 605.58 every month and said

19   that was because he didn't agree and didn't understand why

20   they wanted him to pay more.  He understood they wanted him to

21   pay more.  He just said he didn't understand why and he wasn't

22   going to pay because that's not what they agreed to pay.  They

23   agreed to pay the full amount due.

24           They have two excuses for that.  The first excuse

25   they had coming in was notice.  Well, we know now that the

1    notice argument doesn't work very well because he acknowledges

2    receiving the welcome letter that told them what they owed

3    before they ever made their first payment.

4         THE COURT:    Let me stop you there.  You don't deny

5    that, do you?

6         MR. GOWER:    No, sir.

7         THE COURT:    Well, he testified on direct and what

8    he testified on cross examination were definitely different.

9    Go ahead.

10        MR. ROGERS:    The second argument is this amount is

11   unreasonable, Your Honor.  The first thing is there is no

12   evidence of that.  When you gave your order July 2nd on the

13   motion under Daubert to exclude Mr. Berry's testimony you

14   excluded a lot of stuff about what he had to say about the

15   escrow.  And you said, all right, the thing that you can

16   testify about is whether or not the calculation was consistent

17   with the standard escrow calculation.

18        He didn't testify to that, Your Honor.  There's no

19   evidence of that.  The only evidence in the case that it's

20   unreasonable comes from Mr. McGinnis because he doesn't like

21   it.  But it gets back to the point I was just making, Your

22   Honor.  Nobody ever asked him to pay a dime that wasn't going

23   to the deficiency or the taxes of next year.  Nobody was

24   pocketing extra money out of that.

25        And as the facts show when they failed to make the

1    payments that they had been asked to make there was a

2    deficiency again at the end of 2010.  That was Mr. Berry's

3    testimony.  That's what our record says.

4         So, was it a reasonable calculation?  Yeah, it was a

5    reasonable calculation, Your Honor.  And their calculation and

6    their failure to pay results in a continuation of a deficiency

7    that goes on for more than a year, Your Honor, which is

8    contrary to what even Mr. Berry acknowledged was the purpose

9    of an escrow fund.

10        So the default is undeniable, Your Honor.  The

11   question is did we cause it?  And the answer to that question

12   is, Mr. McGinnis's feeling that what we asked him to pay was

13   unreasonable was the reason he didn't pay it.  But there's no

14   proof that what we asked them to pay was unreasonable and the

15   evidence suggests it was reasonable.

16        MR. GOWER:   Could I respond to that, Your Honor?

17        THE COURT:   Yes.

18        MR. GOWER:   He made the statement that they were

19   asking him -- they were not asking him to pay something he did

20   not owe.  That's in dispute because they were asking him to

21   pay money he did not owe.  They were saying he was one payment

22   delinquent on all of his seven loans when he was not.

23        So they were saying you've got to pay the

24   delinquency of one payment plus you've got to pay the

25   increased amount of the escrow.  So they were saying you've

1        got to do both of those things.

2                 And then in the fax that he sent to them in May of

3        2010 where he says, I know there is a shortage in escrow, I

4        want to pay it.  But I'm not going to pay the extra payment I

5        owe and I'm not going to pay the fees that you've charged

6        which I do not owe.

7                 THE COURT:   Well, but he had already said before

8        that he wasn't going to pay the 800 plus dollars.

9                 MR. GOWER:   Right.

10                THE COURT:   Because they couldn't explain to him

11       why he ought to pay that.

12                MR. GOWER:   That's right.  So he was saying even

13       in May he would pay any shortage in escrow, but he wasn't

14       going to pay fees he didn't owe and he wasn't going to pay a

15       back payment that they said was owed to Taylor, Bean and

16       Whitaker which he did not owe because he had paid it.

17                THE COURT:   So, the problem with this case, from

18       my standpoint is, that I have to say, I don't know whether

19       it's true as a matter of law, but it just looks like he didn't

20       want to pay this because he didn't agree with it.  I mean,

21       that's what it looks like.  And because nobody could tell him

22       he thought he was justified in not paying this amount of

23       money.

24                And you hadn't told me anything about these security

25       agreements that says that the increase in the escrow has to be

```
 1    justified in the mind of the debtor in order for it to be
 2    authorized.  Now you're talking to me about a delinquency of
 3    one payment that he wouldn't pay back.  What is your position
 4    on that?
 5              MR. GOWER:    Well, there was a -- I beg your
 6    pardon.
 7              MR. ROGERS:    I think, Your Honor --
 8              THE COURT:    That was referred to him.
 9              MR. ROGERS:    This is one of the biggest red
10    herrings in the case.  And we've been through this again and
11    again and again.  This is based entirely on the November 3,
12    2009 billing statement, which of course he says he never got.
13    So his belief that he was somehow a payment behind which is
14    based entirely on a document that he says he never received
15    until June of 2010 strikes me as a little incredible.
16              But let's assume that somehow it had something to do
17    with something.  The November 3, 2009 payment, as was brought
18    out again and again and again, was issued on November 3. The
19    monthly payment for November was due on November 1.  So as of
20    November 3, when Mr. McGinnis acknowledged he hadn't even cut
21    the check for November yet, they were late.
22              And it then goes down at the bottom and says the
23    payment that you do -- the new payment which is 843.58 and the
24    late payment of 843.58 and then it says we're going to add a
25    late charge if you don't pay us by December 16, 2009, 15 days
```

1    from December 1.

2            The new payment is December 1.  The old payment is

3    November 1.  How do we know that?  Because the payment in

4    October is 605.58 and if it had been put in a late payment in

5    there for October it would have been 605.58, not 843.58 which

6    was the number for November.

7            So, Your Honor, this is entirely -- I'm sure they

8    believe it, but it's absolutely based on just a complete

9    misunderstanding of that document.

10           The other thing they point to is it shows 11-1-2009

11   as the due date.  But as we went forward and looked and we can

12   show you again, as you look at the statements as they come out

13   that date is the oldest payment still due.  So you've got --

14   we show the July 13th payment statement that was showing the

15   May 1 payment as being due, if Your Honor remembers that.

16   That's the point, this just keeps listing and Mr. Berry

17   acknowledged that on cross examination.  It lists the oldest

18   payment still due.

19           So, in fact, when the November 3 statement says

20   November 1, we know what the old payment is.  It's the

21   November 1, 2009 payment.  He wasn't behind for October.  Mr.

22   Delbene acknowledged that.  He had paid 605.58.

23           Now there was some confusion around this check that

24   he had sent to TBW that turned up and then we cashed it and

25   then they stopped payment on it.  That doesn't have anything

1    to do with this.  That got sorted out very early.

2         The bottom line, Your Honor, is that November 3,

3    2009 document is being completely misread.  And if you look at

4    it, Your Honor, it shows that they weren't one payment behind.

5    The payment that they were behind was November 1.

6         THE COURT:    Do you want to respond?

7         MR. GOWER:    Yes, sir.  Mr. Delbene testified quite

8    clearly that the November statement that Mr. Rogers just

9    referred to shows that they are one payment behind.  Mr.

10   Delbene said that very clearly.

11        The records show -- the loan history documents show

12   that they treated him as being one payment behind.  All of the

13   statements -- if you'll look at Plaintiff's Exhibit 2-1

14   through 2-20 whatever, every single statement shows that they

15   are behind one or more payments consistently.  They've always

16   shown being behind when they were never behind.

17        Mr. Delbene says, and the Taylor, Bean and Whitaker

18   records show, that as of October 30, '09 they were 100 percent

19   current.  The very next day they say you are behind one

20   payment.  You can't be.  It's just that simple.

21        THE COURT:    You want to say something, Mr. Rogers,

22   I can tell.

23        MR. ROGERS:    Well, I'm not sure that I do.  I mean

24   the November 3 statement says they're behind one payment

25   because they're behind one payment.  And then they are behind

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1    one or more payments every month thereafter because they're

2    not paying the amount that is due.  And so it's put in

3    suspense just like they had the right to do under the

4    contract.

5         I mean, I think one of the devastating moments in

6    the case is when Mr. McGinnis admits that his calculation was

7    that he needed to pay $1,200 to get him current.  And because

8    they said it was 1,483 and he didn't want to pay that extra

9    money that had anything to do with 843.58 he wouldn't pay it.

10        THE COURT:    Right.  What else?  Anything else

11   related to your motion?

12        MR. ROGERS:   Yes, Your Honor.  Of course, the

13   interference claim goes the same way.  It's also based on the

14   foreclosure.  The foreclosure was authorized.  We think they

15   lose that as a matter of law and we think that's the case.

16        Intentional infliction of emotional distress, Your

17   Honor.  I would just point you to your own decision in Jiles

18   V. PNB Bank, 2012, US District, Lexis 11-0042.

19        The bottom line here is there was a foreclosure.  If

20   it was authorized there is nothing else in the record that

21   shows that there was any extreme and outrageous conduct.  All

22   the communications appear to have been professional.  If

23   anybody was unprofessional it was Mr. McGinnis who is cussing

24   people and hanging up on them.

25        And, Your Honor, there is just nothing in the record

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1    to support that intentional infliction claim.  So we would

2    ask, Your Honor, for judgment as a matter of law in all of the

3    claims.

4              THE COURT:    All right.  Do you want to respond?

5              MR. GOWER:    Yes, sir.  We respectfully show that

6    it's a jury question.  Because you've got Mr. Delbene saying

7    and the records clearly reflecting that the Taylor, Bean and

8    Whitaker records show it's 100 percent current.

9         Yet in spite of that and in spite of the continued

10   efforts by Adam McGinnis to communicate to them that they are

11   current, they continue to take the position that you're going

12   to have to pay it, they are refusing to recognize the fact

13   that it is current.  And we're not talking about just one

14   loan, we're talking about all seven loans.

15        And in spite of the fact that it's clear evidence

16   it's current, they continually make these phone calls.  And

17   you heard the testimony that he had thousands of letters,

18   collection letters from lawyers.  They called at 8:30 at night

19   from India.  They were on the phone for an hour and seven

20   minutes.

21        You heard the phone calls that were recorded.  They

22   pleaded with them.  They sent the checks from day one showing

23   that they've made the payments.  They consistently say you're

24   behind.  You've never made the payments to Taylor, Bean and

25   Whitaker as you should have and so we're going to add on all

1    these fees, and we're taking the fees out of your account.

2            They have to know that the end result of that is

3    going to be severe emotional distress on someone with all

4    these calls, these collection efforts, and it's just horrible.

5            THE COURT:   Well, have you given me your best

6    answer about this escrow matter?

7            MR. GOWER:   Me?

8            THE COURT:   Yeah.  You know, I told you about my

9    concern related to that.

10           MR. GOWER:   Probably not.

11           THE COURT:   Okay.  Well, be ready to tell me about

12   it tomorrow.

13           MR. GOWER:   Yes, sir.

14           THE COURT:   Anything else?

15           MR. ROGERS:   No, Your Honor.

16           THE COURT:   I'm going to take your motion under

17   advisement.  And we will see you in the morning at 9:00.  And

18   I'll think about it overnight where we're going to go from

19   here.

20           MR. GOWER:   Thank you.

21   (The proceedings for 8-20-13 were thereby concluded).

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT
TRANSCRIPT TO THE BEST OF MY KNOWLEDGE AND ABILITY FROM THE
2   RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

3

4                              _____
                               /s TAMMY W. FLETCHER   CCR, USCR
5                              UNITED STATES DISTRICT COURT
                               MIDDLE DISTRICT OF GEORGIA
6
                               DATE:   September 23, 2013
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25