```
 1            IN THE UNITED STATES DISTRICT COURT

 2            FOR THE MIDDLE DISTRICT OF GEORGIA

 3                       MACON DIVISION

 4            _____

 5

 6   JANE MCGINNIS,              :
                    PLAINTIFF   :   Case No. 5:11-CV-284
 7   VS                         :
                                :       August 21, 2013
 8                              :
     AMERICAN HOME MORTGAGE      :       Macon, Georgia
 9   SERVICING INC.,   DEFENDANT. :
     _____
10
                           JURY  TRIAL
11
                        VOLUME 3 OF 4
12
             BEFORE THE HONORABLE C. ASHLEY ROYAL
13          UNITED STATES DISTRICT JUDGE, PRESIDING

14   APPEARANCES:

15   FOR THE PLAINTIFF:        CHARLES A. GOWER
                               MIRANDA J. BRASH
16                             DAVID ROHWEDDER
                               P.O. BOX 5509
17                             COLUMBUS, GA 31906

18   FOR THE DEFENDANT:        RUSSELL J. ROGERS
                               ANNA BURNS
19                             KELLY THOMAS
                               THOMPSON HINE
20                             TWO ALLIANCE CENTER
                               3560 LENOX ROAD STE 1600
21                             ATLANTA, GA 30326

22

23   _____
                    TAMMY W. FLETCHER   USCR
24                    P. O. BOX 539
                    MACON, GA 31202-0539
25                    (478-752-3497)
```

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

```
 1                    P R O C E E D I N G S
 2   August 21, 2013
 3            THE COURT:    Good morning.  Are we ready to
 4   proceed?
 5            MR. ROGERS:   Yes, Your Honor.
 6            THE COURT:    Well, let me tell you.   We will
 7   bring the jury in and we will have the video played.  And it's
 8   my understanding that that is your only witness.
 9            Have y'all worked out about the exhibits?  Have you
10   figured out everything that needs to be in?
11            MR. GOWER:    There are two that we need to doctor
12   up and we will do that.
13            THE COURT:    That will be fine.  And we'll have
14   plenty of time to take that up.
15            MR. GOWER:    Yes, sir.
16            THE COURT:    And we have made changes to the
17   charges.  I talked to Judge Land last night for a while and
18   got some insight from him.  We will go back into these issues
19   related to the motion for judgment as a matter of law.  And
20   you will have the opportunity to look over the charges and see
21   the changes that we have made.  And then we will argue to the
22   jury.  Is 45 minutes enough for both sides?
23            MR. ROGERS:   I think we're closer to an hour, Your
24   Honor.
25            THE COURT:    What about you, Mr. Gower?
```

1          MR. GOWER:    I think so.

2          THE COURT:    That's fine.  Bring the jury in.

3          MR. GOWER:    After the deposition we have got maybe

4     five minutes of rebuttal which would be part of Mr. Delbene's

5     testimony and then could we have a break?

6          THE COURT:    Yes.  What do you mean of rebuttal?

7          MR. GOWER:    After they play his video, I've got

8     maybe less than five minutes of his deposition that I would

9     like to read into evidence.

10         THE COURT:    That hasn't already been read?

11         MR. GOWER:    Part of it.  It may have already been

12    read, yes, sir.

13         THE COURT:    Well, if it's already been read we're

14    not going to read it again.  You don't get two bites of the

15    apple with the same testimony.  That doesn't work.

16    (JURORS ENTER COURTROOM)

17         THE COURT:    Good morning, ladies and gentlemen.

18    Hope you rested well last night.  We are going to have about

19    an hour or so worth of evidence this morning.  And then I'm

20    going to send you back to the jury room and I'm going to talk

21    to the lawyers about some of the legal issues involved in the

22    case.  We're going to go over the jury charge.  That will take

23    a little while.  And then when you come back these lawyers

24    will present their closing arguments to you.

25              Now, it's my understanding that Mr. Rogers is going

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1    to put up his questions in the Delbene deposition.  And if you

2    remember the first part of the Delbene deposition was shown on

3    Monday.  And I told you -- you remember what I told you about

4    a videotaped deposition.  So I don't have to tell you about

5    that again.  And we'll just sit here and watch.

6                    MR. ROGERS:   Your Honor, we call Mr. Delbene by

7    video.

8                    THE COURT:   All right.

9    (VIDEO DEPOSITION OF MR. DELBENE PLAYED AT THIS TIME)

10                   THE COURT:   Ladies and gentlemen, it's 10:30.  I'm

11   going to let you go out for the mid-morning break.  I didn't

12   realize this was going to take this long.  But go out for

13   about 15 minutes and take a break.

14                   Thank you.  Remember not to discuss the case among

15   yourselves.

16   (JURORS EXIT COURTROOM)

17                   THE COURT:   Mr. Gower, come up here to the

18   microphone.  I want to ask you a question.  Just stand back

19   there at the podium.

20                   A significant part of this deposition has been taken

21   up with the fact that there was a payment of 600 plus dollars

22   made versus the 840.  I'm a little bit confused.  Clearly the

23   600 whatever it was was the amount that was owed according to

24   TB&W.

25                   And then there was an increase of the escrow amount

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1     and it's my understanding that the difference was between the

2     800 amount and the 600 amount was the increase of the escrow

3     payment; is that correct?

4              MR. GOWER:    Yes, sir.   That is correct.

5              THE COURT:    The new amount due would be the 840

6     whatever it was.  And you keep asking him about she paid the

7     604.  And so what are you driving at here?  I'm unclear what

8     that is.

9              MR. GOWER:    Several things.  The 605.58 was the

10    old payment.

11             THE COURT:    605, okay.

12             MR. GOWER:    What I was driving at is she was

13    completely current at all times on the principal and interest.

14    No question about it.  The only dispute was the amount of the

15    escrow.

16             Our position is that before they could increase the

17    escrow they had to do an analysis and they had to provide her

18    with the analysis and the analysis had to be reasonable.  So

19    our position simply is on November 1, '09 when they increased

20    the escrow, thereby increasing the payment from 605.58 to

21    843.58, they caused the default right then and there in

22    violation of both the Security Deed and in violation of RESPA

23    which is incorporated by reference in the Security Deed.

24             So it's our position that they had a duty before

25    November 1, '09 to do the following:  They had a duty to do an

1    escrow analysis.  They had a duty not only to do it but to

2    provide it to the Plaintiff.  And three, the analysis that

3    they did had to be reasonable.  If they violated any of those

4    then any increase in the payment was their having caused the

5    default.

6              THE COURT:   Well, wasn't the escrow analysis sent

7    to them?  I'm confused about that part of it.  I thought an

8    escrow analysis was sent but it wasn't sent within the 60

9    days.  Am I wrong about that?

10             MR. GOWER:   You are wrong.  Well, you're right and

11   you're wrong.  There was no analysis done prior to increasing

12   the payment.  The payment was increased November 1, '09.

13             It's undisputed that there was no analysis done

14   prior to November 1, '09, which was the date of the payment

15   increase.  And that's right there where we say the default

16   occurred because of the failure of the servicer to perform the

17   duty required under them under the Security Deed.

18             Let me back up because I'm not making myself clear.

19   This thing is reverberating in my ear.  I've got some water in

20   my ear and it just kind of goes around.

21             But what I'm trying to say is that on October 27,

22   '09 they sent the hello/goodbye letter which, as we now know,

23   had a payment coupon at the bottom saying that the payment was

24   843.58 effective November 1, '09.

25             Assuming that they got that, the next day

1  October 28, '09, the payment was -- the increase was effective

2  November 1, '09.  Before they could do that they had to do the

3  following.  They had to do an escrow analysis.  They had to.

4

5      Why?  Because the Security Deed says they have to

6  and RESPA says they have to and you said they had to in your

7  order on page 33 through page 36 which is correct.

8      Secondly, they had to provide the analysis, the

9  escrow analysis.  Because the Security Deed, RESPA and your

10 order says so.

11     And third, the analysis that they do has to be

12 reasonable.  So if they violate any of those three by

13 increasing the payment on November 1, '09 they have caused the

14 default themselves and therein lies the problem.

15     And then if you compound on that problem the fact

16 that they say that you are one month behind before November 1,

17 '09 because you didn't make your payment to Taylor, Bean and

18 Whitaker.

19     So you take two of those things together and you've

20 got two errors on the part of the servicer causing the

21 default.

22     THE COURT:   All right.  I understand that.  If I

23 understood Delbene's testimony correctly it looks like there

24 was a new escrow analysis done in February of 2010?

25     MR. GOWER:   There were three escrow analysis done.

1    The first one was done on December 17, '09 which they then on

2    January 15, '10 sent a letter saying disregard that, it's in

3    error.  And then they did another one -- I'm going from memory

4    -- I think it was February of '10.

5                 THE COURT:    Right.

6                 MR. GOWER:    So by that time, by February of '10

7    they had already sent -- they had already said you're in

8    default.  They started these phone calls.  They started the

9    breach letters.  They started the whole house of cards coming

10   down.

11                And prior to that time Adam is sending them a fax

12   saying here are our payments.  We don't owe the 843.58.  All

13   the back and forth trying to straighten it out and from there

14   it just gets worse.

15                THE COURT:    You want to respond to that, Mr.

16   Rogers?

17                MR. ROGERS:    I do.

18                THE COURT:    I mean, we will take this up further

19   but that was where we stopped in the deposition and that's

20   what I wanted to ask him.

21                MR. ROGERS:    You know, Your Honor, starting where

22   you started, his point as he said is that if it had been

23   applied to principle and escrow every month without any

24   consideration of what the full amount due was, then it would

25   have been current on principal and interest.  He says there's

1    no dispute about that.  It's not true, Your Honor.

2          The way it would've been applied, and Mr. Delbene is

3    about to explain this, is you would've made a partial

4    application and then the next payment would have come in to

5    complete that application.  So over time you would have had

6    the same problems as the funds are applied.  The December

7    payment wouldn't have just been applied, a brand new one, and

8    we would just have forgiven the money that wasn't paid in

9    November.  The money that wasn't paid in November would have

10   been taken out of the December payment.  And so over time you

11   would have had the same issue build up whether it's in

12   suspense or not.

13         The suspense account, it just comes out in a month

14   in one lump instead of happening in increments over time.  So

15   it is disputed and it's just not accurate.  They would have

16   fallen behind the same amount if it been applied that way

17   immediately every month because the full payment wouldn't have

18   been made.

19         So when the next payment was received, instead of

20   having it in an escrow account and taking it out then they

21   would have taken a chunk from the new payment to apply to the

22   old payment to bring the account current and then apply the

23   remainder for the new account as Mr. Gower would want it.

24   It's not what the documents say, of course.  So that is that.

25         Back to what has to be done.  Mr. Gower says there

1    has to be an analysis.  We have to provide that analysis to

2    the borrower and it has to be reasonable.

3              Now, I think and part of the reasons that we had

4    some of the designations in here was to make a point that the

5    truth is Delbene didn't know.  Mr. Gower beat on him asking

6    him the same questions again and again, led him around.

7    Delbene doesn't know.

8              What he does say though is there was an analysis.

9    And that's the only evidence on that topic.  Mr. Gower can say

10   that there was no analysis done, but that's just the lawyer's

11   argument.

12             The only evidence in the case is that there was an

13   analysis done.  That's the one thing Delbene seems to know.

14   Who did it?  I still think it was TBW.  I don't know if it's

15   in my interest to make that argument, but it was done.

16             The third thing, is has to be reasonable.  We talked

17   about that yesterday.  There's no evidence that it was

18   unreasonable.  The only person who said it was unreasonable

19   was Mr. McGinnis.  And even when they sent him an escrow

20   analysis in February of 2010 that mirrored his escrow analysis

21   he wouldn't pay that either.

22             So he doesn't know.  He said he doesn't know.  And

23   that certainly didn't cause the default and what happened

24   after February 2010 proves that.

25             The point though Your Honor is, and the point we

1    were at yesterday, do we have an obligation to provide any

2    analysis to the borrower?  And the answer to that question is

3    no.  We don't.

4            It's not in the loan documents.  We've been there.

5    We looked at that.  What he's saying is RESPA applies.  You've

6    already determined that RESPA doesn't apply because it's an

7    investment loan.  Only to the extent that it is incorporated.

8    And it does say in the Security Deed we'll notify you in

9    accordance with RESPA.

10           If you look at RESPA, Your Honor, the statute

11   itself, 12 USC 2609, paragraph B, notification of shortages in

12   escrow account.  "If the terms of any federally related

13   mortgage loan required the borrower to make payments to the

14   servicer, as that term is defined, of the loan for deposit

15   into an escrow account for the purpose of assuring payment of

16   taxes, insurance premiums and other charges with respect to

17   the property, the servicer shall notify the borrower not less

18   than annually of any shortage of funds in the escrow

19   accounting."

20           So it doesn't require a notice before any payment

21   increase.  It just says you have to do it annually.  We have

22   notice of the shortage December 17, 2009 in that escrow

23   analysis.  We have notice of the shortage February 20, 2009 in

24   that escrow analysis.  All within the first four months of our

25   servicing.

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1        So, Your Honor, we complied with the notification

2   requirements of RESPA which don't apply independently but to

3   the extent they're incorporated, we complied.

4        What the regs that have been promulgated under RESPA

5   say, so we are talking now about 3500-17 is what you referred

6   to.  It talks about transfer of servicing in the E subsection.

7   And it says if new servicer changes either the monthly payment

8   amount or the accounting method then within 60 days you need

9   to send an analysis.  The analysis was completed on the 60th

10  day and was mailed on the 61st.  I don't think that caused

11  this default, Your Honor.

12       We have the ability to change it without having sent

13  it.  We only had to send something within 60 days and by the

14  end of the 60 days she was already two payments behind.  So

15  the default had already occurred.  We had the right to change

16  it.

17       Now it does talk about needing to perform an

18  analysis.  But as that part of the regs says, it says, "Then

19  the new servicer shall provide the borrower with an initial

20  escrow account statement within 60 days."  It doesn't say

21  anything like that when it talks about recovering a

22  deficiency.  It just says you have to do an analysis.  It

23  doesn't have those magic words, shall provide.

24       So RESPA is just like the deed.  We've got to make

25  some determination and RESPA calls out all the ways that you

1    determine it.  It says reasonable in the Security Deed.  Maybe

2    they are the same thing.  But neither of them require that

3    that analysis be provided to the borrower before the payment

4    is increased.  And the default occurred before, if you want to

5    be a stickler and say, well it was 61 days instead of 60,

6    which is true, that default occurred before.  That didn't

7    cause the default.

8         What caused the default is Adam McGinnis got notice

9    of what he had to pay before he paid it November 1 and then he

10   didn't pay it because he didn't agree with it.

11        THE COURT:    Okay.  We've already taken up our

12   15 minutes and I need to give y'all all a break to go to the

13   bathroom.  So we will take up this in more detail.  How much

14   longer is this going to last?

15        MR. ROGERS:    About five minutes.

16        THE COURT:    Okay.

17        MR. ROGERS:    I think.  It was an hour and three

18   minutes.  It says an hour and 14 now,  Your Honor.  I guess I

19   should keep up on the changes.

20        THE COURT:    That's no problem.  But we'll give

21   y'all about ten minutes.  I'm going to send Ms. Purvis back

22   and tell the jury that we've been taking up a legal matter and

23   we'll have about ten more minutes.

24   (RECESS)

25        THE COURT:    Are we ready to bring the jury back?

1    Is there going to be anything else?  In other words, we're

2    going to bring them back for five minutes and then send them

3    back out?  Is that basically what we're getting ready to do?

4              MR. ROGERS:   Yes, Your Honor.

5              THE COURT:    Mr. Gower, you're not putting up

6    anything else, are you?

7              MR. GOWER:    No, sir, you told me not to.

8              THE COURT:    Bring them back.

9              MR. ROGERS:   We will tender some exhibits.

10             THE COURT:    That's fine.  There's no problem with

11   that at all.  We'll take care of that.

12   (JURORS ENTER COURTROOM)

13             THE COURT:    Go ahead.

14             MR. ROGERS:   Push play, Your Honor?

15             THE COURT:    Yes.

16   (VIDEO DEPOSITION OF MR. DELBENE CONTINUED)

17             THE COURT:    That's the end of the deposition?

18   Anything more for the defense?

19             MR. ROGERS:   There are a few exhibits that we would

20   tender into evidence, Your Honor.  May I give you that list at

21   this time or would you like to do it --

22             THE COURT:    We can just wait on that.  That will

23   be fine.

24             MR. ROGERS:   Well then, our case in chief is

25   concluded.

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

```
 1                    THE COURT:     Mr. Gower, anything from you?
 2                    MR. GOWER:     No, Your Honor.
 3                    THE COURT:     So all the evidence is closed in the
 4       case?
 5                    MR. GOWER:     Yes, sir.
 6                    THE COURT:     Very good.  Ladies and gentlemen, we
 7       have come to the end of the evidence in the case.  You will
 8       not hear any more evidence.  There won't be any more exhibits
 9       added to the list other than what Mr. Rogers is going to put
10       in.  And I'm going to send you back to the jury room again.
11                    I'm going to have to talk to the lawyers about the
12       jury charges.  We spent quite a bit of time yesterday
13       afternoon.  I think I left here about 6:30, quarter to seven
14       last night.  So we spent a good bit of time last night on
15       that.  But we're going to have to spend some more time on it
16       now.
17                    So I'm just going to send you back.  And then when
18       we finish with the conference with the lawyers I'm going to
19       bring you back and we will have closing arguments in the case.
20       All right.  So just go back and take it easy.  Thank you.
21       (JURORS EXIT COURTROOM)
22                    THE COURT:     So what number, sir?
23                    MR. ROGERS:     D39.
24                    THE COURT:     Do you need to see each one of these,
25       Mr. Gower or do you know --
```

1           MR. GOWER:    I can just look at them.

2           COURTROOM CLERK:   If you can tell us what they are

3    as well.

4           THE COURT:    Yes, tell us what they are.

5           MR. ROGERS:   D39 I know is the family rider to the

6    Security Deed on the 172 Hilton Street property.

7           MR. GOWER:    No problem.  No objection.

8           THE COURT:    That's admitted.

9           MR. ROGERS:   D314 is, I believe, the escrow account

10   disclosure statement on the Hilton Street property, Your

11   Honor, which was the one that was under discussion in the

12   Ocwen phone calls.

13          THE COURT:    All right.

14          MR. GOWER:    No objection.

15          THE COURT:    Admitted.

16          MR. ROGERS:   D316, I believe is a billing

17   statement.  Yeah, it's a monthly billing statement on that

18   same Tucker Circle property, Your Honor.

19          MR. GOWER:    No objection.

20          THE COURT:    Admitted.

21          MR. ROGERS:   D317 is the next annual escrow

22   disclosure on the Tucker Circle property, Your Honor.

23          MR. GOWER:    No objection.

24          MR. ROGERS:   And Defendant's Exhibit 418, Your

25   Honor, which is the Deed under power on 172 Hilton Street.

```
 1              THE COURT:    They are all admitted.  Let me see the
 2   last exhibit you mentioned.  What was the last one you
 3   mentioned?
 4              MR. ROGERS:   418, Your Honor, is the Deed under
 5   power.
 6              THE COURT:    And what was the one before that?
 7              MR. ROGERS:   317, Your Honor.
 8              THE COURT:    And what is that?
 9              MR. ROGERS:   317 is an annual account, escrow
10   account analysis for 111 Tucker Circle.
11              THE COURT:    May I see that.  Anything else?
12              MR. ROGERS:   No.  I will just deliver these, Your
13   Honor.  We will deliver D39 later.  We are apparently having
14   some trouble finding it.  Here it is.
15              THE COURT:    That's fine.
16              MR. ROGERS:   If all those are admitted, Your Honor,
17   then we are done.
18              THE COURT:    Anything further from you, Mr. Gower?
19              COURTROOM CLERK:   You had two that were not
20   admitted.  One was the CV and the summary, 29 and 37.
21              MR. GOWER:    Your Honor, we offer Plaintiff's
22   Exhibit 29 was Tom Berry's CV.  We offer that into evidence.
23              THE COURT:    Any objection to that?
24              MR. ROGERS:   I'm sorry, Your Honor.  I was
25   distracted looking for D39.
```

1         MR. GOWER:    Plaintiff's Exhibit 29 is Tom Berry's

2    CV that we offer into evidence.

3         MR. ROGERS:    No, Your Honor.  We have no objection.

4         THE COURT:    Admitted.

5         MR. GOWER:    And Plaintiff's Exhibit 37 was Tom's

6    summary of the various logs.

7         THE COURT:    I thought that was P3 or something

8    like that?

9         MR. GOWER:    There was a P3 that you admitted.

10   This is a different one.  This is the summary of all the

11   loans.  Plaintiff's Exhibit 37.

12        MR. ROGERS:    It's his expert report, Your Honor.

13   We didn't have any objection if he used it to testify as a

14   recorded recollection.  But it's hearsay.  It's not a business

15   record.

16        THE COURT:    I don't remember seeing that so I

17   think I need to see it.  I don't know.  Did you put that up on

18   the board?

19        MR. GOWER:    Yes, sir.

20        THE COURT:    Did you put that up on the screen?

21        MR. GOWER:    Yes, sir.

22        THE COURT:    Wait a minute.  Let me take a look and

23   see what it is.  Well, I'm not going to admit that because I

24   don't think it satisfies -- I mean, I let the other document

25   in because I thought it was a supplement as allowed by the

1    Federal Rules of Evidence, but I don't think that qualifies.

2    So I'm not going to let that in.  He testified to that.  They

3    will just have to remember his testimony.

4          MR. GOWER:    The only other one, Your Honor, was a

5    portion of Plaintiff's Exhibit 30 which was testified to which

6    was the compilation of the fees on 172 Hilton that is a

7    portion of Plaintiff's Exhibit 30 which was used to compile

8    Plaintiff's Exhibit 3.  And it is a compilation of the fees

9    that we showed up on the board and I've got a blowup and there

10   was no question.

11         THE COURT:    Have you seen this, Mr. Rogers?

12         MR. ROGERS:    They put it up, Your Honor.  We have

13   the same objection.  It's another one of Mr. Berry's

14   productions.  We have the same objections to all of those,

15   Your Honor, which was we didn't have any problem with him

16   testifying to them but they're not business records. They are

17   an expert report so they don't qualify for admission to the

18   jury under the hearsay rule, Your Honor, and the continuing

19   testimony rule also.

20         THE COURT:    Well, I agree with you about the

21   previous exhibit.  But this again does look like something

22   that is a part of the P3 that I did admit.  And so it's part

23   of the voluminous records so I'm going to admit that.

24         COURTROOM CLERK:    Is it contained in P3?

25         MR. GOWER:    Yes, ma'am.  It's contained in P30.  I

```
 1    had an identical one.  We'll just mark this as P30.

 2              COURTROOM CLERK:   And it is?

 3              MR. GOWER:    It is fees on Hilton Street.

 4              THE COURT:    All right.  Anything else?

 5              MR. ROGERS:   Our other objection to that document,

 6    Your Honor, is that it doesn't show the fees that were

 7    credited back.  So we don't think it is a complete and

 8    accurate 1006 summary, Your Honor, which poses our additional

 9    objection to that document.

10              THE COURT:    Fees that were credited back?

11              MR. ROGERS:   That's what Mr. Delbene was just

12    talking about, Your Honor.  What he said is they essentially

13    zeroed out.  You know, he's going through there and he says

14    this one is applied and this one is backed out and that's a

15    credit given here and this was refunded there.

16              THE COURT:    Well, can you show me an example of

17    that on there.  Can you take a look at that document and show

18    me something that was backed out?

19              MR. ROGERS:   Are you talking --

20              THE COURT:    I don't want something that goes out

21    that is inaccurate or that misrepresents something.  That is a

22    different problem altogether.

23              MR. GOWER:    What they have, Your Honor, is they

24    have the loan summary for the entire loan on Hilton Street

25    which shows what was put in and what was taken out.  But it is
```

1    so hard to follow.  And this is the compilation of the fees

2    charged.

3              THE COURT:    Well, Delbene testified that there

4    were certain charges that were credited.

5              MR. GOWER:    Right.  And those would be reflected

6    in the loan payment history document which is in evidence.

7              MR. ROGERS:    Charlie, can I see what you're talking

8    about?

9              MR. GOWER:    Yes, the loan payment history.  P6.

10             MR. ROGERS:    This is what you're trying to get

11   admitted?

12             MR. GOWER:    Yes.  P6 is the loan history right

13   here.

14             MR. ROGERS:    Okay, Your Honor.  I'm thinking of a

15   different document then.  This one doesn't have any of the

16   late fees on it because they were all backed out and so

17   actually I withdraw that.

18             THE COURT:    Very good.  It's coming in.  Thank

19   you.

20             MR. GOWER:    We have nothing else to offer.

21             THE COURT:    So we are all clear on the evidence.

22   I want to make sure that everybody is.  I'll give you as much

23   time as you need, but I just want to make sure we get it all

24   in.

25             You need to understand, I don't send evidence out to

1    the jury that wasn't admitted.  Sometimes they'll come back

2    and say we want this and I'll say, "Sorry, it wasn't admitted,

3    you can't have it."  And you need to make sure Ms. Purvis is

4    clear about her records.  Are you clear Lee Anne?

5              COURTROOM CLERK:   I am as far as what has been.

6    Then we've got those that have to be redacted.

7              THE COURT:   So we have some things that need to be

8    redacted.  That needs to be taken care of if it hasn't been

9    taken care of.  Anything else before we look at the jury

10   charges?  We changed them.

11             MR. GOWER:    No, Your Honor.

12             THE COURT:    Let me tell you.  Sort of give you a

13   little history here and explain some of my frustration with

14   this case.  The Federal courts are flooded with these mortgage

15   cases.  And they come in all the time and everybody has a lot

16   of them.

17             The interesting thing about this case, this is the

18   first case that I know of, in the four or five years we've

19   been getting these, where I denied the motion for summary

20   judgment.  So it's very unusual in that respect.

21             And that means another thing and that is that I have

22   never tried one of these cases before and I think that when I

23   started with the trial of this case I thought it was going to

24   be fairly simple and straightforward but I found out it's

25   anything but that.  And in the future I will approach these in

1    a little bit different way.

2           But I think that one of the main reasons that we

3    denied summary judgment in the case is that we just really

4    couldn't tell what the Defendant had done.  And that raised

5    certain questions about how the matter was handled and what

6    actually lead to the foreclosure.

7           I think that we have a much better understanding but

8    still I'm not exactly clear about what the Defendant did in

9    the case.  And I can certainly see why the Plaintiff in the

10   case would be confused about certain aspects of it.

11          And I think that the problem that I have in trying

12   to rule on the judgment as a matter of law in the case is that

13   I don't have a lot of time to do it.  We spent quite a bit of

14   time on this motion for summary judgment in working that out.

15          I want to go back into some of the issues that were

16   raised yesterday.  I also want to go over the jury charges but

17   I want to go over the jury charges because I think that will

18   raise some of these issues.  And then I'll give both of you

19   the opportunity to put further on the record.

20          And we talked about this at some length last night.

21   As I told you already, I called Judge Land and talked to him

22   about the way he had handled his cases.  I got some

23   recommendations from him about what he had done and what he

24   thought it would be prudent for me to do in this case.

25          So anyway, we're going to work through this and the

1       changes in the charges.  There really aren't that many but I

2       think it's going to raise some issues that we need to talk

3       about.  And then I'll give both of you the opportunity to

4       address anything else with me that you would like to address

5       with me.

6              So you should have before you page 11, instruction

7       number 8.  In other words, we didn't give you the entire

8       charge back.  We just gave you what was in the question.  And

9       what you are going to see is that what is in bold there is

10      what has been changed.  And so instruction number 8, the first

11      page, in order to demonstrate the Defendant breached a legal

12      duty owed to the Plaintiff, the Plaintiff must establish that

13      Defendant's foreclosure of the Plaintiff's property violated

14      the terms and conditions of the Promissory Note or Security

15      Deed or that Defendant did not exercise the power of sale and

16      the Security Deed fairly or in good faith.  The rest of that

17      is a continuation of what was there before.

18             Don't read ahead.  I want you -- let's just focus on

19      this and we'll go one by one and we will talk about these

20      things.  Does anybody have a problem with that?  Either one of

21      you have a problem with that?

22             MR. ROGERS:   No, Your Honor.

23             THE COURT:   I mean it looks straightforward to

24      me.

25             MR. GOWER:   No problem.

1          THE COURT:     The next page, which is 12, at the

2     bottom.   Plaintiff's disagreement regarding the amount of her

3     escrow payment is not a lawful basis to excuse her failure to

4     pay monthly mortgage payments.

5          Now, there are problems in this case involving the

6     escrow but simply because you disagree with the amount that

7     you are supposed to pay I don't think means that you can fail

8     to make the payment.

9          And part of my job as Federal Judge, in control of

10    these trials, is to make sure that the issues get refined and

11    go out to the jury in a fashion that is most likely to result

12    in a verdict that is based on the law and the evidence.  And I

13    can definitely see how there could be some confusion about

14    this point.  So I thought it would be helpful to add that.

15         MR. ROGERS:   No objection from us, Your Honor.

16         MR. GOWER:    Obviously he's not going to object to

17    that.  Until I've read the rest of it I can't comment.

18         THE COURT:    All right.  Well, let's go forward

19    then.  Thirteen.  And I've added here, however, you may not

20    consider whether the escrow amount was reasonable.  I've

21    already concluded that the Plaintiff's escrow payment was

22    reasonable as a matter of law.

23         Now, I'll tell you my thought about this and you can

24    tell me if I'm right or wrong.  I do not believe that the --

25    I'm not at all convinced that a jury is qualified to determine

1    what a reasonable escrow amount is.  Because I think that is a

2    technical question.  And I'm not sure at all that there has

3    been sufficient evidence for them to find whether it's

4    reasonable or unreasonable.

5         And so on the one hand it seems to me that this is a

6    question of law.  On the other hand it seems to me that there

7    has probably been a failure of proof on the issue, anyway.

8    That the jury hasn't been presented with anything from which

9    they can conclude that it's unreasonable.  I did not let the

10   expert, your accountant, testify about the reasonableness of

11   that.

12        So I know that is an issue in the case.  But, number

13   one, I think it's a matter of law.  And, number two, I don't

14   think there's sufficient basis for them to reach some kind of

15   conclusion on that.  So let's go forward.

16             MR. GOWER:    Do you want my comments?

17             THE COURT:    Are you ready?

18             MR. GOWER:    Yes, sir.

19             THE COURT:    I thought you wanted to go forward.

20   Go ahead.

21             MR. GOWER:    I'm fine right now.  With all due

22   respect, we strongly disagree with this statement.

23             THE COURT:    I knew you would.

24             MR. GOWER:    I don't mean this -- I'm not trying to

25   be showman and make a jury argument and all that.  But here's

1    the way I see it, for whatever that's worth.  We had some

2    proposed charges we did last night and when they raised it to

3    843.58 on November 1, '09, as you yourself said in your order

4    on page 33 through 36, it is a jury issue as to whether it was

5    reasonable.  And that's correct.

6            I think your order on page 33 to 36 is the best

7    argument I can make to you right now.

8            THE COURT:   Well, the fact that it's a jury issue

9    means, assuming that I'm wrong now, that I think it's a legal

10   issue, still requires you to present evidence of it.  And so

11   even if I did find it was a jury issue I'm concerned that

12   there is not sufficient basis to take it to the jury.

13           MR. GOWER:   Here's what I want to point out to

14   you.  First off, it has to be -- first off it is a shortage,

15   which you said and that's correct.  Nobody disputes that.

16   It's not a deficiency.  It's a shortage and you pointed that

17   out very clearly in your order.  But a shortage has to be

18   collected over 12 months.  Has to be.  It cannot be collected

19   over a shorter period of time.  It has to be.

20           Uncontroverted evidence is that they increased it

21   300 percent and sought to collect in over four months, which

22   right there by itself is unreasonable.

23           THE COURT:   You're talking about two different

24   things.  One is the way it's to be collected and the other is

25   the amount.  All I'm talking about is the amount.  Do you

1    understand the difference of what you're saying?

2              MR. GOWER:    I do.  I do.  But the amount has got

3    to be both reasonable and has to be collected over 12 months.

4    You can't just separate it out.  And what we're saying --

5    well, the amount is wrong.  Here's why.  If you put the

6    353.45, the amount of the escrow times 12 that's $4,244.10 a

7    year.  That cannot be right because they've got on the left

8    side of the account statement the amount of tax and insurance

9    for the year which is $1,600.

10             So they're seeking -- they are setting an escrow of

11   $4,244 a year, which as a matter of law is unreasonable, has

12   to be.  Because the uncontroverted evidence is on the left

13   hand side of the account statement it shows the $1,600 tax and

14   insurance.

15             So I seriously considered and think we should get a

16   directed verdict on liability as to the fact that they set an

17   unreasonable amount and that they sought to collect it and

18   that they had no right to raise the payment of 843.58 on

19   November 1, '09.

20             THE COURT:    Do you want to respond, Mr. Rogers?

21             MR. ROGERS:    Sure, Your Honor.  Mr. Gower again is

22   arguing based on RESPA, which doesn't apply.  You've

23   determined that and you granted summary judgment.

24             What the Security Deed says is that it will be

25   collected, that the borrower will pay what is required under

1    RESPA in no more than 12 months.

2         So, Your Honor, the RESPA requirement doesn't apply

3    to the shortage collection freestanding.  Right, the law

4    doesn't apply.  And what the Security Deed says is we're going

5    to calculate it under RESPA, you're going to pay under RESPA

6    and in no more than 12 months.

7         So, Your Honor, they can collect it in three months,

8    they can collect it in four months.  That's what the evidence

9    has gone in, Your Honor.  So I think you're right about the

10   failure of the evidence.

11        THE COURT:   Well, what about the proposition of

12   the calculation based on the figures that he just described?

13        MR. ROGERS:   The calculation, Your Honor, and this

14   is also in the evidence, is they were only really expected to

15   pay that for three months.  There was going to be November,

16   December and January and then there was going to be a new

17   escrow analysis effective 2-1 which, of course, was sent out.

18   And then that escrow analysis got superseded by the escrow

19   analysis from February 20, so they wound up paying it for an

20   extra two months.

21        But as the analysis would originally have been done

22   there was going to be that December analysis which would have

23   changed it.

24        So, you know, this is a different question, Your

25   Honor.  But they weren't being asked to pay it over 12 months

1    and that was something that Mr. McGinnis admitted on the stand

2    that there was that escrow change and it was going to be

3    effective 2-1.

4         So the calculation, Your Honor, presumably was based

5    on the fact that there was $1,000 deficiency showing that was

6    coming forward.  When we got the loan there was $260 in the

7    escrow account.  And there was a $1,269 tax bill due in fewer

8    than 45 days.

9         So you had that shortage plus you didn't have any

10   cushion that was left in the account so that's additional

11   shortage.  So it's one sixth of that amount plus, of course,

12   what was still needing to be paid for next year's.  And I am

13   no expert in escrow analyses myself, but that's getting up

14   pretty close to $3,000.

15        So if you have three months at an elevated amount

16   and then you drop back down, which is exactly what happened,

17   Your Honor, and you see -- And Mr. Gower made this point, you

18   go from 843 and then the December analysis says 680.  And then

19   the February analysis says 632.38.  What's happened and why

20   that changes is there were amounts applied to the deficiency

21   over that period.

22        And so that is a perfectly reasonable way to do

23   that, Your Honor.

24        THE COURT:   My concern was an absence of evidence

25   but it sounds to me like there probably is some evidence from

1    which they can conclude that.  I mean, because you're sitting

2    there telling me about why it was reasonable that all these

3    numbers were pulled together the way they were pulled

4    together.

5         And so I'm thinking now that perhaps there is some

6    evidence from which the jury can conclude that it wasn't

7    reasonable.

8         MR. ROGERS:  Well, I don't think there's been any

9    evidence.  I don't think that anyone has said to the jury that

10   it was unreasonable.

11        THE COURT:  They haven't said that but this is

12   part of the records, if I understand what Mr. Gower is telling

13   me.  That these numbers are in the records that have been

14   admitted, these dollars are in the record of what has been

15   admitted.

16        Back to Plaintiff's disagreement regarding the

17   amount of escrow payment is not a lawful basis to excuse her

18   failure to pay the monthly mortgage payments.

19        MR. GOWER:  That is a common evidence, but what we

20   really -- we prepared some proposed charges, some suggested

21   charges which I think will help the Court in me trying to

22   express what I'm trying to say.

23        THE COURT:  All right.  Did you give a copy to --

24        MR. GOWER:  We will right now.

25        MR. ROGERS:  There was a time for the submission of

1    proposed jury charges, Your Honor.

2              THE COURT:    There was what?

3              MR. ROGERS:    Time for the submission of proposed

4    jury charges.  The way the order is written, unless this is

5    something that came up that was unexpected.

6              THE COURT:    Well, we'll take a look at these.

7              MR. GOWER:    Well, it was at 11:00 o'clock last

8    night.

9              THE COURT:    We'll take a look at these.

10             MR. ROGERS:    I still don't have a copy, Your Honor.

11             THE COURT:    Well, he needs a copy.  I'm going to

12   send the jury to lunch and tell them to be back at quarter of

13   one and see if we can get this worked out.

14   (RECESS)

15             THE COURT:    Well, Mr. Gower, if we use all these,

16   we're just going to have to rework the entire instruction that

17   we've already prepared.

18             Well, I'm concerned that we don't have something in

19   here in this charge about the escrow because that certainly is

20   the axis around which this case turns.

21             And charge 16 deals with this issue.  What's your

22   position on 16, Mr. Rogers?

23             MR. ROGERS:    That it's wrong.  Again, it cites the

24   regs under RESPA as a freestanding source and they don't

25   apply.

1          It cites your summary judgment decision which,

2     without having gone back and read it, my recollection is that

3     the thing that troubled you the most, I think, was that we

4     hadn't alleged is they were saying at the time, even though

5     they had received the document, hadn't been told that the

6     payment increased.  It seemed like that was one of the things

7     that really bothered you.  Now, of course, we know that

8     they've admitted that that happened.

9          But again, back to the Security Deed, Your Honor,

10    the Security Deed which is not subject to RESPA except to the

11    extent that it incorporates it.

12          THE COURT:    Well, but that's the whole question.

13    How much does it incorporate?

14          MS. BRASH:    Your Honor, if I can maybe hopefully

15    address this for everyone.  The Security Deed incorporates

16    RESPA for shortages.  Very specifically it says, "If there is

17    a shortage of funds held in escrow as defined under RESPA

18    Lender shall notify borrower as required by RESPA and the

19    borrower shall pay to the Lender the amount necessary to make

20    up the shortage in accordance with RESPA but in no more than

21    12 monthly payments."

22          THE COURT:    Well, that's what --

23          MS. BRASH:    And RESPA says --

24          THE COURT:    RESPA says, "The servicer may require

25    the borrower to repay the shortage amount in equal monthly

1    payments over at least a 12-month period."

2            MS. BRASH:    Right.  And the Security Deed says in

3    no more than 12 months.  So it can be no more and no less than

4    12 months.

5            MR. ROGERS:    Well, that's not what it says at all,

6    Your Honor.  It can be less, it just says no more.

7            MS. BRASH:    Not if you read it together.

8            MR. ROGERS:    But it clearly says it can be less,

9    Your Honor.  That's the meaning of no more.  It's the specific

10   terms of the Security Deed, Your Honor.

11           THE COURT:    Well, you know, we're really splitting

12   some really fine hairs here.  The servicer may require the

13   borrower to repay the shortage amount in equal monthly

14   payments over at least a 12-month period.

15           MR. ROGERS:    That's what RESPA says, Your Honor.

16           THE COURT:    That's what the code says.  But you're

17   saying it can be less than that?

18           MR. ROGERS:    Yes, Your Honor.  That's what the

19   Security Deed says.  RESPA doesn't apply except to the extent

20   incorporated.  The Security Deeds says it, it will be no more

21   than 12 months.  So if --

22           MS. BRASH:    And it specifically incorporates

23   RESPA.

24           MR. ROGERS:   Your Honor, I'm trying to speak.

25           THE COURT:    Wait a minute.  Don't interrupt him.

1          MR. ROGERS:   So, Your Honor, RESPA doesn't trump

2     what the Security Deed says.  It's vice versa.  You've already

3     held it.  RESPA doesn't apply to freestanding because it's an

4     investment property.  The Security Deed is the primary

5     document.  The Security Deed says it will be no more than 12

6     months.  So the Security Deed, which trumps RESPA, permits it

7     to be less than 12 months, Your Honor.  That's the meaning of

8     no more.  The other side of it, freely available.

9          THE COURT:   So other than that aspect of number 16

10    do you disagree with it?

11         MR. ROGERS:   I mean, our objection, Your Honor, is

12    that this entire process is inconsistent with the Court's

13    order which -- and when the time comes for us to make that.

14         THE COURT:   Well, you can make that argument right

15    now.  I mean, quite frankly the problem -- one of the major

16    problems with this case is the law is not clear.  I mean, I

17    think there are some problems with the Georgia Law, the lack

18    of clarity about the Georgia Law.

19         And I'm trying to reach some conclusion about what I

20    should tell this jury to put them in the best posture of

21    returning a verdict in this case that's based on the law and

22    the evidence and not something else.

23         And at this point, I'm pretty happy to get whatever

24    help I can get in order to try and get there.  As you pointed

25    out yesterday you could tell we worked hard trying to get this

1    pulled together and we did.

2         MR. ROGERS:    You did.

3         THE COURT:    And, of course, we did that without

4    knowing what the evidence was going to be and without

5    understanding all the issues in the case.  So now I'm just

6    trying to get it right.

7         MR. ROGERS:    Let's start with the first clause,

8    Your Honor.  It says, "under the law".  It's not under the

9    law.  If it's true it's under the contract.  So if you're

10   going to instruct them you'll be instructing them what the

11   contract means which is not the determination you previously

12   made.  So I have a problem with that.

13        For each of Plaintiff's accounts, Your Honor, I

14   don't think that there is any evidence to support anything

15   about any of the escrow analyses in any of the other accounts.

16   The only person that submitted an escrow analysis from another

17   account is us.  So those other accounts don't have anything to

18   do with this charge.  It doesn't belong in there.

19        The Defendant was required to conduct an escrow

20   analysis to determine whether a surplus, shortage or

21   deficiency existed.  It doesn't have anything to do with this.

22   You're required to do that annually, Your Honor.

23        So they can do it on the service charge but they

24   don't have to do it and this charge isn't inappropriately

25   tailored.  And so it's not even accurate under RESPA.

```
 1              It has been determine that an escrow shortage
 2    existed in this case.  It's been determined that a shortage
 3    and a deficiency existed, Your Honor.  Both of them existed in
 4    this case.  There was a shortage as of November 1.  There was
 5    a deficiency as of December 10.
 6              We can collect a deficiency even under RESPA in
 7    fewer than 12 months, Your Honor.  They're certainly not going
 8    to dispute that.
 9              If the escrow analysis disclosed that a shortage was
10    greater than or equal to and now we're back to the part I have
11    a problem with it's just not consistent with the contract.
12              THE COURT:    Right.
13              MR. ROGERS:   There's nothing about this charge I
14    like, Your Honor.
15              THE COURT:    All right.  And so do you have
16    something that we could use to describe to this jury what they
17    should consider related to this escrow?  Is that one of your
18    charges?  I don't remember if it was or not.
19              MR. ROGERS:   Well, I think Your Honor, they should
20    consider the language of the contract.  Unless Your Honor is
21    going to make a determination as a matter of law what that
22    contract means, then they don't have to consider it at all
23    potentially, then I think they ought to consider the language
24    of the contract.
25              THE COURT:    Okay.  Well, let's look at number 9.
```

1    There was a request that "actually" be changed.  I don't

2    remember what was there before but we changed it to

3    "actually".  There was no objection to that.

4           And then Plaintiff's right to possession.  That was

5    changed.  I don't think there was any objection to that.

6           Conversions of taking and misapplication of personal

7    property in this case.  Plaintiff's monthly mortgage payments,

8    not the taking of real property.  That was what you requested.

9    I think that's consistent with the law.  We need to do that.

10   Let me you know if you have a problem.

11          MR. GOWER:    I have no problem.

12          THE COURT:    Interference with property rights.

13   I'm now on 18.  There was a proximate cause request that be

14   added as a third element.  Does anybody have a problem with

15   that?

16          MR. GOWER:    We do not.

17          THE COURT:    Now look on page 23.  This is one of

18   the things that I thought about last night.  Plaintiff's son,

19   Adam McGinnis, is not a Plaintiff in this case and does not

20   have a claim against the Defendant.  Accordingly, as a matter

21   of law, Adam has no injury by which to recover damage in this

22   case.  Any award for damages must only be based on your

23   determination of the appropriate amount to compensate the

24   Plaintiff for her injury.

25          Now, the evidence, oddly enough in the way it came

1    in this case, in the trial of this case, was mostly about Adam

2    McGinnis and the phone calls that he made and the calls that

3    he got back and his frustration and the confusion.  And very

4    early, very early in the case or in the sequence of events,

5    Plaintiff in this case turned these matters over to him and

6    moved to St. Augustine.  Obviously, you have evidence in the

7    case about her damages.  But she, essentially, in her direct

8    told this jury to compensate her son.  Give his life back, I

9    think, is the way she put it.  And that is not recoverable.

10   That has nothing whatsoever to do with this case.  And I don't

11   think I can let it go to this jury that he has any damages or

12   that they can anyway fashion any award to consider that.

13           MR. GOWER:   I would have to agree with the Court.

14   There's no question about it.  You're right.

15           The only thing that they can compensate is for

16   Jane's worry about her son, which is sort of like asking -- I

17   don't know if I can think of an analogy.  But you're right.

18   There is no doubt about that.

19           THE COURT:   Mr. Rogers?

20           MR. ROGERS:   Sir.

21           MR. GOWER:   Of course, I wish you wouldn't put it

22   in here, but you're right.

23           THE COURT:   Well, the evidence came in in a very

24   odd way in this case I thought and I felt like something

25   needed to be done about that part of it.  Anymore about the

1    jury charges?

2         MR. GOWER:    This is for the record.  I hate to say

3    that.  Mr. Delbene squarely said in his deposition that with

4    regard to the setting of the escrow account RESPA applies.  I

5    can show you that.  No question about it.

6         The Security Deed itself says insofar as setting the

7    escrow RESPA applies.  You yourself have said insofar as

8    setting escrow RESPA applies.  That's right.

9         So the jury -- that's all I've got to say.

10        THE COURT:    We stopped yesterday.  Did I hear from

11   you completely about your motion for judgment as a matter of

12   law under Rule 50.  Do you want to add some more to that?

13        MR. ROGERS:    Well, I suppose we would renew it now

14   that we have finished our case, Your Honor.  The only things

15   really to add -- I mean, you had asked Mr. Gower if he made

16   his best argument on whether or not we needed to send him

17   notice.  It seems like we've already talked about that again.

18        The point I was really going to make about all of

19   this was really a causation point, Your Honor, on wrongful

20   foreclosure.  And the point I was going to make when I started

21   down that road and before we got into the whole question of

22   notice was, there was an analysis done in December.  It was

23   done December 16 and sent December 17.  Sixty-first day,

24   admittedly so.  We don't think that caused the default because

25   they knew before they cut their November check what they were

1    being expected to pay.  And so they were twice in default

2    before that moment.

3            So the causation then, Your Honor, is, if in fact

4    that was breached of legal duty, then it's not the cause.

5            You know, now that we're talking about the amount

6    which is not what we were talking about yesterday.

7            THE COURT:    Right.

8            MR. ROGERS:   Yesterday we were talking about

9    whether they had to send him notice when they did.  And this

10    keeps to be a moving target here.

11            THE COURT:    I noticed that.

12            MR. ROGERS:   Now that we're talking about the

13    amount, they did that analysis in December, which would be

14    consistent even with RESPA if it were applied in its entirety

15    and trumped the contract.  And it was 680.08.

16            And then they did another one in February that was

17    $632.38.  And again consistent because they do these things --

18    when they do their analyses -- and part of the reason that I

19    know that it was probably TBW that did the one that led to the

20    840 is that when they do their analyses they do them under

21    RESPA because they just treat everything the same.  And

22    99 percent of the loans they deal with are residential loans

23    and they're under RESPA.  So that's just how they do it.

24            And again I'm not your -- it behooves me to make

25    that argument to the jury so I probably won't.  But both of

1   the latter two did comply with RESPA.

2          And the 638.32 included an escrow piece for the

3   taxes and insurance in the amount of $140.55, which was

4   exactly the number that Adam McGinnis calculated.

5          The only difference between his escrow calculation

6   and that February 20 calculation was that it included $7.62 or

7   something like that amount, to make up the shortage over a

8   12-month period.  And he acknowledged that he didn't include

9   the shortage but that they didn't have to repay the shortage.

10         So, Your Honor, that February analysis is the

11  analysis that Adam McGinnis did.

12         THE COURT:   Well --

13         MR. ROGERS:   And so from February on he is still

14  not paying it, Your Honor.  So the problem is Adam McGinnis

15  didn't want to pay anymore than 605.58.  The analysis didn't

16  cause the default.  Even when the analysis is something that

17  he agreed with he didn't make the payment.

18         THE COURT:   All right.  Well, let me --

19         MR. ROGERS:   And then he finally says, Your Honor,

20  I know I'm behind 1,217.  And remember how he calculated that

21  is without including the other amounts he didn't agree with

22  from the 800.  He knew he was behind $1,200.  He didn't pay

23  that.

24         And the question, Your Honor, is can a reasonable

25  jury really believe if he had paid the amount that he had

1   acknowledged he was behind and there was $190 in arrears on

2   this account, can a reasonable jury really believe there would

3   have been a foreclosure, Your Honor.

4           THE COURT:    Well, let me ask you this.  Because

5   you actually brought up something I thought about last night

6   and actually came up again today.

7           On this whole causation issue, even if under Mr.

8   Gower's theory the actions of the Defendant caused a default,

9   was that cured by the new escrow analysis in February of 2010?

10          MR. GOWER:    I've got the answer to that.

11          THE COURT:    Good.

12          MR. GOWER:    No.  And here's why.  Because they

13  were -- as you said in your order, they have to correct the

14  accounting errors.

15          But here's what they did.  Is even though the

16  analysis, I think in February of '10, they were still

17  requiring that you pay the arrearage based on the wrong escrow

18  they had sent on November 1, '09.  That's the answer.

19          THE COURT:    Mr. Rogers.

20          MR. ROGERS:    What was your exact question, Your

21  Honor?  I got distracted listening to Mr. Gower.

22          THE COURT:    I wondered if the subsequent act of

23  the Defendant in preparing a new escrow analysis in February

24  of 2010 would cure the alleged default caused by or whether

25  the default allegedly caused by your client?  As opposed to

1    the subsequent act.

2          I mean, the problem here is this property wasn't

3    foreclosed on until January of 2011, a long time after this.

4          MR. ROGERS:   June of 2011, Your Honor.

5          THE COURT:   June, I'm sorry.

6          MR. ROGERS:   What happened was -- I don't think it

7    cured it, Your Honor.   I mean, if you were to conclude that

8    RESPA trumped the contract and that they had to take the

9    shortage over 12 monthly installments.   Now, then in December

10   when it became a deficiency in excess of two monthly payments

11   then RESPA would have permitted them to collect it right away.

12   They could have collected one monthly installment.   And I can

13   assure you Adam McGinnis wouldn't have liked that.

14          So again, I don't really think that that breach is

15   what's going on here.   But the point you just made is the

16   point.

17          They, after that February analysis which is

18   absolutely consistent with RESPA and absolutely consistent

19   with Adam's analysis, they then go on for another 12 months.

20   And then in February of 2011 they make no payment.

21          So again, Your Honor, he acknowledged he was behind

22   even under his own calculations.   He didn't pay that amount.

23   And if he had paid that amount I assure you they wouldn't have

24   foreclosed over $190.   And I don't think any reasonable juror

25   is going to believe that.

1           THE COURT:    All right.

2           MR. ROGERS:    So the cause -- There may or may not

3    have been a breach of duty.  But the cause here is that Adam

4    McGinnis was unreasonable.  He was stubborn.  He didn't want

5    to pay more than 605.58 even though he acknowledged he owed

6    more, even though he acknowledged he was behind.  We waited

7    16 months, Your Honor, until they made no payment at all and

8    then we foreclosed.

9           THE COURT:    All right.  This is what I'm going to

10   do.  I'm going to go back and talk to my law clerk and we're

11   going to come back with a charge and that's what I'm going to

12   charge.

13          And I have heard a lot about this.  And as far as

14   your Rule 50 motion I'm going to take that under advisement.

15   I have a lot of questions in my mind about the case, quite

16   frankly.  And I've heard a lot of argument about it, but I'm

17   still not clear about some of the legal issues in the case.

18          The nice thing about a Rule 50 motion is that I can

19   enter judgment for the movant after a verdict is returned.  I

20   have done that before where I thought the jury got it wrong

21   and went back and reviewed the case.

22          So, I will give y'all about 40 minutes to get a

23   quick snack and when we come back we're going to let Mr. Gower

24   open.  I assume you want to do the opening.  And I'm going to

25   give both of you an hour.

 1          And I'm going to -- I will tell you that Ms. Purvis

 2    is going to keep the clock on you.  And I won't stop you in

 3    mid-sentence but I will stop at the end of the paragraph

 4    because I'll keep you firm to that, especially an hour.

 5    Especially for a two-day trial or two-and-a-half day trial.

 6          But, anyway, I understand the issues are

 7    complicated.  I understand there is a lot of material to go

 8    over.  And I understand that this took place over many months.

 9    So I understand why an hour is justified in this case, even

10    though it was a short trial.

11          Now, Ms. Purvis will give a warning.  In other

12    words, if you want to divide your one hour up into 20 minutes

13    and 40 minutes and you want her to let you know five minutes

14    before your 20 minutes is up or five minutes before your

15    40 minutes is up then she will do that for you.  Likewise for

16    you, Mr. Rogers.  Because I know that we can start talking and

17    not know when to stop and all of a sudden the time is up and

18    we hadn't said everything we want to say.

19          So, if you want to set up some kind of arrangement

20    with Ms. Purvis about that you just need to tell her before

21    you begin the closing arguments what you want to do.

22          Does anybody have any questions about this?  I have

23    no problem with you using anything that was presented in the

24    evidence of the case in your closing argument.  If you want to

25    use your charts or whatever, that's fine.  But I recommend

```
1    that you get organized what you want to do because that's part

2    of your hour trying to get your exhibits together or what you

3    want to use.  So, does anybody have any questions about that?

4              MR. GOWER:   I'm not going to do the opening.  So

5    I'm going to reserve mine until the end.

6              THE COURT:   So you're going to do the whole -- all

7    right.  We need to talk about the verdict form.  Have y'all

8    had the opportunity to look over the verdict form?

9              MR. GOWER:   Yes, Your Honor.

10             MR. ROGERS:   No, Your Honor.

11             MR. GOWER:   I have looked at it a lot.  And I

12   think it's okay.

13             MR. ROGERS:   I can't even find it, Your Honor.  Is

14   it the one that you sent out with the jury charges?

15             THE COURT:   Yes.

16             MR. ROGERS:   We prefer the special interrogatories,

17   Your Honor.  But you obviously decided not to do that.  So

18   without the special interrogatories we have no objection to

19   that.

20             THE COURT:   The verdict form, we really try to be

21   careful with these because we want to make sure we find out

22   what the jury has done and why they did it.  But at the same

23   time if you put too much in there it becomes confusing.

24             MR. ROGERS:   I absolutely understand, Your Honor.

25   We have the same concern.
```

```
 1            THE COURT:    Right.

 2            MR. ROGERS:   Because I think I knew before you knew

 3    that this was going to be quite -- much more complex than you

 4    would expect for what it is.

 5            So we tried to craft the interrogatories that would

 6    take them through the analysis step by step which we thought

 7    was the way to go.  Your Honor didn't want to do that but what

 8    you did, which is much better than just a -- we find for

 9    Plaintiff or Defendant and how much.  So we would love ours,

10    but if we can't have ours we like yours.

11            THE COURT:    Okay.  Very good.  Be back in about

12    40 minutes and then we'll move on out.

13    (RECESS)

14            THE COURT:    I wanted to give y'all the opportunity

15    to read the changes because I put some things in this morning

16    that I took out this afternoon.  And a lot of that was based

17    on the argument that Mr. Gower made.

18            I did go back over the lunch break and I did look at

19    the security agreement because there's a big issue related to,

20    that responsibilities.  And I noticed that RESPA is mentioned

21    1, 2, 3, 4, 5, 6 times and there are various aspects of it

22    that are incorporated into the security agreement.

23            You know, the problem with this case -- I mean, it's

24    really a fairly simple problem from the standpoint of the

25    Defendant, and that is, that there is no escrow evaluation.
```

1        It's never been produced, right?

2                MR. ROGERS:    Your Honor, back to that question of

3        who actually did it.  The escrow cycle, the annual escrow

4        cycle -- do you want me to explain, Your Honor?  It hasn't

5        been produced is the answer to your question.  The reason for

6        that is, Your Honor, my belief is it was TBW that did the

7        analysis.

8                But, again I'm not sure based on the evidence

9        because there's no evidence.

10               THE COURT:    Well, I mean, I think it's problematic

11       that the only testimony about this is the testimony from

12       Delbene, who on the one hand said it was done and then every

13       other time he had anything to say about the escrow agreement

14       was -- escrow evaluation, is that he didn't know anything

15       about it.  So I don't think there's any other testimony that

16       one was done.

17               MR. ROGERS:    There's other evidence in the record,

18       Your Honor.  There's no other testimony.

19               THE COURT:    What is the other evidence?

20               MR. ROGERS:    The evidence in the record, Your

21       Honor, is if you look at the TBW escrow analyses -- and we

22       talked about this with Mr. McGinnis.  You have to do it

23       annually.

24               THE COURT:    Right.

25               MR. ROGERS:    And they were doing theirs in August.

1    And they were servicing the loan in August.

2            And if you look at our payment history when this

3    loan boards it boards at 843.58.  And if you look at the first

4    payment billing statement that comes out it says this is the

5    information based on what we got from TBW.

6            So, Your Honor, I honestly think that the evidence

7    shows TBW did the analysis.  I don't think there is any

8    evidence that we did the analysis, other than Mr. Delbene's

9    statement.  And frankly my take away from Mr. Delbene is the

10   same as yours is a bag full of "I don't know."

11           And Mr. Gower led him into that and he said there

12   was an analysis done which is where we are.  He didn't even

13   say we did it.  He just said there was an analysis done.

14           THE COURT:   Well, I mean, I just think all this

15   raises some questions of fact.  That's the problem with it.

16   It's all mysterious to me.

17           MR. ROGERS:   I don't think it raises a question of

18   fact about causation, Your Honor.

19           THE COURT:   You know, on the other side of the

20   coin I mean it makes absolutely no sense that this money

21   wasn't paid, none whatsoever, to save this house.  Absolutely

22   no sense whatsoever.  But that is a jury argument, I think.  I

23   don't think it's a matter of law.

24           MR. ROGERS:   We think it could be decided as a

25   matter of law.

1          THE COURT:    I understand that you do, but I

2     don't.

3          MR. ROGERS:    I suspect if we dig into those summary

4     judgment orders where you grant it, that you decided this

5     matter of law a lot.

6          THE COURT:    Maybe so.  Anybody have any questions

7     about where we are going?

8          MR. ROGERS:    Is this the point at which you would

9     expect us to preserve our objects to the jury charges, Your

10    Honor?

11         THE COURT:    No.  My point is I don't want you

12    standing up and saying something in your closing argument

13    based on what I have proposed this morning, and now I have

14    changed it.

15         MR. ROGERS:    No.  Do we understand you have ruled

16    on our motion for judgment?

17         THE COURT:    Yes, Yes.  I mean, you can renew it

18    and I'll consider it further.  But I'm willing to consider it

19    further, right.

20         I mean, I'm going to be interested to hear what

21    y'all have to say in your closing arguments, for example,

22    because that may have some bearing on that motion.  Are y'all

23    ready?

24         MR. GOWER:    Could I make a comment?

25         THE COURT:    You may.

1          MR. GOWER:    I'm talking against myself, but the

2     charge on page 12.

3          MR. ROGERS:    I thought we were going to do the jury

4     charges --

5          MR. GOWER:    I just don't want there to be an error

6     on appeal in the event we do get a verdict.  I like your

7     charge.  I'm talking about the last paragraph.

8          THE COURT:    Which one?  Tell me the page number

9     again, I'm sorry.

10          MR. GOWER:    Page 12.  The last paragraph.  I like

11     what you put here but I think because of the fact that the

12     shortage was more than one month that you need to charge the

13     statute.  I think just taking that out and charging the

14     statute will cure it.  Can I approach and show you what I'm

15     talking about?

16          THE COURT:    Yes.  Come on up.

17          MR. GOWER:    What I'm saying is that the shortage

18     was greater than one month so they need to be charged what

19     they should do in that event.

20          THE COURT:    Do you want to see this Lucie?  Do you

21     know what he's talking about?

22          MR. ROGERS:    I do, Your Honor.  Are we doing the

23     jury charges now?  Because I don't like what you put in there.

24     I don't think it's what the contract says and we have a

25     procedural issue with this, Your Honor.

1          The fact that their case proved unprovable as they

2     originally wanted to prove it, which is that they didn't have

3     any notice.  And now we're getting into this which ought to

4     have been something they could have foreseen and we would have

5     had an opportunity to work through and research.

6          Your Honor's order was quite clear about what the

7     pretrial order needed to include and now we're getting

8     ambushed with all these charges because their case has evolved

9     and they should have been able to anticipate this.

10         So we have a procedural concern with this, Your

11    Honor, and we continue to maintain that the contract says what

12    it says and I'm going to argue the contract says what it says.

13         So, you know, Your Honor we don't think that this

14    charge is proper and at the appropriate time we will make that

15    point again.

16         THE COURT:    Well, it sounds like Mr. Gower wants

17    to bring it out too.

18         MR. GOWER:    I'm sorry?

19         MR. ROGERS:   No.  Mr. Gower just wants that one

20    sentence out that might arguably be kind of favorable to us.

21         As regards to what Mr. Gower is saying, if we can

22    get a charge on the deficiency then, Your Honor, that we could

23    recover the deficiency in fewer than 12 months we might then

24    be willing to consider not -- even then we're still going to

25    object, Your Honor.

```
 1              MR. GOWER:    Well, there is no deficiency.  It's a
 2    shortage.
 3              MR. ROGERS:   Sure there is, Your Honor.  There's an
 4    actual deficiency.  The evidence proves there's an actual
 5    deficiency.
 6              MS. BRASH:    When they increased the payment
 7    though, when they took over the loan it increased it based on
 8    a shortage.  At that time only a shortage existed.  There was
 9    no deficiency and that's when they increased the payment.
10              THE COURT:    I understand.
11              MR. GOWER:    My only point, and then I'm going to
12    shut up, is I just want it to be -- if we get a verdict I want
13    it to hold up.  And I think if you could just -- this last
14    paragraph, substitute in lieu of in the statute or something
15    close to it and that's all I've got to say.
16              THE COURT:    So take out where it says "when there
17    is a shortage" all the way down to the end of the page?
18              MR. GOWER:    Yes, sir.
19              THE COURT:    "For at least a 12-month period."
20    Okay.
21              MR. ROGERS:   Your Honor, my point is there was an
22    actual deficiency.  The accounting documents show that Mr.
23    Berry testified --
24              THE COURT:    I understand.  I know that we've been
25    going back and forth about this.  I understand that part of
```

1    it.

2          The reality of this situation is that I hope one

3    side will appeal this and try and get these issues

4    straightened out so that the district court judges will be

5    able to know what they're supposed to do in these cases with

6    all these many issues, legal issues we've had to deal with.

7          MR. ROGERS:   Without withdrawing my objections to

8    what is here, Your Honor, there was, in fact, a deficiency.

9    RESPA, if you've concluded that it applies, in fact permits

10   that to be collected in fewer than 12 months.

11          We could have December 10th increased by way more

12   than 150 or 300 percent.  We could have sent them a bill that

13   said send us this now.

14          And I guess, Your Honor, if you were to include what

15   RESPA provides with respect to deficiencies it's not going to

16   cure what I perceive is the error because it's still not what

17   the contract says.  But at least then I could argue exactly

18   what I just said.  In December, December 10 when an actual

19   deficiency came into existence, then we could have just

20   increased it then by much more than it had been increased

21   prior to that.

22          And I don't think that cures the error, Your Honor,

23   but at least it would give me something to say about what's

24   here.  Because I really feel like -- Well, I really feel like

25   this is unfair.

1          THE COURT:    I understand.   We're going to take

2     out what you objected to and we're going to put in what you

3     recommended.

4          MR. GOWER:    Thank you, Your Honor.

5          THE COURT:    And you have perfected your objection

6     on that.  Can we bring the jury in now?

7          MR. GOWER:    Yes, sir.

8          THE COURT:    Is everybody ready?  Are y'all lined

9     up and ready to go?

10         MR. GOWER:    Yes, sir.

11         MR. ROGERS:    Does this complete our opportunity to

12    object to the jury charges, Your Honor?

13         THE COURT:    No, no.  You can object afterwards.

14    Like I said, I was just trying to tell you that you'll have

15    another opportunity.  But I didn't want you to argue something

16    that I wasn't going to charge.  And that's why I was telling

17    you before now.

18         I mean the jury has been out -- they've been gone

19    for a long time.  So we ought to get them back in here and get

20    rolling.  So that's what we're going to do.

21    (JURORS ENTER COURTROOM)

22         THE COURT:    Ladies and gentlemen, I know you've

23    been out for quite a while.  We have been very busy trying to

24    get the law in such a fashion that we can charge it to you.

25         We are ready now to proceed with the closing

1    arguments in the case.  Each side has an hour.  After that I

2    will charge you.  And then you will go back and begin your

3    deliberations in the case.

4         I want you to remember that what the lawyers say is

5    not evidence in the case.  But the closing argument is an

6    important part of the case.  So I would encourage you to pay

7    attention to both the lawyers as they make their closings.

8    Mr. Rogers.

9         MR. ROGERS:   Thank you, Your Honor.  Ladies and

10   gentlemen, at the outset of the case I told you it was a case

11   about a business deal gone bad.  And it is still a case about

12   a business deal gone bad.

13        But it has become over time a case about broken

14   promises, the broken promises of Ms. McGinnis and the broken

15   promises of her counsel.

16        Let's start with the broken promises of Mr. Gower.

17   When he made his opening statement to you two-and-a-half days

18   ago he made certain pronouncements about what the evidence was

19   going to show.  And he did not follow through on those

20   commitments that he made to you about what the evidence would

21   show.

22        For example, he made a commitment to you that the

23   evidence would show you that no one told Ms. McGinnis what she

24   needed to pay before she made her first payment to AHMSI.  But

25   on cross examination Mr. McGinnis, as you may recall, admitted

1    receiving a note and what we call a hello/goodbye letter.  It

2    just says your old servicer is gone.  We are your new

3    servicer.  We are the new sheriff in town, send your money to

4    us, please.

5         Would you put that up.  It's D89, Kelly.

6         Would you look at the bottom.  This is the statement

7    he acknowledged receiving.  It says right here, you have to

8    pay $843.58.

9         He sat right there and admitted to you that he got

10   that on or before November 1st, 2009.  And he told you he

11   didn't cut that first check until November 6th of 2009.

12        So contrary to what Mr. Gower promised you, the

13   evidence clearly establishes before she ever made her first

14   payment Ms. McGinnis knew what she was expected to pay.

15        Additionally, Mr. Gower told you that the evidence

16   would show that there was no response to Adam McGinnis's May

17   19, 2010 fax that included all the checks that he attached to

18   it and escrow statements from TBW.

19        However, again, sitting right there, Mr. McGinnis

20   admitted that he did get a response to that.

21        Would you put up the June 30, P19.  This letter is

22   in reference to the correspondence received by American Home

23   Mortgage Servicing, Inc. on the above-mentioned loan number

24   and forwarded to my attention for research and resolution.

25        I would like to thank you for giving me the

1    opportunity to address your concerns.  We received

2    correspondence from Adam McGinnis.

3            Adam McGinnis admitted that this was correspondence

4    they got in response to their May 19th fax.  He even testified

5    that they got payment histories and all the billing statements

6    that he said he wasn't getting.

7            So not only did he get a response, he got a fulsome

8    response and Mr. Gower didn't deliver on that promise to you.

9            Finally, Mr. Gower promised that the whole case

10   arose from the fact that they were one payment behind on

11   November 1, 2009.  And all of that is based on this one

12   billing statement.

13           Now, Mr. McGinnis said he didn't get the billing

14   statements so I'm not sure how the whole case can be arising

15   from this problem.  But the billing statement, as we've heard,

16   doesn't show what Mr. Gower wants you to see.

17           Would you put up P2-1, please.  Let's go up to the

18   top.

19           Up here it says statement date 11-3-2009.  Now as

20   Mr. McGinnis acknowledged and as Ms. McGinnis read to us, Ms.

21   McGinnis's payments were due on the first of each month.  So

22   on November 3 her payment was late.

23           Then here it says November 1, 2009.  Remember when

24   we were talking to Mr. Berry and we took him through those

25   other billing statements.  Do you remember what he admitted?

1     He admitted that this is the oldest payment due.  The loan is

2     due for the November 1, 2009 payment.

3             Let's look at that other billing statement now.  I

4     think it's P2-11.  Keep that one handy, Kelly.  I want to come

5     back to it.

6             So here is the date, July 13, 2010.  And here is the

7     payment due date, May 1, 2010.  It's the oldest payment still

8     due.

9             Kelly, actually why don't you give us another

10    example.  Would you put up P2-13.

11            August 16, 2010.  Payment due date May 1, 2010.

12            So let's go back now, Kelly, to P2-1, the document

13    that this is all about.

14            So here it is 11-1, that's the payment, the oldest

15    payment due.  So she didn't start out being one payment behind

16    on November 1.  She was one payment behind for real on

17    November 3.

18            Let's go down to the bottom.  Current payment

19    843.58.  Past due payment, which was the November payment,

20    843.58.  How do we know that the current payment is the

21    December 1 payment?  Mr. Delbene told you that when he

22    explained how he had misread this document.  But we see it

23    down here.  After 12-16-2009 add a late charge total of 24.51.

24

25            So this payment, the past due payment, November 1,

1    current payment December 1.  How do we know that?  Because you

2    have the 15-day grace period before they applied a late fee.

3    And the late fee was going to be applied December 16th.

4         She didn't start out a month behind, ladies and

5    gentlemen, not November 1st.  She didn't put herself more than

6    a month behind, but that was later.

7         So again, Mr. Gower failed to deliver on his promise

8    about that evidence.

9         Now, you're not going to decide the case based on

10   whether Mr. Gower delivered on his promises in the opening

11   statement.  We submit that you should decide the case based on

12   the promises that Ms. McGinnis made in the contract documents.

13   But it's the terms of those documents that are going to

14   dictate the outcome of the case.

15        Ms. McGinnis has made four claims against AHMSI.

16   Wrongful foreclosure, interference with property rights,

17   intentional infliction of emotional distress and conversion.

18        Plaintiff bases all of those claims on three

19   instances of conduct; foreclosure, escrowing the suspense

20   payments and collecting fees.  That's it.  Those are the three

21   things that she complains about and she bases all of her

22   claims on one or more of those three things.

23        We expect the Judge will shortly charge you that if

24   AHMSI was acting in accordance with the contracts and

25   applicable law that she can't prevail on those claims against

1    us.  And we believe that those contracts will show that AHMSI

2    was acting consistent with the contracts and applicable law.

3            So let's look at each of those three instances of

4    conduct so we can see what the contracts have to say about

5    that.

6            Let's start with the foreclosure.

7            Would you put up the note please, Kelly.

8            Under the terms of the note Ms. McGinnis promised

9    that she would pay the full amount of each monthly payment

10   when it was due.  If we look at 3.  I will make my monthly

11   payment on the first day of each month beginning on

12   December 1, 2006.

13           Would you go forward to 6, please.

14           Then she promised, if I do not pay the full amount

15   of each monthly payment on the date that it's due I will be in

16   default.

17           So, ladies and gentlemen, what she promised was I'm

18   going to pay the full amount you tell me to pay on the first

19   of each month and if I don't do it I'm in default under this

20   note.

21           Ms. McGinnis agreed in the Security Deed that if she

22   was in default under the note one of the remedies that was

23   available was foreclosure.  And that is paragraph 22 of the

24   Security Deed, which is really, really long, and that was the

25   one that I read for a really long time.  So I'm not going to

 1    put it back up here and read it again.  But that's what it

 2    says.  And it's paragraph 22 of the Security Deed.

 3          The evidence shows that with respect to the loan on

 4    the investment property at 172 Hilton Street Ms. McGinnis

 5    failed to pay the full amount when due for 16 consecutive

 6    months.

 7          In fact, she never once performed that obligation

 8    before AHMSI made the determination to foreclose on March 1st

 9    of 2011.

10          From November to eventually March $843 and some

11    change was due.  From April 1 until the time that AHMSI

12    decided to foreclose in 2011 $638.32 is what was due.

13          As we discussed with Mr. McGinnis every payment he

14    made through December of 2010 was in the amount of $605.58.

15    He never did increase that.

16          In January of 2011, he finally paid $638.32 but he

17    didn't pay that within the grace period.  He paid it on the

18    18th.  So it was late.  So she never did pay the full amount

19    due when due.

20          And then in February of 2011 she didn't make any

21    payment at all.  At the end of that, AHMSI made a

22    determination to foreclose.

23          During Mr. Delbene's deposition we heard an argument

24    that I expect we're going to hear from Mr. Gower in about an

25    hour, which is that if AHMSI had applied every one of those

1    partial payments it received to principal and interest and

2    then whatever was left over you put into escrow, that she

3    would have been current on principal and interest up to and

4    including the date of the foreclosure.

5        That's not the way it works in the real world.  If

6    you had asked them to apply it on an intern basis instead of

7    putting it in a suspense account they would have applied it as

8    a partial payment.  And then when the next payment came in you

9    would still have to pay the rest of what was due in escrow for

10   the month before.

11       So eventually it's the same problem.  And this is

12   what Mr. Delbene said.  He said, you know, there always would

13   have been late fees because she always would have been late

14   because it always would have been a partial payment.

15       The accounting would've been the same.  There is the

16   same amount owed and the same amount paid.  So over time the

17   same result would have occurred.  So it doesn't matter if we

18   had applied it that way.

19       But more to the point, and this is what Mr. Delbene

20   said, that's not what she agreed.  She didn't agree I'm going

21   to pay principal and interest and whatever I feel like paying

22   on escrow.  She said I'm going to pay principal, interest and

23   escrow.  She didn't do that.

24       So Mr. Gower's argument doesn't bear any

25   relationship to what the contract document says.

1          At least three times in this process we've heard she

2    was offered an opportunity to escape this cycle.  On June 30,

3    2010 AHMSI offered that chance for a payment of $1,491.36.

4    Mr. McGinnis admitted they didn't make that payment.

5          In August -- and I want to put up now P10, if we

6    could, Kelly.  And I want to put up August 18, 2010.

7          In August, as you may recall, Mr. McGinnis has said

8    to somebody, "Look, I want this resolved."  Now, we had

9    already had the May 19 and June 30 letter.  So you already

10   once had somebody look at this and tell him what was going

11   on.

12         But he said again, I want somebody to look at this

13   and tell me what's going on.  And so he wound up talking to

14   this nice lady and they talked a lot, and she sent him a

15   letter.  And they would've talked a lot more if he had ever

16   answered his phone or called her back.  But they talked on

17   August 18th.     And what she said on August 18th, here's the

18   call, "Stated Minimiranda" -- The minimiranda, in case you

19   wonder, is just when they say this is a debt collection call.

20   Anything you say can be used to collect the debt.  That's --

21   in the industry that's known as a minimiranda.

22         He, Mr. McGinnis, says, "He knows he owes the

23   difference between insurance and taxes and once analysis

24   performed his payment changed.  Borrower acknowledged he now

25   understands what his payments are but does not understand the

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1    difference of the amount showing due.  He believes he should

2    be due for September."  In other words paid through August, if

3    he pays $1,291.12.

4         I advised, "His TAD -- in the industry that means

5    total amount due -- is $1,483.31 and this will bring him

6    current until August."  So they are talking about this and Mr.

7    McGinnis admits that he is behind $1,291.

8         He's told it's going to cost him another $192 and he

9    refuses to pay it.  He didn't pay the 1,291 he acknowledged he

10   was late and he didn't pay what he was asked to pay that would

11   have resolved this problem.

12        On September 20 we saw that attorney letter that

13   said they could escape this if they paid $1,908.  As Mr.

14   McGinnis acknowledged he didn't make that payment either.

15        If you put up P-17, Kelly.

16        Finally, even after the foreclosure had been decided

17   we sent him a letter March 2, 2011 that says, hey, we would

18   still like to avoid this foreclosure.  And there are some of

19   these options where they stay with the house, the repayment

20   plan, loan modification.  There's a whole statute about that.

21   And then some others where they don't keep the house but at

22   least there is no foreclosure so they could have avoided those

23   advertisements and the sign out front.

24        Mr. McGinnis acknowledged they didn't take advantage

25   of any of those.  So the bottom line here is this.  Ms.

1    McGinnis was in default.  Ms. McGinnis acknowledged that she

2    wasn't paying enough, that she needed to pay more and that she

3    was behind $1,291.  But she didn't work with AHMSI to take

4    care of it.  Do you think if she had paid $1,291 and there was

5    $192 owing on that account that they would have foreclosed?

6    Do you think that?  Really?

7            So, ladies and gentlemen, in the end she was in

8    default.  She was offered the chance to get out of default.

9    She didn't take it and she left us with no choice.

10            The remedy for default in the contract is

11    foreclosure and they foreclosed.

12            Ms. McGinnis says now that that is our fault, we did

13    that to her.  And she has three reasons for that that she's

14    presented in the course of this trial.

15            The first one is that she was one payment behind on

16    November 1, 2009.

17            The second is that the payment amount was

18    unreasonable.

19            And the third is, I didn't know what I was supposed

20    to pay.

21            Well now, I just talked about the first one.  The

22    evidence doesn't show that she was one payment behind on

23    November 1, 2009.  The evidence shows that she was one payment

24    behind on November 3, 2009.  And there's a reason for that,

25    that's because she was one payment behind on November 3, 2009.

1    So the evidence doesn't show that there was any funky

2    accounting that was going on there.

3         The second issue is a little more serious.  The

4    second issue was, did we calculate the amount due that was due

5    correctly.  Let me start by saying she agreed to pay the full

6    amount due and it was calculated and it was communicated to

7    her.  But if that calculation had been too much, if too much

8    had been collected, and that's not what happened here because

9    we know there was still a deficiency as Mr. Berry admitted.

10   At the end of 2010 there was still a deficiency, we still had

11   to advance funds to pay the insurance.

12        But let's say that hadn't happened.  Let's say she

13   had paid all that money that we asked for her to pay and it

14   was too much, it was more than we needed.  There would have

15   been a surplus.  And then the obligation would have been to

16   repay that at the end of the year.

17        So the point is nobody is taking your money.  Nobody

18   is pocketing your cash.  It's not a money grab like Mr.

19   McGinnis said.  You get your money back.

20        But it doesn't matter here the fact that that is the

21   case because it wasn't an unreasonable estimate.

22        I talked about this in the beginning.  Escrow

23   calculations are based largely on estimates.  You estimate

24   what you think next years taxes are going to be.  You estimate

25   what you think next years insurance is going to be.  You add

1    those two together, you divide it by six which gives you the

2    cushion that RESPA permits, and everybody talked about that.

3    Except for Mr. Delbene, he's the only one that didn't know

4    about it.  But you add that cushion in and then you divide by

5    12.  And if there is a shortage or a deficiency, which is to

6    say if there isn't enough to make up the cushion or if there

7    is an actual negative escrow balance then you can also add

8    that in, you can recover that amount.

9            So what happened here is that TBW did the

10   calculations in August of 2008.

11           And can we put those calculations up there.  They

12   are in the May 19 fax.

13           While he's looking for that.  Because they're based

14   on estimates, because they are based on projections.

15   Sometimes escrow calculations are wrong.  Sometimes it is too

16   much.  Sometimes there is too little.

17           In 2008, as the events clearly demonstrate, TBW made

18   a mistake when it did its calculation.  Because when the loan

19   came to us, to AHMSI, in the end of October of 2009 it had

20   $260 in the escrow account and a tax payment due to Jasper

21   County in December in the amount of 1,269.  So their

22   calculation was wrong by about $1,000.

23           Here is that escrow calculation.  It shows the

24   account history for --

25           I actually want the second page of it, please,

1    Kelly.

2            And here's the calculation for the next year.

3    Projection summary for 10-08 through 9-09.  And you can see

4    down here, this is Mr. McGinnis's handwriting, remember he

5    said this, good until 9-09.

6            This calculation is wrong.  And so when AHMSI got

7    the loan it didn't have enough money to pay taxes and

8    insurance.  And so some time the payment increased.

9            We had a deficiency in the amount of $1,000 and we

10   had the insurance coming right up that required another $400

11   to be advanced.  417.  So that's $1,400.  Plus we had the

12   taxes that were coming due.  Do you remember because you've

13   got to collect for the next year.  So that is another 1,600

14   for the taxes and another 400 for the insurance.  So now

15   you're at 3,600.  Plus you are allowed to keep a cushion of

16   one sixth.  So over $4,000 needed to be collected.  And this

17   escrow analysis hadn't done it.

18           So, there was a change.  It's not entirely clear who

19   did the analysis.  But what is clear is that Mr. McGinnis

20   knew, from what he told you and from what we have here, that

21   there was going to be an analysis done and that his payment

22   was going to change in the fall.  He knew that.  He

23   acknowledged that it happened every year that he had the loan.

24           So it changed.  There was a new figure.  That figure

25   as testified was only going to go until February of 2001.  So

1    that $843 figure, and this is what Mr. McGinnis and I talked

2    about, was only going to apply for November, December and

3    January.  Because there was going to be a new escrow analysis

4    done in the first 60 days on the account.  So you'd have a

5    change effective February 1.

6         Will you put up that escrow analysis, please, the

7    12-17.

8         The 12-17 analysis changed the payment figure to

9    680.08.  And the reason it changed it down is because by that

10   point, by the time of the analysis, she had made payments

11   enough to make monthly payments -- to have monthly payments

12   apply to the amount of 843.58.  And so the amount of the

13   deficiency had gone down.

14        In other words, the amount that they needed to

15   recover because there was this shortage, it was underfunded,

16   had reduced.  And so they calculated it to be 680.08.  And it

17   was going to be effective February 1, 2010.  So that $800

18   figure, November, December, January.  And then there was going

19   to be a change February 1.  That was the plan.

20        Now, so the 843 because you already -- you had in

21   that period of time your actual negative escrow balance,

22   actual deficiencies and advances in the amount of more than

23   $1,400.  A thousand to pay the taxes December 10, 417 to pay

24   the insurance on January 26.  And then it was going to go down

25   to this number and the assumption was that number would be

1   fine because we would have collected some of this other money

2   before.

3          Now, let's go forward, please.  Let's look at the

4   May 19 fax for a second.  Just the text of it.

5          Mr. McGinnis admitted that they weren't paying

6   enough.  Mr. McGinnis admitted that the escrow needed to go

7   up.  There's not really at this point much of a reason to

8   point this out but I will anyway.  They can't deny they knew

9   how much they were being asked to pay.  Here it is in his own

10  document that he's written.  They knew what they needed to

11  pay.

12         It comes down here and says, tax bill attached for

13  the year 2008 was 1,213.30.  In the year 2009 1,269.49.  An

14  increase of 56.19 from '08 to '09.  As for the insurance bill

15  also attached it shows the amount of 417.  The new total tax

16  and insurance is 1,686,59 for the year divided by 12 equals

17  140.55.  Plus the 490.13, that's principal and interest.  Is

18  630.68.

19         So as he acknowledged, this calculation doesn't

20  include the cushion, the additional one sixth.  But even this

21  calculation, which doesn't include all that it could have

22  included, leads to a number that's higher than 605. He knows

23  he needs to pay more.  And then he acknowledges --

24         Put the second page up, please.

25         And then he acknowledges, I know I owe you a little

1    more for the shortage in escrow. In other words, he

2    acknowledges that he has to repay the deficiency, the amount

3    that had to be advanced.

4         So, ladies and gentlemen, he acknowledged that the

5    amount needed to go up and he calculated it.

6         Now, let's look at the first page just one more time

7    real quick. And then I want to go to Exhibit P14. This is

8    the number I want you to focus on, 140.55. That's his number

9    for taxes and insurance, right?

10        Now put up P14.

11        P14 is the February 20 -- well, P14 isn't what I

12   think P14 is. Put up the February 20, 2010, escrow analysis,

13   please.

14        Now remember the figure that we just got from his

15   fax is 140.55. That's not the February 20, 2010, escrow

16   statement. P15.

17        140.55 is the number we got from his May 19 fax.

18        Let's look at the escrow deposit that is asked,

19   starting April 1, 2010. 140.55. It's the same as his. The

20   difference between what he calculated remember was 630. This

21   is 638. It's $7.54 to collect the shortage, which he

22   acknowledged he owed. This is his calculation, ladies and

23   gentlemen, 638.32 effective April 1 of 2010. Did he pay it?

24   No, he didn't pay. He didn't pay it in April. He didn't pay

25   it in May. He didn't pay it in June. He didn't pay it in

1    July, August, September, October, November or December.  His

2    calculation that he admitted was right, he didn't pay it.

3         In the end Ms. McGinnis knew what she was supposed

4    to pay.  That payment was reasonable based on the more than

5    $4,000 that needed to be collected and more than $1,500 or

6    $1,400, I'm sorry, that she actually owed because we had to

7    advance those funds to make up the shortage of the escrow.  It

8    was reasonable.

9         And it was changed effective April 1.  So he

10   wouldn't pay the 800 number because he didn't agree with that.

11   Then it was changed to a number that was consistent with what

12   he said April 1 and he wouldn't pay that either.

13        We gave them multiple opportunities.  You've seen at

14   least four, there may have been more.  He said he was getting

15   phone calls all the time plus five feet of letters.  So there

16   probably were more.  But we know we had at least four.  And he

17   wouldn't work with us.

18        She wouldn't pay the amount that was due.  She

19   wouldn't work with us.  They were patient.  They waited

20   16 months.  And she still wouldn't do right.  And so they had

21   to foreclose on her.  That was their right under the contract

22   and that's a right they exercised.

23        That last argument they say to blame the foreclosure

24   on us is they didn't get the billing statements.  Well, we

25   went through the evidence on that.  And as Mr. McGinnis

1    acknowledged the billing statements he was told that were

2    being sent to him, the woman went into the computer.  She

3    looked to see there's a code in there that said whether or not

4    it was sent.  She checked that code.  The code said it was

5    sent.

6           Mr. Delbene told you what the policy is about

7    mailing those things.  They are mailed the day that they're

8    printed.  We know they were printed because we've got copies

9    of them.

10          So by the procedure and by checking on the computer

11   we know that they were mailed.  It doesn't matter.  The point

12   he's trying to make is, I didn't know what I was supposed to

13   pay.  That was what we came in -- remember, we heard that's

14   what we were going to be told.  He knew before he ever cut the

15   first check.  That's what he admitted.

16          He got that hello/goodbye letter October 27th that

17   told him what to pay.  He didn't agree with it, so he wouldn't

18   pay it.  That's not what she agreed.  She didn't agree to pay,

19   only what she agreed with.

20          So, ladies and gentlemen, that is the cause whether

21   we did or didn't send them.  They knew what they were supposed

22   to pay and they just didn't pay it.  So it didn't cause the

23   default.

24          In sum, the evidence shows that Ms. McGinnis's son

25   and agent knew what Ms. McGinnis was required to pay.  It

1    shows that he admitted what she was paying was too low.   It

2    shows he admitted that they were behind in their payments more

3    than $1,200 and that they didn't make up what they were

4    behind.   They didn't pay what they knew was due and they

5    didn't even pay what they thought was owed.

6          And then when we gave them a chance to escape it

7    they didn't work with us.   That foreclosure, ladies and

8    gentlemen, was unavoidable from AHMSI's perspective.

9    Everything was done and the contract was enforced.

10          The second argument that they make is that AHMSI

11    shouldn't have been suspensing the funds.   That's the second

12    thing.   We'll put the foreclosure aside now and move on to the

13    next complaint, which is that we are suspensing funds.

14          But again we look at this contract, and we will put

15    it up right now.

16          Will you put up the Security Deed, please.   Would

17    you put up Section 3.   No, Section 1.   It's actually the

18    second page of that section.

19          And here it is again.   Remember, the complaints

20    about suspensing.   "Lender may accept any payment or partial

21    payment insufficient to bring the loan current without waiver

22    of any rights hereunder for prejudice to his right to refuse

23    such payment or partial payments in the future.   Lender is not

24    obligated to apply such payments at the time such payments are

25    accepted.   Lender may hold such unapplied funds until borrower

1    makes payment to bring the loan current."

2         So, ladies and gentlemen, that suspensing is exactly

3    what she agreed to in the contract.  She made a partial

4    payment.  She didn't pay the full amount due.  That's exactly

5    what she agreed was going to happen.  That's exactly what

6    AHMSI did.

7         So there wasn't any violation.  And when enough was

8    received to make a payment, and this is what Mr. Berry

9    admitted to you on cross examination, everything she paid was

10   applied to principal, interest or escrow.  That's what he told

11   you. It wasn't applied when it was received but eventually it

12   was applied.  That's what she agreed, ladies and gentlemen.

13        Mr. McGinnis even knew AHMSI was doing this.  It was

14   explained to him in the phone call.  Remember we heard from

15   him about that phone call where it was explained and it was

16   explained in that June 30 letter, that there was $490 in

17   suspense and it would remain in suspense until there was

18   enough to make the next full monthly payment.

19        So, agreed we could do it.  Knew we were doing it.

20   Did it properly under the contract.  Can't be liable for

21   suspensing the funds.

22        Finally the Plaintiff complains that AHMSI was

23   collecting fees.  First, I don't think there's any evidence

24   AHMSI actually collected any fees.  If you listen to Mr.

25   Delbene and I let them -- I intentionally played the whole

1   thing because I wanted you to hear the good and the bad of Mr.

2   Delbene.  And he was talking about 1,469 this and 1,467 that

3   and 2,451 here.  And it gets to be long and involved.

4        But the thing that he said that I wanted you to

5   focus on was this all zeroes out.  It doesn't look, after all

6   the credit given here and the refund given there, and the

7   written off here and the applied here, he said it all zeroed

8   out.  There weren't any late fees collected.

9        And when they talked about the other fees with Mr.

10  Delbene, Mr. Delbene said, yeah, we never got to collect

11  those.  The way those fees work is that's what we have to pay

12  somebody else.  You remember he talked about the breach

13  letter.  He had to pay $20 to the lawyer to send that letter

14  out.  That was money that AHMSI actually paid.  That it was

15  only going to recover if the loan had been reinstated, but the

16  loan wasn't reinstated.  So AHMSI never recovered that money.

17  And then the sale of the foreclosure was a credit to them so

18  there was no actually money that was paid at the foreclosure.

19  So there was nothing to get it out there.  And as Mr. Delbene

20  told you those were all just a loss for AHMSI.

21        So they complain about the fees, but let's start

22  with the fact that they don't have any evidence those fees

23  were paid.  Even if they did, even if you conclude that, that

24  they were, that was authorized.

25        If the look -- let's put the note back up, Section

1      3.  While he's setting that up I'll say what it is.

2              Section 3 says that if you don't pay within the

3      grace period, within the fifteen-day grace period, which is

4      the 16th of the month, that you're going to get charged a late

5      fee in the amount of 5 percent.  Six, I lied.  Five percent of

6      my overdue payment of principal and interest.  So late fees

7      are authorized, if the full payment is not received, the full

8      amount by the 16th, late fees are authorized.

9              Let's look now at the Security Deed, Section 14.

10     What Section 14 says, is any fees that may be associated with

11     the default can be recovered from the borrower.  And it

12     specifically identifies, including but not limited to,

13     attorneys' fees and property valuation and inspection fees.

14     And I believe valuation fees.  Attorneys' fees, property

15     inspection, valuation fees, which is what all of the fees were

16     or some category of that.

17             So the last thing that they complain about that

18     AHMSI did is it collected fees.  There's no proof that AHMSI

19     collected it, ever got paid those fees.  And even if it did

20     the contract documents establish quite clearly that AHMSI had

21     a right to get those fees.  So again, ladies and gentlemen,

22     nothing to complain about.

23             Overall Ms. McGinnis cannot prove that AHMSI did

24     anything that wasn't consistent with the contracts.

25             And I expect what Mr. Gower is going to argue is

1     that AHMSI's 843 figure was too high because they had to

2     collect that over twelve months.  There's no evidence, ladies

3     and gentlemen.  Mr. Berry didn't conduct an escrow analysis to

4     show you that there was anything wrong with that calculation.

5     The only evidence that you're going to hear is Mr. Gower's

6     argument.  The argument of counsel is not evidence.

7            But, ladies and gentlemen, even if you were to

8     conclude that that number was too high, the question for you

9     is did that cause the default?  Did that cause the

10    foreclosure?

11           Maybe if we had foreclosed in January of 2010 you

12    might find that that answer was viable, but we didn't.  We

13    waited 16 months.  And that number changed in April of 2001

14    with a new analysis fully compliant with the contract

15    documents and RESPA.  And it changed to a number consistent

16    with what Mr. McGinnis said.  He didn't make that payment

17    either, ladies and gentlemen.

18           So even if you think that 800 number is the problem,

19    that's not what caused the foreclosure.  If he started paying

20    the 638.32 maybe we wouldn't be here.  But he didn't do that

21    either.

22           He didn't want to pay anything but 605.58.  And

23    that's all he paid.  And he was in default 16 consecutive

24    months.

25           I want to talk just briefly about the elements of

1    the actual claims themselves.  We expect the Judge is going to

2    shortly charge you that the elements of the wrongful

3    foreclosure came or the Defendant owed a legal duty to

4    Plaintiff.  Defendant breached the legal duty and that that

5    breach caused the damages.

6          We've talked about the duty and we've talked about

7    the cause.  The cause is 16 consecutive months.  We don't

8    believe there is any breach of duty.  We believe the contract

9    says quite clearly that shortages and deficiencies can be

10   recovered in no more than 12 months, which authorizes a

11   recovery in less than 12 months.  It just says it's not going

12   to be more.

13         But, ladies and gentlemen, even if you conclude

14   otherwise, the cause is that Mr. McGinnis didn't want to pay

15   more than 605.58.  And even when it changed from that 800

16   number he still wouldn't pay.  When it went to the number he

17   had calculated he still wouldn't pay it.

18         The next count, ladies and gentlemen, is count 4,

19   tortious interference with property rights.  We expect the

20   Judge will charge you that the elements are that the Defendant

21   knowingly interfered with Plaintiff's use and enjoyment of her

22   property.  The Defendant did not have the authority to

23   interfere with the Plaintiff's use and enjoyment of her

24   property.  And that the interference with the use and

25   enjoyment caused the Plaintiff damages.

1              Like the wrongful foreclosure claim, the intentional

2      interference claim is based on the foreclosure.  And again as

3      we have discussed now at some length, the foreclosure was

4      authorized.  It was consistent with the documents.  It was

5      caused by her 16-month refusal to pay any amount other than

6      605.58, breached the contract and the failure in February 2011

7      to pay anything.  So we think you should find for the

8      Defendant on tortious interference.

9              The third claim is for intentional infliction of

10     emotional distress.  We expect that the Judge is going to

11     charge that the elements of that claim are first the

12     Defendant's conduct was intentional or reckless.  Second, that

13     the Defendant's conduct was extreme and outrageous.  And

14     third, the Defendant's conduct caused the Plaintiff to suffer

15     severe emotional distress.  We don't think the Plaintiff has

16     proved any of the three elements of this claim, ladies and

17     gentlemen.

18             First with respect to intentional or reckless

19     conduct.  There certainly isn't any evidence at all that AMHSI

20     has decided that they were going to foreclose and cause Ms.

21     McGinnis this emotional distress.  In fact, the evidence is

22     the contrary.  They waited 16 months  The tried it for a long

23     time.  They gave her many opportunities to avoid it and she

24     wouldn't do it.

25             And they haven't come to collect the deficiency.

They could still sue her on the note for the difference between what the house was sold for and what was owed, about $45,000.  They haven't sued her for that.  Somebody that wanted to go out and hurt somebody would sue them for that money and they haven't done it.  Ms. McGinnis acknowledged that.

As for recklessness, they didn't have any direct contact with Ms. McGinnis.  All the phone calls, all the letters, they went to Mr. McGinnis.  So there is no way in the world that they could have evaluated Mrs. McGinnis's emotional state.  How could they possibly know that they were causing her this kind of distress?

Obviously, being in financial trouble, anybody that's had the experience, knows that causes you distress.  But the stress beyond that which you would expect ordinarily they had no way to know that.  So they couldn't have acted recklessly, ladies and gentlemen.

There's also no evidence that they acted in a way that is beyond all possible bounds of decency.  And that is the second element.  Remember they didn't call Ms. McGinnis directly.  They didn't call -- they called Mr. McGinnis.  They didn't send her letters directly.  They sent those letters to Mr. McGinnis.

When Mr. McGinnis asked them in April -- or in May 19th to research the issue they researched it and responded

1    June 30.  When he asked Ms. Louise in August to research the

2    issue she researched it and called him, what, 15, 16 times.

3    How many times did he acknowledge that she called him.  They

4    eventually sent him a letter saying, hey, I can't reach you,

5    you're not calling me back.  I'm going to close my file.

6        Is that beyond all possible bounds of acceptable

7    conduct in this society?  They sent him letters.  Please pay

8    us.  You are late.  Please pay us.  So they called him, at

9    least pay us.

10       There is a lot of paper involved and a lot of calls.

11   He had seven different loans.  So you get a call every day and

12   you get, you know, a letter once a week, that's a lot of

13   paper.  That's a lot of calls.  But that's because there were

14   seven loans, not because they were trying to punish him.

15       So, ladies and gentlemen, that's not beyond all

16   possible bounds of decency.  That's what servicers do.  We pay

17   people for that.  Not only do we not tell them they can't do

18   it, we pay them to do it.  So the second element hasn't been

19   proved.

20       Finally, there's no evidence that Ms. McGinnis is

21   experiencing emotional distress so severe that no reasonable

22   person could be expected to endure it.

23       Now I'm not saying that she's not experiencing

24   distress.  Clearly she is.  I'm not saying that you wouldn't

25   expect somebody to experience distress.  You would.  It's an

1 investment property, but it's a loss.

2   But there isn't any evidence that the distress that

3 she is experiencing is beyond anything that could reasonably

4 be tolerated by a person in this society.  The house was an

5 investment property.  She never lived there.  Nobody in her

6 family ever lived there.  There wasn't any special emotional

7 attachment to it.  It was something she got in an obviously

8 very bitter divorce.

9   Ms. McGinnis hadn't lived in Monticello for more

10 than five years before the foreclosure.  And as the notes from

11 the psychiatrist said, even after the foreclosure she went

12 back to Monticello and had a good time.

13   So it wasn't like she couldn't show her face in the

14 city.  It wasn't like she couldn't have fun in that town.  She

15 still had been going back.  That's what the note shows.

16   She admitted to Dr. Sappington that she would be

17 financially secure even after the foreclosure.  Remember that?

18   So she saw the therapist.  She saw Dr. Sappington.

19 There's no denying that.  And Dr. Sappington diagnosed her as

20 being depressed.

21   We went through all the elements of that diagnosis

22 and there were seven of them.  And what we found is that four

23 of the seven elements weren't there.  He had to be able to say

24 if this was a manic episode.  He admitted he never asked her

25 if it was a manic episode.

1          And then he said five of the things on this list

2     have to be true, have to have been true all at the same time

3     and all for the two weeks prior to the diagnosis.  And we went

4     through that and he admitted that none of them were in the

5     notes, but he said he remembered some of them.  At most he

6     remembered four were true.  So he didn't have five of the

7     seven.

8          Then the element was that she has to be totally

9     socially impaired or job impaired.  Ladies and gentlemen, the

10    notes show that she moved to a new city.  Made friends.

11    Dated.  Took classes.  Exercised.  Went on a cruise.  Went to

12    visit her friends in Monticello.  Had visitors all the time as

13    you will when you live in a beach town.  And had three jobs.

14    She wasn't impaired.  Didn't meet that requirement.

15         And last it shows there was no physical cause for

16    it.  Remember he admitted, oh yeah, well, she was diagnosed

17    with thyroid problems but she took medication and that helped

18    with some of the symptoms of that depression.

19         His diagnoses isn't proper.  Even if it were proper

20    you have to have listened very carefully to what he said about

21    what the cause was.  When asked about the cause his response

22    was -- I wrote this down -- "Causes are complex".  And then he

23    went on to say the lawsuit was caused, but other factors come

24    into play.

25         And then later at the most you can say is I don't

1    think I would have seen her but for the lawsuit.  The lawsuit

2    Ms. McGinnis filed by the way.

3         And he recited that bit about Humpty Dumpty falling

4    and, you know, the shell wouldn't have broken if he hadn't

5    fallen.

6         So the point, ladies and gentlemen, and then he and

7    I went through this, is she had a lot of sources of stress in

8    her life.  Over time there's not really any question what the

9    biggest source of Ms. McGinnis's emotional state is.  It's the

10   divorce.

11        Dr. Sappington talked about it when we looked at the

12   first note that he wrote.  He said financially she -- it

13   wasn't only this foreclosure, it was the foreclosure in the

14   condo association reactivated those divorce issues.

15        And then over time her daughter is bringing up

16   problems with the divorce.  The guy teaching her computer

17   class is bringing up problems with the divorce.  She's

18   bringing up problems with the divorce.

19        She went back to Monticello, she sees her ex-husband

20   and his ex-wife, seems to have tolerated that pretty well.

21   The divorce, the divorce, the divorce.  She had been in

22   therapy before.  She was in therapy before, after the divorce.

23        Both of her children, when they talk about why they

24   convinced her to move to St. Augustine talk about well, after

25   the divorce we wanted her to get out of town.  Her entire

1    life, since 2005, has been about the divorce.

2           And I'm not saying the lawsuit didn't help to bring

3    some of that up.  This is the property that she got in the

4    divorce.  So I expect it did.  But the real cause of her

5    emotional state, ladies and gentlemen, is evident from the

6    record, it's the divorce.

7           I think in the end what the evidence shows about Ms.

8    McGinnis is that she's like all of us.  She's got a lot of

9    sources of stress in her life, financial problems, job

10   problems, family problems, my brother died, my daughter has

11   cancer, I've got a divorce, this financial trouble over here

12   going on.  But she keeps on.

13          She sees people.  She goes on cruises.  She visits

14   Monticello.  She has people visit her probably from

15   Monticello.  She does what she needs to do.  She has got

16   problems and she's just keeping on.

17          And that's what normal people do in this society.

18   And I think the evidence shows that Ms. McGinnis is a normal

19   person who has reacted normally to a stressor which means that

20   she can't prove the third element of the intentional

21   infliction of emotional distress, which is that she's

22   experiencing emotional stress so severe that no person could

23   possibly be asked to endure it.

24          The fourth claim is conversion, ladies and

25   gentlemen, and it has nothing to do, we expect you'll hear

1   from the Judge, with the foreclosure.  Because you can't have

2   conversion of real property.  So it's related entirely to the

3   fees and to the suspensing.

4          And what it basically is is I took your money or you

5   gave me money that you have a right for me to do one thing

6   with and I didn't do that.

7          And in this case the suspensing was authorized.  So

8   we didn't do anything we weren't authorized to do.  And as Mr.

9   Berry admitted over time all the funds that went into suspense

10  came out and were applied to principle, interest or escrow.

11  So there wasn't any money taken from her by the suspensing.

12         With respect to the fees, the same thing I said

13  earlier.  There's no proof that any fees net were actually

14  recovered.  Some went in, some went out, some were written

15  off.  As Mr. Delbene said they zeroed out.

16         The other fees, those are just a loss for AHMSI.  We

17  advanced those fees and they're gone.

18         So, ladies and gentlemen, there's nothing to support

19  the claim for conversion.

20         A word about damages.  Ladies and gentlemen, the

21  evidence does not prove any financial loss on the part of Ms.

22  McGinnis.  You have to be able to quantify those losses.  So

23  even if you think there might be some, ask yourself right now

24  in your mind how much is it?  You don't have any idea.

25         There isn't any loss that's been proved and there

1    certainly isn't any evidence of how much that loss would be.

2           So she has no financial damages, ladies and

3    gentlemen, which means she's trying entirely to recover

4    emotional damages.

5           We expect the Judge will shortly charge you that in

6    order to recover emotional damages you have to prove the same

7    things that you have to prove when you recover for intentional

8    infliction of emotional distress.

9           And as we just discussed she can't prove those

10   things.  They didn't act intentionally or recklessly.  They

11   didn't act in a way that's outside all the bounds of decency

12   in our society.  And they didn't inflict emotional distress so

13   severe that no reasonable person could be asked to endure it.

14          So she can't recover emotional damages.  They

15   haven't proved any damages in the case, ladies and gentlemen.

16          So even if you were to find, and we don't think you

17   should, but if you should find for AHMSI on all the claims,

18   but even if you were to find for them on a claim there's no

19   damages.  Zero.  They haven't proved them.

20          So, ladies and gentlemen, we think we should win on

21   the compensatory damages claims for the reasons that there's

22   no evidence that we breached any of our duties to her.  All of

23   our actions were consistent with the contract.  Her default is

24   the author of these misfortunes and we think there's no

25   evidence of any damages.

1    She's asking for two other kinds of damages, ladies

2    and gentlemen.  She's asking for punitive damages and she's

3    asking for attorneys' fees.

4    And the first thing about that is, and we expect the

5    Judge will tell you this, you can only get attorneys' fees or

6    punitive damages if you get compensatory damages on your other

7    claims.

8    So if you agree with me either that she hasn't

9    proved liability, in other words we haven't done anything

10   wrong and her default is the problem, or if you agree with me

11   they haven't proved any damages so it's zero, then she can't

12   get attorneys' fees or punitive damages and you're done

13   thinking about it.  You can't award them.

14   If you do, however, reach punitive damages we don't

15   think she's given you any proof that they should be awarded.

16   We expect the Judge will tell you they will have to show that

17   AHMSI's actions showed willfulness, conduct and malice, fraud,

18   wantonness, oppression, or that entire want of care that would

19   raise the presumption of conscious indifference to the

20   consequences.

21   We also expect they'll say near negligence, even

22   gross negligence can't support an award of punitive damages.

23   Ladies and gentlemen, there is just no evidence of

24   any activity like that.  Again she went into default.  We sent

25   her notice.  We gave her 16 months to get out of it.  Repeated

1   opportunities to get out of it.  She wouldn't do it.  She

2   wouldn't pay any amount we asked her to pay.  Not the 800

3   figure, not the 638.32.  She only paid what she wanted to pay

4   and she didn't pay anything at all and then they decided to

5   foreclose.

6         Even after that they offered a chance to get out of

7   it.  She wouldn't take that chance either.

8         So, ladies and gentlemen, there is simply no proof

9   the kind of conduct that would support an award for punitive

10  damages.

11        With respect to attorneys' fees, Ms. McGinnis has to

12  show that AHMSI/Homeward acted in bad faith in the events

13  underlying the case.  It's just what we talked about, ladies

14  and gentlemen.  There was a legitimate dispute at best here.

15        She didn't pay for 60 months, she said she didn't

16  owe that money.  She said she wouldn't pay anymore.  There's

17  no evidence that they acted in bad faith.  We believe the

18  foreclosure was authorized and there's no evidence that that

19  is not the case.

20        So, again, ladies and gentlemen, there's nothing to

21  support an award for attorneys' fees.

22        I tried to think about what I was going to say to

23  sum it up and I think I probably ought to put the evidence

24  about the foreclosure as simply as I know how to put it.  She

25  promised to pay the full amount due on the first of every

1    month.  She knew the payment was going to change in the fall

2    of 2009.  It had changed every year in the fall when Taylor,

3    Bean and Whitaker had it and it was going to change again.  He

4    himself wrote that that Taylor, Bean and Whitaker figure was

5    only good until September 2009.  They knew it was going to

6    change.

7         It changed.  They knew what it changed to before

8    they ever made their first payment.  We told them what they

9    were expected to pay.  They didn't pay it.  It changed again

10   in April of 2010.

11        We didn't foreclose because they didn't want to pay

12   the 800 figure.  We changed it again.  We went to 638.32

13   consistent, as we showed, with his calculations, what he said

14   he ought to be paying.  We did that.  He didn't pay that

15   either.

16        We changed it in April and he went seven more months

17   without ever paying what even he acknowledged was the

18   reasonable amount to be paid.

19        We gave them opportunity after opportunity after

20   opportunity to get out of default and to avoid foreclosure.

21   In August he had an opportunity to pay $1,483.31 to get out of

22   default.  He said he owed $1,291, $192 difference.  He

23   admitted that they were late.  He admitted they were behind.

24   He admitted they needed to pay more.  Here's how much he

25   calculated because he didn't want to pay the 843.  Right, so

1    it was 1,291.  He didn't pay that.  He didn't pay the 1,483.

2    He didn't pay the 1,291.

3         I ask you again, ladies and gentlemen, if he paid

4    the 1,291 that he said he was behind do you think they would

5    have foreclosed over $190?  Do you think they would have

6    written off $45,000 if he came to them even that much?  But

7    no, he didn't.  He knew he was late and he didn't make the

8    payment.

9         He did not ever make the payment that was owed

10   before the time that it was too late, 16 months.  At the end

11   of that he made no payment at all.  They wouldn't work with

12   us.  They were in default.  They weren't making any effort to

13   cure the default.  There was no indication that they were

14   going to stop being in default no matter what we did.

15        They foreclosed because they had to foreclose.  They

16   foreclosed because the contract authorized the foreclosure.

17   And it was Ms. McGinnis who broke her promise to make the

18   payments.  It wasn't AHMSI that broke any promises.

19        We will ask you, please, to find for AHMSI in your

20   deliberations.  Thank you very much.

21        THE COURT:    Ladies and gentlemen, I'm going to let

22   you go back.  You're going to have another one hour of

23   argument and then I'm going to charge you.  The charge will

24   probably take 20 minutes.  So I don't think y'all can make it

25   that long.  I'm going to run you back there and give you about

1      15 minutes and come back and then we'll have Mr. Gower's

2      argument and then I'll charge you and then you can go back and

3      begin your deliberates.  All right.  Thank you.

4      (JURORS EXIT COURTROOM)

5              THE COURT:    Mr. Gower, you ready to go?

6              MR. GOWER:    Soon as I go to the bathroom.

7              THE COURT:    You have 15 minutes to go to the

8      bathroom.

9              MR. GOWER:    Yes, sir.  I will be ready.

10     (RECESS)

11     (JURORS ENTER COURTROOM)

12             MR. ROGERS:   Your Honor, can we take up one

13     housekeeping matter?

14             THE COURT:    Yes.

15             MR. ROGERS:   My understanding is that in order to

16     preserve objections for appeal, in the event that that should

17     become pertinent, that they need to be made before the jury is

18     charged.  I know you intend to charge the jury as soon as Mr.

19     Gower is complete.  Can we -- because they were on the record,

20     because we have been taking down -- I think I've said

21     everything I have to say about the charges already.  Do you

22     want another formal statement or will that suffice?

23             THE COURT:    I'm not technical about that.  I think

24     you have perfected the record as far as I'm concerned.  You

25     don't have to say anymore.  If you want to add some more then

```
 1   you'll add some more after I charge the jury.
 2              MR. ROGERS:   Okay.  Can I make a respectful request
 3   that you tell me not to rise to ask to say more before you
 4   charge the jury, Your Honor.
 5              THE COURT:    What do you want to say?
 6              MR. ROGERS:   I don't want to say anything I haven't
 7   already said.  I just want to make sure I'm not going to get
 8   in trouble.  And with you saying on the record now that you
 9   can say more later, because I don't think later helps me.  I
10   don't have anymore to say.
11              THE COURT:    Yes.
12              MR. ROGERS:   If you'll say that I've said --
13              THE COURT:    You know, I've listened to everything
14   you've said and, of course, you've understood the problems
15   that we've had trying to go through this swamp of law and
16   facts in the case.  And as I told you when I came back what
17   I'm going to charge is what I'm going to charge so there's
18   nothing more for you to say about it.
19              MR. ROGERS:   Okay, good.  With that understanding,
20   Your Honor, I think we're covered on appeal.
21              THE COURT:    All right.
22              MR. ROGERS:   Thank you.
23              THE COURT:    Ready Mr. Gower?
24              MR. GOWER:    Yes, sir.
25              THE COURT:    Bring them in, please.
```

1    (JURORS ENTER COURTROOM)

2         THE COURT:    All right, ladies and gentlemen, it's

3    Mr. Gower's turn.

4         MR. GOWER:    I'm going to try to appeal to your

5    common sense.

6         THE COURT:    Make sure you appeal in the

7    microphone.  We've go to hear you up here, okay.

8         MR. GOWER:    I'm not going to tell you what my wife

9    says about that.  Common sense, I'm talking about.

10        Seriously, I'm not going to give you the lawyer talk

11   because the only people you heard from on the other side is

12   lawyers.  Mr. Delbene, the fellow who testified on video, is a

13   lawyer.  He reviewed this file for about ten days, six days

14   and testified.  He's a lawyer.

15        The only other people you've heard from are these

16   two lawyers.  No other witnesses.

17        More importantly, where is a representative from the

18   Defendant, Homeward?  Do you see anybody sitting here?  The

19   gentleman over there is a paralegal.

20        What does that tell you?  This ain't an important

21   case to them.  Not at all.

22        What I want to discuss with you and I'm going to say

23   one thing is, the only thing standing between abusive

24   corporate power and an individual is the jury.  That is it.

25        Now, I have lived with this case since July of 2011.

1    That's when we filed this lawsuit.  These folks, Jane, did not

2    want to be here.  This is not a case where she sought to get a

3    lot of money.  She didn't want to be here.  Even after we

4    filed the lawsuit they continued.

5          Let me go back to what Mr. Rogers says.  He says,

6    well, you could have paid the $1,200 or $1,400 whatever and

7    everything would have been fine.  Well, that's lawyer talk.

8          The facts are when you look at the billing

9    statement, which they never received, this is on one loan, the

10   billing statement, P2, P2-1.  These are exhibits that you'll

11   take out with you and I ask you to look at them.  Because they

12   start with November and they go through the very last one.

13   Every single one of them says a past due amount.

14          So if they paid that $1,400 or whatever it was they

15   were talking about, that would have brought them current to a

16   previous month.  Then you would still owe the past due.

17          We're talking about these -- there were seven loans.

18   What we've been talking about throughout this trial is one.

19   Because all the others were repeated the same except for one

20   loan.  One they didn't screw up, the rest of them they did.

21          So when you're talking about arrearages, you're

22   talking about what may sound like a little bit of money, $800.

23   It may sound like a little bit but when you think about all

24   the other loans, the total, it's a lot.

25          So just use your common sense.  When they finally

1    reduced the payment down to $638.32 that was a reasonable

2    amount.  That was a reasonable amount to pay.

3           Yes.  I agree it was.  But in order for them to pay

4    that and you've got to pay the arrearages which are on here.

5    And there are arrearages here, plus fees, plus there are other

6    fees that are on another document that you will have out with

7    you, Plaintiff's Exhibit, I think it was, 6.  Yes.  It's the

8    loan history.  This document right here that shows -- this is

9    what I have to pay a CPA $25,000 to figure this out on this

10   and all the other loans.

11          I'm a CPA.  I cannot figure this out.  I spent over

12   a month.  I even went out of town for a week in trying to

13   figure this out.  Took all this stuff with me and I couldn't

14   figure it out.  That's why I hired somebody and he figured out

15   most of it.  And what he came up with, out of this document

16   right here, not the monthly statements but this document is

17   that fees right here on Hilton Street, which that total -- I

18   can't read it upside down -- but these are the fees on Hilton

19   Street.

20          And what we are here about -- Adam is not stupid and

21   Jane is not stupid.  They would have paid the monthly amount

22   happily.  They didn't want to be here.

23          What we've got -- this thing all started on day one,

24   on October 27, '09 they sent that hello/goodbye letter.  The

25   reason they call it that is because the old servicer is gone

1    and the new one is in.

2         They had a payment coupon down at the bottom, 843.58

3    due November 1, '09.  Now, all right, they didn't pay it.  Why

4    didn't they pay it?  Because of this.  This was their old

5    payment, 605.58.  This is principal and interest.  So this is

6    the amount of escrow that they had been paying to Taylor, Bean

7    and Whitaker, which was not enough to cover it.  It was a

8    shortage, we agree.  Yes, it was.

9         But as the Judge will tell you, when we finish here,

10   they have a right to increase the payment, no question about

11   it.  If there's a shortage they've got a right to increase it.

12   But to do that you've got to prepare an analysis and show it

13   to them.

14        And when there is a shortage, as the Judge will tell

15   us, you can do two things.  You can either leave it like it is

16   or you can collect it over 12 months.  You can't just bam, pay

17   it.  You collect it over 12 months.  That's what the Judge is

18   going to tell us.  And that's what they themselves said in the

19   escrow statement.  Any shortage is collected over a 12-month

20   period.  That's the way everybody's loans work.  That's the

21   way mine always worked.  If there's a shortage pay it over

22   12 months.

23        But what they did is -- remember Mr. Delbene, I said

24   where is the analysis?  There ain't one.  Couldn't find one.

25        So here's what it is.  The escrow increased from 105

1    to 343.45.  Now, that may not seem like a lot of money to some

2    of you.  It's a difference of $238.  The same thing happened

3    on the other loans all except for one.

4            So you take 105.45, this is the easy way I do it,

5    times three, that means it's over 300 percent increase right

6    there.  Bam.

7            From October 30th to November 1.  They questioned

8    it.  Who wouldn't in their right mind.

9            They say -- when you call you don't get somebody

10   that knows what they are doing.  Just being straight up right.

11   When you call you get -- you know, you dial, what's your

12   number.  And as Mr. Rogers said, they give you minimiranda

13   warnings.  You know, anything you can -- you know, we're debt

14   collectors.  You know, anything you say we're going to use

15   against you.

16           When you finally get somebody and they look up on

17   the computer and they say, well, you're behind.  Well, how did

18   you come up with this?  Don't know.  You just got to pay it.

19           Well, suppose they had made this $5,000 instead of

20   238.  Suppose it had been 5,000.  You got to pay it.  If you

21   don't pay it you're in default.

22           Then they say, well, we'll give it back to you

23   later.  You just don't have this kind of money.

24           They legitimately questioned it.  So here's what --

25   the Judge said you got to -- if there's a shortage notify them

1    over 12 months and collect it.

2            They gave no analysis, no question about that.

3            And also, the Judge had said it's got to be

4    reasonable.  That makes sense.  And it's not hard to carry

5    that escrow, taxes and insurance and divide it by 12, that's

6    your amount.

7            So I wanted to dispel right off the bat, the notion

8    that he could have paid a little amount and he had to pay the

9    arrearages.  So in addition to this screw up, excuse my

10   language, they also said in addition that you're having to pay

11   the new amount of 843.58, you're also behind one month on not

12   only this loan but all your others.  All of your others.

13           Now, Mr. Delbene -- now he's a lawyer, he'll say one

14   thing and then say another.  But what I've got, this is the

15   typed up version of what you heard on the video.  I'm going to

16   read the question and answer.  And what I'm going to ask about

17   is this monthly mortgage statement, this right here.  This is

18   what I questioned him about right here.

19           This is what I'm asking him about on his deposition.

20   I said, all right, sir, while we are on that subject would you

21   look at P2-1.  That is this.  And that's what I showed you

22   while ago in this booklet, P2-1.  How about you look at that,

23   P2-1.  With all the ones that are behind.  This is what I

24   questioned him about.

25           All right, sir, "Will you agree that this billing

1    statement tells Jane that as of November 1, '09 she is behind

2    843.58?"  Repeat that question.  This is what I'm saying.

3    "Would you agree that this billing statement tells Jane that

4    as of November 1, '09 -- not November 3, as Mr. Rogers said,

5    lawyer talk -- is she behind 843.58?"  The answer, "Yes."

6         Does that make sense?  Well, payment due date

7    November 1, '09.  The past due payment 843.58.

8         And then I go, "And her payment due on November 1,

9    '09 is 843.58?"  That is my question.  Answer, he says, "This

10   states her payment due for 11-1-09, the current payment is

11   843.58."  But the total payment is not for that amount.

12        So I asked a question.  I said, "The total amount

13   due as of November 1, '09 is $1,711.67?"  That's what the

14   statement is saying.

15        So as of November 1, '09 is the 1,711.67 due?  The

16   past due payment plus the accelerated new payment.  So they

17   wanted $1,700.  Not as of November 3rd, but as of November 1.

18        We hired a CPA.  The same thing happened on all the

19   other loans but one.  That's where the problem started.

20        Now, anybody could make a mistake.  This company

21   could make a mistake.  Anybody can make a mistake.  It's

22   understandable.

23        But when you are told about it over and over and

24   over.  When you are sent faxes.  When you are sent a fax with

25   bank statements this thick with canceled checks this thick.

1    When you're talking on the phone constantly with these people.

2    It becomes where it's no longer a mistake.  You know, at some

3    point it becomes intentional.

4          Why?  Why?  Because if you will put up -- this is

5    not a momma and a poppa organization.  This is not an

6    unsophisticated servicer that we're dealing with.

7          This is Plaintiff's Exhibit 46 which is in evidence.

8    And if you look down at the bottom it says AHMSI is the 13th

9    largest mortgage servicer in the country -- not a momma and a

10   poppa -- managing nearly 71 billion in loan servicing.

11   Representing approximately 374,000 customers.

12         So this, when you think about it, if you up

13   somebody's payment arbitrarily, however, and if -- most people

14   are going to pay it.  Because they don't want to lose their

15   home.  So they're playing the odds.  If you don't pay it we're

16   going to take your two payments and put them in a bucket.

17   Your 605.58 and your 605.58 and then we're going to take a fee

18   out and then we're going to apply it to your payments.  So two

19   more payments, take a fee out.  When you do that times all

20   those customers or some small percentage of those customers

21   then it amounts to a substantial amount of money.

22         And then when you finally get down to the -- like in

23   March of '11 they told Adam, well, now you are five payments

24   behind, Adam, March 11th.  It's going to cost you $6,000 to

25   catch it up.

1        That's where, as Mr. Delbene says, they collect the

2   fees.  Most people are going to pay it, but they didn't.

3   Maybe they should have.  Maybe they should have.

4        But they stood up.  We ain't going to pay what we

5   don't owe.  And what happened?  They lost the home.

6        Well, you would think that would be enough.  You

7   think -- then we file a lawsuit in July of '11.  Wouldn't you

8   think by then they would know, look, we've been sued in

9   Federal Court in Macon, Georgia.

10       The same thing continues.  The same thing on the

11  other loans.  The exact same thing.

12       You heard Tom Berry, the CPA, we paid $25,000, and

13  it continues.

14       And then they transfer the loans.  So we go all of

15  '11.  All of 2012 through March or April of this year, when

16  the loan is transferred over to Ocwen.  Homeward sells out to

17  a bigger company, Ocwen.  And then Ocwen starts it.

18       And then what's it do then?  You have seen it.  They

19  start sending the checks back.  The same thing.  Same thing.

20       And they are basing it on what Homeward did, on the

21  Homeward's records.  Same thing.  Sending the checks back.

22  Threatening foreclosure.  There's one in April and here's one

23  in May.

24       So what do you do?  Well, you can, I guess go borrow

25  the money somewhere else and pay it and suck it up.  But is

1    that right?

2          So what did they do?  You heard the phone calls as

3    of May of this year where Adam is calling.

4          And you will see when you go out, it's Exhibit 47.

5    47 -- what we did is we had a court reporter type up these

6    phone calls.  You only heard two on the recording.  But we had

7    them typed up.  They are there for you to read, if you want to

8    read them.  And these are not all of them.  These just happen

9    to be the ones that Adam recorded.  Because we wanted proof of

10   what's happening today.  They are still doing the same thing.

11         So, it ain't a mistake.  It could have been at one

12   point.  You could have logically said it was a mistake.  But

13   it becomes more than a mistake.

14         And what Homeward figures is, well, this is a jury

15   in Macon, Georgia.  We can go down there and we don't even

16   have to send a representative.  We can send some lawyers.

17         Would you mind putting up P26.

18         If you look at the top, Thompson Hine.  That's the

19   name of the law firm in Atlanta, Cincinnati.  Look at the top,

20   Cleveland, Dayton, New York, Washington, wherever.  Come all

21   the way down here to Macon, Georgia.  We can -- well, I think

22   you get the point.

23         Y'all will just have to excuse me.  I got to where I

24   make notes.  And then I screw it up even with that.

25         Well, let's just talk about the witnesses we

1    brought.  We went to Atlanta, Georgia to take the deposition

2    of Mr. Delbene, the lawyer who they said is the person most

3    knowledgeable about this account, we just recently reviewed.

4    That's all he does is just goes around the country testifying.

5         We pay a CPA.  And you've heard what we paid him.

6    Plus we had to pay him to come to court.  We haven't even paid

7    him for that yet.  You heard what he said.  Do you think he

8    lied to you?  If you do, disregard his testimony.

9         He says that right off the bat all the loans were

10   treated as one month behind.  They raised the rate, they

11   charged the fees.

12        Did they hire a CPA to rebut him?  They can more

13   well afford one than we can.  I promise you that.

14        Did they have anyone here from Homeward testify to

15   refute it?

16        Did they hire a psychologist to testify to what Dr.

17   Sappington her psychologist who is a Professor at Alabama for

18   25 years?  No.

19        What it really boils down to is Jane didn't buckle

20   up.  She didn't bow under and say, yes, sir.

21        Y'all probably -- there's one gentleman here that is

22   old enough.  The rest of you likely are not old enough,

23   probably never heard of Tennessee Ernie Ford.  But he was a

24   folk singer or whatever.  I used to listen to him all the

25   time.  He'd say, "a day older and a dollar deeper in debt.  I

 1    owe my soul to the company store."

 2         Well, also something in Proverbs that says, "A

 3    borrower is servant to the lender."  That is so much true

 4    here. But they didn't -- kind of like the recent movie, they

 5    didn't buckle under.  They stood their ground.  And they're

 6    paying the consequences.

 7         They didn't just pay it because they said pay it.

 8         This case is bigger than Jane.  This is an important

 9    case to Jane.  But it's bigger than Jane.  Because you've seen

10    the size of this company.

11         And you know they say a jury is the lightening rod

12    of the conscious of the community and you set the standard.

13         And when we get around it, in just a few minutes

14    talking about what is appropriate in the way of compensation,

15    the standard that you go by is your enlightened conscience.

16         Now what the heck does that mean?  It's unlike

17    workers' compensation, which I think is worse than all there

18    ever was.  If you cut off somebody's hand you look up in a

19    book and say, well, you get so many weeks.  Thank you.  Bye.

20         But here the standard is your enlightened

21    conscience.  It's what your gut tells you is right.  That's

22    all it is.

23         I asked Mr. Delbene did y'all treat Jane fairly?

24    Yes, sir.  Would you do it again? Yes, sir.

25         Well, they will do it again.  They have done it

1     again.  They continued from July of '11 through today.  When

2     we leave this courtroom Jane is facing Ocwen, the new

3     processor, same problems.

4           You know, Abe Lincoln said -- and I know I'm going

5     to screw this one up.  "That you can fool some of the people

6     some of the time and you can fool all of the people" -- I've

7     already screwed it up.  I'm not trying to fool you.

8           One thing, I forgot to tell you this.  It's like Mr.

9     Rogers said, you know, he's a seasoned lawyer and it's the

10    typical not my dog defense that he's offering.

11          You know, you're walking down the street and the dog

12    comes up and bites you and you tell the fellow who owns the

13    house that your dog bit me.  Well, it ain't my dog.  Well, it

14    hangs around your house all the time.  I see your neighbors

15    say -- Well, if it is my dog he didn't bite you.  Well, we got

16    three witnesses say he bit me.  Well, it was my dog and he

17    didn't bite you and he didn't hurt you.  Well, I got all these

18    stitches, you know.  What Mr. Rogers said, well, what we did

19    was right but if you don't buy that she ain't hurt.  It's the

20    typical ain't-my-dog defense.

21          Now, let me ask you, really what it boils down to

22    should a person in America have to hire a lawyer to protect

23    them from their home mortgage company when they're trying to

24    do the right thing?  You can say so by your verdict.  You can

25    tell them.

1          Now, I want to discuss with you the burden of proof.

2     The Plaintiff, that's us, we have the burden of proof.  There

3     are two things you've got to think about --

4          THE COURT:    Move back over by the microphone.

5          MR. GOWER:    Yes, sir.  The burden of proof.  The

6     Judge is going to tell us that the burden of proof is on the

7     Plaintiff, which is to prove by what's called a preponderance

8     of the evidence, which means what's more likely true than not

9     true.

10         If you look at it like scales, we've got to tilt it

11    ever so slightly, 51 percent.  We get a touchdown if we go

12    51 yards.

13         In a criminal case you got to go 99 percent, beyond

14    a reasonable doubt.

15         Here we've just got to prove what's more likely true

16    than not true.

17         So, if you think that what we have presented -- if

18    you believe that what we say is more likely true than not true

19    then we've carried our burden.

20         So then you must decide whether the assertions of

21    wrongful foreclosure, conversion -- and the conversion is

22    where they took the money out of the account and misapplied

23    the payments.  Whether they interfered with her property

24    rights, which they took the house.  You've seen the picture.

25    You see how it looked as of last week.  Imagine what that does

1    to a little town like Monticello.  How it makes Jane feel as

2    the house that she and her husband built --

3        Here is what I want to get at.  On the burden of

4    proof, the Judge is going to charge you there are four things,

5    there's wrongful foreclosure, conversion, interference with

6    property rights and intentional infliction of emotional

7    distress.

8        What you're going to have, you're going to have a

9    verdict form.  When you go out there is a verdict form.  And

10   it will ask questions.  It says, we the jury, find in favor of

11   the Defendant and against the Plaintiff on the Plaintiff's

12   claims.  That's number one.  If you want us to lose you put in

13   there, "yes", and you quit your deliberations and you go home.

14   If you think we should lose you should answer that, "yes".

15   You don't have to read any further.

16       If you think we should win you go answer the next

17   question.  And it asks you as to each of the claims we

18   brought, wrongful foreclosure, conversion, interference with

19   property rights and intentional infliction of emotional

20   distress.        What I request that you do, if you find that

21   we should win, is to answer them all yes.  It is an important

22   legal reason why all of them have to be answered yes.

23       And then it says, "We, the jury, award damages in

24   the following amounts."  And it says, "emotional distress

25   damages" and it has a blank.  And then it says, "other

1    compensatory or actual damages."  Well, this is important, is

2    the number for emotional distress damages is the one that is

3    important.  What you put in on compensatory or actual damages

4    is really -- we don't care.  We do care, but put something on

5    there, $500.

6         But the big one is emotional distress damages

7    because in this case this is important.

8         Now, how do you determine that?  How do you

9    determine it?  Like I said, it's not like workers' comp.  You

10   look at a book, so many weeks.  As I mentioned earlier, it's

11   your enlightened conscience, what your gut tells you.

12        Jane -- and the Judge is going to tell you you

13   cannot award damages for Adam, her son, because he is not the

14   Plaintiff.  He is not the one bringing the lawsuit.  But you

15   can consider how Jane has been hurt worrying about her son and

16   how he is doing and what he is facing.

17        Your emotional distress damages is -- I don't know

18   how to explain it.  The Judge is going to talk about it,

19   grief, humiliation, embarrassment, worry.  You can decide

20   that.

21        And I'm trying to figure out what is a reasonable

22   way to look at it.  Some kind of tool that I can offer to

23   view.

24        As Jane said she would like an ad in the paper in

25   the Monticello paper to clear her name.

1          I did this on 8-20, but today is 8-21.  Well, in

2     this time, because this is where it started, that's when

3     Homeward took over.  This is where we are today.

4          THE COURT:    Mr. Gower, you turned away from us and

5     we're really having trouble hearing you.

6          MR. GOWER:    Yes, sir.  I'm sorry.  But that's

7     where we are today is 1,370 days.  So I'm going to put

8     1,370 days.    That's how many it is.  It's actually more than

9     that but that's what I computed out.  At 24 hours a day that's

10    32,880 hours through today that Jane has dealt with these

11    folks.

12          Now, what would be a fair compensation?  There's no

13    doubt that this number is correct.  There's no doubt about

14    that.  It's actually more than that.  But this is what she and

15    her husband worked for all their life that's being slowly

16    taken away because they stood up.

17          Well, when you think about it -- and I gave this a

18    lot of thought -- what would be a fair hourly rate to suggest?

19    And the thought came -- the answer came to me.  Lawyers, their

20    only defense is lawyers.  The only representative is Mr.

21    Delbene, lawyers.  That's the only people you've heard from.

22          Can you look at the consolidated notes log.  Can you

23    put that up there.  And I think it's P10.

24          Can you flip through the pages where it has the part

25    where it's redacted.  Right there.  What we've got, when you

1    go out, you will take with you Plaintiff's Exhibit 10.  If you

2    would please look at it.  Try to remember that one, please,

3    Plaintiff's Exhibit 10.  Because what this is is this is a

4    log, it's a listing, of all the conversations and so forth

5    that's supposed to have happened on this Hilton Street loan

6    that we subpoenaed from them and they produced it, except for

7    what they redacted.  In other words, this is a whole page that

8    they refused -- they gave us a blank page.  I think there's

9    another page.  There's another page.  We don't know what was

10   said.  We don't know what was done.

11         So this is a lawyer case on their side.  There's no

12   make-believe about it.

13         So what's a fair hourly rate?  What do you think

14   these lawyers are charging?  We've got two lawyers here.  Been

15   here all week.  Today is Wednesday.  $325 an hour for -- this

16   one is a partner in charge of the Atlanta office.  The two of

17   them together.  $325 an hour is low.  Well, that comes up to

18   $10,386,000.  Lawyer charges.

19         Well, if you do it at $300 an hour less it comes up

20   to $9,664,000.

21         If you do it at $275 an hour it comes up to

22   $8,941,000.

23         Now those are big numbers.  There's no doubt about

24   it.  You may disagree with the numbers, but you can't disagree

25   with the hours.

1          This is the numbers I suggest.  I suggested

2    somewhere in that neighborhood because Jane didn't want to be

3    here.  We filed suit in July of '11 and they didn't change.

4    They have not changed.  And as they said, they're not sorry,

5    they'd do it again.  We treated her fairly, yeah.  That's the

6    way we do business.

7          Remember when I asked Mr. Delbene, do you have to

8    set the account as reasonable?  Remember that testimony?  Does

9    the escrow account have to be reasonable?  He said, "I don't

10   know what you mean by reasonable."  Do you remember that?

11         There is no such thing as reasonable in the context

12   of a mortgage.  Does that make common sense?

13         The Judge is going to tell you when setting an

14   escrow account it has to be reasonable.  It just makes sense.

15         Now, a verdict in this area putting it in the

16   Monticello News will get their attention.  It will get their

17   attention of the people in Monticello.

18         But what about Homeward?  Will it get their

19   attention?  They think they can come down here and bamboozle

20   y'all.  How do you get their attention?

21         That's the next thing I want to talk with you about.

22   How do you get their attention?  That's where punitive damages

23   come in, which is to punish.

24         You can't take a corporation and lock them up.  You

25   can't take them out to the woodshed and beat them up.  You

 1    can't take a switch like you do your children.  I don't know

 2    if y'all do it anymore but I did.  I got it.  I learned.

 3            So how do you punish a corporation?  The only way

 4    you can do it --

 5            And put up there, please, Exhibit 46 again.

 6            MR. ROGERS:   Objection, Your Honor.  The financial

 7    wherewithal isn't something to be considered on compensatory

 8    damages as long as you consider you've got the punitive phase

 9    with this.

10            THE COURT:    I think that's right, Mr. Gower.

11            MR. GOWER:   We're not going to suggest an amount.

12    All I'm going to do at this point is -- there is a question on

13    this verdict form that I want to talk about right now.

14            It says, and this is all you've got to answer, yes

15    or no.  It says, "We, the jury, find that punitive damages

16    should be awarded.  Yes or no?"

17            Now, I want to talk about the burden of proof on

18    that claim because it is a different burden of proof on the

19    other claims.  It's a higher burden of proof, as it should be

20    because we're talking about punishing.  So it's a higher

21    burden of proof than preponderance of the evidence, which is

22    simply more likely true than not true.

23            This burden of proof is if you start out equal the

24    preponderance of the evidence is this way, it's a little tilt.

25    But this is what the Judge is going to tell us is by clear and

1    convincing evidence, which is more than a little tilt.

2          But the Judge is going to tell us it's not beyond a

3    reasonable doubt which is what the standard is in a criminal

4    case.  Am I making sense?

5          You start off, the first burden of proof on the

6    claims for emotional damages for Jane is preponderance of the

7    evidence which is a slight tilt.  It's more likely true than

8    not true.

9          On punitive damages you have to go higher or in this

10   case, lower.  But we don't have to go to beyond a reasonable

11   doubt.  It has to be somewhere inbetween.

12         And if you answer that question, "yes", on punitive

13   damages, and I ask you to please do, so we will come back and

14   have about a 15-minute discussion and then you'll go back and

15   determine how much.

16         There is also a question here on attorneys' fees.

17   "Should you award attorneys' fees?  Yes or no."  I would like

18   to get paid.  You can figure out the answer what I would

19   suggest the answer to that one would be.

20         So this is your form.  If you want to rule against

21   us, answer yes to number 1 and you go home.  End of case.

22         If you think we should win, I request that you

23   answer the next questions 2 through 5 yes.  And it's important

24   that all of them are answered yes.

25         And then for amount of money and emotional distress

1    damages that's where I suggest the big money should go.  This

2    is my suggestion.  That's where the big money should go.

3          And compensatory damages I'd say $500.

4          And then for attorneys' fees, that's number seven,

5    and punitive damages I request yes to get their attention to

6    punish them.

7          I got 15 more minutes and I'm not going to take it.

8    I just want to check to make sure I haven't messed up too

9    bad.

10         I hated poetry in school, but one thing I did

11   remember is there was a poet, Robert Frost, on his 85th

12   birthday they asked him, 85th now, and I can appreciate that a

13   little more than I did a few years ago, what he learned about

14   life? He said, "Well, I learned it goes on."

15         Well, Jane's life is going to go on after today.

16   She still has got her loans.  You can make a difference.  I

17   sincerely thank you.

18         THE COURT:    All right, ladies and gentlemen, I'm

19   going to charge you on the law at this time and when I finish

20   you're going to go back to the jury room and begin your

21   deliberations.

22         Your decision must be based only on the evidence

23   presented here. You must not be influenced in any way by

24   either sympathy for or prejudice against anyone.

25         You must follow the law as I explain it even if you

1    do not agree with the law and you must follow all of my

2    instructions as a whole.  You must not single out or disregard

3    any of the instructions on the law.

4         The fact that a corporation is involved as a party

5    must not affect your decision in any way.  A corporation and

6    all other persons stand equal before the law and must be dealt

7    with as equals in a court of justice.  When a corporation is

8    involved, of course, it may act only through people as its

9    employees; and, in general, a corporation is responsible under

10   the law for the acts and statements of its employees that are

11   made within the scope of their duties as employees of the

12   company.

13        As I said before, you must consider only the

14   evidence that I have admitted in the case.  Evidence includes

15   the testimony of witnesses and the exhibits admitted.  But,

16   anything the lawyers say is not evidence and isn't binding on

17   you.

18        You shouldn't assume from anything I've said that I

19   have any opinion about any factual issue in this case.  Except

20   for my instructions to you on the law, you should disregard

21   anything I may have said during the trial in arriving at your

22   own decision about the facts.

23        Your own recollection and interpretation of the

24   evidence is what matters.

25        In considering the evidence you may use reasoning

1    and common sense to make deductions and reach conclusions.

2    You shouldn't be concerned about whether the evidence is

3    direct or circumstantial.

4          Direct evidence is the testimony of a person who

5    asserts that he or she has actual knowledge of a fact, such as

6    an eyewitness.

7          Circumstantial evidence is proof of a chain of facts

8    and circumstances that tend to prove or disprove a fact.

9    There's no legal difference in the weight you may give to

10   either direct or circumstantial evidence.

11         When I say you must consider all the evidence, I

12   don't mean that you must accept all the evidence as true or

13   accurate.  You should decide whether you believe what each

14   witness had to say, and how important that testimony was.  In

15   making that decision you may believe or disbelieve any

16   witness, in whole or in part.  The number of witnesses

17   testifying concerning a particular point doesn't necessarily

18   matter.

19         To decide whether you believe any witness, I suggest

20   that you ask yourself a few questions:

21         Did the witness impress you as one who was telling

22   the truth?

23         Did the witness have any particular reason not to

24   tell the truth?

25         Did the witness have a personal interest in the

1    outcome of the case?

2              Did the witness seem to have a good memory?

3              Did the witness have the opportunity and ability to

4    accurately observe the things he or she testified about?

5              Did the witness appear to understand the questions

6    clearly and answer them directly?

7              Did the witness's testimony differ from other

8    testimony or other evidence?

9              You should also ask yourself whether there was

10   evidence that a witness testified falsely about an important

11   fact and whether there was evidence that a witness said or did

12   something, or didn't say or do something, at another time,

13   that was different from the testimony the witness gave during

14   this trial.

15             But keep in mind that a simple mistake doesn't mean

16   a witness wasn't telling the truth as he or she remembers it.

17             People naturally tend to forget some things or

18   remember them inaccurately.  So, if a witness misstated

19   something, you must decide whether it was because of an

20   innocent lapse in memory or an intentional deception.  The

21   significance of your decision may depend on whether the

22   misstatement is about an important fact or about an

23   unimportant detail.

24             When scientific, technical or other specialized

25   knowledge might be helpful, a person who has special training

1    or experience in that field is allowed to state an opinion

2    about the matter.

3          But that doesn't mean you must accept the witness's

4    opinion.  As with any other witness's testimony, you must

5    decide for yourself whether to rely upon the opinion.

6          In this case there are two burden of proofs.  There

7    is a burden of proof on the issue of whether the Plaintiff has

8    proven her claims in the case and her compensatory damages,

9    and then there is a different burden of proof on the issue of

10   whether punitive damages should be awarded. I will instruct

11   you momentarily on the burden of proof for punitive damages.

12   For all other issues, the burden of proof that the Plaintiff

13   has is the preponderance of the evidence.

14         In this case, it is the responsibility of the

15   Plaintiff to prove every essential part of her claims by a

16   preponderance of the evidence.  This is sometimes called the

17   "burden of proof" or the "burden of persuasion."

18         A preponderance of the evidence simply means an

19   amount of evidence that is enough to persuade you that the

20   Plaintiff's claim is more likely true than not.

21         If the proof fails to establish any essential part

22   of a claim or contention by the preponderance of the evidence,

23   you should find against the Plaintiff.  Again, this is the

24   burden of proof that you should apply to all of the

25   Plaintiff's claims except for the punitive damages claims.

1        When one or more claim is involved, you should
2    consider each claim separately.

3        In deciding whether any fact has been proved by a
4    preponderance of the evidence, you may consider the testimony
5    of all of the witnesses, regardless of who may have called
6    them, and of all the exhibits received in evidence, regardless
7    of who may have produced them.

8        In this case, the Plaintiff has brought four
9    separate state law tort claims against the Defendant.  You
10   should consider each of the Plaintiff's claims separately.
11   The four claims are for wrongful foreclosure, conversion,
12   interference with property rights, and intentional infliction
13   of emotional distress.  I am now going to explain to you the
14   essential elements for each of these claims, in other words,
15   what the Plaintiff must prove by a preponderance of the
16   evidence in order to prevail on these claims.

17       The first claim for your consideration is the
18   Plaintiff's claim that the Defendant wrongfully foreclosed on
19   the Plaintiff's house.  The parties do not dispute that the
20   Defendant foreclosed on the Plaintiff's house; the question
21   for you is whether the Defendant had the right to do so.  To
22   prevail on her wrongful foreclosure claim, the Plaintiff must
23   prove each of the following facts by a preponderance of the
24   evidence:

25       First, that the Defendant owed the Plaintiff a legal

1   duty; that the Defendant breached this legal duty; and

2   that Plaintiff suffered damages as a proximate cause or legal

3   result of the Defendant's breach.

4          In order for you to find that the Defendant breached

5   a legal duty owed to the Plaintiff, you must first decide if

6   the Defendant owed that duty to the Plaintiff.  Under the law,

7   in order to demonstrate that the Defendant breached a legal

8   duty owed to the Plaintiff, the Plaintiff must establish that

9   the Defendant's foreclosure of the Plaintiff's property

10  violated the terms and conditions of the promissory note or

11  security deed, or that the Defendant did not exercise the

12  power of sale in the security deed fairly and in good faith

13  when the Defendant foreclosed on the Plaintiff's house. Thus,

14  if you conclude that the Defendant violated any provisions of

15  the promissory note or security deed or that the Defendant did

16  not exercise the power of sale fairly or in good faith, then

17  you must conclude that the Defendant breached a legal duty

18  owed to the Plaintiff.

19         In determining whether the Defendant breached a

20  legal duty owed to the Plaintiff, you may consider whether the

21  Defendant was lawfully entitled to the foreclosure on the

22  Plaintiff's house.  In this case, the Defendant would only

23  have the right to foreclose on the Plaintiff's house if the

24  Plaintiff was in default under the terms and conditions of the

25  promissory note and security deed at the time of the

1    foreclosure.  You must therefore decide whether the Plaintiff

2    was in default.  In deciding whether the Plaintiff was in

3    default, you may consider whether the Plaintiff owed any

4    arrearage, or past amount due, and whether that arrearage was

5    a default under the terms and conditions of the promissory

6    note and security deed.

7         You may also consider whether the Defendant's acts

8    or omissions caused the Plaintiff to default.  In making this

9    determination, you may consider whether the Defendant's acts

10   or omissions were contrary to the terms and conditions of the

11   promissory note and security deed.

12        The security deed mentions, on several occasions,

13   "RESPA," which is short for the federal statute entitled the

14   Real Estate Settlement and Procedures Act. Under this statute,

15   if the Defendant, as a new servicer, changes the monthly

16   amount of payment, then the Defendant shall provide the

17   Plaintiff with an initial escrow statement within 60 days of

18   the servicing transfer.  A "shortage" means an amount by which

19   a current escrow account balance falls short of the target

20   balance at the time of the analysis.

21        When there is a shortage that is greater than or

22   equal to one month's escrow account, then the Defendant has

23   two possible courses of action.  The Defendant may either

24   allow a shortage to exist and do nothing about it, or the

25   Defendant may require the Plaintiff to repay the shortage in

1   equal monthly payments over at least a 12-month period.

2   If you conclude that the Defendant's acts or omissions caused

3   any default by the Plaintiff, then any action taken by the

4   Defendant as a result of that default would be unauthorized

5   under the law and the terms and conditions of the promissory

6   note and security deed, and, consequently, would result in a

7   breach of legal duty owed to the Plaintiff.

8            For the Plaintiff's damages to be the proximate or

9   legal result of the Defendant's breach, the Plaintiff must

10  show that, except for the Defendant's breach, the damages

11  would not have occurred.  Proximate causation is that which is

12  nearest in the order of responsible causes, as distinguished

13  from remote, that which stands last in causation, not

14  necessarily in time or place, but in causal relation. If you

15  determine that the Plaintiff's damages were caused by the

16  Plaintiff's own acts or omissions, and not by the Defendant's

17  breach, then causation has not been established and you must

18  find for the Defendant on this claim.  I will charge you in a

19  moment about what you may consider in determining the amount

20  of the Plaintiff's damages, if any.

21           The Plaintiff's second claim that you must consider

22  is her claim for conversion.  The Plaintiff alleges that the

23  Defendant converted her property by taking unauthorized fees

24  from her monthly mortgage payments and by not properly

25  applying her monthly mortgage payments to her accounts.  The

1    Defendant denies that it converted the Plaintiff's property

2    and contends that it had a legal right to apply the

3    Plaintiff's payments in the manner alleged.

4         To prevail on her conversion claim, the Plaintiff

5    must prove each of the following facts by a preponderance of

6    the evidence:

7         First, that Plaintiff had an ownership interest in

8    the loan payments; second, that the Defendant actually

9    possessed the loan payments; and third, that the Defendant

10   acted in a manner inconsistent with the Plaintiff's right of

11   possession.  Conversion is the taking and misapplication of

12   personal property, in this case, the Plaintiff's monthly

13   mortgage payments, not the taking of real property.  The

14   Defendant's right to possess the Plaintiff's monthly payments

15   is guided by the terms and conditions of the promissory note

16   and security deed.  Therefore, in order for the Defendant to

17   have acted in a manner inconsistent with its right of

18   possession, the Defendant's actions must be contrary to the

19   terms and conditions of the promissory note and security deed.

20   In this respect, you may consider whether the fees that the

21   Defendant charged the Plaintiff were authorized under the

22   terms and conditions of the loan agreements or whether the

23   Defendant properly applied the Plaintiff's monthly payments to

24   her loan accounts.

25         If you conclude that the Plaintiff was either not in

1   default or that her default was caused by the Defendant's acts

2   or omissions, then any fees pertaining to her default would be

3   unauthorized under the terms and conditions of the loan

4   agreement.  Similarly, if you determine that the Plaintiff was

5   either not in default or that her default was caused by the

6   Defendant's acts or omissions, then the Defendant improperly

7   applied the Plaintiff's loan payments in a manner inconsistent

8   with its right of possession.  You may consider my earlier

9   instructions when deciding whether the Plaintiff was in

10  default.

11      If, however, you find that the Plaintiff's default

12  was not caused by the Defendant, and thus that the Defendant

13  had a right to apply the loan payments in both of these

14  respects, and you determine that the Defendant did apply the

15  Plaintiff's loan payments consistent with its right, you must

16  find for the Defendant as to this claim.

17      It makes no difference whether the Defendant applied

18  the funds to its own use, if the Defendant exercised dominion

19  over the funds contrary to the Plaintiff's right or in a

20  manner inconsistent with it.  It is also immaterial whether

21  the Defendant exercised good faith in controlling the funds if

22  you determine that the Defendant's actions were contrary to

23  the terms and conditions of the promissory note and security

24  deed.  I will charge you in a moment about what you may

25  consider in determining the amount of the Plaintiff's damages,

1    if any.

2             The Plaintiff's third claim that you must consider

3    is her claim for interference with property rights.  The

4    Plaintiff alleges that if the Defendant unlawfully interfered

5    with her possessory interests in her property when the

6    Defendant foreclosed on her house.  The Defendant denies the

7    Plaintiff's allegations and contends that it had a lawful

8    right to foreclose on the Plaintiff's house.

9             To prevail on her interference with property rights

10   claim, the Plaintiff must prove each of the following facts by

11   a preponderance of the evidence:

12            First, that the Defendant knowingly interfered with

13   the Plaintiff's use and enjoyment of her property; and

14   second, that the Defendant did not have the authority to

15   interfere with the Plaintiff's use and enjoyment of her

16   property; and third, that the Defendant's interference with

17   the Plaintiff's use and enjoyment of her property proximately

18   caused damages to the Plaintiff.

19            Under the law, a landowner has the exclusive right

20   to enjoy private property.  However, a landowner can modify

21   this exclusive right by contract, thereby granting another

22   person to enter her property under certain circumstances.  In

23   this case, the terms and conditions of the promissory note and

24   security deed authorize the Defendant to foreclose on the

25   Plaintiff's property if the Plaintiff was in default of her

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

loan obligations.  If you decide that the Plaintiff was not in default of her loan obligations or the default was a result of the Defendant's acts or omissions, then the Defendant did not have the authority to foreclose upon the Plaintiff's property. However, if you decide that the Plaintiff was in default as a legal result of her own actions, then the Defendant did have the authority to foreclose upon the Plaintiff's property.  I will charge you in a moment about what you may consider in determining the amount of the Plaintiff's damages, if any.

The fourth claim that you must consider is the Plaintiff's claim for intentional infliction of emotional distress.  In order for the Plaintiff to recover on a claim for intentional infliction of emotional distress, the Plaintiff must prove the following by a preponderance of the evidence:

That the conduct of the Defendant was intentional or reckless; that the Defendant's actions were extreme and outrageous; and that the Defendant's actions caused the Plaintiff to suffer severe emotional distress.

A party "intentionally" causes harm when that party desires to cause the consequences of its act or believes that the consequences are substantially certain to result from the act.  A party "recklessly" causes harm when that party is aware of, but consciously and carelessly ignores facts and circumstances clearly indicating that the consequences are

1        substantially certain to result from the party's act.

2               Conduct is "extreme and outrageous" if it goes

3        beyond all possible bounds of decency and is regarded as

4        intolerable in a civilized society. Mere insults, indignities,

5        threats, annoyances, or petty oppressions do not rise to the

6        level of "extreme and outrageous" conduct.

7               You are further instructed that emotional distress

8        is "severe" if no reasonable person could be expected to

9        endure it.  I will charge you in a moment about what you may

10       consider in determining the amount of the Plaintiff's damages,

11       if any.

12              Now I'm going to charge you on damages.  You will

13       only reach the issue of damages if you find that the Plaintiff

14       has proven by a preponderance of the evidence the facts

15       necessary to prevail on one or more of her claims as I have

16       previously explained to you.

17              In considering the issue of the Plaintiff's damages,

18       you are instructed that you should assess the amount you find

19       to be justified by a preponderance of the evidence as full,

20       just, and reasonable compensation for all of the Plaintiff's

21       damages, no more and no less.  Compensatory damages are

22       damages designed to compensate the Plaintiff for any of the

23       damages the Defendant caused by the wrongful foreclosure,

24       conversion, interference with property rights, or intentional

25       infliction of emotional distress, if you were to find that the

1    Plaintiff prevailed on those claims.  Compensatory damages are

2    not allowed as punishment and must not be imposed or increased

3    to penalize the Defendant.  Also, compensatory damages must

4    not be based on speculation or guesswork because it is only

5    actual damages that are recoverable.

6         The Plaintiff's son, Adam McGinnis, is not a

7    plaintiff in this case and does not have a claim against the

8    Defendant.  Accordingly, as a matter of law, Adam has injury

9    by which to recover damages in this case.  Any award for

10   damages must only be based on your determination of the

11   appropriate amount to compensate the Plaintiff for her

12   injury.

13        The Plaintiff seeks the following types of

14   compensatory damages: emotional distress damages and

15   other compensatory damages proximately caused by the

16   Defendant's conduct.

17        The Plaintiff also seeks attorney's fees and

18   litigation expenses; and punitive damages, both of which are

19   not compensatory damages.  I will instruct you about these

20   other damages momentarily.

21        I am first going to explain to you the law regarding

22   emotional distress damages.  Emotional distress includes

23   highly unpleasant mental reactions such as fright, horror,

24   grief, shame, humiliation, embarrassment, anger, chagrin,

25   disappointment, worry, and nausea.  Although any damages you

1    award the Plaintiff for her emotional distress must not be

2    based on speculation or guesswork.  No evidence of the value

3    of such intangible things as emotional and mental anguish need

4    be introduced.  In that respect, it is not value you are

5    trying to determine, but an amount that will fairly compensate

6    the Plaintiff for those claims of damage.  There is no exact

7    standard to be applied; any such award should be fair and just

8    in the light of the evidence and based upon the enlightened

9    conscience of fair and impartial jurors.

10          To award emotional distress damages for the

11    Plaintiff's claims, you may only award the amount of damages

12    that are proximately caused by the Defendant's wrongful

13    foreclosure, conversion, interference with property rights, or

14    intentional infliction of emotional distress.

15          Also, there are additional restrictions under the

16    law for the recovery of emotional distress damages arising

17    from the Plaintiff's wrongful foreclosure claim only.  In

18    order for the Plaintiff to recover emotional distress damages

19    arising from a wrongful foreclosure, the Plaintiff must prove

20    the following by a preponderance of the evidence: First, that

21    the Defendant intentionally or recklessly caused the Plaintiff

22    harm in foreclosing on the Plaintiff's house, second, that the

23    Defendant's conduct in foreclosing on the Plaintiff's house

24    was extreme and outrageous, and, third, that the Defendant's

25    actions caused the Plaintiff to suffer severe emotional

1    distress.

2            A party "intentionally" causes harm when that party

3    desires to cause the consequences of its act or believes that

4    the consequences are substantially certain to result from the

5    act.  A party "recklessly" causes harm when that party is

6    aware of, but consciously and carelessly ignores, facts and

7    circumstances clearly indicating that the consequences are

8    substantially certain to result from the party's act.

9            Conduct is "extreme and outrageous" if it goes

10   beyond all possible bounds of decency and is regarded as

11   intolerable in a civilized society.  Mere insults,

12   indignities, threats, annoyances, or petty oppressions do not

13   rise to the level of "extreme and outrageous" conduct.

14           You are further instructed that emotional distress

15   is "severe" if no reasonable person could be expected to

16   endure it.

17           In addition to emotional distress damages, the

18   Plaintiff seeks other compensatory damages that were

19   proximately caused by the Defendant's wrongful foreclosure and

20   conversion.  In determining the amount of these damages, you

21   may consider the following.  Regarding the Plaintiff's

22   wrongful foreclosure claim, you may consider the fair market

23   value of the Plaintiff's house at the time of the foreclosure

24   minus the amount of debt secured by the house.

25           Regarding the Plaintiff's conversion claim, you may

1    consider the value of the converted property at the time the

2    property was converted.

3            The Plaintiff also seeks attorney's fees and

4    litigation expenses.  You may only consider the issue of

5    attorney's fees if you find for the Plaintiff on at least one

6    of her claims.  In evaluating whether the Plaintiff is

7    entitled to recover her attorney's fees under the law, the

8    Plaintiff must prove by a preponderance of the evidence that

9    the Defendant acted in bad faith, has been stubbornly

10    litigious, or has caused the Plaintiff unnecessary trouble and

11    expense.  Bad faith requires a conscious doing of wrong and

12    means a breach of a known duty through some motive of interest

13    or ill will.  Stubborn litigiousness means forcing the

14    opposite party to litigate when there is no genuine

15    controversy.  I will explain to you how to resolve the matters

16    of attorney's fees momentarily.

17            Finally, the Plaintiff makes a claim for punitive

18    damages. The Plaintiff claims that aggravating circumstances

19    exist in this case that warrant an award of additional

20    damages, called punitive damages. You may only consider the

21    issue of punitive damages if you find in favor of the

22    Plaintiff on at least one of her claims and award her some

23    compensatory damages. Punitive damages, when authorized, are

24    awarded not as compensation to a plaintiff but solely to

25    punish, penalize, or deter a defendant.

1           For punitive damages to be authorized, the Plaintiff

2      must prove by clear and convincing evidence that the

3      Defendant's actions showed willful misconduct, malice, fraud,

4      wantonness, oppression, or that entire want of care which

5      would raise the presumption of conscious indifference to

6      consequences.  If the Plaintiff fails to prove by clear and

7      convincing evidence that the Defendant's actions showed

8      willful misconduct, malice, fraud, wantonness, oppression, or

9      that entire want of care which would raise the presumption of

10     conscious indifference to consequences, then you may not award

11     punitive damages.  Mere negligence, although amounting to

12     gross negligence, will not alone authorize an award of

13     punitive damages.

14           Clear and convincing evidence is a different and

15     higher burden of proof than a preponderance of the evidence

16     which I previously explained.  Clear and convincing evidence

17     is defined as evidence that will cause you, the jury, to

18     firmly believe each essential element of the claim to a high

19     degree of probability.  Proof by a clear and convincing

20     evidence requires a level of proof greater than a

21     preponderance of the evidence, which is the standard in

22     determining compensatory damages, but less than the standard

23     for proof beyond a reasonable doubt, which is the standard in

24     a criminal case which this is not.

25           When I am finished reading these instructions, you

1    will begin the first phase of deliberations.  In this first

2    phase, you will determine whether the Plaintiff should prevail

3    on her wrongful foreclosure, conversion, interference with

4    property rights, or intentional infliction of emotional

5    distress claims; whether actual and compensatory damages

6    should be awarded, and, if so, the amount of those damages;

7    and whether attorney's fees and punitive damages should be

8    awarded.

9           In this first phase, however, you will not decide

10   the amount of attorney's fees and punitive damages that should

11   be awarded.  You will only decide whether the Plaintiff should

12   receive punitive damages.

13          If you decide that neither attorney's fees nor

14   punitive damages should be awarded, then the verdict you

15   return will be your final verdict.  However, if you decide

16   that either or both attorney's fees or punitive damages should

17   be awarded, we will reconvene and the parties will have the

18   opportunity to present evidence as to the amount of attorney's

19   fees and punitive damages.  After the parties have finished

20   presenting evidence, I will then instruct you on what you may

21   consider in determining the amount of attorney's fees and

22   punitive damages.  You will then deliberate on the issue of

23   what amount of attorney's fees and punitive damages should

24   that be awarded in this case.

25          Now, of course, the fact that I have given you

1    instructions concerning the issue of the Plaintiff's damages

2    should not be interpreted in any way as an indication that I

3    believe that the Plaintiff should, or should not, prevail in

4    this case.

5          Your verdict must be unanimous.  In other words, you

6    must all agree.  Your deliberations are secret, and you'll

7    never have to explain your verdict to anyone.

8          Each of you must decide the case for yourself, but

9    only after fully considering the evidence with the other

10   jurors.  So you must discuss the case with one another and try

11   to reach an agreement.  While you're discussing the case,

12   don't hesitate to reexamine your opinion and change your mind

13   if you become convinced that you were wrong.  But don't give

14   up your honest beliefs just because others think differently

15   or because you simply want to get the case over with.

16         Remember that, in a very real way, you're judges,

17   judges of the facts.  Your only interest is to seek the truth

18   from the evidence in the case.

19         Now, you have been permitted to take notes during

20   the trial.  Some of you are taking, or perhaps all of you have

21   taken, advantage of that opportunity.

22         You must use your notes only as a aid to your memory

23   during the deliberations.  You must not give your notes

24   priority over your independent recollection of the evidence.

25         And you must not allow yourself to be unduly

1    influenced by the notes of other jurors.

2              I emphasize that notes are not entitled to any

3    greater weight than your memories or impressions about the

4    testimony.

5              During your deliberations, you must not communicate

6    with or provide any information to anyone by any means about

7    this case.  You may not use any electronic device or media,

8    such as a telephone, cell phone, smart phone, or computer; the

9    Internet, any Internet service, any text or instant messaging

10   service; or any blog or website such as Facebook, MySpace,

11   LinkedIn, YouTube, Tumblr, Reddit, or Twitter, to communicate

12   to anyone any information about this case or to conduct any

13   research about this case until I accept your verdict.

14             Now when you go to the jury room, I want you to

15   choose one of your members to act as foreperson.  The

16   foreperson will direct your deliberations and speak for you in

17   court.

18             A verdict form has been prepared for your

19   convenience.  I am holding that in my hand.  You will have

20   this out, and this basically is to help us to understand what

21   your verdict is and to help us to help you to work through

22   these questions.

23             You're going to notice that there is a place where

24   this needs to be dated.  You're also going to notice that

25   there are lines there.  And there's a place for everybody to

1        sign this verdict form.  And by signing the verdict form you

2        are telling me that you agree with this and that the verdict

3        is unanimous.

4                When you've all agreed on a verdict, have your

5        foreperson fill it in, sign it and date it.  Then you'll

6        return it to the courtroom.

7                If you wish to communicate with me at any time,

8        please write down your message or question and give it to the

9        court security officer.  The court security officer will bring

10       it to me and I'll respond as promptly as possible either in

11       writing or by taking you to the courtroom.  Please understand

12       that I may have to talk to the lawyers and the parties before

13       I respond to your question or message, so you should be

14       patient as you wait for my response.  But I caution you not to

15       tell me how many jurors have voted one way or the other at

16       that time.  This type of information should remain in the jury

17       room and not be shared with anyone, including me.

18               Now, ladies and gentlemen, after all that, I'm going

19       to send you out.  I will tell you that you're going to have a

20       copy of the jury charge out with you.  You'll be able to refer

21       to that and, of course, you will have a copy of the verdict

22       form.

23               Now, Ms. Purvis is going to get with the lawyers and

24       we're going to put together all the evidence that has been

25       admitted and it's going to go back there to you.  If it's not

1    back there that means it hasn't been admitted, okay.  Because

2    we take great care to get that part of it right.

3            So head on back to the jury room.

4    (JURORS EXIT COURTROOM)

5            THE COURT:    I think y'all perfected your record

6    for appeal purposes on the charge.  Is there anything anybody

7    would like to add?

8            MR. GOWER:    The only thing on behalf of the

9    Plaintiff, Your Honor, is what we had said yesterday on the

10   damages portion on page 23 through the top part of 25 on the

11   damages for wrongful foreclosure where you also incorporate

12   the intentional infliction of emotional distress elements.

13   It's our belief that the Georgia Court of Appeals has got it

14   wrong.  And as long as you put an intentional tort you're

15   entitled to recover for wrongful damages -- emotional damages.

16   And do not have to prove again the tortious intentional

17   infliction of emotional distress within the tort of wrongful

18   foreclosure.  That's our position.

19           THE COURT:    Right.  Well, you brought that up

20   yesterday.

21           MR. GOWER:    Yes, sir.

22           THE COURT:    That's one of the things I talked to

23   Judge Land about last night.

24           MR. GOWER:    Yes, sir.

25           THE COURT:    And Mr. Rogers says that's the law.

1    MR. ROGERS:   Thank you for believing me.  I don't

2 think that I have anything to add to what we said last night

3 and what we said earlier, Your Honor, so thank you.

4    THE COURT:   Very good.  I appreciate the way y'all

5 conducted this trial and moved it along and were prepared.

6 Don't get too far away.  It wouldn't surprise me at all if

7 they have many questions about this case.  And we just want

8 to make sure you gather up and talk to Ms. Purvis about what

9 goes out.

10 (RECESS)

11    THE COURT:   I'm sure you've heard that they want

12 to go home.  And I always like to give them a brief

13 instruction.  They've heard it many times but I like to tell

14 them again before they go home.

15 (JURORS ENTER COURTROOM)

16    THE COURT:   It is about quarter after five.  I'm

17 going to let you go home now.  But I do want to remind you

18 what I've told you every time and that is you may not talk to

19 anyone about the case.  I'm sure people who you know will be

20 interested in what you have been doing.  They may want to talk

21 to you about it but you must not talk to them about the case.

22    And also you may not do anything to research this

23 case or find out any information about it.

24    With that, I'm going to let you go home.  I want you

25 to be back at 9:00 o'clock in the morning.  Do not begin your

1    deliberations until all of you are there.  All right?  Very

2    good.  Thank you very much.  Y'all have a good night.

3    (JURORS EXIT COURTROOM)

4              THE COURT:    Y'all be back around 9:00 in the

5    morning.  We'll see how long it takes them to make up their

6    mind.  Thank you.

7              MR. GOWER:     Thank you.

8              MR. ROGERS:    Thank you, Your Honor.

9    (The proceedings for 8-21-13 were thereby adjourned)

10

11           *I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT
     TRANSCRIPT TO THE BEST OF MY KNOWLEDGE AND ABILITY FROM THE*
12   *RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.*

13

14                           _____

15                           */s TAMMY W. FLETCHER  CCR, USCR
                             UNITED STATES DISTRICT COURT
16                           MIDDLE DISTRICT OF GEORGIA*

17                           *DATE:  September 23, 2013*

18

19

20

21

22

23

24

25

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*