```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                FOR THE MIDDLE DISTRICT OF GEORGIA

 3                          MACON DIVISION

 4                _____

 5

 6    JANE MCGINNIS,              :
                       PLAINTIFF  :   Case No. 5:11-CV-284
 7    VS                          :
                                  :       August 22, 2013
 8                                :
      AMERICAN HOME MORTGAGE       :        Macon, Georgia
 9    SERVICING INC.,   DEFENDANT. :
      _____
10
                               JURY  TRIAL
11
                            VOLUME 4 OF 4
12
               BEFORE THE HONORABLE C. ASHLEY ROYAL
13             UNITED STATES DISTRICT JUDGE, PRESIDING

14    APPEARANCES:

15    FOR THE PLAINTIFF:          CHARLES A. GOWER
                                  MIRANDA J. BRASH
16                                DAVID ROHWEDDER
                                  P.O. BOX 5509
17                                COLUMBUS, GA 31906

18    FOR THE DEFENDANT:          RUSSELL J. ROGERS
                                  ANNA BURNS
19                                KELLY THOMAS
                                  THOMPSON HINE
20                                TWO ALLIANCE CENTER
                                  3560 LENOX ROAD STE 1600
21                                ATLANTA, GA 30326

22
      _____
23                    TAMMY W. FLETCHER   USCR
                       P. O. BOX 539
24                    MACON, GA 31202-0539
                       (478-752-3497)
25
```

```
 1                    P R O C E E D I N G S
 2    August 22, 2013
 3              THE COURT:    Good morning.  How are y'all today?
 4    You should have a copy of the note.  I'm going to read it into
 5    the record.
 6              "We have one juror way out of agreement with the
 7    other 11.  This juror is refusing to look at documents or
 8    compromise or make any lucid argument to back his position.
 9    It seems to most that this juror has personalized this.  Do
10    you have any advice or direction for us?"
11              Now, obviously I told them not to tell me their
12    division; however, I don't know how they could have conveyed
13    this to me in any other way.
14              In dealing with this I have a charge and there are
15    two Allen charges.  This is called the pre-Allen charge.
16    There is sort of an escalation that goes along with this.  And
17    I typically think it's not a good idea to give the big one
18    first.  I typically think it's better to go in stages.  This
19    would be the first stage.  I think that we could come back
20    later and give the full charge.
21              I think that -- and I only had this come up one time
22    before and it was in a criminal case.  I think I can probably
23    take this juror off of this case if they just are refusing to
24    deliberate.  I have never done that before but I think that is
25    certainly a possibility.
```

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1          So I hope we won't get to that.  I would hope that

2     this would take care of it.  And so I think that what I will

3     do, unless either one of you disagree, is to bring them back,

4     give them this charge and let them go back and see what they

5     do?  Is that agreeable with everybody?

6               MR. GOWER:    Yes, sir.

7               MR. ROGERS:   Yes, Your Honor.

8               THE COURT:    Bring them in.

9     (Court Security brings note)

10              COURTROOM CLERK:   And he's bringing another note.

11              THE COURT:    Bringing another note.  Hold on.

12    Let's see what the other notes says.  We may not have to do

13    this.  Well, this is just another version of what they already

14    said.  I'll read this to you.

15              "The juror mentioned in the previous letter has

16    stated he does believe in punitive damages and that he said so

17    when asked before being picked and was picked anyway.  This

18    person has become utterly obstinate and unwilling to reason at

19    all.  What do we do?"

20              I'll give you copy of that, but y'all understood

21    that?

22              MR. GOWER:    Yes, sir.

23              MR. ROGERS:   Yes, sir.

24              THE COURT:    There's really not any problem with

25    understanding that.  I don't think that changes anything.  It

```
 1        seems to me that what I proposed is the way to deal with it?
 2                  MR. GOWER:    Yes, sir.
 3                  THE COURT:    Do y'all agree?
 4                  MR. ROGERS:   Yes, sir.
 5                  MR. GOWER:    Yes, sir.
 6                  THE COURT:    Now let's try to get them in here.
 7        (JURORS ENTER COURTROOM)
 8                  THE COURT:    Good morning, ladies and gentlemen.  I
 9        hope you're doing well today.
10                  I have received both of your notes.  And the
11        attorneys and parties know what the notes said.
12                  And so I'm going to give you an additional charge
13        and then I'm going to send you back to the jury room.
14                  It is your duty as jurors to discuss the case with
15        one another in an effort to reach agreement if you can do so.
16        Each of you must decide the case for yourself but only after
17        full consideration of the evidence with the other members of
18        the jury.  While you are discussing the case do not hesitate
19        to re-examine your own opinion and change your mind if you
20        become convinced that you were wrong.  But do not give up your
21        honest beliefs solely because the others think differently or
22        merely to get the case over with.  You should deliberate in
23        the spirit of cooperation and in a reasonable manner.
24                  You should evaluate the evidence with a clear mind
25        and in an earnest effort to reach a verdict, if you can.  This
```

1    is not a contest of wills or personalities.  You should be

2    careful to listen to other juror's opinions to reach a fair

3    and impartial verdict in this case.

4            Go back to the jury room.  Thank you very much.

5            And I will tell you at 12:00 o'clock if y'all want

6    to go to lunch that's fine.  Just remember not to discuss the

7    case or talk to anybody about it.

8    (JURORS EXIT COURTROOM)

9            THE COURT:    Any comments from anybody?

10           MR. GOWER:    No, sir.

11           MR. ROGERS:   No, Your Honor

12   (RECESS)

13   (JURORS ENTER COURTROOM)

14           THE COURT:    Have y'all reached a verdict?

15           THE FOREMAN:  Yes, we have.

16           THE COURT:    If you would hand that to the court

17   security officer, please.  Did everyone sign this?

18           JURORS COLLECTIVELY:   Yes, sir.

19           THE COURT:    Is this everyone's unanimous verdict

20   form?  Okay.  Very good.

21           COURTROOM CLERK:   In the United States District

22   Court for the Middle District of Georgia, Macon Division, Jane

23   McGinnis, Plaintiff, versus American Home Mortgage Servicing,

24   Inc., Defendant.  Civil Action Number 5:11-CV-284.

25           Number 1:  We, the jury, find in favor of the

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*

1    Defendant and against the Plaintiff on all of the Plaintiff's
2    claims.  Answer: No.
3            Number 2:  We, the jury, find in favor of the
4    Plaintiff on Plaintiff's wrongful foreclosure claim.
5    Answer:  Yes.
6            Number 3:  We, the jury, find in favor of the
7    Plaintiff on the Plaintiff's conversion claim.  Answer:  Yes.
8            Number 4:  We, the jury, find in favor of the
9    Plaintiff on Plaintiff's interference with property claim.
10   Answer:  Yes.
11           Number 5:  We, the jury, find in favor of the
12   Plaintiff on Plaintiff's intentional infliction of emotional
13   distress claim.  Answer:  Yes.
14           Number 6:  We, the jury, award damages to the
15   Plaintiff in the following amounts:
16           Emotional Distress Damages:  $500,000.
17           Other Compensatory or Actual Damages:  $6,000.
18           Number 7:  We, the jury, find that Plaintiff's
19   attorney's fees should be awarded to the Plaintiff.
20   Answer:  Yes.
21           Number 8:  We, the jury, find that punitive damages
22   should be awarded to the Plaintiff.  Answer:  Yes.
23           So say we all this, the 22nd day of August, 2013.
24   It is signed by the foreperson and the remaining 11 jurors.
25           THE COURT:   Mr. Gower, anything for you?

1          MR. GOWER:    No, sir.

2          THE COURT:    Mr. Rogers?

3          MR. ROGERS:    No, sir.

4          THE COURT:    I think we're going to have to proceed

5    with the second stage.  We need to proceed with the second

6    stage of this.  My recommendation is we send the jury out and

7    ask them to be back at 1:00 o'clock or let's say ten after

8    1:00 because I've given you some -- What is that?

9    (Handing note to Judge from jurors).

10          They want to work through lunch.  That's fine.

11          So I want you to step back to the jury room.  I'm

12   going to talk to the lawyers about how we're going to proceed

13   from this point and then we'll bring you back in.  All right.

14   (JURORS EXIT COURTROOM)

15          THE COURT:    So what do y'all have in mind about

16   going from here?  It's been a long time since I've had

17   punitive damages awarded in a case.

18          MR. GOWER:    We have no evidence.  I would just

19   like to do a closing.  And I would like to reserve my closing

20   until after Mr. Rogers does his.

21          THE COURT:    What about on the attorney's fees?

22          MR. GOWER:    I'm going to waive it.

23          THE COURT:    You're going to waive?

24          MR. GOWER:    Waive my claim for attorney's fees.

25          THE COURT:    Oh, I see, okay.  So I'm going to

1    instruct the jury then that they're only to consider punitive

2    damages.

3            MR. GOWER:   Yes, sir.   That I have waived it.   I'm

4    going to tell them that also.

5            THE COURT:   All right.   So we're going to bring

6    them back.   What about you, Mr. Rogers, what do you want to

7    do?

8            MR. ROGERS:   If he doesn't have any evidence I

9    guess I'll just say what I've got to say.

10           THE COURT:   Okay.   Very good.   So we will bring

11   them back in.   Just one minute.

12           Do they have this?   This is a charge that follows

13   Judge Land's charge.   I'm not sure we even need to give this.

14   So I think that probably the charge -- was there a charge

15   originally?

16           MS. HARTMAN:   Yes.

17           THE COURT:   Do y'all have the -- In the original

18   charge that we sent to you or gave you there was an

19   instruction in there about attorney's fees and punitive

20   damages.   And I'd ask for you to look at that.   Do y'all have

21   that?

22           MR. GOWER:   Yes, we do.   I do.

23           THE COURT:   Mr. Rogers?

24           MR. ROGERS:   No, Your Honor.   Probably, yes, but I

25   don't know where it is.

```
 1          THE COURT:    Well, I understand that part of it.
 2   Lucie is going to run out one for you.
 3          I'm having to make some changes because we had
 4   initially had together the attorney's fees and the punitive
 5   damages.
 6          I mean, we are obviously going to need to strike out
 7   on the first page the second paragraph, the last phrase there,
 8   "Plus any evidence admitted in the most recent phase of the
 9   trial."  Since there won't be any.  So that needs to come out.
10   Anything else that needs to be changed?
11          MR. GOWER:    Looks fine to me.
12          MR. ROGERS:    Looks fine, Your Honor.
13          THE COURT:    So if we take out what I just said and
14   that sentence would then conclude with "You should consider
15   all evidence in the first phase of the trial."  That will be
16   the end of that.  And then the rest of it you're in agreement
17   with.  And then there's a verdict form.  Is the verdict form
18   okay?
19          MR. ROGERS:    You might reverse the order, Your
20   Honor.  Might put 2 up as 1 and 1 as 2, but otherwise --
21          THE COURT:    I think that's reasonable.  I'm not
22   sure that it matters that much.  But I think that is a
23   reasonable way to do it.  Let's reverse it.  Are we clear now?
24          MR. GOWER:    Yes, sir.
25          THE COURT:    You have that Lucie?
```

1              MS. HARTMAN:  Yes.

2              THE COURT:    You have the change on the charge?

3              MS. HARTMAN:  Yes.

4              THE COURT:    I think what I'll do, when the jury

5    comes back is just tell them there's not going to be any

6    evidence or opening statement, just closing argument.

7              Because I think they are expecting a second phase of

8    the trial and they may wonder what -- Is that agreeable?  Do

9    either one of you have a problem with that?

10             MR. GOWER:    No, sir.

11             MR. ROGERS:   No, sir.

12             THE COURT:    And I'm also going to tell them that

13   attorney's fees and expenses of litigation are no longer an

14   issue in the case and they are not to return an award on that.

15   And then you can tell them that too, Mr. Gower.  I think it

16   would be good for you to tell them that so they will

17   understand what happened.  Because they are not going to

18   understand.

19             MR. GOWER:    Yes, sir.

20             THE COURT:    Now are we ready?  Can I bring them

21   back in?  How long are you going to take, Mr. Gower?

22             MR. GOWER:    Fifteen minutes at the most.

23             THE COURT:    Mr. Rogers?

24             MR. ROGERS:   I don't know, Your Honor.  Probably

25   less than that.

1          THE COURT:     Very good.  Bring them in.

2     (JURORS ENTER COURTROOM)

3          THE COURT:     Ladies and gentlemen, you are now back

4     for the second phase of the trial of this case.  I will tell

5     you that it's been simplified.

6          To start off with, there won't be any opening

7     statements.  There's not going to be any additional evidence

8     presented in the case.  You will rely on what you've already

9     heard.  The evidence that has already been introduced in the

10    trial of the case.

11         The only thing we're going to have as a part of this

12    second phase is closing arguments.

13         I will point out to you also that there are not

14    going to be -- there's not going to be an award for attorney's

15    fees or expenses of litigation.

16         So you're only going to deal with the question of

17    punitive damages.

18         As Mr. Gower is going to tell you, he has waived the

19    attorney's fees and expenses of litigation in the case.  So

20    that's why that is gone.  All right.

21         Now, Mr. Rogers.

22         MR. ROGERS:    Good afternoon, ladies and gentlemen.

23    Thank you for your service again.  Thank you for your

24    deliberations.

25         I want to start by talking for a minute about --

1    well, about myself.  Mr. Gower personalized this case in his

2    closing.  He talked about big fancy lawyers, Ms. Burns and

3    myself.

4              I grew up in Augusta, Georgia.  So did Ms. Burns.

5    We both went to the same law school that Charlie Gower went

6    to.

7              We work in Atlanta and we're getting by just as best

8    we can just like anybody else.

9              AHMSI didn't send a representative, not because it

10   doesn't care, but because of what you've already seen in the

11   evidence.  AHMSI sold it's business in March of this year.

12   All the people at AHMSI, one by one, got let go.  I think

13   there may be four or five people left employed over there now.

14             MR. GOWER:   If it please the Court, there's no

15   evidence of any of that.  That's highly improper.

16             MR. ROGERS:   Your Honor, there is evidence of it.

17   The evidence is that they sold their business March 1 and that

18   those people that were going to be let go or either hired by

19   Ocwen are gone.  That was in the press release.  That was in

20   the hello/goodbye letter, Your Honor.

21             THE COURT:   I think I will allow that.  Go ahead.

22             MR. ROGERS:   It wasn't that they don't care.

23   That's the bottom line.  It's not that they had any disrespect

24   for you.

25             This matters, Ms. McGinnis matters, they treated her

1    like she mattered when she was their customer.  And she

2    matters still and this verdict matters.

3              So that had been personalized and I just wanted to

4    say something because I didn't get a chance to talk after Mr.

5    Gower did and I wanted to say that to y'all so that you knew

6    that.

7              Now, let's talk about punitive damages for a minute.

8    You got an instruction in the first phase and you got an

9    instruction before we ever started here that said it doesn't

10   matter if the corporation is a party to the case.  All

11   persons, including corporations, stand equal in the eyes of

12   the law.

13             So you treat the corporation the way you would treat

14   a person and you treat a person the way you would treat a

15   corporation, they're all the same.

16             So the fact that this is a business doesn't matter.

17   That's not something that you should think about when you

18   decide whether or not and how much you should award for

19   punitive damages.

20             The Judge is going to tell you shortly that you

21   don't assess punitive damages for the Defendant being a

22   distasteful business.  Maybe you don't like debt collectors.

23   Maybe you've had a bad experience with debt collectors.

24             It is a business.  People get paid to do that

25   business.  That doesn't make them bad people.  It makes them

1    people that are making a living.  They are like me, they are

2    like Anna, they're like you, getting by.  That's their job.

3         So the fact that you may not like debt collectors is

4    no reason for you to award more money against AHMSI, against

5    Homeward.

6         The Judge, we expect, is also going to charge you

7    that you may only award punitive damages in excess of $250,000

8    if you find that the Defendant acted with the specific intent

9    to cause harm.

10        Ladies and gentlemen, there just isn't evidence of a

11   specific intent.  That's lawyerese for they had set out to

12   hurt Ms. McGinnis.  And there just isn't any evidence of that,

13   ladies and gentlemen.  Certainly there isn't a document

14   anywhere that says, let's get Ms. McGinnis.  Let's take her

15   property.  There's no evidence like that.

16        So when you look at it you're looking at the

17   circumstantial evidence.  And what does the circumstantial

18   evidence tell you about their intention to hurt Ms. McGinnis?

19        The first thing is what Mr. McGinnis told you.  No

20   one is pursuing the deficiency.  As Mr. Delbene told you when

21   the foreclosure sale happened they lost $45,000.

22        Now, under the note they could sue her for that.

23   But they didn't do it.  And that's proof that they didn't

24   intend to harm her because if they intended to harm her they

25   would keep on harming her and they'd get their money.  But

1    they didn't, they wrote it off and they moved on.

2            The second thing is that they never contacted Ms.

3    McGinnis directly.  They never wrote her directly, they never

4    called her directly, they never did anything like that that

5    was disrespectful to Ms. McGinnis at all.  And that's what

6    you've got to look at is the conduct of Ms. McGinnis.

7            And last, they lost $45,000.  Now, maybe they are

8    not the best business in the world.  I don't know.  Maybe

9    y'all went back there and you thought well, you were getting

10   money every month why would you foreclose on somebody that was

11   sending you some money every month.  I don't know what you

12   thought.

13           But they are a good enough business that they don't

14   set out with the idea that they're going to lose $45,000.

15   It's just not credible to think that they set out with the

16   intent to harm Ms. McGinnis and lose $45,000 in the process.

17   He's going to talk about all the loans that AHMSI has under

18   management or had under management.  They don't have any now,

19   but did have under management.

20           You can say, well, if they do this over all of those

21   that's a lot of fees.  Think about the flip side of that,

22   ladies and gentlemen.  If they do that over everyone of those

23   loans and lose $45,000 every time they will wind up in

24   bankruptcy like TBW.

25           So there's no evidence that it was intentional.

1    It's just not credible to think that.  This is not how

2    businesses operate.

3            So the other question is was it reprehensible?  What

4    do you make of how they conducted themselves?

5            Well, we've seen the communications.  We heard some

6    communications with Ocwen.  That's not AHMSI.  Starting March

7    1 of this year, you saw the letter, Ocwen took over.  That's

8    not AHMSI.  You can't punish AHMSI for what Ocwen did.  That's

9    a completely different company.

10           What we saw from all -- well, even from the Ocwen

11   communications, frankly, but from all of the AHMSI

12   communications we saw they were professional.  They were

13   respectful.  They weren't abusive.  They weren't threatening.

14   They were doing the job of a debt collector.  "You are behind.

15   Please pay us.  If you don't pay us there will be

16   consequences."  That's what debt collectors do.

17           It wasn't abusive.  It wasn't disrespectful and it

18   wasn't unprofessional.

19           It also wasn't inconsistent with the contract.  Now

20   y'all obviously think they did do something wrong but we went

21   through the contract and we know that the contract gave them

22   the right to raise the amount.  We know that they told them

23   about the amount that had been raised.  Gave them the right to

24   suspense partial payments when they were received, and they

25   were partial.  Gave them the right to collect fees.  They

1    didn't even collect all the fees.

2           We had that exchange in Mr. Delbene's deposition

3    where he talked about the insufficient funds check.  And Mr.

4    Gower said thank you on behalf of Ms. McGinnis.

5           And then also Mr. Delbene told you about all those

6    fees that got written off.  So they didn't collect -- I don't

7    think they net collected any fees, but they certainly didn't

8    collect all the fees they could have collected.

9           Again, that's proof they didn't act with specific

10   intent to harm or they would have run her up every time they

11   had a chance.

12          But they did all those things and all of those

13   things were permitted by the contract.

14          They were patient.  They waited 16 months to try and

15   avoid this foreclosure.  Now you can think that's out of

16   respect for Ms. McGinnis.  You can think that's out of desire

17   not to lose 45,000.  Whatever reason you think it is they did

18   that, they did it.

19          They waited 16 months. During those 16 months they

20   gave Ms. McGinnis repeated opportunities to avoid the

21   foreclosure.  They didn't want to foreclose on the house.

22   That was something that they wanted to avoid.

23          They asked Ms. McGinnis for her position.  What do

24   you think?  In that May 17 phone call where Mr. McGinnis says,

25   "I'm paying payments.  I don't understand what's going on."

1   They say, send us a letter.  They sent him a letter on May

2   19th.

3          They researched it.  They wrote back on June 30 and

4   they said here's what's going on.  So that goes on a little

5   bit longer.  And then he is on a phone call again in August,

6   August 10, with another representative and he says, "I don't

7   agree with this."  And they said, all right, well we're going

8   to "as flick" (phonetically) this.  So they transferred him to

9   Monica Louise.  And you remember his testimony about Monica

10  Louise.  He said Monica Louise was helpful.  Monica Louise

11  talked to him for hours on the phone.  Monica Louise said,

12  "I'll research that and I'll get back to you."  She researched

13  it.

14         And then she called him -- I don't know I didn't

15  count -- but we went through it with Mr. McGinnis, 10 times at

16  least closer to 15 -- talked to him, explained what was going

17  on.  And then eventually he wouldn't talk to her again.  He

18  wouldn't answer her calls.  She wrote him a letter saying,

19  look, I'm going to stop calling you now, I don't want to

20  bother you with this, but if you want to talk to me give me a

21  call anytime, here's my number, here's my extension. So they

22  listened to her.  They tried to respond to her and they tried

23  to explain what was going on.

24         So their conduct, I think, doesn't suggest that

25  there needs to be a huge award against them.  Certainly it's

1    not intentional.  And they were respectful of her and they

2    tried to avoid the foreclosure.

3          Mr. Gower, I think is going to talk about the

4    resources of Homeward/AHMSI.  The first thing that I would say

5    about that is that was a different company.  The company that

6    exists now doesn't have those resources because they have sold

7    the business.

8          The other thing I would say about it is the numbers

9    that he's going to be putting up, he's talking about amounts

10   of money under management.  He's not talking about the value

11   of the company.  He doesn't have any evidence whatsoever the

12   value of the company, at least it's not in this record.

13         All he's got is evidence about how much in loans

14   they were administering.  That doesn't have anything to do

15   with it.  That just says how big they are.  And they were only

16   ever the thirteenth largest servicer, they weren't even really

17   that big for the industry standards.

18         So I ask you to critically listen to that evidence

19   when you hear it because the evidence in the record doesn't

20   tell you what kind of money they had.  And they don't have it

21   anymore since they sold their business.

22         Ladies and gentlemen, in the end, as I said, AHMSI

23   did what it could do to avoid the foreclosure.  They waited a

24   long time.  They talked to her, gave her multiple chances to

25   avoid it.  Again, you can think that's because they didn't

1    want to lose $45,000.  You can think that's because they

2    respected Ms. McGinnis.  I think it's probably both.  But they

3    tried to avoid it and it just doesn't warrant a large award of

4    punitive damages.  Thank you very much for you time.

5              THE COURT:    Mr. Gower.

6              MR. GOWER:    Thank you.  First off, thank you for

7    your verdict.

8              Did you hear anybody -- Did you hear Mr. Rogers say

9    we're sorry?  Did you hear an apology?

10             All you heard was well this is a broke company.

11   Well, ladies and gentlemen, they ain't broke.  They are

12   anything but that.  They sold it to a bigger company who now

13   owns that company.  And the employees of the other company are

14   now working for the new company.  They got the money when they

15   sold it.  They are still in existence with money.

16             The purpose of punitive damages, as you know, is to

17   punish.  All they have got is money.  The employees are still

18   doing business in Ocwen.

19             They talk about -- they want to play on your

20   sympathy with they lost $45,000 on the house.  They got the

21   house.  They own the house.

22             I suggest the reason they haven't done anything with

23   it is because of this lawsuit.  They want to wait until it's

24   over and sell the house for what it's worth.  They ain't lost

25   $45,000.

1          Now, I told y'all before my closing argument earlier
2     I said that this whole procedure, once you return your
3     verdict, would last no more than 15 minutes, that's why I
4     waived my claim for attorney's fee.  Because I would have to
5     take the stand and testify about that and Mr. Rogers would
6     cross examine me and we would be here for hours.  So I have
7     waived it because the more important thing is punitive
8     damages.  And Jane will take care of me out of the verdict.
9          But it is important that you return a verdict for
10    punitive damages in an amount that will get the attention of
11    Homeward.  Homeward exists.
12         They ain't apologized.  They ain't going to
13    apologize.  You've got to get their attention.
14         The only way you're going to get their attention --
15    because you can't, like I said before, you can't spank them or
16    anything -- is by money.
17         So when someone in the board room, they still have a
18    board room, when somebody up there says, "Well, what's this
19    check for?"  If it's got enough zeros on it somebody is going
20    to have to answer that question.  Well, it was a jury down in
21    Macon, Georgia that we tried to pull the wool over and we
22    weren't successful.  They punished us for the way we treated
23    Jane.  So that they won't treat other Jane McGinnises the same
24    way.  That's what it is for.
25         Just a few things here and I'm going to make this

1    very short.  This is Plaintiff's Exhibit 24.  This is when

2    Jane wrote to Homeward and basically asked simple questions

3    about her loan.  And said, whatever you do don't send me

4    computer printouts, please just answer my questions.  And what

5    she gets is a letter from his law firm right here and sends

6    them the computer printouts.

7            And here's the computer printouts right here.  This

8    is just on this one loan.  We got one for each of the loans.

9    This is what you cannot understand.  This is the reason we had

10   to pay $25,000 to a CPA and he spent hours and hours and hours

11   trying to understand it.

12           And once you understand it you will see that there

13   are fees charged for each of the loans.

14           They talk about -- the thing about it is on your

15   verdict form when you go out there, after the Judge instructs

16   you, you will take this verdict form out there and you'll have

17   a question.  Did you find that they acted with specific intent

18   to cause harm?  Yes or no.  If you answer yes, then you can

19   award more than $250,000.  If you don't answer that yes then

20   your verdict is limited to $250,000, which would be an

21   absolute joke.  They would be jumping for joy.  I promise you

22   that.

23           Now, what do you have to find in order to conclude

24   that they acted with specific intent to cause harm?  Nobody is

25   going to ever be able to hear what they say or do and you've

1    got to do it by their actions, by what -- circumstantial

2    evidence.  They were told numerous times of the errors.  They

3    were told numerous times.  And what did they do?  They

4    continued.

5            So using your common sense -- and the Judge is going

6    to charge you.  And specific intent to cause harm is defined

7    in a way where is if you believe that consequences are

8    substantially certain to result.

9            Well certainly by not straightening out the account

10   in the face of numerous requests over the years, any

11   reasonable person would conclude that damages or harm is

12   substantially certain to result.  Because you are at their

13   mercy.  Only they can straighten out the account.  And that's

14   all they asked them to do was straighten out the account.

15           So if you believe that they had the opportunity and

16   chose not to do it then you can easily conclude that they knew

17   the consequences harmful to Jane would occur.  That's all it

18   means.  You'll have these instructions.

19           Now, what would be -- so if you answer that yes then

20   you can award more than 250.  If you answer it no then you are

21   limited to 250, which is not going to get their attention

22   whatsoever.

23           Now, you'll have back in -- and you've seen, this is

24   on their website, which I printed off.  This will be June of

25   '12 and printed off.  Where they are bragging -- this is on

1    the computer, their website -- that they are the 13th largest

2    in the country, and that they are managing nearly 71 billion

3    in loan servicing with 3,400 employees.

4           And I'm going to be very, very short here, but if

5    you take 71 billion -- and I have practiced this -- that's 71

6    billion.  And I've had it double checked.  What is one

7    percent?  I'm speaking about what is one percent of 71

8    billion?  Well, it's 710 million.

9           What I suggest, in your verdict that you return for

10   this 500,000 -- certainly we're not suggesting anything here.

11   That would be absurd.  What I'm suggesting is eight or nine

12   times this figure.  I'm suggesting eight or nine times

13   500,000.  I'm suggesting somewhere between four million and

14   five million.  That's my suggestion of what punitive damages

15   are recommended.

16          And you can just say I'm whatever, that's my

17   suggestion.  That that would mean a total of this and then

18   this for punitive's and that would get their attention.

19          And then check and answer yes on specific intent to

20   cause harm, because otherwise you're limited to 250,000.  If

21   you were to return a verdict for this amount and not check yes

22   the Judge would have to write it down.  He would have to

23   reduce the verdict to 250,000, if that makes any sense.

24          Again, thank you.  Thank you, Your Honor.

25          THE COURT:   Ladies and gentlemen, you've decided

1   to award punitive damages in the case.  I will now explain to

2   you the rules of law that you must follow and apply in

3   deciding the amount of a punitive damages award.

4        The charges I previously gave you regarding your

5   duty to deliberate and consider the evidence still apply.

6        I'm now going to explain the law on the appropriate

7   amount of punitive damages.  You must determine the

8   appropriate amount of punitive damages.  In doing so you

9   should consider all of the evidence in the first phase of the

10  trial.  You should also bear in mind that the Plaintiff's

11  injury has been made whole by your award of compensatory

12  damages.

13       When assessing punitive damages you must be mindful

14  that punitive damages are meant to punish the Defendant for

15  the specific conduct that harmed the Plaintiff in the case and

16  for only that conduct.  For example, you cannot assess the

17  punitive damages for the Defendant being a distasteful

18  business.  The measure of punitive damages is your enlightened

19  conscience as an impartial jury.  Punitive damages are meant

20  to punish the Defendant for this conduct only and not for

21  conduct that occurred at another time.  Your only task is to

22  punish and deter the Defendant for the actions it took in this

23  particular case.

24       The amount you award should reflect these purposes

25  only.  In fixing the amount you may consider the financial

1    resources of the Defendant.  You may only award punitive

2    damages in excess of $250,000 if you find that the Defendant

3    acted with specific intent to cause harm.  Therefore, if you

4    award punitive damages in excess of $250,000 you must indicate

5    on the jury verdict form whether you find specific intent to

6    cause harm.

7         Under the law, the party possesses specific intent

8    to cause harm when that party desires to cause the

9    consequences of its act or believes that the consequences are

10   substantially certain to result from it.

11        Intent may be shown by direct or circumstantial

12   evidence.  An intent is ordinarily ascertained from acts and

13   conduct.

14        You may not presume that the Defendant acted with

15   specific intent to harm, but you may find specific intent to

16   harm upon consideration of the words, conduct, demeanor,

17   motive and all other circumstances connected with the alleged

18   act.

19        Your foreperson will continue to preside over your

20   deliberations and will speak for you here at court.

21        I've prepared another verdict form.  It is very

22   simple and straightforward.  You will take the verdict form to

23   the jury room and when you've reached a unanimous verdict you

24   will have your foreperson fill in the verdict form, date and

25   sign it and then return it to the courtroom.

1          If you should desire to communicate with me at

2    anytime, please write down your message or question and pass

3    the note to the security officer who will bring it to my

4    attention.  I will then respond as promptly as possible either

5    in writing or by having you return to the courtroom so that I

6    can address you orally.

7          I caution you, however, with regard to any message

8    or question you might send that you should not tell me your

9    numerical division at the time.

10          And I will send this out with you.  So there you go.

11   You may step back out there.

12   (JURORS EXIT COURTROOM)

13          THE COURT:    Anything from either side?

14          MR. GOWER:    No, sir.

15          MR. ROGERS:    No, Your Honor.

16          THE COURT:    Stand by.  My guess is they're not

17   going to be out there for very long.

18   (RECESS)

19   (JURORS ENTER COURTROOM)

20          THE COURT:    Ladies and gentlemen, have y'all

21   reached a verdict?

22          THE FOREPERSON:   Yes, sir, we have.

23          THE COURT:    Hand it to the court security officer,

24   please.  Now it appears that everyone signed this; is that

25   correct?

1          THE FOREPERSON:   Yes, sir.

2          THE COURT:   This is a unanimous verdict.   There

3 you go.

4          COURTROOM CLERK:   In the United States District

5 Court for the Middle District of Georgia, Macon Division, Jane

6 McGinnis, Plaintiff, versus America Home Mortgage Servicing,

7 Inc., Defendant, civil action number 5:11-CV-284.

8          Number 1:   We, the jury, find that the Defendant

9 acted with specific intent to cause the Plaintiff harm?

10 Answer:   Yes.

11          Number 2:   We, the jury, having found that punitive

12 damages should be awarded to the Plaintiff in this case

13 further find that the punitive damages should be awarded to

14 the Plaintiff and against the Defendant in the amount of

15 $3,000,000.

16          So say we all this 22nd day of August.   It is signed

17 by the foreperson and the 11 remaining jurors.

18          THE COURT:   Anything from the Plaintiff?

19          MR. GOWER:   No, Your Honor.

20          THE COURT:   Anything from the Defendant?

21          MR. ROGERS:   No, Your Honor.

22          THE COURT:   Ladies and gentlemen, I want to thank

23 you.   It took three-and-a-half days like it was predicted.

24 And I appreciate your attention.   I appreciate your time.   I

25 appreciate you being prompt.   And you are now free to go.

```
1    You will not be called on again any time soon.  And we will be

2    happy to have you back if you are called on again.  So thank

3    you very much.

4    (JURORS DISMISSED)

5          THE COURT:   Once again I want to thank y'all for

6    your professionalism for which you tried the case, being

7    prepared, being ready to go and moving the case forward.

8    Anything further?

9          MR. GOWER:   No, sir, thank you.

10         MR. ROGERS:   Thank you, Your Honor.

11   (The proceedings for 8-22-13 were thereby concluded).

12

13         *I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT*
     *TRANSCRIPT TO THE BEST OF MY KNOWLEDGE AND ABILITY FROM THE*
14   *RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.*

15

16                         _____
                           */s TAMMY W. FLETCHER  CCR, USCR*
17                         *UNITED STATES DISTRICT COURT*
                           *MIDDLE DISTRICT OF GEORGIA*
18
                           *DATE:  September 23, 2013*
19

20

21

22

23

24

25
```

*TAMMY W. FLETCHER - US COURT REPORTER - 478-752-3497*