IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| JANE MCGINNIS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action |
| | : | No. 5:11-CV-284 (CAR) |
| AMERICAN HOME MORTGAGE | : | |
| SERVICING INC., | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

## ORDER ON MOTION FOR NEW TRIAL

This case is presently before the Court on remand from the Eleventh Circuit Court of Appeals for consideration of Defendant Homeward Residential's motion for new trial on the issue of punitive damages.  Upon due consideration of the Eleventh Circuit's mandate, the evidence, the parties' arguments, and the relevant law, the Court finds that the jury's punitive award in this case is neither unconstitutional, unconscionable, nor excessive in light of the evidence presented at trial.

## PROCEDURAL HISTORY

Plaintiff Jane McGinnis ("McGinnis") filed the present action for wrongful foreclosure, conversion, interference with property, and intentional infliction of emotional distress against Defendant Homeward Residential, Inc. ("Homeward"), the servicer of the mortgages on several properties for which Plaintiff was a landlord.  At

1

the end of a bifurcated trial, the jury found against Homeward on all claims and awarded McGinnis $3,506,000.00 in damages ($6,000.00 for her economic injury, $500,000.00 for her emotional distress, and $3,000,000.00 in punitive damages).

After the trial, Homeward renewed its motion for judgment as a matter of law under Rule 50 of the Federal Rule of Civil Procedure ("Renewed JMOL"), and also moved, in the alternative, for a new trial and/or remittitur of damages under Rule 59. Homeward's Renewed JMOL was granted only on the issue of punitive damages.[1]  The motions were otherwise denied.

The parties, thereafter, cross-appealed, and the Eleventh Circuit Court of Appeals affirmed this Court's ruling in its entirety.   That opinion was vacated a short time later (following a decision by one the judges to recuse herself), and the appeal was referred to a second panel.[2]  After review, the second panel affirmed all but one of the Court's rulings, concluding that Homeward was procedurally barred from challenging the punitive damages award in its Renewed JMOL.[3]  The Court's ruling on this issue under Rule 50 was accordingly reversed.  The case was then remanded to this Court for consideration of the same arguments under Rule 59, which had been timely raised by Homeward but not yet ruled upon by the Court.

---

[1] *See* Order, *McGinnis v. Am. Home Mortg. Servicing Inc.*, No. 5:11-CV-284 CAR, Doc. 124 at 42, 2014 WL 2949216 at *16 (M.D. Ga. June 30, 2014), aff'd in part sub nom. 621 F. App'x 935 (11th Cir. 2015), vacated (June 2, 2015), and rev'd and vacated, 817 F.3d 1241 (11th Cir. 2016).
[2] Doc. 145-1 at 1.  *See also* Docs. 135, 136.
[3] *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241 (11th Cir. 2016).

Homeward's motion for new trial on the issue of punitive damages is thus now again before the Court.[4]   On remand, the parties were allowed to each file a supplemental brief for consideration.   Homeward filed a post-appeal motion, and McGinnis filed a response thereto.[5]  Homeward then moved to file a reply brief.[6]  That motion is **GRANTED** over McGinnis's objection,[7] as her response included new arguments to which Homeward may respond.  The reply has thus been considered.[8]

## HOMEWARD'S MOTION

Homeward's "Post-Appeal Motion to Reduce Punitive Damages Award, or Alternatively for New Trial or Remittitur"[9] is now ripe for consideration.

### I.      Standard of Review under Rule 59

Rule 59 of the Federal Rules of Civil Procedure allows the district court to order a new trial on evidentiary grounds if the trial judge, in his discretion, determines that the jury's verdict is against the "great weight" of the evidence presented at trial.[10]   Thus, because the weight of the evidence is considered, the district judge may grant a new trial even if there was sufficient evidence to prevent a directed verdict under Rule 50.[11]

---

[4] *See id.* at 1264.
[5] Docs. 145, 147
[6] Doc. 148
[7] Doc. 149
[8] Doc. 148-1
[9] Doc. 145
[10] *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).  *See also Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1081 (11th Cir. 2003).
[11] *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984).

When considering a motion for new trial, however, the district judge may not substitute his own credibility choices and inferences for those made by the jury.[12]   The jury's verdict may be set aside on evidentiary grounds only if "the verdict is against the great - not merely the greater - weight of the evidence."[13]   The jury's award of damages must likewise stand undisturbed unless the amount is shown to be clearly outside "the universe of possible awards which are supported by the evidence."[14]

With these standards in mind, the Court now turns to the arguments raised in Homeward's Motion for New Trial: (1) that the jury's punitive award is unconstitutionally excessive; (2) that the jury's punitive award is grossly excessive under Georgia law; and (3) that the jury's verdict on punitive damages is against the great weight of the evidence presented at trial.

## I.    The Jury's Punitive Award is Not Unconstitutionally Excessive

The first issue before the Court is whether the jury's punitive award is so excessive that it violates due process.  A punitive damages award may run afoul of the Due Process Clause "when it can fairly be categorized as grossly excessive" in relation to "a [s]tate's legitimate interests in punishing unlawful conduct and deterring its repetition."[15]   The relevant question in this case is thus whether the jury's award is

---

[12] *Williams v. City of Valdosta*, 689 F.2d 964, 973 (11th Cir. 1982).
[13] *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001).
[14] *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1329 (11th Cir. 1999); *Carter v. DecisionOne Corp.*, 122 F.3d 997, 1004 (11th Cir. 1997), *Narcisse v. Illinois Cent. Gulf R. Co.*, 620 F.2d 544, 547 (5th Cir. 1980).
[15] *Myers v. Cent. Florida Investments, Inc.*, 592 F.3d 1201, 1218 (11th Cir. 2010) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 560 (1996)).

grossly excessive in relation to Georgia's strong interest in preventing a mortgage servicer from unfairly exercising its power of sale.[16]

When deciding whether an amount of punitive damages offends due process, three factors must be considered: the degree of reprehensibility of the defendant's conduct; "the disparity between the actual or potential harm suffered by the plaintiff and the punitive . . . award"; and "the difference between the punitive damages awarded and civil penalties authorized or imposed in comparable cases."[17]

A. Reprehensibility

The degree of reprehensibility of a party's conduct is the "dominant consideration" in determining whether a punitive award is excessive.[18]  Evaluating the reprehensibility of a defendant's conduct is meant to ensure that the "damages imposed on a defendant . . . reflect the enormity of his offense."[19]  The "gravity of the defendant's conduct" must therefore be balanced with the "harshness of the award of punitive damages"[20] – i.e., a higher degree of reprehensibility weighs in favor of a larger award of punitive damages.  With respect to this inquiry, courts have been instructed to consider a number of sub-factors, such as whether the harm caused was physical or economic; whether the defendant's conduct showed an indifference to the health and

---

[16] *See generally*, O.C.G.A. § 23-2-114; *DeGolyer v. Green Tree Servicing, LLC*, 291 Ga. App. 444, 448 (2008).

[17] *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *Gore*, 517 U.S. at 575).

[18] *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1283 (11th Cir. 2008).

[19] *Gore*, 517 U.S. at 575.

[20] *Browning–Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 301 (1989) (O'CONNOR, J., concurring in part and dissenting in part)

safety of others; whether the target of the conduct was financially vulnerable; whether the conduct involved repeated actions or a single incident; and whether the evidence showed malice, trickery, or deceit.[21]  Thus, for example, repeated "conduct which causes emotional as well as economic harm [may be viewed as] more reprehensible than that which causes only economic harm."[22]

After considering the facts of this case in light of the relevant factors, the Court finds a high degree of reprehensibility in Homeward's conduct.  During the trial of this case, there was ample evidence presented to show that Homeward was aware of both McGinnis's financial vulnerability and her good-faith attempts to notify Homeward of its error in calculating the amount owed.[23]   Homeward nonetheless bullied and harassed McGinnis to pay greater amounts and flatly maintained that she was required to pay "any amount" it demanded, regardless of whether it was reasonable or in error.[24] When McGinnis refused to pay the disputed amounts, Homeward proceeded with foreclosure in a short amount of time; and as a result of Homeward's repeated refusals to concede its error, McGinnis suffered not only an economic injury but also physical and emotional harm.[25]   Homeward's actions in this context were reprehensible and warrant a substantial penalty beyond the award of compensatory damages.

---

[21] *Campbell*, 538 U.S. at 419.
[22] *Merrick v. Paul Revere Life Ins. Co.*, 594 F. Supp. 2d 1168, 1185-86 (D. Nev. 2008).
[23] *See* McGinnis, 2014 WL 2949216 at *6, 11, aff'd by, 817 F.3d at 1259.
[24] *Id.* at *9, 11-12, aff'd by, 817 F.3d at 1259.
[25] *Id.* at *11, aff'd by, 817 F.3d at 1259.

6

B.  Ratio Between Compensatory and Punitive Damages

The Court must next consider the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award."[26]   In this inquiry, the mathematical ratio of punitive to compensatory damages is instructive.[27]   A single-digit ratio (less than 10-to-1) will most likely comport with due process.[28] There is, however, no firm rule or "bright-line ratio which a punitive damages award cannot exceed."[29] The core question is whether the amount of punitive damages is "reasonable and proportionate to" the amount of compensatory damages recovered.[30]   The reasonableness of the award thus depends "on the facts and circumstances of the defendant's conduct and the [actual and potential] harm" that was likely to result.[31]

In this case, the ratio of punitive to compensatory damages is 5.9-to-1.[32]   This is a single digit ratio and not presumptively suspect.[33]   Homeward, nonetheless, contends that, even at a single-digit ratio, the punitive award offends due process because of McGinnis's substantial recovery for emotional distress.

In support of its motion, Homeward relies on frequently-cited caselaw suggesting that, if an award of compensatory damages is substantial, it is possible that

[26] *See Campbell*, 538 U.S. at 418.
[27] *See State Farm*, 538 U.S. at 425
[28] *See Campbell*, 538 U.S. at 425.
[29] *Id*. *See also Gore*, 517 U.S. at 582.
[30] *See Campbell*, 538 U.S. at 426; *Gore*, 517 U.S. at 583.
[31] *Id*. at 425.
[32] The Court is unpersuaded by Homeward's contention that only the economic damages should be considered in this analysis. *See Goldsmith*, 513 F.3d at 1283.
[33] *See Campbell*, at 425 (suggesting in dicta that single digit ratios are presumptively valid).

7

"a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."[34]  Prior cases have also suggested that a punitive damages award "more than four times the amount of compensatory damages might [in some cases] be close to the line of constitutional impropriety." [35] These suggestions, however, are no more than suggestions – intended to be instructive; they neither demarcate an uppermost limit for a punitive award nor mandate the use of any particular calculation for determining whether a punitive damages award is outside the acceptable range.[36]  Federal courts have "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula."[37]

Thus, "particularly egregious conduct . . . may justify bumping the acceptable ratio to a higher level."[38]  The Eleventh Circuit has, many times, upheld ratios greater than 5.9-to-1.[39]  Punitive awards having a greater ratio of disparity have even been

---

[34] *Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302, 1321 (11th Cir. 2007) (quoting *Campbell*, 538 U.S. at 425).

[35] *See id.* at 1322.

[36] *Id.*

[37] *Gore*, 517 U.S. 582 ("We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case.")

[38] *See Register v. Rus of Auburn*, 193 F. Supp. 2d 1273, 1277 (M.D. Ala. 2002) (citing *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 460 (1993)).

[39] *Brim v. Midland Credit Mgmt., Inc.*, 795 F. Supp. 2d 1255, 1264 (N.D. Ala. 2011) ("The Eleventh Circuit as approved numerous punitive awards where the ratio was similar or higher.") (citing *Johansen*, 170 F.3d at 1338 (ratio of 100:1); *Goldsmith*, 513 F.3d 1261, 1283 (11th Cir. 2008) (ratio of 9.2:1); *W & O*, 213 F.3d at 616–17 (ratio of 8.3:1); *Action Marine*, 481 F.3d at 1323 (ratio of 5.5:1). "[T]he one occasion where the Eleventh Circuit struck down a punitive award for constitutional excess, it reduced an award with a ratio of 8,692:1 to an award with a ratio of 2,173:1." *Brim*, 795 F. Supp. 2d at 1264 (citing *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1357 & 1365 (11th Cir. 2004) (reducing the punitive award from $1,000,000 to $250,000 when compensatory damages amounted to $115.05, noting "a single digit multiplier would not have effectively deterred At & T from future misconduct).

upheld in cases factually similar to this one:  In *Brim v. Midland Credit Mgmt., Inc.*,[40] for example, the district court upheld a ratio of 6.23-to-1 after finding a high degree of reprehensibility in the defendant's attitude of indifference and failure to investigate consumer complaints, where there was: evidence that plaintiff made numerous efforts "to have the defendant correct its records";  testimony "regarding … the amount of time [the plaintiff] had to devote to his credit … because of defendant's actions or inactions"; and evidence "that the defendant's sole effort [in response to consumer complaints] was to check its records against its very own records." [41]

Furthermore, the actual injury caused to McGinnis in this case is not the only relevant consideration:  The potential that existed for a greater harm is also relevant.[42]  If the potential or likelihood for greater harm is high, the jury may impose a higher award to "teach a duty of care" and/or deter the repetition of such conduct.[43]  Heavier punitive awards are likewise "justified when wrongdoing is hard to detect (increasing chances of getting away with it)" or when the value of the economic injury provides little incentive to sue.[44]  Indeed, in some cases, only a heavy penalty will cause the kind of "memorable and unmistakable sting" necessary to punish and deter repetition of the conduct. [45]

---

[40] 795 F. Supp. 2d at 1264

[41] *Id.* at 1261-1262.

[42] *Gore*, 517 U.S. at 581 (emphasis in original) (citing *TXO Prod. Corp*, 509 U.S. at 460 (quotation marks omitted).

[43] *TXO Prod. Corp.*, 509 U.S. at 459–60.

[44] *Exxon Shipping*, 554 U.S. at 494 (citations omitted).

[45] *Flying Fish Bikes, Inc. v. Giant Bicycle, Inc.*, 8:13-cv-2890, 2016 WL 695972, at *17 (M.D. Fla. Feb. 22, 2016). *See also Gore*, 517 U.S. 559, 591 (1996) ("Since a fixed dollar award will punish a poor person more than a

All of these justifications for a large award of punitive damages are present here. The potential for financial and economic harm – if Homeward's conduct was repeated on a large scale – is tremendous.   The indifference and obstinacy shown by Homeward's agents in this case likewise suggest that a strong deterrence from repetition may be needed.   Smaller actions by Homeward – such as the collection of unreasonable amounts, fees and expenses – may also be hard to detect, and the amounts collected, in just a single case, may often be too small to justify litigation.   Homeward is, in addition, a wealthy corporation: "AHMSI [was] the 13th largest mortgage servicer in the country managing nearly $71 billion in loan servicing,"[46] and thus a higher award may necessary to achieve the desired goals of punishment and deterrence.

The Court, therefore, does not find the jury's punitive award to be disproportionately excessive.

## C.  Civil Penalties

The final factor to be considered in this analysis is the amount of any civil penalties authorized or imposed in comparable cases.[47]  This factor is often accorded less weight than the first two.[48]

---

wealthy one, one can understand the relevance of this factor to the State's interest in retribution."); *W&O, Inc.*, 213 F.3d at 616–17 (noting that "wealth and size of the defendant" can be considered in determining whether the punitive award is reasonable).

[46] Doc. 89-5 (Pl.'s Trial Ex. 45)

[47] *Campbell*, 538 U.S. at 428.

[48] *Compare Cont'l Trend Res. v. Oxy USA*, 101 F.3d 634, 641 (10th Cir. 1996) (declining to considering factor of potential penalties where defendant's "misconduct involved a violation of common law tort duties that do not lend themselves to a comparison with statutory penalties"); *Cortez v. Trans Union, LLC*, 617 F.3d

In this case, Homeward asks the Court to compare the civil penalties authorized under the Real Estate Settlement Procedures Act ("RESPA")[49] with the punitive damages awarded.   RESPA, however, provides no real guidance in this case; and Homeward fails to identify any comparable cases in which RESPA penalties were considered or imposed.   The Court thus give little, if any, weight to this factor.   Yet, even if RESPA penalties were to be considered, the Court suspects that they would also weigh in favor of a large punitive award, as even under RESPA, there is no cap on the penalty which can be imposed in the case of multiple intentional wrongs by a lender.[50]

Accordingly, and having now weighed all of the relevant factors identified above, the Court finds that the jury's punitive award in this case cannot be fairly categorized as grossly excessive in relation to the State's legitimate interests.[51]

## II.      The Punitive Damages Award is Not Unconscionable under State Law

Homeward next contends that the jury's punitive award is grossly excessive under state law.  The Court presumes, as does McGinnis, that Homeward's argument is made under Georgia's common law criteria for determining whether a punitive award is excessive.[52]   Most relevant to this inquiry is that, under Georgia law, the purpose of

---

688, 724 (3d Cir. 2010) ("third guidepost is not useful in the analysis of punitive damages here as there is no 'truly comparable' civil penalty [to a punitive damages award under the Fair Credit Reporting Act]").
[49] *See generally* 12 U.S.C. § 2609.
[50] § 2609(d)(2).
[51] *See Myers*, 592 F.3d at 1218.
[52] If the defendant does not raise (or has waived) a federal due process claim, state courts have applied "state common law criteria for determining whether [the] award is excessive." *See Time Warner Entm't Co. v. Six Flags Over Ga. LLC*, 254 Ga. App. 598, 603 (2002).

an "award of punitive damages . . . is to deter the repetition of reprehensible conduct by the defendant or others."[53]  "Because deterrence is based on factors other than the actual harm caused," Georgia has "rejected the notion that punitive damages must necessarily bear some relationship to the actual damages awarded by the jury."[54]

Thus, in Georgia, a punitive award will generally be upheld absent evidence that there was a "prejudice or bias on the part of the jury."[55]   If there is no direct proof of prejudice or bias on the part of the jury, Georgia courts will "look to the ratio of compensatory to punitive damage (and other federal guideposts) for some evidence that the punitive damages award is infected by bias or prejudice."[56]   The bar for satisfying this standard is, however, a high one:  Georgia courts have stated that, for an award to be set aside on the ground that it is excessive, it must, "when considered in connection with all the facts," "shock the moral sense, appear exorbitant, flagrantly outrageous, and extravagant."[57]   It must be "monstrous indeed"; it must carry its death warrant upon its face."[58]

---

[53] *Id.* (citing *Hosp. Auth. of Gwinnett County v. Jones,* 261 Ga. 613, 614–615 n. 2 (1991)).  *See Colonial Pipeline Co. v. Brown*, 258 Ga. 115, 120 (1988).

[54] *Id.*

[55] *Id.*

[56] *Id.* at 604. ("We believe the *Gore* guideposts might also be helpful in determining whether an award of punitive damages is infected by bias or prejudice.") *See also Georgia Clinic, P.C. v. Stout*, 323 Ga. App. 487, 494 (2013) ("trial court did not abuse its discretion in denying the motion for new trial or j.n.o.v. on this ground because there is no evidence that the award of punitive damages was 'infected by undue passion and prejudice'"). *See also e.g. Middlebrooks*, 256 F.3d at 1250 (10-to-1 ratio "does not convince us that the award is tainted by prejudice or bias").

[57] *Id. Western & Atlantic R. v. Burnett*, 79 Ga. App. 530, 542–543 (1949)) (emphasis added)

[58] *Id.* at 604 (quoting *Western*, 79 Ga. App. 530, 542–543) (emphasis added).

In this case, the Court finds no direct proof that the jury's award was infected by other considerations, bias, or prejudice;[59] nor does the Court find (for those reasons already discussed in Part I. *supra*) that the amount of the jury's punitive award is so excessive as to "shock the judicial conscience."   The Court accordingly does not find the award to be grossly excessive under Georgia law.

### III.   The Punitive Award is Not Excessive in Light of the Evidence Presented

The final question before the Court is whether the jury's punitive damages verdict is against the great weight of the evidence presented at trial.[60]  Before reaching this issue, however, the Court must first address the procedural objection raised on remand.  In her post-appeal response, McGinnis contends that Homeward is procedurally barred from now challenging the sufficiency of the evidence as to punitive damages in its motion for new trial because it did not raise any objection to the sufficiency of this evidence prior to the verdict.

As the Court discussed at length in its prior order,[61] litigants are barred, under Rule 50 from raising arguments for the first-time post-judgment.  However, Rule 59, applicable here, does not have the same procedural bar.[62]   A district judge may grant a

---

[59] *See also Georgia Clinic, P.C. v. Stout*, 323 Ga. App. 487, 494 (2013) ("trial court did not abuse its discretion in denying the motion for new trial or j.n.o.v. on this ground because there is no evidence that the award of punitive damages was 'infected by undue passion and prejudice'"). *See also e.g. Middlebrooks*, 256 F.3d at 1250 (10-to-1 ratio "does not convince us that the award is tainted by prejudice or bias").

[60] *See* Doc. 145 at 10.

[61] *See McGinnis*, 2014 WL 2949216, at *13.

[62] *See Urti v. Transport Commercial Corp.*, 479 F.2d 766, 769 (5th Cir. 1973) (failure to make Rule 50 motion did not bar motion for new trial under Rule 59); *Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 364-65 (3d Cir.

new trial under Rule 59 based on the weight of the evidence - even if there was sufficient "evidence [to] prevent the direction of a verdict" at trial under Rule 50.[63]

Still, not all arguments may be raised for the first time in a motion for new trial. A district court need not grant a new trial under Rule 59 based on arguments or theories that were previously available, but not pressed.[64]  As McGinnis suggests, Homeward could have argued at trial that there was insufficient evidence to present the claims for capped and/or uncapped punitive damages to the jury, but it did not.   Homeward is thus barred from making those arguments now.

Homeward's present argument – that the amount of the jury's award on punitive damages is excessive in light of the great weight of the evidence presented at trial – poses an entirely different question, is subject to different burden of proof, and was not one available to Homeward at trial.   At trial, Homeward could not yet have known what the damages award would be.   Homeward is thus not procedurally barred from raising the two evidentiary challenges now before the Court.

## A. Willful and Wanton Misconduct

Homeward first contends that the jury's punitive damages award must be vacated or remitted because, under Georgia law, punitive damages may not be

---

1999) (same); *TCP Industries, Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 546 (6th Cir. 1981) (citation omitted) ("motions for directed verdict and judgment n.o.v. are not prerequisites to a motion for a new trial").

[63] *Hewitt*, 732 F.2d at 1556. *See Urti*, 479 F.2d at 769; *Lipphardt*, 267 F.3d at 1186.

[64] *Davis v. Habitat for Humanity of Bay Cty., Inc.*, 558 F. App'x 850, 852 (11th Cir. 2014).  *See also Linet, Inc. v. Village of Wellington*, 408 F.3d 757, 763 (11th Cir. 2005) (a plaintiff may not use "Rule 59(e) motion to re-litigate old matters, raise arguments or present evidence that could have been raised prior to … judgment").

awarded absent a finding that the defendant's actions were "willful, malicious, fraudulent, wanton, oppressive, or intentionally taken without concern for the consequences that might result therefrom."[65]  Homeward suggest that there was little or no evidence presented at trial from which the jury could infer "willful misconduct, malice, fraud, wantonness, oppression, or an entire want of care" on its part. Homeward thus believes the jury's finding of such conduct was against the clear weight of the evidence.

After a review of the evidence, the Court strongly disagrees.  The Court in fact finds (as it has before)[66] ample evidence from which the jury could infer that Homeward continued to harass and demand payment from McGinnis with a willful and wanton disregard for Plaintiff's rights and conscious indifference to the consequences of its actions.[67]  The jury's decision to award punitive damages in this case was thus not against the great weight of the evidence presented at trial.[68]

B. <u>Specific Intent to Harm</u>

Homeward next argues, in the alternative, that the jury's award of uncapped punitive damages must be vacated or remitted because the jury's finding of "specific

---

[65] *See* O.C.G.A. § 51–12–5.1(b).
[66] *McGinnis*, 2014 WL 2949216, at *12, 15.
[67] *Id*.
[68] *See Lipphardt*, 267 F.3d at 1186.

intent to harm" – a prerequisite to an award in excess of Georgia's $250,000.00 statutory cap – is against the clear weigh to the evidence.[69]

This Court has already found that the evidence presented at trial sufficiently demonstrates that Homeward's conduct was "extreme and outrageous,"[70] "reprehensible,"[71] "wanton,"[72] and "reckless."[73]  The same evidence, however, is not necessarily sufficient to also satisfy the standard of proof required for finding a specific intent to harm.[74]   In fact, when previously considering this issue under Rule 50, the Court found no evidence that Homeward *set-out* or *desired* to cause McGinnis harm at the time it inherited her loan.[75]  The Court likewise found no evidence that Homeward would have otherwise *desired* to cause Plaintiff's injuries or that it believed the injuries actually suffered by Plaintiff were substantially certain to result from its obstinacies and demands for payment.[76] "All evidence instead suggests that Homeward intended and believed its conduct would cause Plaintiff to make the payments demanded."[77]

---

[69] O.C.G.A. § 51-12-5.1(f),(g).

[70] *McGinnis*, 2014 WL 2949216, at *12-13.  *See also McGinnis*, 817 F.3d at 1259-60 (reaching the same conclusion and affirming this ruling)

[71] *Supra* at 6-7.

[72] *McGinnis*, 2014 WL 2949216, at *12 (finding evidence sufficient for jury to find "extreme and outrageous conduct, arising from an intentional and wanton abuse of power by Homeward").

[73] *Id.* at *10(finding "sufficient evidence from which the jury could reasonably find that Homeward acted "in reckless disregard" for the rights of others.").

[74] *See Viau v. Fred Dean, Inc.*, 203 Ga. App. 801, 804 (1992).  *See also Amegy Bank Nat. Ass'n v. Deutsche Bank Alex.Brown*, 619 F. App'x 923, 932 (11th Cir. 2015) (noting that the "want of care which would raise the presumption of conscious indifference to consequences – falls short of specific intent").

[75] *See McGinnis*, 2014 WL 2949216 at *15.

[76] *Id.*

[77] *Id.*

On remand, however, McGinnis asks the Court to reach a different conclusion. McGinnis contends that, while the Court may have been correct in finding "no direct evidence" to show that Homeward "purposely sought" to cause the specific injuries McGinnis's suffered, there is, nonetheless, evidence from which the jury could infer specific intent – i.e., evidence that Homeward engaged in a course of conduct despite knowing that it would almost certainly harm McGinnis.[78]

McGinnis is correct that this Court is not bound by its previous ruling on this issue.[79]   The Eleventh Circuit vacated this Court's ruling under Rule 50 and did not reach the issue of specific intent on appeal.   McGinnis is also correct that a finding of specific intent may be supported by either (1) evidence that the actor *desired* to cause the consequences of its act or (2) evidence the actor knew the consequences of his act were certain, or substantially certain, to result and still went ahead.[80]   Intent to harm thus does not require direct proof.   A jury can find intent through consideration of the words, conduct, demeanor, motive, and circumstances connected with the defendant's actions[81] - or as in this case, the actions of the defendant's agents.[82]

---

[78] Doc. 147 at 12.

[79] *See Burgos v. Napolitano*, 330 F. App'x 187, 188 (11th Cir. 2009) ("law of the case doctrine bars consideration of only those legal issues that we actually, or by necessary implication, decided"). *See also* United *States v. Tamayo*, 80 F.3d 1514, 1521 (11th Cir. 1996) (issues outside the scope of the limited mandate are precluded by law of the case doctrine)).

[80] *See* J.B. Hunt Transport, Inc. v. Bentley, 207 Ga. App. 250, 255 (1996). Restat. 2d of Torts § 8A (emphasis added).

[81] *Croley v. Matson Navigation Company*, 434 F.2d 73 (1970).

[82] *Anderson v. Radisson Hotel Corp.*, 834 F. Supp. 1364, 1374 (S.D. Ga. 1993) (quoting *Croley v.Matson Nav. Co.*, 434 F.2d 73, 77 (5th Cir. 1970) ("A question of 'intent' is a question regarding state of mind. As the

The Eleventh Circuit Court of Appeals has also rejected attempts "to narrow [the] definition of specific intent" in a manner that requires proof that the defendant purposely sought to cause the harm suffered.[83]  The Court's instruction to the jury (to which Homeward did not object) also did not define specific intent so narrowly.[84] Homeward thus cannot now argue that more is required;[85] nor can Homeward escape an uncapped punitive award because it was not absolutely certain which one of multiple harmful consequences would result from its actions.  To infer specific intent, the jury only needed to find evidence that the defendant knew it would certainly (or almost certainly) cause harm to the plaintiff and yet continued in the same course of conduct despite the known consequences of its actions.

Yet, upon review of this Court's prior findings under Rule 50, it is apparent that Homeward's arguments[86] (and thus this Court's consideration thereof) focused primarily on the first method of proof and the lack of evidence that Homeward specifically set-out or desired to cause McGinnis's injuries.  The Court thus will now, in light of McGinnis' arguments on remand, revisit this issue and further consider the evidence she identified as creating an inference of Homeward's specific intent to harm.

---

former Fifth Circuit observed in an analogous context, '[state of mind] on the part of the company can be proved only by showing the state of mind of its employees.").

[83]*See* Doc. 147 at 9; *Action Marine*, 481 F.3d at 1312.

[84] *See id.*

[85] *See Action Marine*, 481 F.3d at 1312.

[86] *See* Doc. 115 at 11-12 (Homeward arguing that "…the punitive damages cap cannot be pierced unless the plaintiff presents sufficient evidence to show that the defendant actually intended to injure the plaintiff. … In other words, under Georgia law, uncapped punitive damages are only permitted where there is evidence that the defendant specifically set out to do harm to the plaintiff") (citation omitted).

1. *Evidence of Homeward's Conduct and Awareness of its Error*

McGinnis first contends that evidence demonstrating Homeward's conduct, words, demeanor, and knowledge of its error is sufficient proof of its intent to harm.[87] At trial, McGinnis indeed produced evidence and testimony to show the jury that she did not owe the amounts demanded and that she repeatedly notified Homeward both of its error in calculating her escrow payment and that its demands for payment were unreasonable.[88] McGinnis then showed the jury that, despite both her good-faith efforts and Homeward's "own tacit admission of its erroneous calculation and subsequent decrease in the escrow amount,"[89] its agents "continually failed to justify the increase," refused to "retract its demand that [she] pay the inflated amount,"[90] and responded to her requests for help with indifference, obstinacy, and, at times, belligerence.[91]  The Court agrees that this evidence would allow the jury to infer an intentional, rather than mistaken, infliction of harm.

This evidence was also, for the most part, un-rebutted by Homeward at trial. When questioned, Homeward could neither verify nor produce a copy of its escrow

---

[87] McGinnis made a similar argument for the jury at trial in closing:  Anybody can make a mistake.  It's understandable. But when you are told about it over and over and over. … When you are sent a fax with bank statements this thick with canceled checks this thick. When you're talking on the phone constantly with these people. It becomes where it's no longer a mistake. You know, at some point it becomes intentional."
Trial Tr. Vol. III, Doc. 110 at 103-104.
[88] *See McGinnis*, 2014 WL 2949216 at *6, 11.
[89] *McGinnis*, 817 F.3d at 1259.
[90] *Id.*
[91] *Id.*(noting "Homeward's awareness of its error … opaqueness, unresponsiveness, and belligerence").

analysis to justify the payment increase.[92]   Homeward's witness, Christopher Delbene,

just blindly "insisted that [Homeward's] escrow analysis was correct, even though he

had not seen the document and had not attempted to calculate the escrow."[93]   It was

also Homeward's position, according to Delbene, that "Plaintiff was required to pay

any amount Homeward demanded, regardless of whether it appeared reasonable or in

error, simply because that is what she agreed to under the note and mortgage,"[94] and, if

there was an error, Plaintiff could later request a refund of any amounts received in

excess of what was necessary to pay her taxes and insurance at the end of the year.[95]

Meanwhile, however, McGinnis would be deprived of the use of her money, possibly

"hundreds of dollars … every month on each of her seven loans,"[96] without any firm

guarantee that those amounts would actually be refunded.

　　Homeward's own evidence (or lack thereof) thus did little or nothing to dispel

the inference of an intent to harm.   From the evidence presented, the jury could have

reasonably inferred that Homeward's agents continued in the same course of conduct

despite the knowledge of its error and a belief that its actions would certainly (or almost

certainly) cause McGinnis harm – whether it be from the Homeward's wrongful taking

and withholding of hundreds of dollars each month (if she did make the payments) or

---

[92] *McGinnis*, 2014 WL 2949216, at *6.
[93] Id. at *11
[94] Id.
[95] Id.
[96] Doc. 118 at 23.

from Homeward's eventual foreclosure on her property (if she continued to refuse to make the disputed payments).  The Court thus finds that the great weight of this evidence is not against the verdict.

### 2.   Evidence of Homeward's Use of the Suspense Account

McGinnis has also argued that the jury's finding of intent is supported by Homeward's collection of late fees and other expenses, as income, through use of a suspense account.[97]  The jury did find that this collection and withholding of money in a suspense account was an unlawful conversion of McGinnis's payments, an intentional tort which, under Georgia law, supports an award of punitive damages.[98]

According to the evidence at trial, once McGinnis refused to pay any increase, Homeward began placing her monthly payment into a suspense account, rather than crediting those payments to her account, and then further deducted, as its own income, late fees and other expenses.[99]  Homeward in fact collected more than $6,000 in fees and expenses from McGinnis by holding her payments in the suspense account.[100]  And, according to the evidence, Homeward was, while collecting these fees, also aware that it had increased McGinnis's "monthly escrow payment by more than 300 percent, an

---

[97] *Id*.at 15.
[98] "A willful repetition of … conversion can authorize a claim for punitive damages." *E. Prop. Dev. LLC v. Gill*, 558 F. App'x 882, 887 (11th Cir. 2014).  *See also Taylor v. Powertel, Inc.*, 250 Ga. App. 356 (2001)).
[99] *McGinnis,* 2014 WL 2949216, at *7.
[100] Doc. 118 at 14.

amount far in excess of that allowed by the Security Deed and RESPA."[101] McGinnis had "repeatedly brought these errors to Homeward's attention."[102]

From this evidence, a jury could reasonably infer that Homeward knew its use of the suspense account and collection of related fees would further pressure McGinnis into paying the amounts greater than what she owed[103]; and yet Homeward's agents continued use of the suspense account and collection of fees as penalties for the non-payment of an increase McGinnis had disputed, with evidence, in good faith and had shown to be unreasonable. The Court thus agrees that the jury could have considered Homeward's use the suspense account as evidence of a specific intent to harm – whether it be by forcing McGinnis to pay amounts in excess of what she owed, by requiring her to pay penalties and fees Homeward could collect as income, or by decreasing the likelihood that she would be able cure the default and avoid foreclosure.

### 3. *Evidence of Intentional Infliction of Emotional Harm*

Evidence regarding McGinnis and her son's many calls and letters from (and to) Homeward may also support an inference of Homeward's intent to harm. As noted by the Eleventh Circuit on appeal:

> The evidence indicated that over the course of Homeward's relationship with McGinnis, Homeward's agents frequently harassed McGinnis by phone and mail. Because Homeward's misconduct involved [multiple properties owned by McGinnis] . . . this harassment [became] a constant

---

[101] Doc. 118 at 6-7.

[102] *Id*.

[103] *AAFMcQuay, Inc. v. Willis*, 308 Ga. App. 203, 214 (2011) (emphasis added).

fixture of their lives; in fact, if you stacked all the collection letters together, they would reach five feet high.[104]

The jury heard this and other evidence suggesting that Homeward's agents were aware of the emotional distress they were causing – if only due to the sheer volume of adversarial communications between them and looming threats of foreclosure they repeatedly offered.   The jury was obviously swayed by this and similar evidence at trial, as indicated by its verdict in favor of McGinnis's claim of intentional infliction of emotional distress ("IIED") and sizable award of emotional damages.

The inferential leap required to go from the jury's verdict on Plaintiff's IIED claim to a finding of specific intent to harm is not too great.  The same evidence would have allowed the jury to infer that Homeward knew it was certainly (or almost certainly) causing McGinnis some level of emotional harm – whether it be due to stress caused by Homeward's weekly (if not daily) harassing demands; frustration caused by Homeward's indifference and lack of response to her plight; or worry and fear caused by Homeward's repeated and obstinate threats of foreclosure – but Homeward nonetheless proceeded in the same aggressive, unresponsive, and condescending tactics in hopes McGinnis would eventually just concede defeat and pay whatever amounts it demanded.   As McGinnis suggested to the jury, under similar circumstances, "most people are going to pay it … because they don't want to lose their home."[105]

---

[104] *McGinnis*, 817 F.3d at 1258-59.
[105] Doc. 110 at 104.

### 4.  *Homeward's Attempts to Avoid Foreclosure*

Finally, McGinnis contends that Homeward's offering her the opportunity to bring her account current does not negate any inference of specific intent.[106] Homeward did offer McGinnis an opportunity cure her default and thereby avoid foreclosure.  But, under Homeward's terms, McGinnis would have had to give in to all of Homeward's existing demands – paying the full amount of the increase in dispute as well as the all penalties and fees subsequently incurred.[107]

McGinnis's acceptance of Homeward's non-negotiable terms for avoiding foreclosure would thus not have allowed her to escape Homeward's tactics unharmed. McGinnis would suffer the same economic injury as if she had previously paid the inflated amounts – without any firm guarantee that she would receive any refund for the overpayments, much less the fees, expenses, and penalties already charged.  The Court thus agrees that Homeward's giving McGinnis an opportunity to bring her account current prior to foreclosure does not preclude an inference of intent to harm.

Accordingly, and after considering the evidence presented by McGinnis against that produced by Homeward, the Court is unable to conclude that the jury's finding of specific intent and award of uncapped punitive damages was against the great weight

---

[106] Doc. 114 at 16.
[107] *McGinnis*, 2014 WL 2949216 at *6, 11.

24

of the evidence presented at trial.  Neither Homeward's arguments nor its evidence in conflict with the verdict is enough to set it aside.[108]

## IV.   Conclusion

Homeward's Motion for Reduction, New Trial, and/or Remittitur of the punitive damage award is therefore **DENIED**.


**SO ORDERED,** this 6th day of March, 2017

S/ C. Ashley Royal
C. ASHLEY ROYAL, JUDGE
UNITED STATES DISTRICT COURT

---

[108] *Lipphardt,* 267 F.3d at1186.